UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| EZRA SMITH,<br><br>    Plaintiff,<br><br>v.<br><br>DEPUTY MONIQUE TRACEY, DEPUTY RAUL GOMEZ, DEPUTY SHENEQUA JACKSON, and ERICA SANCHEZ,<br><br>    Defendants. | Civil Action No.:<br><br>**Demand for Jury Trial** |

## AMENDED COMPLAINT

Plaintiff Ezra Smith, through his undersigned counsel, brings this lawsuit against Defendants Deputy Monique Tracey, Deputy Raul Gomez, Deputy Shenequa Jackson, and Erica Sanchez for violation of his Fourteenth Amendment rights and negligent performance of a ministerial duty while he was detained at the Rockdale County Jail. In support, Mr. Smith alleges:

### Jurisdiction and Venue

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Mr. Smith brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Fourteenth Amendment to the U.S. Constitution.

3.  Mr. Smith further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

4.  Venue is proper in this district under 28 U.S.C. § 1391(b), this being the district where the claims arose and where Defendants conduct business.

## Parties

5.  Plaintiff Ezra Smith resides in Rockdale County, Georgia and is otherwise *sui juris*. At all times relevant to the allegations herein, Mr. Smith was detained on an open warrant at the Rockdale County Jail. On the date of filing, Mr. Smith is not incarcerated or detained and therefore not a "prisoner" as that term is defined by the Prison Litigation Reform Act.

6.  Upon information and belief, Defendant Deputy Monique Tracey resides in Rockdale County, Georgia, and is otherwise *sui juris*. At all times material to allegations herein, Deputy Tracey was a detention deputy at the Rockdale County Jail, which is operated by the Rockdale County Sheriff's Office. At all times material to the allegations herein, Deputy Tracey was acting under color of state law. Deputy Tracey is being sued in her individual capacity.

7.  Upon information and belief, Defendant Deputy Raul Gomez resides in Rockdale County, Georgia, and is otherwise *sui juris*. At all times material to allegations herein, Deputy Gomez was a detention deputy at the Rockdale County Jail, which is operated by the Rockdale County Sheriff's Office. At all times

material to the allegations herein, Deputy Gomez was acting under color of state law. Deputy Gomez is being sued in his individual capacity.

8. Upon information and belief, Defendant Deputy Shenequa Jackson resides in Rockdale County, Georgia, and is otherwise *sui juris*. At all times material to allegations herein, Deputy Jackson was a detention deputy at the Rockdale County Jail, which is operated by the Rockdale County Sheriff's Office. At all times material to the allegations herein, Deputy Jackson was acting under color of state law. Deputy Jackson is being sued in her individual capacity.

9. Upon information and belief, Defendant Nurse Erica Sanchez resides in Rockdale County, Georgia and is otherwise *sui juris*. At all times material to allegations herein, Nurse Sanchez was an employee of Naphcare, which contracts with the Rockdale County Sheriff's Office to manage and deliver healthcare services at the Rockdale County Jail. At all times material to the allegations herein, Nurse Sanchez was acting under color of state law. Nurse Sanchez is being sued in her individual capacity.

## Factual Allegations

10. Mr. Smith, who suffers from serious mental health disorders, has a history of suicidal ideation and behavior, all of which was well-known to the Rockdale County Sheriff's Office and jail staff. One such incident occurred in 2022, when Mr. Smith, while incarcerated in the Rockdale County jail, attempted

suicide by wrapping a telephone cord in the booking cell around his neck.

11. In May 2024, Mr. Smith was again booked into the Rockdale County Jail. Mr. Smith was charged with reckless conduct, and the Rockdale County Sheriff's Office reported that he had grabbed a firearm and "put it in his mouth, head, and waving around acting suicidal."

12. Mr. Smith was admitted to mental health observation upon booking at the Rockdale County Jail, where it was noted by nursing staff that he was suffering from "extreme agitation and head banging." Nursing staff reported that Mr. Smith was also paranoid and that he reported a history of suicidal ideations and "a suicide attempt via hanging at age 16."

