## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

EZRA SMITH, Plaintiff,      )
                *vs.*      )     CIVIL ACTION FILE NO.
                    )
MONIQUE TRACEY, *et al.*,  )     1:24-cv-05158-TWT
   Defendants.        )

### DEFENDANT TRACEY'S SUMMARY JUDGMENT BRIEF

COMES NOW Defendant TRACEY in the above-styled action, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, files her Brief in Support of her Motion for Summary Judgment as follows:

### INTRODUCTION

This lawsuit arises from Plaintiff Ezra Smith's suicide attempt in the Rockdale County Jail around 1:30 a.m. on July 9, 2024. Plaintiff asserts claims under 42 U.S.C. §1983 and a state law negligence claim. Deputy Tracey was a detention officer. Tracey moves for summary judgment on all claims against her.

### FACTUAL OUTLINE

Plaintiff Ezra Smith was detained in the Rockdale County Jail on July 8, 2022. Smith Dep. at 26. Defendant Monique Tracey was a detention officer. Tracey Dep. at 15:6-9. Tracey had to work in booking because it was so busy and backed up. Tracey Dep. at 39:8-9. Tracey's shift began at approximately 3:00 p.m. Tracey Dep. at 39:19-20.

At approximately 8:00 p.m. there were numerous inmates in the holding

cell with Smith. Smith Dep. at 29. An inmate called on the intercom. Tracey Dep. at 57. The inmate jokingly stated a "white guy" wanted to kill himself. Tracey Dep. at 57:20-21. By video Tracey could see inside Holding Cell 7 and all of the inmates including Smith were standing around laughing. Tracey Dep. at 60:13-14.

Deputy Tracey saw that Smith was denying what was said about him. Tracey Dep. at 57-58, 59-60. Tracey told the inmates to stop playing with the intercom; she could clearly see that inmate Smith was not in danger and she continued working. Tracey Dep. at 59-60. Deputy Tracey did not believe Smith was a risk for suicide. Tracey Dep. at 87-88.

### Verbal Altercation Between Plaintiff and Deputy Tracey

Eventually all of the inmates in Holding 7 were cleared out, except for Smith. Holding Cell Video at 1:25:00. Plaintiff had already been dressed in an orange jail uniform. Holding Cell Video at 1:25:00. Smith started kicking the door and striking the door with his head. Smith Dep. at 37, 60; Tracey Dep. at 49.

Officer Tracey went to the cell in an attempt to defuse the situation and get Plaintiff to stop banging his head. Tracey Dep. at 49. According to Plaintiff, in the heated discussion that followed Tracey told him she spoke to his mother, knew everything about him, thought he was a "piece of shit" and "need[ed] to kill himself." Smith Dep. at 48:11-15, 52:14-16.

Plaintiff claims he stated he was going to "do it." Smith Dep. at 54:20-22. Nurse Sanchez could hear this discussion and believes she heard Plaintiff's

assertion that he would attempt suicide. Sanchez Dep. at 69:14-15. According to Plaintiff this back and forth repeated several times. Smith Dep. at 55:4-6.

Deputy Tracey left the window and went back to a desk. Booking Area Video at 1:29:32 *et seq*. Plaintiff asserts that shortly after that he pressed the intercom and repeated he was suicidal. Smith Dep. at 57:16-18. Plaintiff claims that Deputy Tracey yelled something about killing himself. Smith Dep. at 58:1-6.

Plaintiff continued to yell and bang in the cell. Smith Dep. at 67-68; Holding Cell Video at 1:29:32 *et seq*. Video from a camera inside the cell shows that roughly two (2) minutes after Deputy Tracey had left the window, Plaintiff went to where a telephone was mounted to the wall. Holding Cell Video at 1:31:24. Eventually only Plaintiff's feet could be seen on video. Holding Cell Video at 1:31:40 *et seq*. The Holding Cell Video shows that Plaintiff's feet moved continuously for some time but eventually stopped moving. Holding Cell Video at 1:31:40 *et seq*. Plaintiff had wrapped the telephone cord around his neck and eventually passed out. Smith Dep. at 63:17-24.

### Deputy Tracey's Discovery and Response

Within five (5) minutes of leaving the cell window, Deputy Tracey realized that Plaintiff had stopped yelling and banging, so she went to his cell to investigate. Booking Area Video at 1:33:55 *et seq*.; Tracey Dep. at 41; Jackson Dep. at 79-80. Deputy Tracey saw that Plaintiff was in the cell with the phone cord wrapped around his neck. Tracey Dep. at 41.