13. Nurse Sanchez was one of the nurses who administered drugs to Mr. Smith in May 2024. She administered or attempted to administer olanzapine and hydroxyzine pamoate to Mr. Smith. The former is an antipsychotic medication used to treat schizophrenia and bipolar disorder, and the latter helps control anxiety.

14. In or around June 2024, Mr. Smith was arrested by officers employed by the City of Conyers outside a facility where he was scheduled to be evaluated for mental health issues. When transported to the Rockdale County Jail, he was turned away because the nurse told detention staff that Mr. Smith was not well enough to be booked.

15. Mr. Smith then went to a crisis center for inpatient mental health services. Upon release, he was arrested again at a court appearance and taken to the Rockdale County Jail on or about July 8, 2024.

16. On July 8, 2024, Mr. Smith was taken to booking and placed in Holding Cell 7, where he was held with more than a half-dozen others waiting to be processed by jail staff.

17. At around 8 p.m., one of the individuals incarcerated in Cell 7 called Deputy Tracey over the intercom to tell her that "this white guy says he wants to kill himself," referring to Mr. Smith. Deputy Jackson also heard that call. Neither deputy reported the situation to their supervisors or medical staff, nor did they take any action.

18. After that incident, Ms. Smith's mother, Carmen Pittman, called the jail and was connected to Deputy Tracey. Ms. Pittman told Deputy Tracey that Mr. Smith had just gotten out of a Viewpoint Crisis Center a few days earlier and that she had been trying to get him into an outpatient facility. She told Deputy Tracey that Mr. Smith was suicidal and that she was scared to death because she had never seen her son like this. Deputy Tracey told Ms. Pittman she would look out for Mr. Smith, but that booking was backed up.

19. Eventually, everyone else in Cell 7 was processed except Mr. Smith.

20. Mr. Smith became frustrated with being held in booking for such a long period of time. Starting sometime after 1:25 a.m., he began banging on the window and kicking on the cell door.





21. All Defendants were present and could hear Mr. Smith banging on the window with his fists and kicking the door.

22. Deputy Tracey went over to Cell 7 around 1:28 a.m. Deputy Gomez was behind her, and Nurse Sanchez was also in earshot.



23. According to Nurse Sanchez and Deputy Gomez, Mr. Smith asked what was going on with booking.

24. Deputy Tracey told Mr. Smith that he was acting like a "spoiled asshole" and that his mother had called about him.

25. Mr. Smith told Deputy Tracey, in the presence of Deputy Gomez and Nurse Sanchez, that he was going to kill himself. According to Deputy Gomez and Nurse Sanchez, Deputy Tracey replied, "go kill yourself then."

26. According to Deputy Gomez's report, Deputy Tracey said this four times while also saying that she wanted to see him do it and to "be a man about it."

27. As depicted below, during this encounter, Deputy Tracey made a hanging gesture with her hand to Mr. Smith.



28. All Defendants knew that there was a telephone in Cell 7, which was attached by a cord.

29. The officers left a few minutes later, and Mr. Smith began to hang himself by wrapping the telephone cord in Cell 7 around his neck. While he was hanging himself, his face was off-screen, but the camera clearly depicted his feet quickly fluttering around until he eventually stopped moving.

8



30.     Several minutes passed, and Defendants all noticed that Mr. Smith was no longer banging at the door. Deputy Tracey—who just told Mr. Smith that she wanted to watch him kill himself and to "be a man" about it—was on camera duty.

31.     Approximately 5 minutes after she left Mr. Smith, Deputy Tracey returned to Cell 7 and looked in. She then called for help, and Deputy Jackson grabbed the cell door keys and opened the door.

32.     Mr. Smith's face was blue, he had blood coming from his nose and urine on his jumpsuit, and the telephone cord was wrapped around his neck.

9

33. Deputy Jackson unwrapped the telephone cord and placed Mr. Smith on his back.

34. Nurse Sanchez then came into the cell to perform chest compressions. At that time, she reported that Mr. Smith had no pulse and was not conscious.