Deputy Tracey yelled for the keys to be brought to open the cell. Tracey Dep. at 41. Deputy Jackson opened the cell and removed the phone cord from Plaintiff's neck. Jackson Bodycam Video at 1:34:30 *et seq.* Deputy Tracey yelled for the nurse. Sanchez Dep. at 92:18-20, 85:20. Plaintiff was unconscious. Jackson Bodycam Video at 1:34:30 *et seq.*

Nurse Sanchez and Deputy Jackson did chest compressions on Plaintiff. Jackson Bodycam Video at 1:35 *et seq.* Soon Plaintiff was revived. Tracey Dep. at 42:8-12. Plaintiff's only non-transitory physical injury from trying to strangle himself consisted of ruptured blood vessels in his eyes. Plaintiff Response to Gomez Interrogatory 12.

**Jail Policy**

Rockdale County Jail policy 5.22 stated that where an inmate threatens or attempts suicide at a time like 1:30 a.m., then the medical department should be notified and "the inmate may also be placed on a "Suicide Watch" to monitor his/her behavior." Policy 5.22 (I) (A), (D). As relevant to this case, suicide watch "may" involve checks every 15 minutes and placing the inmate in an observation cell without their personal clothing. Policy 5.22 (I) (D).

## ARGUMENT AND CITATIONS TO AUTHORITY

## I. DEFENDANT TRACEY IS ENTITLED TO SUMMARY JUDGMENT ON THE FEDERAL DELIBERATE INDIFFERENCE CLAIMS

Plaintiff's Section 1983 claims are premised on the Fourteenth Amendment's prohibition on "cruel and unusual punishment" of pretrial

detainees.[1] To prove that claim Plaintiff must show that Defendant Tracey was "deliberately indifferent" to a strong likelihood of suicide by showing the Defendant had "(1) subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in  conduct that amounts to subjective recklessness." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024).

Against Defendant Tracey, Plaintiff's case fails on each element. The circumstances did not support a "strong likelihood" that Smith would attempt suicide. Aside from that, Tracey's actions after Smith threatened suicide were reasonable. Tracey monitored Smith, discovered his suicide attempt, and promptly summoned help that saved Smith's life. But for Defendant Tracey's actions, Smith would have died by his own hand. Tracey's actions were the <u>opposite</u> of "criminal recklessness." These points are covered in turn below.

## 1.  There Was No Apparent "Strong Likelihood" of Suicide

In an attempted suicide case the Plaintiff must show the Defendant had knowledge of a strong likelihood, not the mere possibility, that he would attempt suicide. *Cook ex rel. Est. of Tessier v. Sheriff*, 402 F.3d 1092, 1115 (11th Cir. 2005); see *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 (1994) ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

---

[1] In relation to Defendant Tracey, counts 1 and 2 of the amended complaint are the same claim, stated twice. Accordingly no distinction is made in this Brief between counts 1 and 2.

### a. The Circumstances Did Not Support a Credible Suicide Risk

Smith's suicidal statements in the midst of a temper tantrum raised no more than a "mere possibility" that he would attempt suicide under the totality of the circumstances. The context was a heated yelling match at the end of a long difficult shift, where earlier Plaintiff had denied suicidal intent after another inmate jokingly called over the intercom. See *Burnette v. Taylor*, 533 F.3d 1325, 1332 (11th Cir. 2008) (holding that a jailer was not deliberately indifferent to the risk of a fatal drug overdose in part because the jailer "observed [the inmate] 'laughing and talking' with his cellmates").

Officers are not required automatically to credit an inmate's threat of self harm. See *Fowler v. Chattooga Cnty., Ga.*, 307 F. App'x 363, 366 (11th Cir. 2009) (*per curiam*) (affirming grant of summary judgment where the defendant knew the inmate had used "idle threats of suicide to get his way"). An inmate's "prior threat or attempt also must appear to have been genuine—to have been free of indicia of manipulative sham or pretense—in order to impart sufficient warning to the prison officials." *Greffey v. State of Ala. Dep't of Corrs.*, 996 F. Supp. 1368, 1383 (N.D. Ala. 1998).

For example, in *Whitaker v. Jefferson*, No. 4:22-CV-00038-CDL-MSH, 2023 U.S. Dist. LEXIS 84333 (M.D. Ga. Apr. 19, 2023), the inmate told an officer "that he was feeling suicidal." *Id*. at *7. The officer "responded there was nothing she could do about it. She did not let a member of the mental health staff

know about the threat, even though she knew about his mental health condition." *Id.* Roughly two hours later the inmate "cut himself on the arms four times with a piece of metal." *Id.* The court granted summary judgment to the officer, in light of the officer's reasonable belief that the inmate threat was an "effort[] to manipulate his placement in an HSP cell so he could be by himself." *Id.* at *11.