35. Several minutes later, Deputy Gomez entered the cell as well. Others entered and continued to perform chest compressions, now about 10 minutes after Deputy Tracey left Cell 7 the first time and more than 7 minutes since Mr. Smith's legs stopped moving on the camera depicting the inside of the cell.

36. At around 1:39 a.m., staff placed an oxygen mask on Mr. Smith. At almost 1:40 a.m., Mr. Smith was revived and started breathing again.

37. EMS then arrived, and Mr. Smith was taken to the hospital and later to Riverwoods Behavioral Health for a week.

38. Upon release from the hospital, his reported diagnoses were myalgia, conjunctival hemorrhage, elevated blood pressure, transaminitis, and major depressive disorder.

39. As a result of Defendants' acts and/or omissions, Mr. Smith suffered emotional and physical harm.

40. The Rockdale County Sheriff's Office terminated Deputy Tracey because of this incident. The agency also found that Deputies Gomez and Jackson violated jail policies and procedures for "failure to place [Mr. Smith] within the

Suicide Watch protocol" having knowledge that he stated he was going to commit suicide.

41. Specifically, Rockdale County Sheriff's Office ("RCSO") General Order 5.22 dictates that when a detainee or inmate threatens or attempts self-mutilation or suicide, such acts or statements are viewed as a mental health emergency.

42. During Deputy Tracey's post-incident Merit Review Board hearing, Major Welch of RCSO stated that per agency policy (and grand jury recommendations), RCSO deputies have no discretion under General Order 5.22 to ascertain the legitimacy of the threat when it is made but instead are required to escalate intervention to a mental health professional. Deputy Tracey agreed at the Merit Review Board hearing that she lacked discretion to determine the legitimacy of a threat of suicide or self-harm.

### COUNT I
### Deliberate Indifference Under the Fourteenth Amendment
### (as to Tracey and Jackson)

Plaintiff Ezra Smith repeats and re-alleges paragraphs 1 through 42 above, as if fully set forth herein and further alleges:

43. Deputies Tracey and Jackson, each acting under color of state law, deprived and violated Mr. Smith's federally secured constitutional rights, including his right to be secure in his person and his substantive due process rights.

11

44. Mr. Smith had a serious risk of self-harm while in the custody and control of Deputies Tracey and Jackson.

45. Specifically, each of these defendants, separately, knew or should have known that Mr. Smith faced a substantial risk of serious self-harm because they heard other detainees tell them that Mr. Smith threatened to commit suicide.

46. Deputies Tracey and Jackson ignored and were deliberately indifferent to those substantial risks of serious self-harm by failing to act to place Mr. Smith on suicide watch or take other measures to ensure his safety and well-being.

47. As a direct and proximate result of the acts and/or omissions of Deputies Tracey and Jackson, which were performed under color of state law and in violation of Mr. Smith's rights, Mr. Smith suffered extreme emotional, mental, and psychological injury, and physical pain, embarrassment, humiliation, anguish, and disgrace. The psychological injury will continue to occur in the future.

## COUNT II
### Deliberate Indifference Under the Fourteenth Amendment
### (as to all Defendants)

Plaintiff Ezra Smith repeats and re-alleges paragraphs 1 through 42 above, as if fully set forth herein and further alleges:

48. Each Defendant, acting under color of state law, deprived and violated Mr. Smith's federally secured constitutional rights, including his right to be secure in his person and his substantive due process rights.

49. Mr. Smith had a serious risk of self-harm while in the custody and control of Defendants.

50. Specifically, each Defendant, separately, knew or should have known that Mr. Smith faced a substantial risk of serious self-harm because Mr. Smith had reported to the jail a history of previous suicide attempts, including an attempted hanging at the jail by a telephone cord, and because they heard Mr. Smith threaten to commit suicide. Additionally, Deputies Tracey and Jackson heard other detainees tell them that Mr. Smith threatened to commit suicide earlier in the day.