Turning to this case, Plaintiff had a temper tantrum and then engaged Deputy Tracey in a yelling match. An inmate's "[a]nti-social, aggressive behavioral problems do not rise to the level of a strong risk of suicide." *Jackson v. West*, 787 F.3d 1345, 1354 (11th Cir. 2015). According to Plaintiff's story, Deputy Tracey brought up the idea of suicide, meaning that the idea did not originate with Plaintiff. Smith Dep. at 48:11-15, 52:14-16.

All of this was in the context of a heated emotional exchange between two frustrated people, which is different altogether from a spontaneous suicide threat. See *Popham*, 908 F.3d at 1564 (citing *Estate of Cartwright v. City of Concord*, 618 F.Supp. 722, 728 (N.D.Cal.1985), *aff'd*, 856 F.2d 1437 (9th Cir.1988) (suicide threat made under the influence of drugs or alcohol did not furnish jailers with reason to believe decedent was suicidal)).

Smith's comments, yelled in the heat of a violent argument, raised nothing more than a "mere possibility" that Smith was genuinely at risk for suicide. Under the circumstances a reasonable officer could judge the risk to be low, particularly since a few hours before Smith had denied being suicidal when other inmates

7

jokingly called over the intercom about him.

### b. The Circumstances Did Not Support a Strong Likelihood that Suicide Was Feasible

In cases where prisoners manage to harm themselves in ways that seem improbable, courts usually hold that officers do not act with "deliberate indifference" by failing to guard against bizarre or unlikely events. Put differently, whether a strong likelihood of suicide exists depends in part on whether the inmate clearly has the means to carry out self harm. For liability "[t]he official must be subjectively aware that the *combinatio*n of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008) (emphasis in original).

In *Gish* the prisoner was able to reach through a police vehicle partition (which the officer thought was locked), grab an officer's gun on the passenger seat and shoot himself. *Gish*, 516 F.3d at 953. That unlikely scenario did not present a strong likelihood that suicide was feasible under the circumstances, resulting in a finding that the officer was not deliberately indifferent. *Id*. at 955.

*Gish* followed the lead of *Cagle v. Sutherland*, 334 F.3d 980 (11th Cir. 2003), where the Eleventh Circuit held that the risk of an inmate hanging himself with the elastic from his underwear was not sufficiently feasible to support a strong likelihood of suicide under the circumstances. *Cagle*,  334 F.3d at 989.

In this case Plaintiff used the cord from a telephone fastened to a wall

above a concrete bench. Jackson Bodycam Video at 1:36:25 (screen shot below).



Strangulation by hanging requires a scenario where the subject's body weight applies strong pressure to tighten a securely fastened neck ligature. Here the telephone was secured at or below normal chest level with a bench directly below, providing a highly improbable configuration for hanging in comparison to means employed in most hanging scenarios.[2]

The wall telephone did not present a realistic hanging risk because of the low elevation and bench position. Likewise, the cord had no obvious means to make a knot, since one end was fastened to the telephone (which was attached to the wall) and the other end had a telephone receiver.

In hindsight, it turns out that on his knees Plaintiff was able to use the cord to apply enough pressure to cut off blood flow in his neck. In hindsight, the

---

[2] See *United States v. Rice*, 36 F.4th 578, 582 (4th Cir. 2022) (explaining Black's Law Dictionary defines "hanging" as "[t]he act of carrying out an execution by suspending the person above the ground by a rope around the person's neck." *Hanging*, Black's Law Dictionary (8th ed. 2004)).

inmate in *Gish* was able to secure a gun and shoot himself. And the inmate in *Cagle* was able to hang himself with elastic from his underwear. None of those scenarios seemed possible before the inmates demonstrated that with sufficient ingenuity suicide could be accomplished. None of these scenarios presented a strong risk that suicide was feasible. In line with *Gish* and *Cagle*, Defendant Tracey is entitled to summary judgment.

### 2. Deputy Tracey Responded Reasonably to Plaintiff's Statements and Suicide Attempt

Plaintiff must show that Deputy Tracey's conduct was objectively unreasonable in response to the circumstances at hand. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844, 114 S. Ct. 1970 (1994); *Wade v. McDade*, 106 F.4th 1251, 1255  (11th Cir. 2024) (*en banc*) (explaining that "a defendant who responds reasonably to a risk, even a known risk, cannot be found liable" for deliberate indifference).