51. Deputy Tracey knew that Mr. Smith had threatened suicide earlier in the day when other detainees called her; she knew that Mr. Smith was at risk of suicide after speaking with Mr. Smith's mother; and she knew of the risks when Mr. Smith was slamming and banging on the door and window in the cell and expressed to her that he was going to commit suicide.

52. Deputy Jackson knew that Mr. Smith had threatened suicide earlier in the day when other detainees called Deputy Tracey, which she overheard; and she knew of the risks when Mr. Smith was slamming and banging on the door and

window in the cell and expressed to Deputy Tracey that he was going to commit suicide.

53. Deputy Gomez and Nurse Sanchez knew that Mr. Smith had threatened suicide after slamming and banging on the door and window in his cell. They also heard Mr. Smith express suicidal intentions and heard Deputy Tracey respond, encouraging him to commit suicide.

54. Each ignored and were deliberately indifferent to the above-referenced substantial risks of serious self-harm by failing to act to place Mr. Smith on suicide watch or take other measures to ensure his safety and well-being. Further, in the case of Deputy Tracey, she was also deliberately indifferent to those needs by taunting Mr. Smith to commit suicide through words and actions.

55. As a direct and proximate result of the acts and/or omissions of Defendants, which were performed under color of state law and in violation of Mr. Smith's rights, Mr. Smith suffered extreme emotional, mental, and psychological injury, and physical pain, embarrassment, humiliation, anguish, and disgrace. The psychological injury will continue to occur in the future.

## COUNT III
### Negligent Performance of a Ministerial Duty
### (as to Defendants Tracey, Gomez, and Jackson)

Plaintiff Ezra Smith repeats and re-alleges paragraphs 1 through 42 above, as if fully set forth herein and further alleges:

14

56. Defendants Tracey, Gomez, and Jackson were at all material times employed by RCSO as detention deputies at the Rockdale County Jail.

57. As part of their duties with RCSO, Defendants Tracey, Gomez, and Jackson were required to obey all rules, polices and procedures of RCSO.

58. At the time, RCSO policy dictated that detention deputies were required to treat any threats of suicide or self-harm as a "medical emergency." Under that policy, detention deputies lacked any discretion to determine the legitimacy of validity of a threat of self-harm, and instead were required to escalate the threat to mental health professionals.

59. On at least two occasions, Mr. Smith verbally expressed a desire to commit suicide while detained at the Rockdale County Jail.

60. Despite hearing or having knowledge of Mr. Smith's threats of suicide, Defendants Tracey, Gomez, and Jackson failed to take action to escalate Mr. Smith's threats to a mental health professional at the jail.

61. As a direct and proximate result of the acts and/or omissions of Defendants Tracey, Jackson, and Gomez in violation of RCSO policy, Mr. Smith suffered extreme emotional, mental, and psychological injury, and physical pain, embarrassment, humiliation, anguish, and disgrace. The psychological injury will continue to occur in the future.

## Prayer for Relief

Plaintiff Ezra Smith respectfully requests that the Court enter judgment in his favor and against Defendants on all counts and award against each Defendant:

A. compensatory damages;

B. punitive damages;

C. attorney's fees under 42 U.S.C. § 1988;

D. court costs; and

E. all other relief at law or in equity to which Plaintiff is legally entitled.

## Jury Demand

Plaintiff Ezra Smith demands a trial by jury pursuant to Rule 38(b) on all issues so triable.

Dated: September 26, 2025

Respectfully submitted,

SPEARS & FILIPOVITS, LLC
315 W. Ponce de Leon Ave., Ste. 865
Decatur, Georgia 30030
(404) 905-2225
jeff@civil-rights.law
wingo@civil-rights.law

**Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

**Wingo Smith**
Wingo Smith
Georgia Bar No. 147896

**James M. Slater**
James M. Slater
Georgia Bar No. 169869

SLATER LEGAL PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, Georgia 30345
(404) 458-7283
james@slater.legal