"The reasonableness of a prison official's response to a threat does not rise or fall on [an] all-or-nothing, one-size-fits-all approach." *Mosley v. Zachery*, 966 F.3d 1265, 1271 (11th Cir. 2020). Instead, whether an officer's response is reasonable is a fact-bound inquiry that is "dependent upon the exigence of the specific circumstances." *Cox v. Nobles*, 15 F.4th 1350, 1360 (11th Cir. 2021). Critically, "[a] reasonable decision does not have to be a perfect decision, and it

does not require that any potential harm was actually averted." *Stalley v. Cumbie*, 124 F.4th 1273, 1287 (11th Cir. 2024). Here, Deputy Tracey's actions were reasonable under the circumstances.

### a. Deputy Tracey Monitored Plaintiff Closely

Even where an inmate is believed to be suicidal, federal law does not require officers to keep a detainee under continuous surveillance, or to perceive and account for all unusual risks that may materialize. See, *e.g.*, *Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003) (finding that video monitoring at 15-minute intervals and a 100-minute gap between checks, which violated jail policy, was not deliberate indifference).

Where officers take reasonable steps to prevent suicide they are not liable, even where they fail to take additional steps that the plaintiff claims would have prevented suicide. *Belcher v. City of Foley*, 30 F.3d 1398 (11th Cir. 1994) (granting qualified immunity for officers who failed to take decedent to hospital, retrieve medication or contact psychiatrist, but who took other steps to prevent suicide); *Hofer v. City of Auburn*, 155 F. Supp. 2d 1308, 1313 (M.D. Ala. 2001) ("[T]he prisoner must prove that the preventive measures taken were so inadequate as to be deliberately indifferent to the risk."). The federal constitution does not require perfection or success.

Here, following the confrontation where Plaintiff asserted he was suicidal, Defendant Tracey paid close attention to Plaintiff. For several minutes Plaintiff

continued beating on the cell door. Booking Area Video at 1:29:30 *et seq*. Tracey listened to him banging on the cell door, and she watched him on a video montor.

Within minutes after Plaintiff quit banging and Tracey could not fully see him on the monitor, she went to the cell to check on him. All of this happened within five (5) minutes of the shouting confrontation. Booking Area Video at 1:29:30 – 1:34:00. Deputy Tracey's actions met or exceeded what federal law established as reasonable precautions in response to a violent, agitated detainee within five (5) minutes of his suicide threat.

### b.   Deputy Tracey Quickly Responded to Discovery of Plaintiff's Strangulation, Resulting in Plaintiff's Life Being Saved

When Deputy Tracey checked on Plaintiff she discovered that he was kneeling and not moving. Since Plaintiff had just been violently beating on the cell window, this scenario potentially presented (a) a ruse by Plaintiff or (b) an emergency requiring other officers. Deputy Tracey immediately called for Deputy Jackson to bring the cell keys, after which officers discovered Plaintiff was unconscious. Tracey yelled for the nurse and rescue efforts commenced. Those rescue efforts resulted in Plaintiff being revived.

Deputy Tracey's response to Plaintiff's suicide attempt was the complete opposite of "deliberate indifference." An officer who intended to inflict cruel and unusual punishment on Plaintiff would have reacted by walking away without telling anyone or initiating rescue efforts. See *Wade v. McDade,* 106 F.4th 1251, 1257 (11th Cir. 2024) ("Only inflictions of punishment carry liability for

deliberate indifference." (quoting *Farmer*, 511 U.S. at 839, 841)). Had Deputy Tracey acted with deliberate indifference, Plaintiff would not be alive.

### 3. Deputy Tracey Did Not Act With Criminal Recklessness

In *Wade v. McDade* the Eleventh Circuit explained that in a prisoner's deliberate indifference case "the plaintiff must demonstrate that the defendant acted with subjective recklessness as used in the criminal law and to do so he must show that the defendant was actually, subjectively aware that [her] own conduct caused a substantial risk of serious harm to the plaintiff … ." *Wade v. McDade*, 106 F.4th 1251, 1262  (11th Cir. 2024) (*en banc*) (cleaned up); see *Stalley v. Cumbie*, 124 F.4th 1273, 1289-90 (11th Cir. 2024) (explaining that *Wade* emphasized the rule by saying the same thing eight different times).

Turning to this case, there is no evidence that Deputy Tracey was "actually, subjectively aware" that closely monitoring Plaintiff, checking on him shortly after he quit banging on the cell door and then quickly calling for help to save Plaintiff's life "caused a substantial risk of serious harm" to Plaintiff. See *Wade*, 106 F.4th at 1262. Put differently, there is no basis to find that Deputy Tracey acted with "criminal recklessness."

Tracey's actions did not actually put Plaintiff at risk of harm, and no reasonable jury could find that Tracey was *aware* of having put Plaintiff at strong risk of accomplishing suicide. In light of Tracey's intensive monitoring after Plaintiff's suicidal statements and her prompt life-saving efforts in response to

discovering Plaintiff was unresponsive, there is no basis for the "criminal recklessness" showing required for Plaintiff's deliberate indifference claim against Defendant Tracey.

### 4. Conclusion

Under Plaintiff's story Deputy Tracey had information that Plaintiff threatened suicide. Under the indisputable objective facts about what Tracey actually did in response, Plaintiff has no case that Tracey acted with deliberate indifference. And as detailed in the next section, Plaintiff cannot show that Deputy Tracey violated clearly established law.

## II.    QUALIFIED IMMUNITY PROTECTS DEFENDANT TRACEY

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 US 731, 743, 131 S.Ct. 2074 (2011). To overcome qualified immunity, there is no strict requirement for "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741; *Taylor v. Barkes*, 575 U.S. 822, 135 S.Ct. 2042 (2015).

The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that

he or she faced." *Plumhoff v. Rickard*,  572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014) (internal punctuation and citation omitted).

"The burden of showing that an officer violated clearly established law falls on the plaintiff, and a plaintiff's citation of general rules or abstract rights is insufficient to strip a 1983 defendant of his qualified immunity." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). "The standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs." *Id*. at 1165.

### 1.  Defendant Tracey Acted Within Her Discretionary Authority

To establish qualified immunity Defendant Tracey had to have been "acting within the scope of [her] discretionary authority" for the actions in question. *Hudgins v. City of Ashburn*, 890 F.2d 396, 404 (11th Cir. 1989). The proper inquiry is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1282 (1998). This showing is easily met for Tracey, who was a deputy working in the booking area where Smith was housed. She responded to Smith's disturbance and later his suicide attempt as part of her job as a detention officer. That meets the very low bar for "discretionary authority."

### 2.  Defendant Tracey Did Not Violate Clearly Established Law

To defeat qualified immunity, Plaintiff has the burden to show that binding

authority from a pertinent court had clearly established by July 2024 the unconstitutionality of Defendant's conduct under similar circumstances.

Plaintiff cannot meet this burden because, at the time of his suicide attempt, it was not clearly established that Defendant had a constitutional duty to take different steps in response to Plaintiff's statements, and Defendant's response did not violate clearly established law. As explained above, Tracey (1) did not have sufficient information to conclude that Smith presented a "strong likelihood" of suicide; and (2) Tracey's actions were reasonable and did not come close to the criminal recklessness standard required to establish this claim. *Farmer*, 511 U.S. at 837; *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (*en banc*); *Heggs v. Grant*, 73 F.3d 317, 320  (11th Cir. 1996) (granting qualified immunity where detainee threatened suicide, recanted, and hanged herself despite 15-minute watches and removal of bedding from cell).

The most remarkable illustration for qualified immunity comes from the Fifth Circuit's decision in ***Cope v. Cogdill*, 3 F.4th 198**, 209-10 (5th Cir. 2021).[3]

---

[3]    While decisions from other federal courts of appeal cannot clearly establish the law in the Eleventh Circuit, they can support qualified immunity by showing that federal judges do not view the law as settled, or alternatively that the law is settled in an officer's favor. *Coffin v. Brandau*, 642 F.3d 999, 1017 n.16 (11th Cir. 2011) ("opinions from other courts can suggest that reasonable jurists would not know that certain factual situations rise to the level of constitutional violations, and therefore reasonable officers would not either.").

[I]n the absence of controlling precedent, cases decided outside this Circuit can buttress our view that the applicable law was *not* already clearly established. We must not hold police officers to a higher standard of legal knowledge than that displayed by the federal courts in

In that highly similar case, an agitated inmate strangled himself with a telephone cord while alone in a jail cell. An officer similarly situated to Defendant Tracey (Officer Laws) conceded he knew the inmate was suicidal. *Id*. at 208.

The court explained what happened:

> [Inmate] Monroe became visibly angry and appeared to beat the toilet in his cell with a toilet plunger. [Officer] Laws then began mopping the area outside of Monroe's cell. While Laws mopped, Monroe remained visibly upset, slamming the phone receiver against the wall several times.
>
> Monroe wrapped the phone cord around his neck around 8:37 a.m., while Laws continued mopping. As Monroe strangled himself with the cord, Laws made a phone call to Brixey. Laws did not call Emergency Medical Services. About a minute or two after the strangulation began, Monroe's body stopped moving. Throughout the next five minutes, Laws looked into the cell several times, but he never unlocked or entered it.

*Cope v. Cogdill,* 3 F.4th 198, 203 (5th Cir. 2021). The inmate later died. *Id.*

The Fifth Circuit granted qualified immunity to Officer Laws, holding that the law was not clearly established and that the officer's delay and failure to act in response to an ongoing suicide was not "so extreme" that it violated clearly established law. *Cope,* 3 F.4th at 210. The court reasoned that qualified immunity was due because the officer took *some* action, namely calling another officer for assistance, "albeit not as promptly as should have been done." *Id.* at 209.[4]

reasonable and reasoned decisions … .

*Youmans v. Gagnon*, 626 F.3d 557, 565 (11th Cir. 2010).

[4] *Cope* held the officer's relative inaction unconstitutional, *id.* at 209, but not so extreme as to disqualify the officer for qualified immunity in light of the dearth of prior clearly established law.

Here, Defendant Tracey's actions far exceed the efforts of Officer Laws in *Cope*. After the heated verbal exchange Deputy Tracey monitored Plaintiff closely, noticed that minutes later Plaintiff stopped kicking and beating on the cell door, after which Tracey went to investigate when she could no longer view what Plaintiff was doing by video. Immediately after discovering that Plaintiff was not moving and had the phone cord wrapped around his neck, Tracey called for the cell door to be opened, yelled for the nurse, and all of that triggered the coordinated response that saved Plaintiff's life. Tracey's actions did not partake of any of the unconstitutional inaction in *Cope*. And, because the officer in *Cope* was entitled to qualified immunity, Deputy Tracey is too.

Likewise, to the extent that Plaintiff contends Tracey should be liable for failing to take additional precautions to prevent him from trying to harm himself, the Supreme Court disagrees.

> No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols. And … the weight of that authority at the time of [the inmate's] death suggested that such a right did not exist.

*Taylor v. Barkes*, 575 U.S. 822, 826, 135 S. Ct. 2042, 2044 (2015). At the time of this incident *Taylor* remains the law. Tracey's close monitoring of Smith and prompt response met or exceeded any clearly established federal standard for suicide prevention precautions. *Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003) (monitoring using video at 15-minute intervals but missing checks for 100

minutes, together with removal of belt and shoelaces, were sufficient precautions); *Belcher v. City of Foley*, 30 F.3d 1398, 1400 (11th Cir. 1994) (holding that there was no clearly established federal prohibition on leaving suicidal inmate unguarded in a cell with barred doors and the means to hang himself, and granting qualified immunity for officers who failed to take decedent to hospital, retrieve medication or contact psychiatrist).

Because similarly situated officers have received qualified immunity under similar circumstances, there is no basis for an argument that Deputy Tracey had a "non-debatable" federal duty to respond differently to Plaintiff's conduct. Therefore, qualified immunity protects Defendant Tracey.

## III.  PLAINTIFF'S NEGLIGENCE CLAIM IS BARRED BY OFFICIAL IMMUNITY, ASSUMPTION OF THE RISK,  FAILURE TO EXERCISE ORDINARY CARE AND PERSONAL FAULT

Count 3 raises a state law negligence claim based on the allegation that Defendant was required under a policy to "escalate Mr. Smith's threats to a mental health professional at the jail." Doc. 63-1 at ¶ 60. This claim fails for a variety of reasons, as detailed below.

### A.  Official Immunity Protects Deputy Tracey from Liability

Official immunity bars claims against a public officer unless the public officer (1) negligently performed a ministerial duty, or (2) acted with actual malice[5] or an actual intent to cause injury while performing a discretionary duty.

---

[5] "[I]n the context of official immunity, 'actual malice' requires a deliberate intention to do wrong, and denotes 'express malice or malice in fact.' This

See Ga. Const. of 1983, Art. I, Sec. 2, Par. IX (d); *Black v. Wigington,* 811 F.3d 1259, 1265 (11th Cir.2016). In other words, public officers can be held personally liable for the negligent job performance only if the act in question can be categorized as 'ministerial.' *Cameron v. Lang*, 274 Ga. 122, 123(1) (2001).

> Whether an official's act is ministerial or discretionary is determined based on the facts of each case. *Grammens v. Dollar*, 287 Ga. 618, 697 S.E.2d 775, 777 (Ga. 2010). Georgia courts define a "ministerial act" as "commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Id.* "A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*

*Speight v. Griggs*, 579 F. App'x 757, 759 (11th Cir. 2014).

Official immunity covers Defendant Tracey's actions for three reasons. First, Defendant's actions were discretionary, and Plaintiff cannot show that Tracey acted with malice or intent to cause injury. Second, even if any alleged actions could be considered "ministerial" duties, they were performed without negligence and did not cause harm to Plaintiff.

### 1. Deputy Tracey's Action Was Discretionary

To the extent Plaintiff claims that some type of emergency response was required before he was discovered unconscious, Georgia law provides that

---

definition is consistent with express malice which, in criminal law, is similarly defined as a deliberate intention to do an unlawful act. ... see also Ballentine's Law Dictionary, 3d ed. (1969) (express malice is a "deliberate or premeditated design to inflict injury or take life")." *Adams v. Hazelwood*, 271 Ga. 414, 414(2) (1999) (citations and punctuation omitted).

emergency responses are always and inherently discretionary. See *Polk Cty. v. Ellington*, 306 Ga. App. 193, 201 (2010) ("responding to an emergency is not a relatively simple, specific duty."). Likewise, inmate supervision is inherently discretionary. *Parrish v. Akins*, 233 Ga. App. 442, 444, 504 S.E.2d 276, 278 (1998).

Where a function is discretionary, it follows that all acts or omissions by an officer relating to the discretionary function are immunized from liability. That is true even if otherwise simple, discrete mandated acts are omitted or performed negligently *while performing the discretionary function;* officers still are entitled to immunity.[6]

Turning to this case, following the heated exchange shortly before Plaintiff tried to strangle himself, Tracey had to decide what to do about Plaintiff, who was extremely agitated and seemed very aggressive. Tracey chose to monitor Smith in the short term (which in this case was five (5) minutes or less) and allow him to cool down before undertaking any other action about this situation. The potential alternative was to re-engage Smith and immediately go through the exercise of having him stripped and moved to another cell, which would have required more officers and potentially involved a physical fight.

---

[6]     *Cameron v. Lang*, 274 Ga. 122, 125(2) (2001) (granting official immunity to officers in an emergency response despite negligent violation of traffic law); *Reece v. Turner*, 284 Ga.App. 282, 285-286 (2007) (granting official immunity even where specific school policies were violated); *Hanse v. Phillips*, 276 Ga.App. 558 (2005) (granting officer immunity even where officer's emergency response may have been "in contravention of certain directives in the [departmental] policy manual."); *Hersh v. Griffith*, 284 Ga.App. 15, 21 (2007) ("even a police officer who negligently directs traffic and thereby causes a collision is entitled to official immunity."); *Perkins v. Morgan County School Dist.*, 222 Ga.App. 831, 835 (1996) (same as *Reece*).

In the five minutes relevant to this case, Tracey had to exercise "personal deliberation and judgment, which in turn entail[ed] examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Grammens*, 697 S.E.2d at 777. That is, Deputy Tracey's response to Smith's suicide threat was discretionary under the circumstances. Because the evidence does not support that Tracey's response to the suicide threat was illegal and with malicious intent to injure Smith, she is entitled to official immunity.

## 2.  Deputy Tracey Did Not Breach a Ministerial Duty

Policy 5.22 (I)(A) is somewhat unclear, but arguably it provides that an inmate's suicide threat should be reported to a "Mental Health Professional" who eventually will interview the inmate and review the medical chart at some unspecified time. An "emergency" mental health referral was supposed to be acted upon within 25 hours. Sanchez Dep. at 25:1-10. In cases when events occur "other than normal working hours" so that there is no mental health professional on site—which was the circumstance in this case—Subsection (I)(A)(2) provides that "Jail staff will notify the Medical Department … ." *Id.*

Turning to this case, the intercom call from another inmate (not Smith) around 8:00 p.m. was not a suicide threat from Plaintiff, and on video Plaintiff expressly denied making such a threat. Tracey Dep. at 57-58, 59-60. Plaintiff testified the call was "formed as a joke." Smith Dep. at 148:14-15. Nothing about that incident triggered policy 5.22 (I).

Moving to roughly 1:30 a.m., in the course of the verbal altercation between Plaintiff and Deputy Tracey, Nurse Sanchez heard Plaintiff yell he was suicidal. Sanchez Dep. at 69:14-15. Tracey's only alleged duty under policy 5.22 (I) was to report the threat to the nurse, and Tracey knew the nurse already knew about the threat because the nurse was present and heard it with her own ears. Tracey Dep. at 26:2-8. The policy does not require an officer pointlessly to repeat information to a nurse who already has the information.[7] Under the circumstances, Tracey did not breach any mandatory requirement under Policy 5.22.

### 3.   Any Failure to Report Did Not Cause Harm to Plaintiff

As explained above, at most the policy required Defendant to report Smith's suicide threat to Nurse Sanchez. Sanchez already had that information, so that Tracey's failure to report to Sanchez did not cause harm to Plaintiff. Beyond that, no mental health professional was on hand for an evaluation within the five (5) minutes between Smith's suicide threat and his suicide attempt. Any breach of a "ministerial duty" did no harm to Plaintiff as a matter of undisputed fact.

### B.   Assumption of the Risk Bars Plaintiff's Claim

Plaintiff assumed the risk that intentionally strangling himself with a telephone cord posed the likelihood of injury or death, barring recovery in this action. "A person cannot undertake to do what is obviously a dangerous thing and

---

[7]    Even if Plaintiff contends that the policy implicitly required pointless repetition of information already known to the nurse, this scenario raised a judgment call for Deputy Tracey about whether pointless repetition was required when the policy does not say so. Such judgment calls are inherently discretionary.

at the same time avoid the responsibility for the self-assumed risk." *First Pacific Mgmt. Corp. v. O'Brien*, 184 Ga.App. 277, 281, 361 S.E.2d 261 (1987).

The Georgia appellate courts routinely find that assumption of risk is a ground for summary judgment, even in cases where the conduct is less risky than suicide. *Muldovan v. McEachern*, 271 Ga. 805, 807-808 (1999); *Williams v. City of Tybee Island*, 362 Ga. App. 775, 778 (2022) (assumption of risk barred claim where victim swam to save another swimmer with knowledge of hazard presented by ocean current); *Thompkins v. Gonzalez-Nunez*, 355 Ga. App. 144, 147 (2020) (reversing denial of summary judgment based on assumption of risk defense).

In *Muldovan*, *supra*, the Georgia Supreme Court affirmed summary judgment based on the assumption of the risk doctrine, where a drunk adolescent was shot while playing "Russian Roulette." The only significant differences between this case and *Muldovan* are that Plaintiff harmed *himself*, as opposed to someone else pulling a trigger. That difference makes the assumption of the risk doctrine even more clear-cut in this case than in *Muldovan*.

Plaintiff knew that fastening the phone cord around his neck could cause him injury or  death, and he took specific action to make that risk materialize. Therefore, the assumption of the risk doctrine bars Plaintiff's state law claim.

### C.  Plaintiff's Failure to Exercise Ordinary Care Bars His Claim

Similar to the assumption of the risk doctrine, comparative fault and Plaintiff's failure to exercise ordinary care bars Plaintiff's state law claim.

Plaintiff had the duty to avoid obvious risks of harm, and the law presumed he was able to appreciate and avoid obvious danger.

> That which a plaintiff may not do without barring himself from recovery is to accept a risk so obvious that taking it amounts to failure to exercise ordinary care for his own safety, or recklessly to test an observed and clearly obvious peril. A person cannot undertake to do an obviously dangerous thing without himself being guilty of such lack of due care for his own safety as to bar him from recovery if he is injured.

*Sewell v. Dixie Region Sports Car Club of America, Inc.*, 215 Ga.App. 611, 612-613, 451 S.E.2d 489, 491 (1994).

Here, Plaintiff breached his duties of self-preservation and reasonable care by intentionally strangling himself. He was at least 50% responsible for his self-inflicted harm, barring recovery under Georgia law.[8] No rational jury could ever find that Plaintiff was less than 50% responsible for the incident he sues about. Consequently, Defendant Tracey cannot be liable for Plaintiff's suicide attempt and summary judgment must be granted.

---

[8]  See O.C.G.A. § 51-11-7 ("If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover."); O.C.G.A. § 51-12-33 (requiring decedent's fault to be apportioned); *McReynolds v. Krebs*, 290 Ga. 850, 851, 725 S.E.2d 584, 586–87 (2012) (statute "prohibit[s] recovery where the plaintiff is 50 percent or more responsible for the injury or damages claimed."); *Rappenecker v. L.S.E., Inc.*, 236 Ga. App. 86, 510 S.E.2d 871 (1999) (affirming summary judgment where plaintiff failed to "exercise[] reasonable care for his own safety."); *Union Camp Corp. v. Helmy*, 258 Ga. 263, 267, 367 S.E.2d 796,799 – 800 (1988) (no recovery is available where plaintiff's fault equals or exceeds aggregate fault of defendants); *Union Carbide Corp. v. Holton*, 136 Ga.App. 726, 730-731, 222 S.E.2d 105, 109–110 (1975) ("every adult is presumed to possess such ordinary intelligence, judgment, and discretion as will enable [him] to appreciate obvious danger.").

## CONCLUSION

For all the foregoing reasons, Defendant Tracey is entitled to complete summary judgment.

Respectfully submitted,

**WILLIAMS & WAYMIRE, LLC**

/s/ *Jason C. Waymire*
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorney for Defendant Tracey

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30581
678-541-0790
678-541-0789
jason@wmwlaw.com

## CERTIFICATION OF COMPLIANCE WITH L.R. 5.1(B).

Counsel for Defendants certifies that the this Brief complies with the font and point size requirements of Local Rule 5.1(B).