Page 1

```
               IN THE UNITED STATES DISTRICT COURT
               IN THE NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION


     EZRA SMITH,                   )
                                   )
               Plaintiff,          ) CIVIL ACTION
                                   ) NO. 1:24-CV-05158-TWT
               vs.                 )
                                   )
     DEPUTY MONIQUE TRACEY, et al, )
                                   )
               Defendants.         )
     ------------------------------/



               Deposition of ERICA SANCHEZ, taken on behalf of
     PLAINTIFF, pursuant to the stipulations set forth below,
     before Meg Armistead, Certified Court Reporter, at 999
     Peachtree Street, Suite 950, Atlanta, Georgia, commencing
     at the hour of 10:00 a.m., Wednesday, September 10, 2025.




               BULL & ASSOCIATES, INC.
               COURT AND DEPOSITION REPORTERS
          315 West Ponce de Leon Avenue, Suite 650
                    Decatur, Georgia 30030
                       (404) 256-2886
```

Page 2

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:
 3        JAMES M. SLATER, Esq.
          Slater Legal, PLLC
          2296 Henderson Mill Road, Suite 116
          Atlanta, Georgia 30345
 4        Phone: (404) 458-7283
          Email: james@slater.legal
 5             * * *
 6        WINGO SMITH, Esq.
 7        JEFFREY R. FILIPOVITS, Esq.
          Spears & Filipovits, LLC
          315 West Ponce de Leon Avenue, Suite 865
 8        Decatur, Georgia 30030
          Phone: (404) 407-5418
 9        E-mail: wingo@civil-rights.law
               jeff@civil-rights.law
10   FOR DEFENDANT:
11        ANTONIO E. VEAL, Esq.
          Huff Powell & Bailey, LLC
          999 Peachtree Street, Suite 950
12        Atlanta, Georgia 30309
          Phone: (404) 892-4022
13        Email: aveal@huffpowellbailey.com
               * * *
14        JASON C. WAYMIRE, Esq.
          Williams & Waymire, P.C.
15        4330 South Lee Street
          Building 400, Suite A
16        Buford, Georgia 30518
          Phone: (678) 541-0790
17        E-mail: jason@wmwlaw.com
               * * *
18        TIMOTHY J. BUCKLEY III, Esq. (via Zoom)
          Buckley Christopher & Hensel, PC
19        2970 Clairmont Road, Suite 650
          Atlanta, Georgia 30329
20        Phone: (404) 633-9230
          Email: tbuckley@bchlawpc.com
21

22
23
24
25
```

Page 3

```
 1              INDEX TO PROCEEDINGS
                 EXAMINATION INDEX
 2
     WITNESS:                    PAGE
 3   ERICA SANCHEZ

 4              EXAMINATION

 5   EXAMINATION by MR. JAMES M. SLATER        4

 6   EXAMINATION by MR. JASON C. WAYMIRE       105

 7   EXAMINATION by MR. ANTONIO E. VEAL        106

 8   EXAMINATION by MR. TIMOTHY J. BUCKLEY, III  109

 9   FURTHER EXAMINATION by MR. SLATER         110

10
               INDEX TO PLAINTIFF'S EXHIBITS
11
     Plaintiff's Exhibit No. 1          7
12
     Plaintiff's Exhibit No. 2          20
13
     Plaintiff's Exhibit No. 3          33
14
     Plaintiff's Exhibit No. 4 (Video Retained)   81
15
     Plaintiff's Exhibit No. 5          83
16
     Plaintiff's Exhibit No. 6          90
17
     Plaintiff's Exhibit No. 7          94
18
19             INDEX TO DEFENSE'S EXHIBIT
20   Defense Exhibit No. 1             105
     (Screen Shot from a Video - Exhibit Retained)
21
```
```
22
            (In the following transcript, dashes [--] are
23   used to indicate an intentional or purposeful
     interruption of a sentence, and ellipsis [...] is used
24   to indicate halting speech or an unfinished sentence in
     dialogue, written material.)
25
```

Page 4

```
 1        (The Reporter's Disclosure was presented and
 2   is attached.)
 3             ERICA SANCHEZ
 4   having been previously sworn, testifies as follows:
 5             EXAMINATION
 6   BY MR. JAMES M. SLATER:
 7        Q    Morning, Ms. Sanchez.  Could you please state
 8   your full name for the record?
 9        A    Erica Renee Sanchez.
10        Q    How are you doing this morning?
11             MR. TIMOTHY J. BUCKLEY:  I can't hear you.
12   Can I ask you to speak up, please?
13             MR. SLATER:  Sure.  How's this, Tim?
14             MR. BUCKLEY:  That's good.
15             MR. SLATER:  Okay.  I'll try to speak up.
16             MR. BUCKLEY:  I didn't hear the witness say
17   anything.  I can tell she was talking.
18        Q    (By Mr. Slater) Okay.  Ms. Sanchez, have you
19   ever given a deposition before?
20        A    No.
21        Q    No?  Have you ever given any testimony in any
22   sort of proceeding before?
23        A    No.
24        Q    I'm going to explain some of the ground rules
25   to you.  This is -- you're not in court.  There's no
```

Page 5

1  judge here. It's just the lawyers, you, and the court
2  reporter, who's transcribing what I'm saying and what
3  you're saying.
4        The purpose of today is to hear your testimony
5  involving a lawsuit that was filed in federal court here
6  in Atlanta on behalf of Ezra Smith, who was detained at
7  the Rockdale County Jail when you were working there.
8        I'm going to ask questions. I'm going to ask
9  you that you answer my questions. Because this is being
10  transcribed by the court reporter, I'm going to ask that
11  you not just nod your head or shake your head, that you
12  verbalize an answer: "yes," "no," whatever your answer
13  may be.
14        From time to time, you may hear your counsel
15  or some of the other lawyers object to my questions, and
16  that's totally fine. If you hear your counsel, Mr.
17  Veal, direct you not to answer a question, then you
18  don't answer a question. Otherwise, if he or any other
19  attorney object, you're still required to answer my
20  question; okay?
21     A  Yes.
22     Q  Okay. Great. Are you taking any sort of
23  medication or anything that will impair your ability to
24  give truthful testimony today?
25     A  No.

Page 6

1     Q  I don't expect that we're going to be here all
2  day. If you need a break at any time, you just let me
3  know. The only thing that I'll ask is that if I'm
4  currently asking a question, you just finish your answer
5  before we take that break; is that okay?
6     A  Yes.
7     Q  Okay. Great. I want to ask you very
8  briefly -- and I'm not going to ever ask you the
9  substance of your conversations with Mr. Veal, but how
10  did you prepare for your deposition today?
11     A  We prepared by -- we watched some of the
12  footage from the incident that happened. We reviewed
13  the policies and procedures and the medical note that
14  was in the chart.
15     Q  And when you say the videos, the fixed-wing
16  camera footage? That means the camera footage that's
17  sort of up in the prison that's being recorded through
18  the video cameras there?
19     A  Yes.
20     Q  And when you say the policies and procedures
21  are those Navcare's policies and procedures?
22     A  Yes.
23     Q  Did you review any other policies or
24  procedures?
25     A  No.

Page 7

1        (Plaintiff's Exhibit No. 1 was marked for
2  identification.)
3     Q  (By Mr. Slater) I'll show you what we'll mark
4  as Exhibit 1. That's the document that was produced by
5  your counsel in this case. It's Bates-stamped at the
6  bottom Smith versus Sanchez 1 through 2.
7        Do you see that?
8     A  Yes.
9     Q  Okay. And this is a document that purports to
10  be your resume --
11     A  Yes.
12     Q  -- is that correct?
13     A  Yes.
14     Q  It is your resume? Great.
15        And I want to just take -- walk you through a
16  little bit. Let's start on page 2. And it says that
17  you received -- and I'm here at the education section --
18  an associate degree in arts from Palm Beach State
19  College; is that correct?
20     A  Yes.
21     Q  What was your area of study there?
22     A  Well, I -- generally nursing, but I was taking
23  core-ed classes at the time. So ...
24     Q  And then it says from the same ... from the
25  same college, Palm Beach State College, in December of

Page 8

1  2017, you received an LPN, license practical nurse
2  degree; is that correct?
3     A  Yes.
4     Q  Is that separate from the associate's degree?
5     A  Yes.
6     Q  Okay. What is the -- what's the difference
7  between obtaining an associate's degree related to
8  nursing and the LPN degree?
9     A  The LPN is a certificate, and associate's
10  degree is classes you work towards your RN degree.
11     Q  Okay. I understand that. Is it correct to
12  say that you do not currently have an RN degree or
13  license?
14     A  No.
15     Q  What kind of curriculum is there for an LPN
16  degree? What do you study?
17     A  It's a year of schooling Monday through Friday
18  8:00 to 4:00, and we study the general nursing classes.
19     Q  Are there any sort of clinical classes?
20     A  Yes.
21     Q  What kinds?
22     A  We did clinicals at nursing homes, and we did
23  a rotation in the hospital.
24     Q  And what rotation did you do in a hospital?
25     A  In the hospital I worked in ICU.

## Page 9

1  Q   What kind of -- when you were doing that
2  clinical, what kind of duties did you have?
3      A   Just observing the registered nurse.
4      Q   And I see you're from Lake Worth; is that
5  correct?
6      A   Yes.
7      MR. SLATER:  I'm from Boynton.
8      THE WITNESS:  Okay.
9      MR. SLATER:  So's not far.
10     Q   (By Mr. Slater)  I'm looking at the bottom
11 here, certifications and licenses.  We already went over
12 your LPN.  But I also see a BLS certification.  What's
13 that?
14     A   Basic life support, or CPR.
15     Q   What does that mean?
16     A   That means I'm certified do CPR.
17     Q   CPR?
18     A   Yes.
19     Q   Other than your BLS and LPN certifications, do
20 you have any other certifications?
21     A   No.
22     Q   I want to turn now to the first page of your
23 resume, and I want to focus -- it looks like I'm seeing
24 there's McDonald's.  There's HCA Florida, radiology
25 clerk.

## Page 10

1      Was that part of your -- related to your study
2  at Palm Beach State?
3      A   No.
4      Q   What about this practice-manager position at
5  Envision Healthcare?  What did you do there?
6      A   It wasn't related to nursing.
7      Q   Okay.  I see here it says you reviewed
8  subpoenas.  You unloaded information for radiologists.
9  You scheduled procedures; is that right?
10     A   Yes.
11     Q   Looking here, looks like your first nursing
12 position was for Armor Health starting in August 2018;
13 is that correct?
14     A   Yes.
15     Q   And that's here in the Atlanta area?
16     A   Yes.  Well, I started off in Florida, and I
17 moved out here.
18     Q   Okay.  Walk me through that.  So you started
19 in Florida.  Was that at a facility?
20     A   I worked at a jail in Florida.
21     Q   Which jail?
22     A   Palm Beach County jail, but it was with Armor.
23     Q   Understood.  So you were employed by Armor?
24     A   Yes.
25     Q   Contracted to the Palm Beach County jail?

## Page 11

1      A   Yes; correct.
2      Q   And I see here that you list your -- it says
3  Armor Health/Wellpath.  Are those two different
4  companies?
5      A   Yes.  Armor switched over to Wellpath.  The
6  medical contractor changed.
7      Q   Okay.  Were those both with the Palm Beach
8  County jail?
9      A   Yes, it was.
10     Q   Okay.
11     A   And then when I moved out here, it was still
12 Wellpath.
13     Q   I'll get to that in a second.  But let's talk
14 about the Palm Beach County jail.  What were your duties
15 at Palm Beach County jail?
16     A   I worked there as an LPN.  So I administered
17 medication, made sure the patients were taken care of.
18     Q   What does that mean?
19     A   If they got any sick calls, I would address
20 them, just depending where I worked in the jail.
21     Q   And what does it mean to address a sick call?
22     A   So the inmate puts in a sick call.  When I was
23 working at Palm Beach at the time, it was on paper.  So
24 I would see what it was that they were requesting,
25 whether it was a headache, and I would try to triage it

## Page 12

1  the best way I could.
2      Q   And when you say "triage," would that involve
3  speaking to other medical staff, or would that involve
4  you directly with the patient?
5      A   It would involve me directly, what I can do as
6  an LPN within my scope.
7      Q   There is a scope of practice?
8      A   Yes.
9      Q   What is scope of practice for an LPN?
10     A   We really can do anything a registered nurse
11 can.  We can't do the initial assessment.
12     Q   What does that mean, the initial assessment?
13     A   Like ... I don't know.  Like, we can do an
14 assessment.  It's -- but, like, a registered nurse has
15 to sign off on our assessment -- on our initial
16 assessment.  So they peer-review everything that we do.
17     Q   Okay.  Okay.  So, for instance, as an LPN, you
18 could do the initial -- when a person comes to the jail,
19 you could be the initial person that sees them?
20     A   Yes; correct, but an RN will have to sign off
21 on my work.
22     Q   Okay.
23     A   And the there are some protocols that I can't
24 do that an RN can do.  The name of the protocols, I
25 don't know, but there are.

## Page 13

1  Q   Could you describe them?
2  A   Like, an LPN can do a headache protocol or
3  constipation, and an RN can do the same thing.  But
4  there are things I -- protocols that I can't do that an
5  RN can do.  I don't know the exact ones.
6  Q   How long were you at the Palm Beach County
7  jail?  Here it lists 2018 to 2023 with Armor and
8  Wellpath.
9  A   Yes.
10  Q   But --
11  A   No.  It was combined.  I would say about a
12  year.
13  Q   A year?
14  A   Yeah, in Florida.
15  Q   Did you have any issues while you were there,
16  disciplinary issues?
17  A   No.
18  Q   Complaints by either the inmates or staff?
19  A   No.
20  Q   Okay.  So you were at the Palm Beach County
21  jail for about a year.  So that's, let's say,
22  summer-fall of 2019.
23      Is that when you would have come up here?
24  A   Yes.
25  Q   And I understand that you're either with

## Page 14

1  Armor/Wellpath at the time or just Wellpath when you
2  were up here?
3  A   It was Wellpath when I moved up here.
4  Q   And what facility did Wellpath put you in when
5  they put you in?
6  A   DeKalb County jail.
7  Q   DeKalb County jail.  And how long were you at
8  the DeKalb County jail?
9  A   2019 to 2022.
10  Q   Okay.
11      MR. BUCKLEY:  I'm sorry.  I didn't hear the
12  end of her answer.
13      MR. SLATER:  She said until the end of 2022.
14      MR. BUCKLEY:  Thank you.
15  Q   (By Mr. Slater)  And do you understand that
16  you were an LPN there; that was your role?
17  A   Yes.
18  Q   And were your duties the same that you
19  described for Palm Beach County, handling sick calls
20  there --
21  A   Yes.
22  Q   -- addressing patients?
23      Any other duties?
24  A   I mean, I worked in booking as well.
25  Q   And we'll talk about sort of the booking

## Page 15

1  process in a bit.
2      So booking, sick calls, administering
3  medication.  Anything else at DeKalb?
4  A   No.
5  Q   Any issues while you were at the DeKalb County
6  jail?
7  A   No.
8  Q   Complaints by inmates, staff?
9  A   No.
10  Q   So that brings us to 2022.  And looking at the
11  resume, it says you're still with Wellpath until 2023?
12  A   Yes.
13  Q   So did you transfer to another facility?
14  A   No.
15  Q   I think you told me you were at the DeKalb
16  County jail until 2022.  So what you were doing between
17  2022 and 2023?
18  A   I started working at Navcare.
19  Q   Oh, at Navcare.  Okay.  Oh, I see.  So here on
20  your resume, it says February 2022 to present, Navcare?
21  A   Yes.
22  Q   But was there some sort of overlap?  Because
23  it says June 2023 for Wellpath.
24  A   I mean, I don't remember the exact years, but
25  they're pretty close.

## Page 16

1  Q   Okay.  But you weren't working at both at the
2  same time; is that fair, Wellpath and Navcare?
3  A   I was.
4  Q   You were?  Okay.
5  A   Eventually, I left DeKalb because it was
6  becoming too much, and I stayed at Rockdale.
7  Q   What do you mean?
8  A   I was working two jobs.  They were overlapping
9  each other, the hours.
10  Q   You were finding it hard to fit your schedule?
11  A   Yeah.
12  Q   Got it.  So you came over, looks like, in
13  February 2022 to Navcare.  And you're still currently
14  employed with Navcare?
15  A   Yes.
16  Q   And you said you went over to Rockdale.  And
17  that would be in February of 2022 that you started at
18  Rockdale?
19  A   Yes; seems about right.
20  Q   Have you worked at any other facilities while
21  employed at Navcare?
22  A   Piedmont.
23  Q   I see that here on your resume as well.  It
24  says November 2022 to present, Piedmont Healthcare in
25  Conyers.  Are you employed by Piedmont, or are you

1    employed by Navcare working at Piedmont?
2        A   So Navcare is the jail. Navcare is Rockdale
3    County jail. Piedmont is separate. So I work Piedmont
4    per diem. I'm not full-time there.
5        Q   Got it. Got it. Understood. So you
6    currently have two employers?
7        A   Yes.
8        Q   Perfect. Okay. I'll turn back to Rockdale in
9    a second. Let me ask you about Piedmont. It says
10   you're an LPN there. So same role, right, but obviously
11   perhaps not.
12           Is it any different working at Piedmont than
13   at the jail?
14       A   The workload is different. I'm -- that's
15   really about it. The setting is different.
16       Q   Are you still -- the same sort of
17   responsibilities --
18       A   Yes.
19       Q   -- pills, triage, things like that?
20       A   Yes.
21       Q   And I want to ask you about your LPN license.
22   Is that -- is that a license in Florida and Georgia or
23   just in Florida?
24       A   It's a compact.
25       Q   It's a compact. So it's, like, you can work

1    in a series of states? Okay. But is it run through the
2    Florida Department of Health?
3        A   Mm-hm.
4        Q   Okay.
5        A   It's run through Florida Board of Nursing.
6        Q   Got it. So the Florida -- the license you
7    have --
8            So that I understand it correctly, the license
9    that you have through the Florida Board of Nursing
10   permits you to practice in multiple states. Is that
11   every state in the union?
12       A   I don't think all states do the compact.
13       Q   But obviously Georgia?
14       A   Yes.
15       Q   I'm looking at your resume here because we
16   sort of skipped over Navcare and your position at
17   Navcare. So you have three bullet points here. It
18   says, first, "Planning and managing patient care
19   according to each patient's needs."
20           What does that mean?
21       A   Well, every patient is different. So we have
22   to provide the care based off their medical conditions
23   if they have any, their mental health history if
24   they have it. Or sometimes they don't have any issues
25   and develop them at the jail.

1        Q   How would you learn about a patient's mental
2    health history?
3        A   By asking questions.
4        Q   Are there other ways you could learn?
5        A   Yeah.
6        Q   What are they?
7        A   Well, if they have mental health issues and
8    they -- we can verify it, we can request records from
9    the facility that they received treatment from outside
10   the jail.
11       Q   Other than requesting records from facilities
12   or asking questions of a patient, are there any ways
13   while working at the Rockdale County jail that you could
14   determine whether an inmate has a mental health issue?
15       A   Not to my knowledge.
16       Q   Would you be able to look through your system
17   to determine if that person previously --
18       A   Oh, yeah.
19       Q   How does that work?
20       A   Well, when they come in the jail, they have to
21   be processed. So they have to be fingerprinted before
22   they can cross over in my system. Once they do, I can
23   pull up their name and see how many booking/receivings
24   they've had in our system.
25       Q   And how do you know that's the way the system

1    works, that they have to be fingerprinted first?
2        A   Because that's -- it has to go through the
3    jail side. Nothing can cross over to our system until
4    they get processed.
5        Q   Do you know how long it takes after someone's
6    processed to go through your system?
7        A   No.
8            MR. SLATER: I want to turn now to -- we'll
9    mark this as Exhibit 2.
10           (Plaintiff's Exhibit No. 2 was marked for
11   identification.)
12           MR. SLATER: Okay. And this is marked
13   confidential.
14           And, Antonio, this was the full spreadsheet
15   you provided?
16           MR. ANTONIO E. VEAL: Yeah.
17           MR. SLATER: But I just took off some of
18   this -- maybe we'll just make this a composite so
19   that's --
20           MR. VEAL: That's fine. Can I see a copy?
21           MR. SLATER: So here -- that's the full
22   spreadsheet. And then I don't have an extra truncated
23   copy for you.
24           MR. JASON C. WAYMIRE: That's fine. Is this
25   mine?

1    MR. SLATER: You can keep that.
2    Q   (By Mr. Slater) I'm going to show you what
3  we've marked as Exhibit 2. I provided you two pages.
4  It's marked "Confidential." This is a spreadsheet that
5  was provided by your counsel on behalf of Navcare, your
6  employer. And the full spreadsheet has your name and
7  your email address and things like that, but I've
8  truncated it to make it more readable. It should be
9  four columns; okay?
10       Hopefully, you can read that, Ms. Sanchez.
11  Are you able to?
12    A   Yes.
13    Q   I tried to make it as big as possible. I'll
14  represent to you that this is a list of the courses that
15  you have enrolled in and completed while employed at
16  Navcare. Could you take a minute and look through the
17  course titles and confirm that this is -- to the best of
18  your knowledge, this is correct?
19    A   Yes.
20    Q   Okay. I want to take you through some of
21  these trainings so that I can get a better sense of what
22  you -- what they were.
23       So sort of starting at the top, if we go down
24  to No. 3, "Whistleblower Information," what is that?
25    A   I believe a whistleblower -- I'm not for sure

1  the exact definition, but I believe when you see
2  something and you don't report it.
3    Q   Okay. And I'm curious. What would you have
4  learned in this course, if you remember?
5    A   I don't.
6    Q   You don't remember?
7    A   I'm sorry.
8    Q   That's fine. Is there a consequence as an
9  employee of Navcare if you see something and don't say
10  something?
11    A   I don't know because I never been in that
12  situation.
13    Q   Have you ever been disciplined while employed
14  at Navcare?
15    A   No.
16    Q   No? Have you received any sort of -- I don't
17  know what it's called there, but, like, a corrective-
18  action plan or anything like that?
19    A   Yeah.
20    Q   Okay. When have you received the actual --
21    A   My corrective-action plan was tardiness.
22    Q   When did you receive that?
23    A   I don't remember.
24    Q   Okay. This year? Several years ago? Like,
25  sort of a time frame.

1    A   Maybe, like, last year. And I don't even know
2  if it was a corrective-action form. I think it was
3  just, like, verbally me and my supervisor talking.
4    Q   Okay. Other than tardiness, any other issues?
5    A   No.
6    Q   Okay. I want to turn now -- go down three
7  more to what's called the Columbia Suicide Severity Risk
8  Scale.
9       Do you remember that training?
10    A   Yes.
11    Q   Can you tell me about it?
12    A   So everybody that comes in the jail has to do
13  a -- we have to do a Columbia suicide screening, and
14  it's just seeing if they have any -- this is in the
15  intake. So we just ask them if they have any intent of
16  suicide or any thoughts of suicide. If they do, if they
17  have a plan and if they try to commit suicide, actually
18  attempt suicide but not successful and if they check
19  yes, was it in the last three months.
20    Q   So I understand it, like, you ask these
21  questions. And then there's a -- sort of depending on
22  how it's answered, it informs how you respond?
23    A   Yes. So depending how they answer, it will
24  give us, like, steps to go by. So if they said, yes,
25  it's been within the last three months, you have to

1  place them on suicide watch.
2    Q   So only within the last three months?
3    A   Yes. I mean -- or it could be based on your
4  nursing judgment. Like, if you feel even though they
5  said -- even though it wasn't within the last three
6  months and you feel like they're suicidal, we can still
7  place them on suicide watch. It's just a screening,
8  kind of like guideline that we use.
9    Q   You said it's during the intake process?
10    A   Yes.
11    Q   This would be after this person passed over
12  from security to medical?
13    A   Yes.
14    Q   All right. Would you -- during this
15  evaluation, would you look at their previous history at
16  the Rockdale County jail?
17    A   Yes.
18    Q   What if the person has a suicide attempt two
19  years, three years prior, but was denying suicidal
20  ideations? Would that help inform the risk?
21    A   It would, like, alert for a mental health
22  referral or maybe mental health observation, depending
23  on how they still answer the question or how they're
24  acting. But it doesn't mean they got to be placed on
25  suicide watch.

Page 25

1  Q   And what is the mental health referral?
2  A   That means mental health would have to see
3  them within a certain amount of time.
4  Q   And roughly what would that -- I mean, does
5  that time change?  Is there a specific set amount of
6  time?
7  A   It changes based on the urgency of the
8  referral.  If it's a team referral, they have up to so
9  many days.  If it's urgent, they have 25 hours to see
10 the patient.
11 Q   And you said there's a difference between
12 observation and suicide watch.  What is that?
13 A   So suicide watch is, they're stripped down;
14 and they have nothing in the room, and they're naked.
15 Mental health observation, they're not stripped down,
16 but we're still keeping an eye on them.
17 Q   Are they in a different room than the normal
18 cell?  Or do you remember?
19 A   They're by themselves.
20 Q   In, like, a confinement cell?
21     MR. VEAL:  Object to form.  Trying to
22 distinguish between which one you're talking about with
23 the mental health, with suicide watch.
24 A   Okay.  So suicide watch, they're both placed
25 in a room.  It's, like, the booking area is -- there's

Page 26

1  about 15 cells.  And we would place them in an
2  individual cell by themselves.  So if they're on suicide
3  watch, they'd be placed in a cell by themselves, and
4  they're naked.  And officers do rounds within the 15
5  minutes.  If they're on mental health observation,
6  they're still by themselves, but they're not naked.
7  Q   Are these cells different from the normal
8  booking cell that you'd either put someone in for either
9  observation or watch?
10     THE WITNESS:  I don't understand the question.
11 Q   (By Mr. Slater)  So, for instance, some of
12 the booking cells have phones.
13 A   Oh, yeah.
14 Q   Did cells that you put someone in for either
15 mental health observation or suicide watch have the
16 booking phone?
17 A   No.  The only cell that has the booking phone
18 is the holding cell, and that's where all the inmates go
19 after they get dressed out or get fingerprinted.  All
20 the other rooms don't have phones.
21 Q   I also understand there's specific cells that
22 are maybe padded or have some other features for suicide
23 precautions; is that right?
24     We're talking about Rockdale County jail.
25 A   Yes.

Page 27

1  Q   What are those cells like?
2  A   We have one padded cell, and we really don't
3  like to put people in that padded cell unless they're,
4  like, showing signs of -- like, they're hitting their
5  head on the wall.
6  Q   Why don't you like to put folks in there?
7  A   Because there's no toilet.  There's no --
8  like, it's just a padded cell.
9  Q   Get it.
10 A   Sometimes based off -- like, they could get
11 missed.  We just don't want them to not be taken care of
12 be or be overlooked.
13 Q   Would they get missed because it's in a
14 specific part of the jail, or is there another reason?
15 A   No; it's just for safety.
16 Q   I'm not sure I understand.  So you said they
17 might be -- you would be concerned about them getting
18 missed?
19 A   It's because the padded cell -- like, we don't
20 put people in there unless they're exhibiting signs of
21 hurting themselves.  So just for the safety of us and
22 the patient, if we put somebody in there, it's just for
23 a short amount of time.  That's not going to be their
24 room.
25 Q   Got it.  So concern would be that you don't

Page 28

1  normally have someone in there.  So it's not something
2  that comes to mind maybe; is that fair?
3  A   That's fair.
4  Q   I want to turn now, like, 11 more down from
5  the Columbia Suicide Severity Risk Scale to "Suicide
6  Preventions in Jail, Basics and Beyond."
7     Do you see that?
8  A   Yes.
9  Q   Okay.  Do you remember that training?
10 A   I mean, I remember it.  But I don't know,
11 like, verbatim what it was about.
12 Q   Do you have, like, a general idea?
13 A   General idea, just preventing suicide in the
14 jail.
15 Q   Sort of without remembering the course, do you
16 sort of have any sort of understanding of what the
17 policies are for preventing suicide at the jail?
18 A   Just making sure we do the Columbia screening.
19 That's really the main thing for preventing suicide in
20 the jail and addressing mental health concerns that
21 inmates may have.
22 Q   Okay.  I'm going to go two more down, "A
23 Proactive Approach to Suicide Prevention in a Jail
24 Setting."
25     Do you remember that training?

Page 29

1  A  No.
2  Q  Okay.  And looks like the first one -- the
3  previous one I mentioned was, you had done it in 2024.
4  It says you enrolled in 2023 and took it and completed
5  it October 29, 2024.
6      Are these, like, in-person trainings?  Or are
7  they online?
8  A  No; they're online.
9  Q  You have, like, a portal?
10 A  Yeah.
11 Q  And this is, like, through the Navcare system?
12 A  Yes.
13 Q  Okay.  Are they live trainings or just click
14 it and watch it, like videos?
15 A  We click it and watch it like a video.
16 Q  Okay.  So and looks like -- I see again just
17 below that the Columbia Suicide Severity Risk Scale,
18 enrolled 2023, and it said you completed it April 5th,
19 2024.
20     Was that an annual training?
21 A  It might have been.
22 Q  I want to go down quite a bit now, maybe
23 another dozen, to Navcare employee handbook and policies
24 completed on April 5th, 2024.
25     Do you see that one?

Page 30

1  A  Yes.
2  Q  Okay.  Do you remember that training?
3  A  I remember doing them, but I don't, like,
4  remember, like, the content and material verbatim.
5  Q  Just so I understand, are these trainings --
6  are they -- like, do they have a set amount of time?
7  Are they an hour long each, does it depends on training?
8  A  It depends on the training.
9  Q  What would you say these trainings are?  Do
10 you have to sit there half a day?  Is there a rough
11 ballpark you can give me on how long these trainings
12 might be?
13 A  I don't know.
14 A  But ...
15 A  Roughly if you -- it could take up to an hour
16 depending on how much content is in that module.  Some
17 are shorter than others.
18 Q  Were you provided any written materials when
19 you were provided these trainings?
20     THE WITNESS:  Did you say "written"?
21     MR. SLATER:  Yeah written.
22     THE WITNESS:  What do you mean?  Like --
23     MR. SLATER:  Like for us --
24     THE WITNESS:  Like an actual policy book?
25 Q  (By Mr. Slater)  Like -- I'll explain what --

Page 31

1  for lawyers what we have to do is similar sort of.
2  We'll sometimes be provided like a .PDF packet or
3  something that sort of outlines what was the training
4  was or has materials from the trainings so we can refer
5  back to it.
6      Do you have anything like that when you do the
7  trainings?
8  A  Yeah.  We can download a .PDF.  Yeah.
9  Q  Are these -- you may not know the answer to
10 this, but are these trainings, like, created by Navcare?
11 Or are they created by third parties?
12 A  I don't know.
13 Q  You don't know?
14     Have you ever downloaded any of the .pdfs from
15 these trainings?
16 A  I probably have.  I mean, not all of them
17 because I don't know all of them.  I know the policies
18 and procedures for sure because you can get that on the
19 Navcare website.  But I don't know about all the other
20 ones.
21 Q  Okay.  Right under the Navcare employee
22 handbook and policies, there's another -- there's a Hot
23 Topics and Suicide Prevention in Jail Settings.  Looks
24 like you took that in 2022.
25     Do you remember that course at all?

Page 32

1  A  No.
2  Q  And it looks like another dozen or so down,
3  "Suicide Prevention in Jails Basic and Beyond."  I think
4  that's the second -- yeah.  There's two of those.
5      Would that be an annual training?
6  A  Probably.
7  Q  And then another dozen down, "Self-Harm
8  Behaviors, Head Striking."  You completed that in April
9  of 2024.
10     Do you remember that course?
11 A  No.
12 Q  What can you tell me about head striking?
13 What is that in terms of your duties if you see someone
14 head striking?
15 A  I'm not for sure.
16 Q  You're not sure what that means?
17 A  Yeah; I'm not sure.
18 Q  And then again, another three or four down,
19 Navcare policy and procedure review completed on April
20 12, 2022.  I think that's the second procedure review.
21 I think they're titled a little bit different.  I know
22 one is handbook and policies, and one's a policy and
23 procedure review.
24     To the best of your knowledge, did you have a
25 sort of annual refresher on Navcare's policies and

Page 33

1  procedures?
2      A   Yeah.
3      Q   And you're expected to know those procedures
4  as part of your job with Navcare; is that a fair
5  statement?
6      A   That's fair.
7      MR. SLATER:  I want to go specifically through
8  one of Navcare's policies with you.  This is also marked
9  "Confidential."  We'll make this Exhibit 3.
10     (Plaintiff's Exhibit No. 3 was marked for
11 identification.)
12     Q   (By Mr. Slater)  Okay.  This was produced --
13 I'll represent to you, Ms. Sanchez, this was produced to
14 us by your employer, Navcare.  And it is Bates
15 stamped -- when I say "Bates stamp," that's the numbers
16 at the bottom that helps us know what the pages refer
17 to.  Navcare 171 through 174, and it's marked
18 confidential.  My printer was having some issues, but it
19 was marked "Confidential" for the court reporter.  And
20 this is a document titled "B-5 Suicide Prevention and
21 Intervention."
22     Do you see that at the top?
23     A   Yes.
24     Q   Okay.  Have you ever seen this document
25 before?

Page 34

1      A   Not in paper.
2      Q   Okay.  But maybe on your computer or a tablet
3  or something like that?
4      A   Just looks a little different on the computer.
5      Q   Let's go through it together, and maybe that
6  will help you.
7      A   Okay.
8      Q   Sort of -- so this is effective 2018 and
9  revised May the 16th, 2024.  And the title is "Suicide
10 Prevention and Intervention."  And so it identifies the
11 purpose.  It's to establish procedures for
12 identification and management of acutely and nonacutely
13 suicidal patients, to reduce the potential for suicide,
14 to minimize when suicide attempts occur, and to minimize
15 the overall number of suicide attempts."
16     I want to go through -- there's about a dozen
17 or so actual procedures.  Do you see that where it says
18 "procedure" halfway through the first page and then
19 identifies certain procedures?  Do you see that?
20     A   I see "procedure."
21     THE WITNESS:  And you said "identified"?
22     Q   (By Mr. Slater)  So here, if you just look,
23 it says "procedure."  Then there's one, two, three,
24 four -- okay?  So I want to go through each of these.
25 So the first one says, "A program for suicide prevention

Page 35

1  is maintained in all contracted facilities."
2      To the best of your understanding, your
3  employer, Navcare, employs a suicide-prevention program
4  or policy at the Rockdale County jail; is that correct?
5  Is that right?
6      A   Yes.
7      Q   And then I think we talked about this.  This
8  is .2 here:  "A receiving screen is conducted on all
9  patients entering the facility as soon as possible after
10 arrival."
11     Do you see that?
12     A   Yes.
13     Q   I think you were talking to me about some of
14 the processes that you employ when someone arrives after
15 they're fingerprinted and switched over to your system,
16 which I see is Navcare's system.  Then you would do a
17 sort of medical consult; right?
18     A   Yes.
19     MR. BUCKLEY:  I don't want to interrupt.  Did
20 you mark this as Exhibit 3?
21     MR. SLATER:  This is James, but yes, Exhibit
22 3.
23     MR. BUCKLEY:  That's okay.  I can't see faces
24 on this thing.  Thank you.
25     Q   (By Mr. Slater)  And then for No. 3 on the

Page 36

1  procedures, it identifies this Columbia Suicide Rating
2  Scale, what's included in the screen.  That's what we
3  just talked about; right?
4      A   Yes.
5      Q   And here it identifies for No. 3 a list of
6  questions about past illness, hospitalizations, drug
7  use, withdrawal symptoms, other pertinent mental health
8  questions.
9      Do you see that?
10     A   Yes.
11     Q   When you do the screening, do you have a form
12 or document that you use to sort of check the boxes?
13     A   The forms on the computer.
14     Q   For the Columbia severity screening?
15     A   Yes.
16     Q   Do you just ask the questions that are on
17 there, or do you ask other questions?
18     A   Both.
19     Q   Both.  Would you ask about prior suicide
20 attempts?
21     A   Yes.
22     Q   Hospitalizations?
23     A   Mm-hm.
24     Q   Going back to Procedure No. 2, it identifies
25 the screen is to be conducted as soon as possible after

Page 37

1  arrival.
2          Are there ever instances when you're doing a
3  receiving screen before a patient is processed over from
4  security to medical?
5      A    Well, there's an initial screening that we do.
6  And that's when the arresting officer brings them in the
7  jail.  Security will notify us that -- they input codes.
8  They have one stay on the bench.  So we would go and
9  kind of just be, like, a general -- just ask, like,
10  basic questions to see how they -- how -- if they have
11  any chronic medical issues, if they're feeling suicidal
12  because if they are, then went to take that initiative
13  treatment and get them to the hospital before the
14  arresting officer leaves.
15      Q    Okay.  So sounds like there's two points of
16  contact during, like, sort of the booking process or the
17  initial screen where when the person first arrives and
18  then the sort of secondary screening after they're
19  processed over from security?
20      A    Yes.
21      Q    And I see looking at now Procedure No. 5.  It
22  says, "Upon admission to the facility, a qualified
23  health-care provider with appropriate training will
24  conduct an initial mental health screening on all
25  patients."

Page 38

1          Is that what you were talking about, the
2  initial screen, on-the-bench screening?
3      A    Yes.
4      Q    And I think you sort of described some of the
5  questions you ask.  Can you kind of --
6      A    When they come in, we don't want to do a full
7  comprehensive screening because we have to do it when
8  we're sitting down at the computer.  But we just ask
9  them, "Do you have any medical issues?"  If they say
10  yes, we ask, "What are they?"  If they say high blood
11  pressure, diabetes, we'll get a blood pressure.  We'll
12  check their blood sugar.  If it's abnormal or not -- if
13  it's really abnormal, we'll let security know that the
14  arresting officer needs -- we need to get a clearance
15  from the hospital.
16          If they're feeling mentally -- if they have
17  any mental health issues, we'll do the same thing:  "Did
18  you take your medication?"  Because that makes a
19  difference.  And then we'll ask them if they're
20  suicidal.  And then depending how they answer those
21  questions, we'll take precautions right there as well.
22      Q    Okay.  So you ask if they're currently feeling
23  suicidal; right?  Do you ask if they've had any suicidal
24  issues, ideations, episodes in the past during the
25  initial screen?

Page 39

1      A    Yeah, we do.  Well, I can't speak for every
2  nurse, but that kind of like falls with:  Do you have
3  any mental health history?  And if they say yes, I'll
4  dive in a little bit deeper.  So ...
5      Q    Okay.  What if someone told you during this
6  initial screen, "Yeah; I tried to kill myself two years
7  ago"?  How would you respond to that?
8      A    I would ask them, "How are you feeling right
9  now?  Are you feeling suicidal now?  Do you have any --
10  Are you feeling suicidal right now?"
11          I want to know how they're feeling right now
12  because two years ago, it matters.  But I don't know
13  what they were going through two years ago.  You know,
14  people change.  They get treatment.  So I'm more
15  concerned about now.
16      Q    Okay.  Turning now at the bottom of this page
17  Bates Stamp 171, Procedure 7 identifies -- says that
18  "any patient that screens positive for suicidal ideation
19  will be placed on a safety ... will be placed on ..."
20  it says, "a safety precautions."  It's a typo based on
21  safety precautions "... and kept under close observation
22  based on a level of suicide risk."
23          I think we talked about that; right?  So
24  there's a difference.  There's observation.  There's
25  suicide watch; right?  There's --

Page 40

1          These are folks that are confined separately
2  from everyone else?
3      A    Yes.
4      Q    Is there anything else for precautions that
5  are taken at the Rockdale County jail when someone
6  screens positive for suicidal ideations?
7      A    No.
8      Q    And here under sub A -- I'm on page Bates
9  Stamp 172 -- it says, "Acutely suicidal patients are
10  those that are actively engaging in self-injurious
11  behaviors and threaten suicide with a specific plan."
12          What kind of self-injurious behavior would you
13  say would qualify someone that needs observation?
14      A    Anything that's inflicting pain.
15      Q    And here it says -- there's a second sentence,
16  "Health staff will order placement under constant
17  observation, monitored by an assigned staff member on a
18  continuous, uninterrupted basis."
19          Does that occur at the Rockdale County jail?
20      A    Yes.
21      Q    I think earlier you talked about 15-minute
22  checks and things like that.  Are there any sort of
23  cameras that look into these observations cells?
24      A    There's a camera in every cell.
25      Q    There's a camera in every cell.  And to the

Page 41

1  best of your knowledge, are these cameras monitored by
2  the jail staff at the Rockdale County jail?
3      A   I don't know.
4      Q   And here it says for sub B, it identifies
5  nonacutely suicidal patients, and it says they will be
6  monitored at unpredictable intervals with no more than
7  15 minutes.  Okay.  Earlier we were talking earlier
8  about 1515-minute checks.
9          Other than watching the cameras for those
10 folks that are threatening suicide, are there any other
11 sort of methods that the either the medical staff or the
12 security staff employed to monitor suicidal patients at
13 the jail?
14     A   That's it right there.
15     Q   Okay.  And it's Procedure 8.  I'm still on the
16 same page: "any staff that hears a patient verbalizing
17 a desire or intent to commit suicide, observes a patient
18 making an attempt or gesture or otherwise feels a
19 patient is at risk of suicide -- I'm sorry -- at risk
20 for suicide, will take immediate steps to ensure that
21 the patient is continuously observed and prevented from
22 harm until appropriate medical, mental health, and or
23 supervisory assistance is obtained."
24         How does that procedure work in practice at
25 the jail?

Page 42

1      A   So the officers, they have more direct contact
2  with the inmates than we do.  So if an inmate is saying
3  that they're feeling suicidal, security will either
4  place them on suicide watch, or they'll call medical and
5  let us know.
6      Q   What if medical staff hears a patient
7  verbalizing a desire or intent to commit suicide?
8      A   If medical hears it or security hears it, we
9  assess the patient to see what's going on or why they're
10 feeling suicidal.
11     Q   Okay.  Anything else?
12     A   No.
13     Q   And it says that they should be continuously
14 observed until appropriate mental, medical health, or
15 supervisory assistance is obtained.
16         What does that mean, "appropriate medical,
17 mental health, or supervisory assistance"?  What does
18 that mean?
19     A   That means if we feel like they are a risk for
20 suicide, we are going to take the measures to prevent
21 them from hurting themselves.
22     Q   Okay.
23     A   Whoever's on shift at the time.
24     Q   I want to turn to page 173.  And under
25 Procedure 11, it identifies training.  And it says the

Page 43

1  staff will receive training on an annual basis.  It
2  includes general information regarding suicide and
3  suicidal behaviors, recognizing of signs and symptoms of
4  such behavior, factors that increase the risk of suicide
5  and so forth.
6          And I understand from going over your training
7  and schedule and your testimony that you're getting an
8  annual training on the risks of suicide and information
9  regarding suicidal behaviors and things like that; is
10 that correct?
11     A   Yes.
12     Q   And so as both under the Navcare policies and
13 under your role as an LPN at the jail, you're
14 responsible for ensuring that patients who you see or
15 hear having suicidal ideations that they're perceiving
16 get the care that they're required to receive; is that
17 correct?
18     A   Yes.
19     Q   I want to turn to Section 12.  It says,
20 "Reporting and Reviews, Serious Suicide Attempt."
21         Do you see that?
22     A   Yes.
23     Q   I want to ask you -- it identifies in
24 subsection B RHA.  What is an RHA?
25     A   I don't know.

Page 44

1      Q   Would that be, like, the regional health
2  administrator?
3      A   It could be.
4      Q   Do you know who that might be for Rockdale
5  County?
6      A   No.
7      Q   Sorry.  Your shaking your head.
8      A   No.  I'm sorry.  No.
9      Q   Under sub C, it says that "Medical emergency
10 code report is to be completed by staff members and
11 forwarded to RHA within 24 hours."
12         Do you see that?
13     A   Yes.
14     Q   Okay.  And I understand you've completed those
15 forms before; right, the reports?
16     A   Yes.
17     Q   Okay.  And I understand you did one for Ezra
18 Smith; is that right?
19     A   Yes.
20     Q   And says forward to the RHA.  Did you forward
21 that report -- I'm talking specifically about Ezra
22 Smith -- to a specific person or to this email address?
23     A   I didn't forward it to the email address.  I
24 completed it, and I informed my HSA, my supervisor,
25 because I never completed one of these before.

Page 45

1  Q   And is your HSA Erman Gunindi?
2  A   Yes.
3  Q   How did you inform that person?
4  A   I told him that we had a suicide attempt at
5  the jail.
6  Q   In person?  On the phone?  By email?
7  A   Oh.  On the phone.
8  Q   When on the phone did you tell him?
9  A   The night it happened or the morning.
10  Q   Under subsection D here, it advised that a
11  review will be conducted within 30 days.
12      Did you participate in any review after you
13  issued your report for Mr. Smith?
14  A   I reviewed -- we had a -- our monthly staff
15  meeting.
16  Q   And you spoke about Mr. Smith at the monthly
17  staff meeting?
18  A   Not exactly Mr. Smith but ways to kind of
19  like -- what we could have done to make things better,
20  you know, just going for improvement.
21  Q   What specifically was discussed about ways to
22  make things better or room for improvement?
23  A   Just as far as the whole -- like, the suicide
24  prevention.
25  Q   Sure.  But what specifically?

Page 46

1  A   I don't remember, like, specifically, but I
2  just remember we had a, like, discussion about, you
3  know -- not about him but, like, the situation.
4  Q   Okay.  So when you say "not about him but the
5  situation," you didn't specifically talk about Ezra
6  Smith?
7  A   Yes.
8  Q   But we talked about when something like that
9  happened to him happens, what we might do differently?
10  A   Correct.
11  Q   And as far as I understand, you don't remember
12  what was discussed; right?  Was this on Zoom?  In
13  person?
14      How was this monthly team meeting conducted?
15  A   In person.
16  Q   In person at the jail?
17  A   (Nonverbal response.)
18  Q   Is this just medical and jail staff?
19  A   Just medical.
20  Q   Just medical?  How many people attended?
21  A   I don't know.
22  Q   Okay.
23  A   I don't remember.
24  Q   Did Erman Gunindi attend?
25  A   Yes.

Page 47

1  Q   Anyone else that you remember who attended?
2  A   No.
3  Q   Do you know if anyone took notes at that
4  meeting?
5  A   No.
6  Q   Did anyone record that meeting?
7  A   No.
8  Q   Did you -- I'm going to speak specifically now
9  about Mr. Smith.  Did you ever attend any other meetings
10  or discussions?  And I'm not talking about with your
11  lawyer.  I'm talking about after the incident about what
12  happened on July 9th, 2024, with Mr. Smith.
13  A   Yes.
14  Q   What else did you participate in?
15  A   I don't know what it's called for security
16  side, but I was asked to attend -- I guess it was like
17  a board meeting for the -- on Ms. Tracey's behalf to see
18  if her termination was wrongfully terminated.
19  Q   Sure.  Like, her merit board hearing?
20  A   Yeah, something like that.  I was asked to go
21  to that.
22  Q   Other than this monthly staff meeting and her
23  board hearing, did you attend any other meetings?
24  A   No.
25  Q   Any sort of debriefings about what happened?

Page 48

1  A   No.
2  Q   And I'm turning now to Procedure 13,
3  Corrective Action Plans.  We talked about corrective-
4  action plans earlier.
5      Do you know if there was a corrective-action
6  plan in place for what happened to Mr. Smith?
7  A   No.
8  Q   Who would be the best person to speak to about
9  that?
10  A   Erman.
11  Q   Erman?
12  A   E-r-m-a-n.
13  Q   Section -- or Procedure 14 describes a
14  critical incident debriefing "to allow staff and
15  patients to process their feelings about the incident to
16  discuss who may have been affected by it."
17      Did that occur after Mr. Smith's suicide
18  attempt?
19  A   That's kind of what I was initially talking
20  about, like, a debriefing.  That was at our staff
21  meeting.
22  Q   Other than -- so you had your monthly staff
23  meeting.  You attended the merit board hearing.  Other
24  than -- I'm not going to ask you communications with
25  your lawyer.

Page 49

1      Other than communications with your lawyer,
2  have you talked with anyone else about what happened
3  with Mr. Smith?
4      A   No.
5      Q   Have you texted anyone else?
6      A   No.
7      Q   Emailed?
8      A   No.
9      Q   I want to turn -- before we talk about the
10 incident in more detail -- back to your duties at the
11 Rockdale County jail in the summer of 2024.  We talked
12 about this initial screening, and this is when I think
13 you said an officer comes and put someone on a bench?
14     A   The arresting.
15     Q   The arresting officer.  What if someone comes
16 into the jail from, like I said, a psychiatric hospital?
17 Are they still given the initial screening?
18     A   Yes.
19     Q   What if someone comes in, like, on an out-
20 of-county warrant or something like that?  Are they
21 still given the initial screening?
22     A   Everyone.
23     Q   Everyone?
24     A   Regardless of --
25     Q   Do you believe you gave an initial screening

Page 50

1  to Mr. Smith?
2      A   He was there before my shift.  So I ... I
3  didn't do an initial screening.
4      Q   Let's talk about that.  When did your shift
5  start on either -- it would have been either July 8th or
6  July 9th.
7      A   So I worked overnight.  So 7:00 p.m.
8      Q   7:00 p.m. on the 8th?
9      A   Yes.
10     Q   Did you arrive, then, at 7:00?
11     A   7:15, a little after 7:00.  It was close.
12     Q   And before -- I'm going to shift gears a
13 little bit, and I've already kind of started that.  But
14 I guess I must ask does anyone need a break?
15         THE COURT REPORTER:  I could use a comfort
16 break.
17         MR. SLATER:  I'm generally terrible about
18 asking.  Glad I remembered.  Let's go off the record.
19         (A recess was taken.)
20         MR. SLATER:  All right.  Back on the record,
21 Ms. Sanchez.
22     Q   (By Mr. Slater) Before we took a break, we
23 were just sort of talking a little bit more about the
24 day of with Mr. Smith.  And I believe you said you
25 weren't there for the initial screening because you came

Page 51

1  on after he was already at the jail; is that right?
2      A   Yes.
3      Q   And you believe -- you said your shift started
4  at 7:00 p.m.?
5      A   Yes.
6      Q   And just to clarify, you said you weren't
7  there at the initial screen, and you don't know whether
8  he had an initial screen; is that right?
9      A   Correct.
10     Q   Do you know who the nurse was on the day
11 shift?
12     A   No.
13     Q   But as I understand it from your testimony,
14 you hadn't done a booking screen of Mr. Smith; is that
15 right?
16     A   Correct.
17     Q   Okay.  But the booking screen is not the first
18 screen that a patient has when they come to the jail?
19     A   Correct.  The booking screening is the second.
20 They're actually sitting in my chair.
21     Q   Great.  Do you know who else was working on
22 or -- so we're talking about night of the July 8th,
23 2024.
24         Do you know who else was working that night?
25         THE WITNESS:  As far as security or medical?

Page 52

1          MR. SLATER:  Both.
2      A   As far as medical, it was Nurse Smith and
3  Nurse Napier.  And for security you had Lt. Daniels.
4  You had Officer Tracey, Officer Gomez, and those are the
5  only ones that I remember vividly.
6      Q   What about Jackson?
7      A   She was there.
8      Q   Okay.  And when we talk about where -- this is
9  in the booking area; right?  You were assigned to
10 booking that night?
11     A   Yes.
12     Q   Do you have any other positions within the
13 jail besides booking?
14     A   Pill call.
15     Q   Pill call?  So pill call was -- was pill call
16 assignment separate from a booking assignment?
17     A   So we do -- so me being assigned to booking,
18 I'm going to go to do pill call in booking.  Those
19 nurses assigned to pill call in the back, they'll do
20 their pill call in the back, or one will deal with the
21 females.
22     Q   So when you were assigned on July 8 that
23 evening, you were doing -- you did booking but also pill
24 call?
25     A   For booking.

Page 53

1  Q  For the booking area. Correct. All right.
2     Okay. So you referenced a Smith, Nurse Smith
3  and Nurse Napier, and they were also in the booking
4  area; is that right? No.
5     So these would have been either pill call or
6  women's section?
7  A  They were in the medical area.
8  Q  Where is the medical area from booking? Is
9  it --
10  A  It's separate. You got to walk out of
11  booking, go down the hall, go in a separate door. They
12  got to see you open the doors for you to get out.
13  Q  It's not like you hear somebody someone in
14  the --
15  A  Yeah.
16  Q  Got it. Did you interact with Nurses Smith
17  and Napier that evening at all?
18  A  Yes.
19  Q  When?
20  A  Before my shift and after everything that
21  happened.
22  Q  And when you say "after everything that
23  happened," do you mean with Mr. Smith?
24  A  Yes.
25  Q  Did you discuss what happened with Mr. Smith?

Page 54

1  A  Well, I told security to -- "I need -- can you
2  call other nurses? I need help."
3  Q  Did they come to help?
4  A  Yes.
5  Q  And did they arrive while Mr. Smith was still
6  at the jail?
7     THE WITNESS: While I was doing CPR?
8     MR. SLATER: Yes.
9  A  Yes.
10  Q  (By Mr. Slater) Okay. Did you speak to them
11  about what happened with Mr. Smith?
12     THE WITNESS: Like, as far as?
13  Q  (By Mr. Slater) Did you have any
14  conversations with Nurses Smith or Napier about the
15  incident that night?
16  A  Yes.
17  Q  Okay. What did you discuss?
18  A  Just him committing suicide and more, like,
19  how traumatizing it was for me.
20  Q  Was this the first time you'd ever seen
21  anything like that?
22  A  Yes.
23  Q  Did you discuss anything else with them?
24  A  No.
25  Q  Make sure you speak up.

Page 55

1  A  No.
2  Q  Okay. Let's turn to security, Lt. Daniels.
3  Did you speak with him that evening?
4     MR. BUCKLEY: Y'all both need to speak up.
5     MR. SLATER: Okay.
6     MR. BUCKLEY: Thank you.
7     MR. SLATER: I asked if she'd spoken with Lt.
8  Daniels that evening.
9  A  I mean, not really, besides letting him know
10  I'm getting EMS on the way. That's the only interaction
11  I had with him that night.
12  Q  (By Mr. Slater) Have you talked to him about
13  what happened with Mr. Smith at all?
14  A  No.
15  Q  Make sure you speak up. Sorry.
16  A  No.
17  Q  Okay. Gomez. Did you speak with Gomez at
18  all?
19  A  No.
20  Q  Have you spoken with Dep. Gomez about the
21  incident since then?
22  A  No.
23  Q  When I say "since then," I mean since the
24  incident occurred.
25  A  No.

Page 56

1  Q  What about Dep. Tracey? Did you speak to her
2  the night of the incident?
3  A  Yeah.
4  Q  Okay. When did you speak with her?
5  A  I spoke with her -- I mean, it was minimum.
6  It wasn't about the incident.
7  Q  Was it before or after the incident that you
8  spoke with her?
9  A  Before.
10  Q  Around what time?
11  A  I don't remember.
12  Q  Was it earlier in your shift or closer to when
13  the incident occurred?
14  A  It was both.
15  Q  So you spoke with her more than one occasion?
16  A  Yes.
17  Q  Do you remember the substance of any of the
18  your discussions?
19  A  It was, like, "Ready for pill call."
20  Q  Anything else?
21  A  No.
22  Q  No? Did she do pill call with you?
23  A  I don't remember.
24  Q  Okay. One, an officer --
25  A  Yeah.

Page 57

1   Q   -- has to do pill call with a nurse?
2   A   Yeah.
3   Q   Have you communicated with Dep. Tracey since
4   the night of the incident?
5   A   No.
6   Q   I believe she asked you -- she may have asked
7   you a question or two at the merit board hearing; is
8   that right?
9   A   Yeah.  I don't remember.
10  Q   Other than that, no?
11  A   Yeah.  No.
12  Q   Dep. Jackson.  I think you said she was there
13  that night; right?
14  A   She was.  I didn't see her until I was doing
15  CPR.
16  Q   Are you folks friendly?
17  A   We're professionals.
18  Q   But --
19  A   I guess.
20  Q   I'm not trying to trip you up or anything.
21  A   No.
22  Q   This is not -- no one likes to be questioned
23  like this; right?  I'm just trying to get a sense of
24  whether -- like, you're at work.  But outside of work,
25  do you talk?

Page 58

1   A   No.
2   Q   Okay.  What about with any of the other people
3   that I referenced?  Are you friendly with them outside
4   of work?
5   A   No.
6   Q   Have you talked to Dep. Jackson since the
7   incident?
8   A   No.
9   Q   Have you texted or sent any messages to anyone
10  about what happened --
11  A   No.
12  Q   -- to Mr. Smith that night?
13      Okay.  And I'm going to show you some video in
14  a little bit, but I want to kind of understand where you
15  were sort of generally that night while you were
16  working.  Are you --
17      I understand there's a nursing station; is
18  that right?
19  A   Yes.
20  Q   Are you just kind of, like, posted up there
21  until you're needed?  Or are you walking around?  What
22  are you doing when you're on shift?
23  A   Both.
24  Q   Both?
25  A   Yeah.

Page 59

1   Q   Okay.  Let's talk about this night, then, the
2   night of the 8th-9th leading into the 9th.
3       Do you remember sort of what you were doing
4   that night?
5   A   Well, I was in the medical area and booking.
6   And then I did my pill call.  And then I stayed in
7   booking for the remainder of the night.  Unless I needed
8   to go to medical to get something, I pretty much stayed.
9   Q   When you say you stayed in medical [sic], are
10  you just kind of, like, seated at your computer?  Do you
11  ever walk around, look at what's going on in the cells?
12  What are you doing?
13  A   I'm usually sitting on my computer.
14  Q   When you're sitting at your computer, are you
15  getting anything?  Are you working on reports?  What
16  are you typically doing on a night at booking?
17  A   I'm screening people.
18  Q   If there's no one left to screen, do you kind
19  of just hang out until you're needed?
20  A   Yeah, or I'm cleaning up, organize, do stuff
21  like that.
22  Q   Okay.  This particular night, you did pill
23  call; right?
24  A   Yes.
25  Q   Okay.  Do you remember anything about pill

Page 60

1   call in particular?
2   A   Nothing out of the usual.
3   Q   Okay.  Did you speak to any of the inmates
4   while you were doing pill call?
5   A   Yes.
6   Q   Do you recall any of the substance of your
7   conversations with them during pill call?
8   A   "How are you?"  "Are you okay?"  "Do you"need
9   anything?"
10  Q   Where you're situated sort of in your medical
11  area, can you hear what's going on in the booking area?
12  A   If it's quiet enough or nobody's banging on a
13  door, yeah; I can hear.
14  Q   Can you hear the other deputies and what
15  they're saying?
16  A   I mean, it depends.  If it's quiet in there
17  and they're yelling, or, I mean, if they're up in the
18  back, I can't hear.  But if they're talking loud enough
19  to where I can hear, it, yeah; I can hear it.
20  Q   How far away is your station from the
21  platform?
22  A   Not far.
23  Q   10 feet?  20 feet?  I'm trying to get, like, a
24  visual.
25  A   Maybe from here to all the way into the hall.

1   Q   The end of this hall?
2   A   Yeah.
3   Q   That's not very helpful for me.
4   A   20 feet.  I don't know, like, how far 20 feet
5   is.
6   Q   Let's take it this way.  If you were to walk
7   from your station to the booking platform, how long do
8   you think it would take you?
9   A   Not long.  I'm really right there.  My room is
10  right there, and the cells start right next to my room.
11  Q   Would that be Cell 1.
12  A   That would be Cell 14.
13  Q   So can you look out of your station and see
14  Cell 14?
15  A   No, because it's right next to me.  But I can
16  see other cells.
17  Q   What cells can you see?  Do you know?
18  A   I can see the holding cells.
19  Q   Is that Holding Cell 7 as well?  You can see
20  that cell?
21  A   Mm-hm.
22  Q   How long would it take for you to walk from
23  your station at a normal pace to Cell 7?
24  A   Less than a minute.
25  Q   Less than 30 seconds?

1   A   Maybe 30, 45 seconds.
2   Q   I'm trying to get a sense -- I've never been
3   to the jail.  I've seen the videos, but I'm not there.
4   So I don't really know; okay?  So I'm just trying to
5   picture this in my head.
6       So you're -- 30, 45 seconds to walk to Cell 7.
7   You said 14 is kind of next to you.
8   A   Right next to me.
9   Q   And you can see into all the holding cells,
10  you said?
11  A   If I'm leaning like this, I can kind of, like,
12  look.  (Witness indicating.)  If they're in the window,
13  I can look at -- get a visual of maybe everybody.
14  Q   We're not on video.  So leaning like this,
15  she's --
16  A   If I'm leaning back in my chair at my desk, I
17  could see the majority of the cells except Cells 1 and 2
18  because they're -- the booking desk is over it.
19  Q   Okay.  And do you have a door for your
20  station?
21  A   (Nonverbal response.)
22  Q   Is your door closed at all?
23  A   Never.
24  Q   Never.  On the night of July 8th leading into
25  July 9th, do you remember hearing anything from the

1   deputies at all?
2   A   Yes.
3   Q   Okay.  What did you hear?
4   A   I heard what Officer Tracey was saying to
5   Ezra.
6   Q   Okay.  And that's -- like, we're talking about
7   the time around 1:30 or so; right?
8   A   Mm-hm.
9   Q   I want to ask you about before that.  Do you
10  remember anything anyone said before that?
11  A   No.
12  Q   Can you hear when someone calls on the
13  intercom from booking, from the holdings cells?  Can you
14  hear that?
15  A   No.
16  Q   No?  I think you said you didn't really
17  remember anything during pill call.
18  A   Nothing unusual, no.
19  Q   Did any of the deputies talk to you about
20  anything with any of the inmates during pill call?
21  A   No.
22  Q   Specifically with regard to Ezra, I think you
23  described him and Dep. Tracey talking prior to that
24  period.
25      Did anyone talk to you about Ezra?

1   A   No.
2   Q   If a deputy had told you that he had voiced a
3   suicidal ideation -- said something like, "I'm going to
4   kill myself" -- would you be required to do something at
5   that point?
6       MR. VEAL:  Object to form.
7       You can answer.
8       MR. BUCKLEY:  Join.
9       MR. SLATER:  They're just doing objections for
10  the record, but you can answer.
11      THE WITNESS:  Repeat the question.
12  Q   (By Mr. Slater)  If an officer were to tell
13  you, "Hey, nurse.  This inmate or this person in, you
14  know, Cell 7 said he's going to kill himself.  I'm just
15  letting you know," what would you ... what would you do
16  next?
17  A   I would assess the patient first.
18  Q   Okay.  Like, physically you go there and talk
19  to the patient?
20  A   Or they'd bring it outside where it had more,
21  like, private.
22  Q   Okay.  Did you have any -- up until the point
23  you discussed Dep. Tracey and Ezra speaking around 1:30
24  in the morning did you have any communications with
25  Ezra?

Page 65

1    A  No.
2    Q  Did anyone talk to you about him?
3    A  No.
4        MR. SLATER:  I want to show you some videos.
5    Bear with me a second.  I'm going to show you two
6    videos, Ms. Sanchez.  They were both produced in this
7    case.  I'll represent to you that they are the
8    fixed-wing camera.  When I say "fixed-wing," I mean a
9    camera that's installed in the upper area from the jail,
10   and they're from two vantage points.  It's time stamped
11   July 9th around midnight in 2024, and this one is called
12   booking --
13       MR. BUCKLEY:  Hold it.  Hold it.  Hold it.  I
14   can't watch this video.  So I really need to hear what
15   you're saying, and I didn't hear what you just said.
16       MR. SLATER:  I'll repeat it, Tim.  So there's
17   two fixed-wing views that I'm going to show Ms. Sanchez.
18   The first one is identified -- was bruised afterwards
19   Ezra Smith booking area 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.mp4.
20       And on the video itself, it starts around
21   midnight on July 9th, and there's a, like, a sort of
22   stamp on the bottom-left corner of the video that says
23   "booking for intake side."
24       MR. BUCKLEY:  All right.
25       MR. SLATER:  May I proceed?

Page 66

1        MR. BUCKLEY:  Thank you.
2        MR. SLATER:  So I'm going to show you this
3    video.
4        (A portion of a video file was played.)
5    Q   (By Mr. Slater)  We're just going to stop
6    now.  And you see the time is just after midnight.
7        Do you recognize this area, Ms. Sanchez?
8    A   I'm trying to -- I think my office is behind
9    the camera.
10   Q   I would agree with you, but I just --
11   A   Yeah.
12   Q   So these are -- I'm looking at this wall here,
13   and there's about a dozen or so cells.
14       Are these the holding cells in the booking
15   area?
16   A   Yes.
17   Q   And then this area up here when we discussed
18   the booking platform, is that what we were talking about
19   on the left side, sort of like a half wall, like, with
20   some computers behind it?
21   A   Yeah.
22   Q   And would that be where the deputies are?
23   A   Yes.
24   Q   I'm going to actually go now to -- okay.  So
25   I'm going to go to -- this is 1:27 a.m.  And we see a

Page 67

1    person walking towards a cell here.  And it was a man in
2    the cell; right?
3    A   Mm-hm.
4    Q   All right.  Do you recognize those people?
5    A   It's kind of blurry.  I mean, I recognize the
6    officer.  I can't identify the person behind the door on
7    the computer.
8    Q   Okay.  And who is the officer?
9    A   Tracey.
10   Q   Okay.  And this is just before 1:30 on July
11   the 9th.  And so I understand that you --
12       (A portion of a video file was played.)
13   Q   (By Mr. Slater)  I'm going to pause here.
14       I understand that you identified the first
15   time you were made aware of Ezra was when he was kicking
16   at the door.
17       MR. VEAL:  Object to form.
18       You can answer.
19       MR. SLATER:  Let me rephrase my question.
20   Q   (By Mr. Slater)  When was the first time you
21   were alerted to Ezra's presence at the jail?
22   A   When I was -- I mean, I didn't know it was
23   Ezra until after everything happened, but what caught my
24   attention was him banging.
25   Q   And where were you when this banging was

Page 68

1    happening?
2    A   I am sitting at any desk.
3    Q   Did you come out to see what was happening?
4    A   No.
5    Q   Were you able to see what was happening?
6    A   Yes.
7    Q   And so here we have Dep. Tracey at the cell.
8    Do you know what cell that is?
9    A   7.
10   Q   And that would be the cell that Mr. Smith was in
11   that evening?
12   A   Yes.
13   Q   Was he the only one in that cell when you came
14   to it?
15   A   Initially when I arrived on my shift, no; the
16   cell was full.
17   Q   But around 1:30 or so when you went into the
18   cell to perform CPR?
19   A   He was the only person in there.
20   Q   When Dep. Tracey came to this cell around 1:30
21   in the morning, do you recall what she said?
22   A   She was using some foul language.
23   Q   Could you tell me it was?
24   A   She was making statements, like, "You have
25   your effing mommy calling the jail."  She made a

Page 69

1  comment, like, "Well, kill yourself, then."
2      Q   Let me kind of go through that a little bit.
3  When she talked about his, quote, "mommy calling the
4  jail," did you hear that call?
5      A   No.
6      Q   Do you know whether that call happened or not?
7      A   No.
8      Q   Did you hear him say anything?
9      A   I mean, I hear, like -- I mean, after she said
10  that, I didn't hear exactly what he was saying, but I
11  heard him talk back to her.
12     Q   Okay.  You don't remember what he was talking
13  about?
14     A   He made a comment saying he was going to kill
15  himself, and that's when she was, like, "Then effing do
16  it."  Then she had she made a comment about his mommy
17  calling the jail.
18     Q   And what were you doing when this was
19  happening?
20     A   I was sitting in my computer.
21         MR. SLATER:  And then I'm just going to play
22  through it here a little bit.
23         (A portion of a video file was played.)
24     Q   (By Mr. Slater)  So you see another
25  individual approach the cell at 1:20 a.m.,

Page 70

1  approximately.
2         Do you recognize that person?
3      A   Yes.
4      Q   Who is that?
5      A   Gomez.
6      Q   When Dep. Gomez was at Cell 7, did you hear
7  him say anything?
8      A   No.
9      Q   Okay.  Did you -- other than Dep. Tracey
10  saying, you know, "Your fucking mommy called," "Go kill
11  yourself," something to that effect and Ezra saying,
12  "I'm going to kill myself" -- that's what you heard him
13  say?
14         MR. WAYMIRE:  Object to form.
15     A   Yes.
16     Q   (By Mr. Slater)  Could you tell me what you
17  heard Ezra saying?
18     A   Well, after -- Ezra says, "I'm going to kill
19  myself," and Ms. Tracey is, like, "Well, effing do it."
20     Q   After that back and forth, do you recall
21  anything either of them may have said after that?
22     A   No.
23     Q   Do you know whether they continued to talk or
24  whether that was the end of the conversation?
25     A   They continued to talk, but I don't

Page 71

1  remember...
2      Q   Okay.  While they were continuing to talk,
3  what were you doing?
4      A   I was sitting at my computer.
5      Q   Would be you looking at them, or were you
6  looking at your computer?
7      A   I was -- I mean, both.
8      Q   Okay.  You were kind of, like, maybe looking
9  over while the conversation continued?
10     A   Yes.
11     Q   Okay.  And at a certain point --
12         MR. SLATER:  I'm just going to play through it
13  a little bit more.
14         (A portion of a video file was played.)
15     Q   (By Mr. Slater)  So there's Dep. Tracey and
16  Dep. Gomez there.  You see Dep. Gomez walks away at
17  1:28 a.m. and 40 seconds.  Did you witness deputy --
18  still playing the video.
19         Did you witness Dep. Tracey make any gestures
20  or anything like that?
21     A   No.
22     Q   And then -- okay.  So at 1:29 a.m., just after
23  1:29 a.m., do you see that Dep. Tracey walked away;
24  right?
25     A   Yes.

Page 72

1      Q   When Dep. Tracey walked away, what were you
2  doing at that time?
3      A   Sitting at my computer.
4      Q   And I understand that at a certain point, you
5  came to perform CPR on Ezra Smith; right?
6      A   Yes.
7      Q   Between the time that Dep. Tracey walked away
8  from the cell at 1:29 a.m. and the time that you came to
9  perform CPR, what were you doing?
10     A   Sitting at my desk.
11     Q   And what were you doing sitting at your desk?
12     A   I don't remember.
13     Q   Did you call --
14         MR. BUCKLEY:  I didn't hear that.
15         THE WITNESS:  I don't remember.
16     Q   (By Mr. Slater)  Did you call anyone on your
17  medical team?
18     A   No.
19     Q   Did you speak to anyone at security?
20     A   No.
21     Q   Okay.  We went through your policies -- when I
22  say "your," I mean your employer's policies,
23  specifically the policy involving the requirement of a
24  staff member who hears a patient verbalizing a desire or
25  intent to commit suicide, that they are supposed to be

Page 73

1  continuously observed and prevented from harm until
2  medical/mental health/supervisory assistance is
3  obtained.
4      After you heard Mr. Smith say, "I'm going to
5  kill myself," did you take any steps to ensure he was
6  observed?
7      MR. VEAL:  Object to form.
8      You can answer.
9      A   No.
10     Q   (By Mr. Slater)  Did you take any steps to
11 alert any supervisory personal about what you heard?
12     A   I mean, after it happened.  But, no.
13     Q   Between the time that you heard him say that
14 and that you went in to personal CPR?
15     A   No.
16     Q   No?  Okay.  There was nothing that prevented
17 you from calling a supervisor about what you heard;
18 right?
19     MR. VEAL:  Object to form.
20     You can answer.
21     A   No.
22     Q   (By Mr. Slater)  And there's -- you could have
23 spoken to Dep. Tracey or one of the other deputies about
24 what you heard and indicated that Mr. Smith needed
25 observation; is that right?

Page 74

1      THE WITNESS:  I'm ... I'm sorry.  Repeat the
2  question again.
3      MR. SLATER:  Yeah.  I'm just trying to
4  understand.
5      Q   (By Mr. Slater)  The policy says what it
6  says; right?  You could have done something between the
7  time that you heard him say, "I'm going to kill myself,"
8  and the time that you came to the cell to perform CPR;
9  is that right?
10     MR. VEAL:  Object to form.
11     You can answer.
12     A   Yes.
13     Q   (By Mr. Slater)  Okay.  But you didn't do
14 anything?
15     A   No.
16     Q   Okay.  Why not?
17     A   Well, based off my experience working in
18 corrections, I didn't feel at the time he was a suicide
19 risk to himself.  And based off the exchanges being made
20 between Ms. Tracey and Ezra, I felt like it was more
21 behavioral, and it's not uncommon in a jail for that to
22 happen.  So ...
23     Q   So have you heard other people say that they
24 were going to kill themselves while working at the
25 Rockdale County jail?

Page 75

1      A   Yeah.
2      Q   Okay.  And in those cases, did you take any
3  steps to ensure their observation on any sort of
4  intervention?
5      MR. VEAL:  Object to form.
6      You can answer.
7      A   Well, it was more like behavioral.  Like, they
8  kind of want something in exchange.
9      Q   (By Mr. Slater)  But you didn't talk to Ezra
10 before you came in and performed CPR that day?
11     A   I didn't know who he was.
12     Q   How do you know it was behavioral?
13     A   Based off his actions and how they were -- him
14 and Miss Tracey were communicating.
15     Q   What were his actions?
16     A   He was angry.
17     Q   What was he doing in the cell that alerted
18 Dep. Tracey to come and speak to him, if you remember?
19     MR. VEAL:  Object to form.
20     You can answer.
21     A   He was banging on the door, and it was -- from
22 what I was informed that he was there all day.  He was
23 in the holding cell during day shift.
24     Q   When were you informed that?
25     A   After everything happened.

Page 76

1      Q   So you weren't informed of that before; right?
2      A   No, because I didn't know who he was.
3      Q   Right.  And I'm just looking at the procedure.
4  Again, it just says any staff who hears a patient
5  verbalize a desire or intent to committed suicide will
6  take immediate steps to ensure the patient is
7  continuously observed.
8      Did you violate the policy by not doing that
9  after you heard Mr. Smith say, "I'm going to kill
10 myself"?
11     MR. VEAL:  Object to form.  If you need to,
12 read the whole policy because that was not the full
13 policy.
14     MR. SLATER:  I'll read the whole policy.
15     "Any staff who hears a patient verbalizing a
16 desire or intent to commit suicide, observes a patient
17 making an attempt or gesture, or otherwise feels a
18 patient is at risk for suicide, will take immediate
19 steps to ensure the patient is continuously observed and
20 prevented from harm  until appropriate medical, mental
21 health, and or supervisory assistance is obtained."
22     Q   (By Mr. Slater)  Did you not violate the
23 policy by not doing anything after hearing Mr. Smith
24 verbalize a desire or intent to commit suicide?
25     A   I don't feel like I violated a policy because

Page 77

1    at the time I didn't feel like he was a suicide risk.
2        Q   Why not?
3        MR. VEAL:  Object to form.
4        You can answer again.
5        A   Because I felt like it was more behavioral
6    based off my experience and based off how they were
7    communicating to each other.
8        Q   (By Mr. Slater)  I'm just trying to
9    understand.  So what is more behavioral?  What does
10   "behavioral" mean in that context?
11       A   Meaning he's not getting his way or he's
12   not -- he's not getting his way.  He's not being told
13   what he wants to know.
14       Q   Did you know he wasn't getting his way or not
15   being told what he wants to know when you heard him say,
16   "I'm going to kill myself"?
17       A   I mean, no.  I just know he was there all day,
18   and I know he was seeing other people leave before him.
19   And ...
20       Q   Well, you didn't know he was there all day
21   when you heard him say he was going kill himself?
22       A   Well, I know he was there, and I believe other
23   people left.  And he was still in the cell at 1:30 in
24   the morning.
25       Q   Do you remember what you said at the merit

Page 78

1    board hearing when asked why you didn't respond?  Did
2    you hear him say that?
3        A   The everything happened kind of quickly.  So
4    right after she said that, it was one minutes.  Felt
5    like seconds.
6        Q   Yeah.  Do you know how long it was before --
7    between the time that Mr. Smith said, I'm going to kill
8    myself," and when it happened?
9        A   I don't know.  I just know it happened very
10   quickly.  It felt quick.
11       Q   I'm just going to play -- so here at 1:29
12   a.m., we have Dep. Tracey walking away from Cell 7.
13       Do you see that?  I'm just going to play it.
14       (A portion of a video file was played.)
15       Q   (By Mr. Slater)  So we're about a minute --
16       MR. VEAL:  Object to form.
17       Q   (By Mr. Slater)  You would agree that you
18   could have called a supervisor or someone within a
19   minute of hearing Mr. Smith make that statement; right?
20       MR. VEAL:  Object to form.
21       You can answer.
22       A   I could have.
23       Q   (By Mr. Slater)  And we can see that in the
24   cell that Mr. Smith is still moving around in there;
25   right?

Page 79

1        A   Yes.
2        Q   Would you agree with that?
3        A   Yes.
4        Q   So by all accounts, he's still alive a minute
5    later?
6        MR. VEAL:  Object to form.  You're implying
7    that he had to die.
8        Q   (By Mr. Slater)  By all accounts, he hasn't
9    hanged himself at this point?
10       A   Yeah.
11       Q   Now, it's 1:31 a.m., two minutes later,
12   approximately.  And we just a moment ago see him moving
13   in there.  Would you agree that within two minutes after
14   hearing Mr. Smith state that he was going to kill
15   himself that you could have called the supervisor and
16   gone to talk to the deputies about what you heard?
17       MR. BUCKLEY:  I'm sorry.  I need you to speak
18   up.
19       MR. SLATER:  I'll repeat it.
20       Q   (By Mr. Slater)  Within two minutes, you
21   could have called the supervisor or spoken to the
22   deputies about what you heard; is that right?
23       A   If I felt like he was a suicide risk, yes.
24       Q   I just want to go back through the policy
25   again one more time.  So you have it open in front of

Page 80

1    you.
2        Procedure 8.  Does it give you any -- does
3    your reading of it give you any wiggle room to decide
4    that?
5        It says, "Any staff who hears a patient
6    verbalizing a desire or intent to commit suicide ..."
7    and then' other things that -- "... observing an attempt
8    or gesture or otherwise, staff member feeling a patient
9    is at risk will take immediate steps..."
10       So you admit you heard Mr. Smith state that he
11   was going kill himself; right?
12       A   Yes.
13       Q   And says you will take immediate steps; right?
14       MR. VEAL:  Object to form.
15       You can answer.
16       A   Yes.
17       Q   (By Mr. Slater)  We agree, you didn't take
18   any steps?
19       A   Correct.
20       Q   Okay.  If you were to have called or gone to
21   check on Mr. Smith and you decided based on that
22   encounter that he needed to be placed observation or
23   suicide watch, what would happen next?
24       A   What would happen next.  He would get stripped
25   down.

Page 81

1  Q   Would he be removed from the cell that had the
2  phone with the cord in it --
3  A   Yes.
4  Q   -- to a cell that wouldn't have a phone with a
5  cord; is that right?
6  A   Yes.
7  Q   You have to speak up.
8  A   Yes.
9  Q   Do you believe if there were any -- I think we
10 talked about that one cell that is fully padded.  Do you
11 know if that cell was available that evening?
12 A   I don't remember.
13     MR. SLATER:  Okay.  And we'll identify that
14 video as Exhibit 4P.
15     (Plaintiff's Exhibit No. 4 was marked for
16 identification.)
17 Q   (By Mr. Slater)  And I understand.  I'm not
18 going to go through the video because it's obviously --
19 we already discussed it was traumatic for you.  But at a
20 certain point, I'll just pull up the time stamp so we
21 have it.  So bear with me for a second.
22     So here you see -- at 1:34 a.m. you see the
23 two deputies are back at the cell.  And here at 1:34:45,
24 you see the cell door is open; right?
25 A   Yes.

Page 82

1  Q   And then I missed it.  So we're at 1:34 a.m.
2  You see the two deputies enter the cell.  And then
3  pausing here at 1:34 a.m. and 19, was that someone
4  running toward cell?  Is that you?
5  A   Yes.
6  Q   And that's you coming from your medical area?
7  A   Yes.
8  Q   So it's, what, give or take, four or five
9  minutes from when you heard him say, "I'm going to kill
10 myself," until you were running to the cell?
11 A   Yes.
12 Q   I want to -- I understand that you went into
13 the cell and you performed CPR.  Can you describe how
14 Mr. Smith was when you entered the cell?
15 A   He was blue.  He didn't have a pulse.  His
16 nose was bleeding.  He peed on himself.  He was kind of
17 starting to corticate, when your arms go like this when
18 you're losing oxygen to the brain.
19 Q   Anything else?
20 A   Not that I can think of.
21 Q   Was there a cord around his neck?
22 A   Well, there was the marking of it.
23 Q   The cord had been removed by the time you
24 entered the cell?
25 A   Yes.

Page 83

1      (Plaintiff's Exhibit No. 5 was marked for
2  identification.)
3  Q   (By Mr. Slater)  I'll show you what we'll
4  mark now as Exhibit 5.  This is a document that we
5  produced, and it's Bates stamped E. Smith 29 through 31.
6  And it's styled Navcare Medical Emergency Code Report.
7      Do you see that at the top?
8  A   Yes.
9  Q   And we talked earlier about these medical
10 emergency code reports, and I think that's in the policy
11 that we referenced, BL5, Suicide prevention.  And just
12 take a minute to look through this.  I'll ask you some
13 questions about it.
14 A   Okay.
15 Q   Okay.  Is this the medical emergency code
16 report that you authored after Mr. Smith's suicide
17 attempt?
18 A   Yes.
19 Q   I see here at the top it identifies Rockdale
20 County jail.  It has his name, Mr. Smith, and code
21 suicide attempt.  And says time called, 1:45.  Time
22 arrived, 1:46.
23     What do those times mean?
24 A   Well, when I did the report, it -- I couldn't
25 remember the exact time to put something in there, and I

Page 84

1  couldn't -- I was so, like, mind-boggled.  I had to put
2  a best estimate.
3  Q   Okay.  Yeah.  I just wasn't sure if this was
4  for some other -- the time EMS was called or something
5  else.  I totally understand that.  So it identifies --
6      Is this, like, a prebuilt form that you fill
7  in?
8  A   Yes.
9  Q   And it identifies event calls, suicide
10 attempts, and vitals upon arrival.  It has the O2 sat a
11 zero; blood pressure, zero; heart rate, zero; temp,
12 zero; respirations, zero.
13     Were those actually his vitals when you --
14 A   No.  I filled them in.  It was hard to obtain
15 a blood pressure at the time.  So I put what I could do
16 at the bottom under progress note.
17 Q   Okay.  Okay.  So this says, you know, progress
18 notes on the bottom of what's Bates stamped E. Smith
19 129.  It says at 152, pulse present.  Inpatient A plus O
20 X 4.
21     What does that mean?
22 A   Alert and oriented to time, person, place, and
23 situation.
24 Q   "Heart rate, 122.  O2 sats, 100 percent."
25     So oxygen saturations of 100 percent; is that

Page 85

1  right?
2      A   Yes.
3      Q   And then "EMS on scene."
4          How long did it take for EMS to arrive?
5      A   They were there pretty quickly.
6      Q   Within a minute or so after being called?  10
7  minutes?  20 minutes?
8      A   I just know once he started reviving again,
9  they came.
10     Q   I understand.  Just so we're completely clear,
11 he started reviving prior to EMS arriving?
12     A   Yes.
13     Q   Okay.  All right.  And that was under your
14 care.
15         Then it says, "Officers involved," and back
16 towards the top, Dep. Tracey, Lt. Daniels.
17         Do you see that?
18     A   Oh, yeah.  I see it.
19     Q   Why did you reference those officers?
20     A   Dep. Tracey was the one that told me to come
21 and Lt. Daniels was their supervisor.
22     Q   Okay.  All right.  Under medical history,
23 you've checked the box for "none."
24         Do you see that?
25     A   Yes.

Page 86

1      Q   But I understand ... I understand that when
2  you heard Mr. Smith speak with Dep. Tracey, you hand
3  looked at him in the system or anything like that;
4  right?  Had you looked him up by the time you generated
5  this report?
6      A   I believe so.
7      Q   And that was your assessment based on what
8  came up in the system?
9      A   Just from what I remember.  I don't remember
10 any medical.
11     Q   Okay.  So you wouldn't -- like, because I'll
12 represent that Mr. Smith tried to hang himself at the
13 same jail in 2020.  You wouldn't identify that under
14 medical?
15     A   no.  It would be more like mental health.
16     Q   Are you aware that he tried to do that?
17     A   (Nonverbal response.)
18     Q   I want to turn to the second page which is
19 Bates-stamped E. Smith 30.  And there's a narrative here
20 at the top.
21         Do you see that?
22     A   yes.
23     Q   Did you write that?
24     A   Yes.
25     Q   And so it says, "Early this morning around 145

Page 87

1  hours, patient attempted suicide in Cell 7 by wrapping a
2  telephone cord around his neck.  Writer arrived
3  immediately to scene.  Patient was laying on floor, blue
4  in face.  Blood noted in nose.  Urine on jumpsuit.  No
5  pulse, and scar noted on neck from phone cord.  CPR
6  initiated immediately.  EMS called right away."
7          Then we have some other vitals, and then
8  there's a second paragraph here that says, "Prior to
9  incident, apparently he was waiting in Cell 7 since
10 previous shift.  He was not showing in the booking queue
11 to be screened.  Patient started banging on door,
12 wanting to know what's going on with his process."
13         How did you learn that information?
14         MR. VEAL:  Object to form.
15         THE WITNESS:  How did I what?
16     Q   (By Mr. Slater)  "So prior to incident,
17 apparently he was waiting in Cell 7 since previous
18 shift."
19         How did you know that?
20     A   Well, this was after everything happened.
21     Q   Did you talk to anyone?
22     A   Well, yeah.  I talked to security because I
23 wanted to know what was going on I wanted to know what
24 were his charges, like, why wasn't he showing in my
25 system.  How long has he been here?  Obviously, he's

Page 88

1  been in for a while because he hasn't crossed over to my
2  queue to be screened.  I would have been screening if I
3  saw him in my system.
4      Q   Right.  Okay.  Who did you speak to?
5      A   I don't remember who I spoke to.  It could
6  have been --
7      Q   Tracey?
8      A   No; it wasn't Tracey.  It might have been one
9  of the techs.  I don't remember her name because
10 she's --
11     Q   What do you mean, "tech"?
12     A   Like, they're training.
13     Q   Okay.
14     A   Like, they work in the computers, but they
15 don't do the security part.
16     Q   Are they employed by the sheriff's office?
17     A   Yes.
18     Q   Okay.  You don't remember any description?
19 Male?  Female?
20     A   I believe it was a female.
21     Q   Any other characteristics?
22     A   No.
23     Q   Okay.  And it says here he was not showing in
24 the booking to be screened, and I think we established
25 that; right?  And I think you also said you don't -- you

Page 89

1  never -- you don't know who was on shift earlier to
2  conduct the initial screen, whenever that happened?
3      A   Yeah; I wouldn't remember.
4      Q   "Patient started banging on door, wanting to
5  know what was going on with his process."
6          When did you learn that?
7      A   After everything that happened.
8      Q   Not the banging on the door but what was going
9  on with the process?
10     A   Right.
11     Q   And then I'm looking at this medical diagram
12  of the injury.  It's not completed as I read it.  Were
13  you just rushing to get this done?  Is there a reason
14  why?
15     A   I don't know why I didn't -- maybe I wasn't
16  sure what that meant, so I didn't want to complete it.
17     Q   And then under -- underneath the images, the
18  diagram of entry.  There's a bunch of boxes that can be
19  checked.  Do you see that?
20     A   Yes.  Down here, yeah.
21     Q   I don't see any checked there; right?
22     A   No.
23     Q   And then on the final page, E. Smith 31, it
24  has your signature.  Do you see that?
25     A   Yes.

Page 90

1      Q   And then it says, "Date and time completed,
2  7/9/24 at 2:00 a.m."?
3      A   Yes.
4      Q   Is that the exact time or is that just an
5  approximation?
6      A   This was an approximate.
7      Q   This was done right after the incident; is
8  that right?
9      A   Well, not right after.  It was done after the
10  incident, but not right after.
11     Q   But not like two or three hours?
12     A   Yeah.
13     Q   2:00 would be an approximate time that you
14  wrote the report?
15     A   Yeah
16         (Plaintiff's Exhibit No. 6 was marked for
17  identification.)
18     Q   (By Mr. Slater)  I'm going to mark this as
19  Exhibit 6.  This is -- I'll represent to you this is an
20  email chain that we received produced by, I think, the
21  sheriff's office --
22     A   It is.
23     Q   -- as part of the investigation into Dep.
24  Tracey.
25     A   Okay.

Page 91

1      Q   And if you start on page 2 -- it's not
2  Bates-stamped on anything.  If you start on page 2,
3  it says, "Good morning, Erman."  if you go back the
4  page, you know, at the very it says from Erica Sanchez
5  to Erman Gunindi.
6          Am I saying that name right?
7      A   Yes.
8      Q   Okay.  And it says sent July 9th at 9:59 a.m.
9          Do you see that on the first page at the
10  bottom?
11     A   Yes.
12     Q   Okay.  So now turning back to the second
13  page -- sorry.  It's a little bit confusing.  Do you
14  remember sending an email to Erman the morning of the
15  incident?
16     A   I didn't at the time, but, yeah, I guess.
17  Okay.
18     Q   Sitting here today, do you remember sending
19  this email?
20     A   Yes.
21     Q   I think you said your shift started at 7:00.
22  Did you finish at 7:00 in the morning?
23     A   Sometimes I stay a little after, but I don't
24  remember.
25     Q   Okay.  Would you have sent -- do you think you

Page 92

1  would have sent this from home after your shift or while
2  you were still at the jail?
3      A   I don't remember.
4      Q   Is Erman here in Atlanta, or is he in a
5  different time zone?
6      A   No; he's here.
7      Q   And looking at this, there's, what, four
8  paragraphs.  Do you see that?
9      A   Yes.
10     Q   Okay.  And kind of just skimming the first
11  three, perhaps it kind of looks like what you had
12  written in your MERC, the report that we just looked at
13  in Exhibit 5; is that right?
14     A   Yes.
15     Q   And then the final paragraph is a statement,
16  "All I heard was Dep. Tracey making statements 'Go kill
17  yourself then' by the cell door when he was kicking.
18  There was no longer kicking on the door, and then I
19  heard a deputy yelling for a nurse because the patient
20  was turning blue."
21         Do you see that?
22     A   Yes.
23     Q   And is it -- would it be fair to say what you
24  told me today is more accurate than what you put in this
25  email?

Page 93

1    MR. VEAL: Object to form.
2    You can answer.
3    A   I feel like it's the same.
4    Q   Here you just say all you heard was Dep.
5    Tracey saying "go kill yourself". But today you told me
6    "your mommy" stuff and Ezra saying "I'm going to kill
7    myself." So you heard more than just "go kill
8    yourself"; right?
9    A   Yes.
10   Q   Okay. That's what I'm trying to say.
11   A   Oh, okay. Yeah.
12   Q   Yeah.
13   A   That was what was -- yeah. Yeah.
14   Q   This specifically -- if I'm looking at this, I
15   would say this is specifically about Dep. Tracey; right?
16   A   Yes.
17   Q   Did you file a complaint against Dep. Tracey?
18   A   No; because I think that was already in the
19   process.
20   Q   This was right after the incident. Do you
21   know if -- do you know when the process with Dep. Tracey
22   began?
23   A   Once I notified my supervisor, I think that's
24   when things started. What's the word I'm looking for?
25   I think that's when she was, like ... when it was -- the

Page 94

1    complaint. When the complaint was on her end.
2    Q   Did you file or send or submit any other kind
3    of complaints about Dep. Tracey?
4    A   No.
5    Q   Before -- so the email. You sent it some time
6    that morning. Between 1:30 or 2:00, when the incident
7    with Ezra Smith occurred and you left shift, were there
8    any other suicide calls that evening at the jail?
9    A   No.
10   (Plaintiff's Exhibit No. 7 was marked for
11   identification.)
12   Q   (By Mr. Slater) I'll mark this as 7. These
13   are -- this is a document for Exhibit 7 called Defendant
14   Ezra Smith's Responses and Objections to Plaintiff's
15   First Interrogatories.
16   Have you seen this document before?
17   A   I think this is the one that they gave me when
18   they subpoenaed me.
19   THE WITNESS: Is this the one?
20   MR. SLATER: Just take a minute to look it
21   through.
22   A   I don't remember seeing this document.
23   Q   (By Mr. Slater) Okay. And I'm asking because
24   I have the document. But this is a document that's
25   supposed to have your signature with it generally. And

Page 95

1    I don't have that. So I don't know. But anyway let's
2    go through some of it.
3    This is a document called interrogatories.
4    They're basically questions that we sent to your counsel
5    to respond to under oath. And some of this we've
6    already kind of covered. Question 1, if you turn to
7    page 2, is about your employment and refers to your
8    resume, which we went over.
9    But No. 3 asks about -- and this is the next
10   page. No. 3 asks about your recollection anyone
11   who's investigated the FACTS surrounding the litigation,
12   the facts surrounding what happened to Ezra Smith that
13   night.
14   Do you know any -- other than the sheriff's
15   office anyone who's investigated what happened with
16   Ezra?
17   A   No.
18   Q   Has your employer, Navcare, to your knowledge
19   investigated what happened to Ezra?
20   A   I don't know.
21   Q   Okay. You've got to speak up a little.
22   A   I don't know.
23   Q   And then No. 5. It asks you if you
24   communicated with any person about Ezra Smith's suicide
25   attempt from July 8th up until your answer to this

Page 96

1    interrogatory and asks you sort of date, the time. And
2    I think we've covered that. But I just want to make
3    sure, Ms. Sanchez. I think you've -- we have your email
4    to email your -- the HSA; right? Erman is the health
5    services administrator?
6    A   Yes.
7    Q   You maybe talked to a tech after the incident
8    happened. You testified at the merit board hearing;
9    right?
10   A   Yes.
11   Q   You had the monthly meeting. And then I think
12   that was it that you testified to. Is there anyone else
13   that you communicated with about what happened to Ezra?
14   A   No.
15   MR. SLATER: Okay. And Antonio let's get a
16   verification for this. I don't think we have one.
17   MR. VEAL: Okay.
18   Q   (By Mr. Slater) Is there anything else about
19   the incident with Ezra that you remember that I haven't
20   asked you about?
21   A   No.
22   Q   Okay. And I'm not going the put in this in as
23   an exhibit. I'm just looking at -- you're aware that
24   you filed or through your counsel filed a motion to
25   dismiss in this case earlier on?

1    A   Yes.
2    Q   Okay.  And probably aware that it was denied.
3   This case is proceeding.  But I'm just looking at the
4   motion to dismiss.  And on page 6 your counsel wrote
5   that "because Plaintiff had not yet been processed
6   Defendant Sanchez you, was not yet responsible for
7   providing medical services to plaintiff."
8       Do you agree with that statement?
9    A   Yes.
10   Q   Okay.  Why?
11      MR. VEAL:  Object to form.
12      You can answer again.
13      THE WITNESS:  Repeat the question one more
14   time.  I'm sorry.
15   Q   It said that because he wasn't processed, you
16   weren't responsible for providing care to him.
17   A   I mean, it's just he wasn't in my queue, so
18   it's hard to answer this.  It's hard to give a definite
19   answer to that question.  He wasn't in my system.  I
20   didn't know who he was.  I didn't know nothing about
21   him.
22   Q   If an inmate in the jail who hadn't been
23   processed starts having a heart attack, are you allowed
24   to say, "Not in the system yet.  I can't get you medical
25   attention"?

1       MR. VEAL:  Objection.  Form.
2       You can answer if you know.
3    A   No.  Well, if it's an emergency.
4    Q   (By Mr. Slater)  Right.  So if there's --
5   just because someone's not in the system doesn't mean
6   you're not required to treat them if they have a medical
7   need?
8       MR. VEAL:  Object to form.
9       You can answer.
10   A   It would be hard to know.  I mean, it's hard
11   to answer that question, only because he would have been
12   sitting there all day.  Security hadn't told me because
13   I don't ... I don't know who's all in there unless they
14   tell me or he shows up in my system.  But if he was
15   having a heart attack, of course, I would have
16   responded.  It's an emergency.
17   Q   (By Mr. Slater)  I think I'm just trying to
18   sort of process this all I think you're making a good
19   point.  There's a difference between -- "I have
20   medication I need every day, and I haven't -- no one's
21   asked me about it yet." you just won't know that unless
22   it's in your system that I said "I need this medication"
23   versus "I'm having a heart attack.  I'm having a
24   stroke."  and so we would agree that if someone is
25   having an emergent situation, just because they're not

1   in your system you have to treat them?
2       MR. VEAL:  Object to form.  The language said
3   "responsible" in a contractual sense.  I think you're
4   asking her two different things.
5       You can still answer.
6    A   I just -- if it's an medical emergency, yes; I
7   will address the situation because heart attack, suicide
8   attempt, we don't want the patient to die.  But --
9    Q   I wouldn't suggest that you would want that.
10   I'm not saying that.
11   A   But -- and I don't know.  He wasn't in my
12   system.  He was the only one in the cell.  It's hard to
13   answer this question.  But I wouldn't deny emergency
14   medical care.
15   Q   And we'd agree that a suicide attempt or
16   suicide ideations is an emergency?
17      MR. WAYMIRE:  Object to form.
18      MR. VEAL:  Object to form.
19   A   A suicide attempt is an emergency.  Maybe a
20   suicide remark, it's not an emergency unless based on my
21   nursing judgment how I want to handle the situation
22   because -- like I said, because I deal with it so much,
23   sometimes they just want attention.  They just want to
24   talk because being placed on suicide watch is serious
25   because you're naked.  Nobody wants to get naked.  Here,

1   they're eating mushed up food.  So I just like to see
2   what's -- "Did you just want a sandwich?  Do you want to
3   uses the phone?  What is it?"
4    Q   But is it your understanding that the
5   policy -- this policy allows any discretion if you hear
6   someone voice a suicidal ideations?
7       MR. VEAL:  Object to form.
8       You can answer.
9    A   I mean, yeah if they're feeling suicidal.
10   Before we put them on suicide watch, we want to see
11   what's going on.  What's the underlying cause?  Why do
12   you want to be on suicide watch?  Are you really --
13   like, do you have that blunt affect?  Do you feel like
14   your life is over?  What are your charges?  What are you
15   here for?  Did your mom pass away?  Are your children
16   getting took away?  Or do you just want to use the
17   phone?  You just want to know what the charges are?  You
18   want to talk to your mom?  Are you hungry?  It's just
19   not common to see it or hear it so ...
20   Q   But you would follow up, is kind of what I'm
21   understanding.
22   A   Yeah; I'm not going to place -- if I place
23   everybody on suicide watch, the whole jail would be --
24   it would be a lot of people.  So we just want to correct
25   the underlying cause to make them feel better, you know.

Page 101

1   Q   I understand that.  So you've got to figure
2   out what the issues are.
3   A   Is it behavioral, or is it suicidal?  Because
4   you can really -- you can kind of distinguish between
5   the two.
6   Q   Well, just by hearing someone say, "I think
7   I'm going to kill myself," or by following up and
8   getting more information?
9   A   Both.  Both.  well, hearing it and --
10  Q   How can you know just by hearing it?
11      MR. VEAL:  Object to form.
12      You can answer.
13  A   Well, hearing it and following up; correct --
14  Q   Okay.
15  A   -- on the issue.
16      MR. SLATER:  Okay.  All right.  Let's take
17  five.  I think I'm wrapping up.
18      (A recess was taken.)
19      MR. SLATER:  All right, Ms. Sanchez.  I just
20  have a few more questions for you.
21  Q   I think we've sort of ascertained you've
22  been -- prior to Ezra's stint, you were at the jail,
23  Rockdale County jail, for, what, two years, give or
24  take?
25  A   Yes.

Page 102

1   Q   Okay.  How often were you working in booking?
2   A   I worked in booking -- feels like all the
3   time.
4   Q   And I think you told me that.  So there's,
5   what, 15 cells in booking; is that right?
6   A   So there's 15 cells in booking, and then
7   there's four cells on the transport side.  So it's,
8   like, behind the booking -- behind that little platform.
9   Q   Okay.  And are -- so excluding the transport
10  side of the -- like, what you said, 14 or 15?  I can't
11  remember now.
12  A   15.
13  Q   15.  Okay.  The 15 cells in booking.  Are they
14  all the same, those cells?
15  A   (Nonverbal response.)
16  Q   No?  What's the difference between them?
17  A   So Cells 7 and 8 and 15, they have phones in
18  them.  They're bigger.  They're holding cells.
19  Q   Right.  These will the bigger holding cells
20  that can fit a whole number of people?
21  A   Yeah.  That's where we put the patients that
22  initially come in.  And then there's one cell -- I think
23  it's 12.  I'm not for sure -- that's padded.
24  Q   That's the one we were talking about earlier.
25  So 7 and 8 are bigger, and they have the phone?

Page 103

1   A   And 15.
2   Q   Do the other cells have a way of
3   communicating?
4   A   No.
5   Q   You got to just bang on the door?
6   A   They'll come out on rotation and use the phone
7   outside.
8   Q   So 7 and 8 are the only one with the phone.
9       Prior to the incident, had you seen what the
10  phone look like in there?
11  A   No, not really, because I don't really --
12  yeah.
13  Q   Go ahead.  Sorry.
14  A   I haven't.
15  Q   Okay.  But you knew they had a phone?
16  A   Yes.
17  Q   And just to clarify, you said you weren't
18  really sure what the phones were like, or you had a
19  general idea?
20  A   It's, like, a -- just a phone on the wall, and
21  it's like one of those collect phones.
22  Q   Like, from when we were kids?  A pay phone
23  with a cord?
24  A   Exactly.
25  Q   You knew that it was sort of this pay phone

Page 104

1   with a cord prior to Ezra's incident; right?
2   A   Yes.
3   Q   Okay.  Last thing I wanted to touch on, the
4   merit board hearing where you testified.  Do you
5   remember that?
6   A   Yes.
7   Q   Okay.  It was like on Teams or something like
8   that?
9   A   Yes.
10  Q   If we go back and look at that, is there
11  anything that you didn't say in that hearing that you
12  would want to have said?
13      MR. VEAL:  Object to form.
14      You can answer.
15      MR. WAYMIRE:  Join.
16      MR. BUCKLEY:  Join in the objection.
17  A   no; I don't think so.
18  Q   Okay.  And you were truthful and -- when you
19  gave testimony there?
20  A   Yes.
21      MR. SLATER:  Okay.  Okay.  I have nothing
22  further for you, Ms. Sanchez.  The other lawyers may
23  have some questions for you.  If not, you get to,
24  hopefully, go home and not back to work.
25      MR. WAYMIRE:  I'm Jason Waymire, and I

Page 105

1  represent Dep. Tracey and I just have a couple of
2  questions for you.
3              EXAMINATION
4  BY MR. JASON C. WAYMIRE:
5      Q   First one is what year were you born?
6      A   1,983.
7          MR. BUCKLEY:  I can't hear you, so please
8  speak up.
9          MR. WAYMIRE:  I have a screen shot here, and
10 it's from the video that counsel showed you previously.
11 I'm going to call it Defense Exhibit 1.
12         (Defense Exhibit No. 1 was marked for
13 identification.)
14     Q   (By Mr. Waymire)  If you take a look at that,
15 I want you to describe where you are if you see yourself
16 there.
17     A   I'm in the middle in the all-black.
18     Q   And you would be the biggest human figure
19 from -- based on the perspective of the camera?
20     A   Yes.
21     Q   Okay.  And you're kind of in the middle of the
22 hallway?
23     A   Yes.
24     Q   And you're running toward the cell where
25 another officer is?

Page 106

1      A   Yes.
2      Q   And you're coming for where?
3      A   My office, the booking office.
4      Q   Got it.  Those are all my questions.  Thank
5  you.
6          MR. VEAL:  I have a few questions.
7              EXAMINATION
8  BY MR. ANTONIO E. VEAL:
9      Q   I want to refer your attention to the exchange
10 with plaintiff's counsel about your opinion about the
11 exchanges between Dep. Tracey and the person you learned
12 to be Mr. Smith.
13         Do you recall that exchange?
14     A   Yes.
15     Q   Okay.  And in that exchange -- now I'll
16 paraphrase -- you said you did not think that -- you did
17 not take the -- from the discussion that Mr. Smith was
18 actually going to commit suicide; is that fair?
19         MR. SLATER:  Object to form.
20     A   Yes.
21     Q   Why was that?  Why is it that you did not
22 believe, based on that interaction that you heard and
23 observed, that he was actually going to commit suicide?
24     A   Just like I was saying earlier, I've been
25 working in corrections for a long time.  To me it's been

Page 107

1  a long time, and it's just, you -- it's not uncommon for
2  inmates to say that.  It's really not.  And just off the
3  exchanges that I heard between him and Miss Tracey at
4  the time, it didn't seem like a risk for suicide.  It
5  just didn't.
6          And if it did, of course, I would -- I mean, I
7  don't want to do CPR.  That was my first time ever doing
8  CPR.  So, of course, I didn't want him to -- when he did
9  it, it traumatized me.  But at the time I didn't feel
10 like he was a risk for suicide.
11     Q   While you've been at the Rockdale County jail,
12 have you ever had the opportunity to place someone under
13 suicide watch?
14     A   Yes.
15     Q   Have you ever had the opportunity to refer
16 somebody for mental health treatment?
17     A   Yes.
18     Q   So the time that you have referred someone for
19 mental health treatment and for suicide watch, that's
20 that behavior that you saw or heard about consistent
21 with what you heard in the exchange between Dep. Tracey
22 and Deputy -- I'm sorry -- and Ezra Smith such that you
23 would also put him on suicide watch at the time?
24         MR. SLATER:  Object to the form.
25     A   No.

Page 108

1      Q   (By Mr. Veal)  How -- if you can answer -- if
2  you can't, I understand.
3          How often during that shift -- during your
4  night the shift do you hear a patient or inmate say they
5  want to commit suicide?
6          MR. SLATER:  Object to the form.
7      A   All the time.  Well, it's -- it happens a lot.
8      Q   (By Mr. Veal)  And are you able to determine
9  based on what you hear, maybe some of the interactions
10 with the officers, whether you believe there is a
11 legitimate threat to commit suicide?
12         MR. SLATER:  Object to the form.
13     A   It's not.
14     Q   (By Mr. Veal)  Okay.  Now, did you also
15 witness that in DeKalb County jail when you were there?
16 Did you hear inmates or patients threaten to commit
17 suicide?
18     A   So at -- so Rockdale is a really small jail.
19     Q   Right.
20     A   DeKalb County is huge.  So DeKalb County I did
21 pill call.
22     Q   Okay.
23     A   So not as much as Rockdale, if that makes sense.
24     Q   Did you hear any?
25     A   At DeKalb County, yes.

Page 109

1    Q   And while you were there, were you able to
2  determine based on those interactions whether someone
3  was legitimately wanting to commit suicide while you
4  were at DeKalb County jail?
5    A   No.
6        MR. SLATER:  Object to the form.
7    A   I was able to tell it wasn't -- it wasn't they
8  weren't at risk for suicide.  They want something
9  completely different.
10        MR. VEAL:  That's all I have.
11        MR. SLATER:  I just want to ask a few
12  follow-ups.
13        MR. BUCKLEY:  Hang on.  Hang on.
14        MR. SLATER:  Sorry.  Sorry, Tim.  I forgot
15  about you for a second.
16            EXAMINATION
17  BY MR. TIMOTHY J. BUCKLEY, III:
18    Q   Good afternoon., ma'am.  I'm Tim Buckley.  I
19  represent Deputies Gomez and Jackson.  So I have very
20  few questions.
21    A   Okay.
22    Q   In your testimony today, the interaction that
23  you experienced and watched between Mr. Smith and
24  someone from Rockdale County was Dep. Tracey; right?
25    A   Yes.

Page 110

1    Q   You do not reference in your testimony today
2  anything that Gomez said, did, or that you observed him
3  do that day relative to the interaction with Tracey as
4  to the suicide attempt; right?
5    A   Correct.
6    Q   Same question with regard to Jackson.  You
7  don't reference anything about her in terms of that
8  interaction and the suicide attempt; right?
9    A   Correct.
10    Q   And the interaction between Dep. Tracey and
11  Mr. Smith in your mind didn't really involve Gomez or
12  Jackson; right?
13        MR. SLATER:  Object to the form.
14    A   Correct.
15        MR. BUCKLEY:  That's all I have.  Thank you.
16        MR. SLATER:  Thank you, Tim.  Ms. Sanchez I
17  want to follow up a little bit on what your lawyer, Mr.
18  Veal, asked you about.
19        FURTHER EXAMINATION
20  BY MR. SLATER:
21    Q   He asked you about other incidents where you
22  thought, quote, there was a legitimate suicide risk;
23  right?  And I think when we talked, we have established
24  that you had -- if you hear someone make a suicide sort
25  of ideations, say, "I'm going to kill myself," you need

Page 111

1  to follow up in order to determine whether they're at
2  risk and whether they need observation or to be placed
3  on suicide watch; is that right?
4    A   Well, I want to find the underlying cause.
5  From what I see at my job at Rockdale, the ones that are
6  saying they're suicidal, they are mental health.  But
7  they want something.  They didn't get their night snack.
8  They want their night snack.  They didn't get rotation.
9  They want to use the phone.  They want coffee.
10    Q   They may want something --
11    A   Right.
12    Q   -- and they may not want to kill themselves,
13  but you would need to do more to determine whether they
14  just need something or want something whether they're
15  going to kill themselves?
16    A   Right.
17        MR. SLATER:  That's it.  That's it.
18        THE COURT REPORTER:  Who needs the transcript?
19        MR. SLATER:  We'd like an electronic.
20        MR. VEAL:  Electronic and read and sign.
21        MR. WAYMIRE:  I don't need one right now.
22        MR. BUCKLEY:  I'd like an e-copy, and I'd like
23  a hard copy.  That's the four pages with the glossary.
24        THE COURT REPORTER:  Okay.  Got it.
25        (Deposition concluded at 12:45 p.m.)

Page 112

1            J U R A T
2
3
4
5
6
7        _____
8            ERICA SANCHEZ
9
10
11
12
13    _____
14    Notary Public
15
16    Sworn and Subscribed to me
17
18    This _____ day of _____.
19
20
21
22
23
24
25

Page 113

CERTIFICATE

GEORGIA:
FULTON COUNTY:

I hereby certify that the foregoing deposition was
stenographically recorded by me as stated in the caption,
and the colloquies, questions and answers were reduce to
typewriting under my direction; that the foregoing transcript
is a true and correct record of the evidence given.
The above certification is expressly withdrawn and
denied upon the disassembly or photocopying of the foregoing
transcript, unless said disassembly or photocopying is done
under the auspices of BULL AND ASSOCIATES, INC., Certified
Court Reporters, and the signature and original seal is attached
thereto.
I further certify that I am not a relative, employee,
attorney or counsel of the parties, nor am I a relative or
employee of such attorney or of any party, nor am I financially
interested in the outcome of the action.

This 21st day of October, 2025.

_____
MEG ARMISTEAD
Certified Court Reporter and
Notary Public. My commission
expires March 31, 2026.

Page 114

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of
the Judicial Council of Georgia, I make the following disclosure:
I am a Georgia Certified Court Reporter. I am here as a
representative of BULL AND ASSOCIATES, INC.
Bull and Associates, Inc. was contacted to provide court
reporting services for this deposition. Bull and Associates, Inc.
will not be taking this deposition under any contract that is
prohibited by O.C.G.A 9-11-28 (c)., O.C.G.A. 15-14-37(a) and (b).
Bull & Associates, Inc. has no contract/agreement to provide
reporting services with any party to the case, any counsel in the case,
or any reporter or reporting agency from whom a referral might have
been made to cover this deposition.
Bull & Associates, Inc. will charge its usual and customary
rates to all parties in the case, and a financial discount will not
be given to any party to this litigation.

OFFICIAL CODE OF GEORGIA ANNOTATED 15-14-37
(a)    Contracts for court reporting services, not related to a
particular case or reporting incident, between a certified
court reporter or any person with whom a certified court
reporter has a principal and agency relationship and any
attorney at law, party to an action, or party having a
financial interest in an action, are prohibited. Attorneys
shall not be prohibited from negotiating or bidding reasonable
fees for services on a case-by-case basis.
(b)    In order to comply with subsection (a) of this Code Section,
each certified Court Reporter shall make inquiry regarding
the nature of the contract for his or her services directed
to the employer or the person or entity regarding said
Court Reporter's services as an independent contractor.

# Erica Sanchez



Work Experience

**LPN (Licensed Practical Nurse)**
Piedmont Healthcare-Conyers, GA
November 2023 to Present

- Scheduling patients for pulmonary or sleep medicine appointments
- Administering injections and/or medications
- Obtaining authorizations

**LPN (Licensed Practical Nurse)**
Naphcare, Inc.-Conyers, GA
February 2022 to Present

- Planning and managing patient care according to each patient's needs
- Interviewing and recording patient history
- Monitoring/communicating patient's progress or regress for mental health

**LPN (Licensed Practical Nurse)**
Armor Health/Wellpath-Decatur, GA
August 2018 to June 2023

- Planning and managing patient care according to each patient's needs
- Interviewing and recording patient history
- Monitoring/communicating patient's progress or regress for mental health

**Practice Manager**
Envision Healthcare-Lake Worth, FL
June 2018 to May 2019

- Responsible for subpoena's, peer reviews, MD to MD phone calls, obtaining authorizations, organizing case reviews for University of Miami students with radiologists
- Uploading CMEs to CE broker for radiologists
- Scheduling IR procedures

**Radiology Clerk**
HCA Florida JFK Hospital-Atlantis, FL
November 2013 to February 2018

- Sorting and distributing mail to the appropriate departments
- Providing patients with their diagnostic images/report
- Scheduling appointments and putting in outpatient orders

**Shift Manager**
McDonald's-Lake Worth, FL



EXHIBIT

tabbies

Smith v. Sanchez  000001

January 2010 to November 2013

- Customer satisfaction
- Making schedules for employees
- Daily and weekly inventory
- Keeping a well-managed and professional shift

## Education

**Licensed Practical Nurse in Nursing**
Palm Beach State College - Lake Worth, FL
January 2017 to December 2017

**Associate's degree in Arts**
Palm Beach State College - Lake Worth, FL
August 2013 to December 2015

**High school diploma**
Lake Worth High School - Lake Worth, FL
August 2007 to May 2011

## Skills

- Patient care

## Certifications and Licenses

**BLS Certification**

**LPN**

Smith v. Sanchez 000002

| Course title | Enrollment Date | Completion Date | Course Enrollment Status |
|---|---|---|---|
| Segregation Rounds | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Corporate Compliance Program | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Whistleblower Information | 2022-03-03 11:00:00 | 2022-03-30 11:00:00 | Completed |
| Infection Control Manual | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Bloodborne Pathogens | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Columbia-Suicide Severity Risk Scale | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| COVID -19 Vaccine Training: General Overview | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Dental Screening in the Correctional Facility | 2023-03-15 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Social Media Policy | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Nursing Assessment Protocols | 2023-04-12 11:00:00 | 2024-04-05 11:00:00 | Completed |
| NaphCare Employee Handbook | 2022-03-03 11:00:00 | 2022-03-30 11:00:00 | Completed |
| TechCare Receiving Screening | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Dental Screening in the Correctional Facility | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Preventing Slips, Trips, & Falls | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Medication Refusals, Patient Rights, And Our Responsibilities | 2023-03-31 11:00:00 | 2024-04-05 11:00:00 | Completed |
| TechCare: An Overview | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Suicide Prevention in Jails: Basics & Beyond | 2023-04-11 23:00:00 | 2024-10-29 18:44:20 | Completed |
| Tuberculosis | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| A Proactive Approach to Suicide Prevention in a Jail Setting | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Urine Drug Screen | 2023-03-07 23:00:00 | 2023-03-08 23:00:00 | Completed |
| Columbia-Suicide Severity Risk Scale | 2023-03-15 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Multi Dose and Single Dose Vials | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| HIPAA & HITECH Orientation Training | 2023-10-26 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Emergency Response Bag - Standardization Process | 2023-06-20 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Utilization Review Training Manual | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| NetCE & Lippincott | 2023-02-03 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Multi Dose and Single Dose Vials | 2023-03-15 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Mental Health Screening | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Universal Precautions to Infection Control | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Taser Education | 2022-04-27 11:00:00 | 2022-09-08 11:00:00 | Completed |
| PREA: Medical Health Care for Sexual Assault Victims in Confinement Setting - INACTIVE | 2024-07-23 12:27:29 | 2024-10-29 18:45:09 | Completed |
| NaphCare Drug Diversion Policy | 2074-04-04 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Nursing Protocols - Sleep Disturbance and Anxiety | 2023-04-03 11:00:00 | 2024-04-05 11:00:00 | Completed |
| NaphCare Employee Handbook & Policies | 2024-01-18 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Hot Topics in Suicide Prevention in Jail Settings | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Substance Abuse Care & Treatment | 2022-03-03 11:00:00 | 2022-03-30 11:00:00 | Completed |
| Annual Preventative Care Visits | 2023-06-28 11:00:00 | 2024-04-05 11:00:00 | Completed |
| When to Send a Patient to the ER | 2024-07-23 12:27:29 | 2024-10-29 18:47:35 | Completed |
| Nursing Assessment Protocols | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Sexual Harassment | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Sexual Harassment | 2023-04-11 23:00:00 | 2024-10-29 18:41:44 | Completed |
| Needlestick Prevention | 2023-03-29 11:00:00 | 2024-04-05 11:00:00 | Completed |
| NaphCare IT Security Awareness | 2023-08-03 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Substance Abuse Care & Treatment | 2023-03-29 23:00:00 | 2024-10-29 20:07:03 | Completed |
| Correctional Orientation | 2024-08-01 15:02:20 | 2024-10-29 18:44:43 | Completed |
| Infection Control Manual | 2023-03-15 11:00:00 | 2024-04-05 11:00:00 | Completed |
| CQI Manual | 2023-03-15 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Medication Administration Training | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Suicide Prevention in Jails: Basics & Beyond | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| LPN Medication Calculation Exam | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| HIPAA Refresher Training Course | 2024-01-18 11:00:00 | 2024-04-05 11:00:00 | Completed |
| NaphCare Drug Diversion Policy | 2023-02-13 23:00:00 | 2023-02-24 23:00:00 | Completed |
| PREA: Standards and Informed Trauma Care | 2022-06-19 11:00:00 | 2022-09-08 11:00:00 | Completed |
| Delirium Tremens | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| HIPAA; HITECH Orientation Training | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| PREA:Standards and Trauma Informed Care - INACTIVE | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Business Travel Policy & Procedure Acknowledgment | 2023-06-09 11:00:00 | 2024-04-05 11:00:00 | Completed |
| A Proactive Approach to Suicide Prevention in a Jail Setting | 2023-03-15 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Code of Business Ethics and Conduct Guide | 2024-01-18 11:00:00 | 2024-04-05 11:00:00 | Completed |
| HIPAA Security Policies - INACTIVATED | 2022-11-14 11:00:00 | 4/5/2024 11:00 | Completed |
| TechCare for Nurses, Medical Technicians, Lab Technicians & Medical Assistants | 2022-03-03 11:00:00 | 2022-03-30 11:00:00 | Completed |
| IT Self Service Instructions | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Self-Harm Behaviors (Head Striking) | 2023-04-28 11:00:00 | 2024-04-05 11:00:00 | Completed |
| NaphCare Annual Refreshment Security Awareness Training | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| CQI Manual | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Mental Health Scheduling and Referrals | 2022-12-28 11:00:00 | 2023-01-26 11:00:00 | Completed |
| NaphCare Policy and Procedure Review | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |
| Splint Training | 2022-03-03 11:00:00 | 2022-03-30 11:00:00 | Completed |
| PREA: Standards and Informed Trauma Care - INACTIVE | 2023-09-07 23:00:00 | 2024-10-29 18:46:47 | Completed |
| Medication Refusals, Patient Rights, and Our Responsibilities | 2022-03-03 11:00:00 | 2022-03-30 11:00:00 | Completed |
| HIPAA Refresher Training Course | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Correctional Orientation | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| NaphCare Policy and Procedure Review | 2023-04-12 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Medication Administration Training | 2023-04-12 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Musculoskeletal Wellness: A Guide to Preventing Falls | 2023-09-28 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Code of Business Ethics and Conduct Guide | 2022-03-03 11:00:00 | 2022-03-15 11:00:00 | Completed |
| Mental Health Screening | 2023-04-12 11:00:00 | 2024-04-05 11:00:00 | Completed |
| Preventing Slips, Trips and Falls | 2022-03-03 11:00:00 | 2022-04-12 11:00:00 | Completed |



EXHIBIT 2

| Full Name | Email | Job Title | Branch Name | Location | Course Title | Enrollment Date | Completion Date | Course Enrollment Status |
|---|---|---|---|---|---|---|---|---|
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Corporate Compliance Program | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Whistleblower Information | 2022-03-03 11 00 00 | 2022-03-30 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Infection Control Manual | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Bloodborne Pathogens | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Columbia Suicide Severity Risk Scale | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | COVID-19 Vaccine Training: General Overview | 2022-03-03 11 00 00 | 2022-03-31 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Dental Screening in the Correctional Facility | 2022-03-03 11 00 00 | 2024-04-06 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Social Media Policy | 2022-04-06 11 00 00 | 2022-04-17 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Nursing Assessment Protocols | 2023-04-12 11 00 00 | 2023-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Employee Handbook | 2022-03-03 11 00 00 | 2022-03-30 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | TechCare Receiving Screening | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Dental Screening in the Correctional Facility | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Prevent ng Slips, Trips, & Falls | 2022-03-03 11 00 00 | | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Medications, Refusals, Patient Rights, and Our Responsibilities | 2023-03-31 11 00 00 | 2023-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | TechCare: An Overview | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Suicide Prevention in Jails: Basics & Beyond | 2023-04-13 23 00 00 | 2024-10-29 18 44 20 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Tuberculosis | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | A Proactive Approach to Suicide Prevention in a Jail Setting | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Urine Drug Screen | 2023-03-07 23 00 00 | 2023-03-08 23 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Columbia Suicide Severity Risk Scale | 2023-03-31 11 00 00 | 2024-04-06 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Multi Dose and Single Dose Vials | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | HIPAA & HITECH Orientation Training | 2022-03-03 11 00 00 | 2022-04-02 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | JaiOps GA Rockdale County | Emergency Response Bag - Standardization Process | 2023-06-20 11 00 00 | 2022-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Utilization Review Training Manual | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NarCan Administration | 2022-03-03 11 00 00 | 2022-04-06 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Multi Dose and Single Dose Vials | 2022-03-15 11 00 00 | 2022-04-06 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Mental Health Screening | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Universal Precautions to Infection Control | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Taser Education | 2022-04-27 11 00 00 | 2022-03-08 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | PREA: Medical Health Care for Sexual Assault Victims in Confinement Settings - INACTIVE | 2024-07-23 12 27 29 | 2024-10-29 18 45 09 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Drug Diversion Policy | 2024-04-04 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Nursing Protocols - Sleep Disturbance and Anxiety | 2023-04-03 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Emergency Handbook & Policies | 2024-01-18 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Hot Topics #5: Code Prevention in Jail Settings | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Substance Abuse Care & Treatment | 2022-03-03 11 00 00 | 2022-03-30 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Annual Preventative Care Visit | 2023-06-29 11 00 00 | 2024-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | When to Send a Patient to the ER | 2024-07-23 12 27 29 | 2024-10-29 18 47 33 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Nursing Assessment Protocols | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Sexual Harassment | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Sexual Harassment | 2023-04-11 23 00 00 | 2024-10-29 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Needlestick Prevention | 2023-03-29 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare IT Security Awareness | 2023-06-03 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Substance Abuse Care & Treatment | 2023-03-29 23 00 00 | 2024-10-29 20 07 03 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Correctional Orientation | 2024-05-01 15 02 20 | 2024-10-29 18 44 43 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Infection Control Manual | 2023-04-11 11 00 00 | 2024-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Medication Administration Training | 2022-03-03 11 00 00 | 2022-04-17 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | CQI Manual | 2023-03-31 11 00 00 | 2024-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Suicide Prevention in Jails: Basics & Beyond | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | LPN Medication Education Exam | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | HIPAA Refresher Training Course | 2024-01-18 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Drug Diversion Policy | 2023-02-13 23 00 00 | 2023-02-24 23 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | PREA: Standards and Informed Trauma Care | 2022-06-19 11 00 00 | 2022-05-04 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Delirium Tremens | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | HIPAA, HITECH Orientation Training | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | PREA Standards and Trauma Informed Care - INACTIVE | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Business Travel Policy & Procedure Acknowledgement | 2023-05-09 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | A Proactive Approach to Suicide Prevention in a Jail Setting | 2023-03-31 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Code of Business Ethics and Conduct Guide | 2024-01-18 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | HIPAA Security Policies - INACTIVATED | 2022-11-14 11 00 00 | | 4/5/2024 11 00 Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | TechCare for Nurses, Medical Technicians, Lab Technicians & Medical Assistants | 2022-03-03 11 00 00 | 2022-03-30 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | IT Self Service Instructions | 2022-03-03 11 00 00 | 2022-03-31 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Self-Harm Behaviors (Head Striking) | 2023-04-28 11 00 00 | 2024-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Annual Refreshment Security Awareness Training | 2022-03-03 11 00 00 | 2022-04-31 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | CQI Manual | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Mental Health Scheduling and Referrals | 2022-12-28 11 00 00 | 2023-01-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Policy and Procedure Review | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Sports Training | 2022-03-03 11 00 00 | 2022-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | PREA: Standards and Informed Trauma Care - INACTIVE | 2022-09-07 23 00 00 | 2024-10-29 18 46 47 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Medication Refusals, Patient Rights, and Our Responsibilities | 2022-03-03 11 00 00 | 2022-03-30 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | HIPAA Refresher Training Course | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Correctional Orientation | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | NaphCare Policy and Procedure Review | 2023-04-01 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Medication Administration Training | 2023-04-12 11 00 00 | 2024-04-01 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Musculoskeletal Wellness: A Guide to Preventing Pain | 2023-09-28 11 00 00 | 2024-04-05 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Code of Business Ethics and Conduct Guide | 2022-03-03 11 00 00 | 2022-03-15 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Mental Health Screening | 2023-04-12 11 00 00 | 2024-04-06 11 00 00 | Completed |
| Erica Sanchez | erica.sanchez@naphcare.com | Licensed Practical Nurse | 000099 - Rockdale County | Ja-Ops GA Rockdale County | Preventing Slips, Trips and Falls | 2022-03-03 11 00 00 | 2022-04-12 11 00 00 | Completed |

CONFIDENTIAL

# B-05 Suicide Prevention And Intervention

**Effective Date:** 09/19/2018

**Policy Revised:** 05/16/2024

**NCCHC Standard:** B-05

**NCCHC Opioid Standard:** Suicide Prevention (O-G-01)

**NCCHC MH Standard:** Suicide Prevention Program (MH-G-04)

**ACA Standard:** Suicide Prevention and Intervention (5-ALDF-4C-32-33); Suicide Prevention and Intervention (5-ACI-4C-32)

**Other Applicable Standard:** FMJS Chapters 9.16; FCAC 15.04M

## Purpose

To establish procedures for the identification and management of acutely and non-acutely suicidal patients; to reduce the potential for suicide; to minimize the harm when suicide attempts occur; and to minimize the overall number of suicide attempts with the goal of eliminating completed suicides.

## Policy

Health staff will maintain a program for the prevention of suicides and to identify and implement appropriate corrective action when suicides do occur. In facilities where another contracted vendor (or facility staff) provides the mental health services, medical staff will work in close association with facility or vendor mental health services to prevent suicides.

## Procedure

1) A program for suicide prevention is maintained in all contracted facilities.

2) A receiving screen is conducted on all patients entering the facility as soon as possible after arrival. Qualified health care professionals complete the receiving screen.

3) The receiving screen includes administration of the Columbia-Suicide Severity Rating Scale (C-SSRS): Screening version as well as questions regarding past or current mental illness, including hospitalizations; legal or illegal drug use; drug withdrawal symptoms; and other pertinent medical and mental health questions. Reception personnel record on the receiving screen observations of the patient's appearance, behavior, state of consciousness, ease of movement, breathing, etc.

4) The C-SSRS: Screening Version is available to non-mental health professionals to identify individuals who may require a more in-depth suicide risk assessment. The C-SSRS is routinely administered during the Receiving Screening and during monitoring under medically supervised withdrawal protocols (see F-04 Medically Supervised Withdrawal and Treatment). Following the color-coded triage prompts, the non-mental health professionals alert mental health staff when an individual requires further assessment.

5) Upon admission to the facility, a qualified health care professional with appropriate training will conduct an initial mental health screening on all patients.

6) The mental health screen includes inquiries regarding: prior psychiatric hospitalizations; past suicidal ideation and/or attempts; current suicidal ideations; suicidal threats or plans; prior violent behavior; prior victimization; special education placement; prior cerebral trauma or seizures; prior sex offenses; current and past use of psychotropic medications; current and past drug or alcohol use; substance use hospitalization; detoxification and outpatient treatment; and, behavior observations regarding the patient's orientation to person, place and time. Additionally, questions regarding significant losses, family mental health and suicide history, and suicidal behaviors during prior admissions will be recorded. Any observations from transporting officers or other staff that may contribute to a suspicion of suicidal ideation will also be noted in the record.

7) Any patient who screens positive for suicidal ideation will be placed on a safety precautions and be kept under close observation based on level of suicide risk.

**EXHIBIT**

**3**

tabbies®

aphCare 000171

CONFIDENTIAL

a) Acutely suicidal patients are those that are actively engaging in self-injurious behavior and/or threaten suicide with a specific plan. Health staff will order placement under constant observation monitored by an assigned staff member on a continuous, uninterrupted basis. Documentation of monitoring will occur per facility staff protocols. Health staff will encourage the use of cameras only as an adjunct to facility or health staff observation.

b) Non-acutely suicidal patients are those that express current suicide ideation by expressing a wish to die without a specific plan, have a recent history of self-destructive behavior, or demonstrate other concerning behavior indicating the potential for self-injury. Health staff will order that these patients are monitored by facility or health staff at unpredictable intervals with no more than 15 minutes between documented checks.

8) Any staff who hears a patient verbalizing a desire or intent to commit suicide, observes a patient making an attempt or gesture, or otherwise feels a patient is at risk for suicide, will take immediate steps to ensure the patient is continuously observed and prevented from harm until appropriate medical, mental health, and/or supervisory assistance is obtained.

9) A qualified health care professional will respond upon notification and conduct a face-to-face evaluation of the patient, document appropriately, and report findings during consultation with the site psychiatrist or qualified mental health professional. Health staff will recommend that a potentially suicidal patient be housed in a suicide resistant cell, or other secure housing, and placed on a safety precautions until evaluated by a qualified mental health professional.

a) Suicide resistant cells are the areas that have been modified to remove all items that a patient could use to harm themselves. Many times, this is a "flat" or "safe" cell that has had toilets, faucets, sprinklers, bunks, etc. removed from the cell in order to make it less likely for the patient to harm themselves with or by using objects in the room.

10) Safety Precautions:

a) Patients placed on a safety precautions may be strip searched prior to being placed in a suicide resistant cell according to the facility's policies and procedures.

b) All clinical decisions regarding the removal of a patient's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk as determined on a case-by-case basis by a qualified mental health professional and documented in TechCare. This does not apply to custody-ordered restrictions, only clinically ordered restrictions.

c) If a qualified mental health professional determines that a patient's clothing needs to be removed for reasons of safety, health staff will not restrict the use of a safety smock and safety blanket.

1) Restoration of clothing and other items are clinically assessed by the mental health professional with each evaluation completed at least once daily.

d) Clinically ordered physical restraints may only be utilized as a last resort for periods in which the patient is physically engaging in self-destructive behavior. The decision to utilize physical restraints for suicidal patients are only to be made by qualified mental health professionals in conjunction with the appropriate facility staff, according to the facility's policies and procedures. See G-01 Restraint and Seclusion.

e) The patient who is on safety precautions will be assessed at least once daily by a qualified mental health professional or appropriately trained qualified health care professional on days where no qualified mental health professional is onsite. These assessments will be recorded in TechCare using the appropriate mental health forms.

f) Only a qualified mental health professional has the ability to remove a patient from safety precautions.

1) Dependently licensed mental health professionals must consult with the appointed independently licensed professional(s) for their worksite prior to discontinuing safety precautions. This consultation should be documented in the health record.

2) Patients placed on safety precautions should be maintained on safety precautions for a minimum of 24 hours.

3) Patients on safety precautions at the time of release from custody should be evaluated to determine if they meet criteria for post-release civil commitment following the sites specific procedures as well as the laws of the jurisdiction.

4) For facilities that house ICE patients, the Clinical Director (Medical Director) must clear patients from safety precautions.

g) The patient will be reassessed 1-3 days after discharge from suicide precautions by a qualified mental health professional, or appropriately trained qualified health care professional on days where no qualified mental health professional is onsite. Further periodic follow-up assessments will continue as deemed clinically appropriate and in accordance with facility or governmental requirements (e.g., technical manuals, department orders, legislation, etc.).

h) Referral for follow-up with a mental health provider is to made as clinically indicated.

i) Where appropriate, interdisciplinary team meetings, to include institutional, mental health, and medical staff will be conducted to discuss patients on suicide precautions that require close supervision and planning.

j) Treatment plans for suicidal patients are developed with follow-up as clinically indicated.

11) Training:

a) Staff responsible for patient assessment, treatment, or supervision will receive suicide prevention training as part of their orientation. Staff will also receive a training update on an annual basis.

b) Training will include:

1) General information regarding suicides and suicidal behaviors;
2) Recognition of the signs and symptoms of suicidal behavior, particularly as they pertain to the institutional environment;
3) Factors that increase the risk for suicide;
4) A review of the Suicide Prevention policy.

c) Qualified mental health professionals, in collaboration with the institutional training officers, may assist with suicide prevention training of facility staff as well as orient all institutional staff with responsibility for patient supervision to the Suicide Prevention policy. Qualified mental health professionals may also be asked by institutional training officers to be involved in annual suicide prevention training for officers.

d) All health staff will be trained in standard first aid and cardiopulmonary resuscitation (CPR).

e) Standard first aid and CPR are to be initiated on anyone found to be unconscious and not breathing.

1) The staff is trained not to presume that a patient is deceased.
2) Standard first aid and CPR are to be continued until relieved by appropriate medical personnel.

12) Reporting and reviews – serious suicide attempt:

a) A serious suicide attempt is defined as those incidents requiring outside treatment or hospitalization.

b) The RHA or designee will immediately notify the on-site Medical Director and institutional authority of any serious suicide attempt.

c) A Medical Emergency Code Report is to be completed by staff members responding to the emergency and forwarded to the corporate office via email at notification@naphcare.com by the RHA within twenty-four (24) hours.

1) Only one Medical Emergency Code Report is completed for each incident. This report should be inclusive of all attendees at the event.
2) After completion, the Medical Emergency Code Report should be scanned into the patient's TechCare record.
3) Any staff with the need to document any additional comments concerning their specific intervention shall document that intervention in a Quick Note or SOAPE Note in the patient's health record.

d) An administrative review will be conducted by the RHA within thirty (30) calendar days of the event to assess the response actions and procedure used by the facility and emergency staff

involved. This administrative review can be part of a MAC meeting, CQI meeting, or other regularly scheduled mental health meeting as long as it is completed within 30 days of the death.

   e) A mental health clinician will complete the Suicide and Self-Harm Behavior Case Report. This should:

      1) Be completed within seven (7) days of the event.
      2) Provide information on patient characteristics and precipitating factors.
      3) Assist in identifying trends and opportunities for improvement, as well as ascertain compliance with corporate standard of care.
      4) Be forwarded to the corporate office via email to notification@naphcare.com .

   f) A Psychological Autopsy Report should be completed by a psychiatric provider, mental health director, or designee for any completed suicide within 14 days. This report should:

      1) Provide detailed, comprehensive documentation of information and circumstances that led to the event.
      2) Be used to assist in identifying trends and opportunities for improvement, as well as ascertain compliance with corporate standard of care.
      3) Be forwarded to the corporate office via email at notification@naphcare.com.

   g) The incident report form, and Medical Emergency Code Report, should be forwarded to the corporate office along with the above noted forms. These forms should be sent via email to notification@naphcare.com.

   h) Upon completion, the conclusions of all of the above information should be shared with the treating staff in the form of a Morbidity and Mortality meeting. Minutes of this meeting should be forwarded to the corporate M and M coordinator. See A-09 Procedure in the Event of a Patient Death, if the event resulted in death.

   i) The corporate Morbidity and Mortality (M&M) Review Committee will review all documentation and will report results to the on-site health care team.

   j) Reviews should include the following:

      1) A critical review of the circumstances surrounding the incident;
      2) A critical review of procedures relevant to the incident with copies of documentation confirming procedural implementation;
      3) A synopsis of all relevant training received by involved staff;
      4) Pertinent physical and mental health care services reports, including a summary of the patient's involvement prior to death; and
      5) Recommendations, if any, for change in policy, procedure, training, and physical or mental health care services in the form of a corrective action plan

13) Corrective action plan:

   a) Corrective action identified through the review process may require the implementation of a Corrective Action Plan (CAP).
   b) CAPs will be developed by the RHA in coordination with the site's psychiatric provider or mental health director.
   c) CAPs should be submitted to the Corporate Chief Medical Officer for approval and forwarded to the Corporate M&M coordinator.
   d) CAPs are to be implemented and monitored through the facility's continuous quality improvement program.
   e) The ultimate goal is to identify, evaluate, and improve the quality and efficiency of health care rendered at all institutions with the aim to reduce morbidity and mortality.

14) Critical incident debriefing:

   a) A critical incident debriefing provides affected staff and patients an opportunity to process their feelings about the incident.
   b) Critical incident debriefings are available to all staff and patients who may have been affected by a serious suicide attempt or a completed suicide.



## Medical Emergency Code Report

| Facility:<br>Rockdale County Jail | Date:<br>7/9/2024 | Code:<br>Suicide Attempt | Time Called:<br>0145 | Time Arrived:<br>0146 |
|---|---|---|---|---|
| Name:<br>Ezra Smith | DOB: | Location:<br>Booking Cell 7 | ID#:<br>164822 | Allergies: |

**Reason Called:**

Suicide Attempt

**Vitals Upon Arrival:**

O2 SAT:0 _____    BP:0 _____    HR:0 _____    TEMP:0 _____    RESP:0 _____    BS: _____

**Witnesses:**

**Position of Patient Upon Arrival:**
Supine

**Officers Involved:**
Deputy Tracie, Lt. Daniels

**Health Care Staff Involved:**
Nurses: Vorquishala Smith, Enoa Sanchez, Samo Napier
MD: _____
NP: _____

| Chief Complaint:Suicide Attempt | | Onset: |
|---|---|---|

**Medical History:**
☑None  ☐Asthma  ☐CAD  ☐COPD  ☐CVA  ☐DM  ☐HTN  ☐HIV  ☐MI  ☐Seizures  ☐Cancer  ☐Hep C  ☐Other: _____

**Current Medications:**

| Respiratory | CIRCLE ALL THAT APPLY | Cardiovascular |
|---|---|---|
| WNL☐ Labored☐ Cough☐ SOB☐ Wheezes☐ Stridor☐<br>Crackles☐ Hemoptysis☐ Pain with Breathing☐ Diminished☐<br>Nasal Flaring☐ Other: NO respirations | | WNL☐ Chest Pain☐ Left Arm Pain☐ Diaphoresis☐ Orthopnea☐<br>Edema☐ Palpitations☐ Dizzy Spells☐ Syncope☐ Tachycardia☐<br>Bradycardia☐ Other: Pulseless |

| Neurological | Treatments |
|---|---|
| WNL☐ Oriented x3 ☐Disoriented to person/place/time☐<br>Headaches☐ Dizziness☐ Seizure☐ Tremors☐ Fainting☐<br>Walking Problems _____ Speech Problems _____<br>R/L: Altered sensation:_____<br>R/L: Altered motor:_____<br>Pulses: Present  Absent<br>Other:_____ | ☑ Oxygen applied: Time 0148      15      liters<br>☐ IV access started: Time_____ Cath size_____<br>   Site _____ Inserted by_____<br>☐ Lactated Ringer<br>☐ D5W<br>☐ Normal Saline<br>☑ CPR started: Time 0148 _____<br>☑ CPR terminated: Time 0150 _____<br>☐ Life Pack applied: Time _____<br>☐ VS every 5-10 minutes until transported:<br>   Time:____ BP____ Pulse____ Resp____ O2 Sats____<br>   Time:____ BP____ Pulse____ Resp____ O2 Sats____<br>   Time:____ BP____ Pulse____ Resp____ O2 Sats____<br>☐ Emergency department notification time:_____<br>☐ Report given to:_____<br>☑ Time ambulance notified: 0145 _____<br>☑ Ambulance arrival time: 0155 _____<br>☐ Ambulance departure time: _____ |

**Progress Notes**

At 0152 Pules present and patient A+O x 4. HR 122, O2 Sats 100 %, EMS on scene.

SMITH, EZRA 164822 (242425)

**EXHIBIT**

tabbies

5

ESmith0029

**Name**            **ID#**

Early this morning around 0145 hrs., patient attempted suicide in cell 7 by wrapping telephone cord around his neck. Writer arrived immediately to scene. Patient was laying on floor, blue in face, blood noted in nose, urine on jumpsuit, no pulse, and scar noted on neck from phone cord. CPR initiated immediately. EMS was called right way and chest compressions were started for about two minutes. Pulse was checked and noted, oxygen 2 L NC was give. VS were 116/73, 114, 99%, 16.  EMS arrived, patient was alert and stable, transferred to hospital.

Prior to this incident, apparently, he was waiting in cell 7 since previous shift. He was not showing in the booking queue to be screened. Patient started banging on door wanting to know what is going on with his process.

**Medical Diagram of Injury**

1. _____  2. _____  3. _____  4. _____

5. _____  6. _____  7. _____  8. _____



FRONT          BACK

**NOTIFY MEDICAL PROVIDER/RN IMMEDIATELY IF:**

| Lacerations | Fractures | Contusion |
|---|---|---|
| ☐ Wound is severe/deep/requires sutures | ☐ Obvious deformity, loss of sensation | ☐ Deformity is present |
| ☐ Bleeding is uncontrolled | ☐ Numbness/severe pain, absent distal pulses | ☐ Impaired neurological/vascular status |
| ☐ Wound has imbedded debris not easily irrigated | ☐ Mechanism of injury suggested hidden trauma | ☐ Mechanism of injury suggesting hidden trauma |
| ☐ Laceration to the face, ear, nose, eyelid or over joint | ☐ Takes anticoagulants, over age 50 | ☐ Marked swelling is present |
| ☐ Wound that edges do not approximate easily with Steri-strips | ☐ X-rays, analgesics, tetanus booster, crutches | ☐ Condition not responding to intervention |
| ☐ Signs of infection present | | |
| ☐ Laceration to the Abdomen or chest that may penetrate underlying organs | | |

SMITH, EZRA 164822 (242425)          ESmith0030

| Name | ID# |
|---|---|

| **Outcome** |
|---|
| PAtient was admitted. Pulse present after 1 round of CPR. Patient A+O x 4 prior to EMS arrival. |

**Returned to Infirmary:** ☐ Walking   ☐ Wheelchair   ☐ Other: _____

**Out to Hospital:**   ☐ Car   ■ Ambulance   ☐ Other: _____

**Signature/Credentials of Person Completing Report:** Erica Sanchez

**Date/Time Report Completed:** 7/9/2024 0200

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Reviewed and Approved by MD/NP/PA:** _____   **Date:** _____

## Fw: Re Suicide Attempt 7/9/24

**Erman Gunindi <erman.gunindi@naphcare.com>**
Tue 7/9/2024 10:00 AM
To:Kevin Tatum <Kevin.Tatum@RockdaleCountyGA.gov>

📎 1 attachments (18 KB)
OutlookEmoji-16275094054907254688d-2bd3-4ce3-8726-3e8083fc4a0c.png;

Erman Gunindi, BSN | HSA-Rockdale County Jail
911 Chambers Dr. Conyers, Ga 30012
██████████@naphcare.com
(O)770-278-8251
(F) 770-278-8229

[1627509405490]

Follow Us: Facebook<https://urldefense.com/v3/__https://www.facebook.com/NaphCare-Inc-
124549757608960/?
fref=ts__;!!HxK7s4GrzN6EjdqyTA!qpOC686wCBRo3QeOWaXgLlYW9FYoOvUtVRkC_vv8XYCwYYq5FIhhVvGl
-tMS3z1u0VVafubEBHrkCeqSLG3Jl-jM4gUDffAfKi6wnzs$ > |
Twitter<https://urldefense.com/v3/__https://twitter.com/NaphCareInc?
ref_src=twsrc*5Egoogle*7Ctwcamp*5Eserp*7Ctwgr*5Eauthor__;JSUIJSU!!HxK7s4GrzN6EjdqyTA!qpOC686
wCBRo3QeOWaXgLlYW9FYoOvUtVRkC_vv8XYCwYYq5FIhhVvGl-tMS3z1u0VVafubEBHrkCeqSLG3Jl-
jM4gUDffAfgdqND1I$ > |
LinkedIn<https://urldefense.com/v3/__https://www.linkedin.com/company/naphcare-inc-
__;!!HxK7s4GrzN6EjdqyTA!qpOC686wCBRo3QeOWaXgLlYW9FYoOvUtVRkC_vv8XYCwYYq5FIhhVvGl-
tMS3z1u0VVafubEBHrkCeqSLG3Jl-jM4gUDffAf3eatC-Q$ > | Advancing Correctional Healthcare |
NaphCare<https://urldefense.com/v3/__https://www.naphcare.com/__;!!HxK7s4GrzN6EjdqyTA!qpOC686w
CBRo3QeOWaXgLlYW9FYoOvUtVRkC_vv8XYCwYYq5FIhhVvGl-tMS3z1u0VVafubEBHrkCeqSLG3Jl-
jM4gUDffAf4KyTKSE$ >
Confidentiality Notice: This e-mail, including any attachments, is for the sole use of the intended
recipient(s) and may contain privileged and confidential information. Any unauthorized review, use,
disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.

From: Erica Sanchez
Sent: Tuesday, July 9, 2024 9:59 AM
To: Erman Gunindi
Subject: Re Suicide Attempt 7/9/24

EXHIBIT
6

Good morning Erman

Early this morning around 0145 hrs., patient #242425, attempted suicide in cell 7 by wrapping telephone cord around his neck. I arrived immediately to the scene. Patient was laying on floor, blue in face, blood noted in nose, urine on jumpsuit, no pulse, and scar noted on neck from phone cord . EMS was called right way and chest compressions were started for about 1-2 minutes. Pulse was regained, oxygen 2 L NC was given, pupils dilated with pen light.

VS were 116/73, 114, 99%, 16. EMS arrived, patient was alert and stable, transferred to hospital.

Prior to this incident, apparently, he was waiting in cell 7 since previous shift. He was not showing in the booking queue to be screened. Patient became irritated and started banging on door wanting to know what is going on with his process.

All I heard was Deputy Traci making statements "Go kill yourself than" by the cell door when he was kicking. The was no longer kicking on the door and than I heard Deputy yelling for a nurse because patient was turning blue. Patient has a history of mental health in his chart and has been to facility multiple times.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

EZRA SMITH,              )
                                )
     Plaintiffs,         )
                                )
v.                          )
                                )   CIVIL ACTION FILE NO.
DEPUTY MONIQUE TRACEY,  )   1:24-cv-05158-TWT
DEPUTY RAUL GOMEZ, DEPUTY )
SHENEQUA JACKSON, and ERICA )
SANCHEZ.              )
                                )
     Defendants.       )
                                )

## DEFENDANT ERICA SANCHEZ'S RESPONSES
## AND OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES

Defendant Erica Sanchez ("Defendant Sanchez"), objects and responds to Plaintiff's First Interrogatories as follows:

### PRELIMINARY STATEMENT

1.    The following responses are based upon information presently available to Defendant Sanchez, which it believes to be correct. They are made without prejudice to her right to amend these responses based on subsequent discovered facts.

2.    Defendant Sanchez expects that Plaintiff and other defendants will produce documents and answers through the course of discovery. Accordingly, the



following responses are made with a complete reservation of rights to amend based on any new information received in such documents or during discovery.

3.      This Preliminary Statement is incorporated in each of the responses set forth below.

## INTERROGATORIES

1.  State your employment history beginning with your first job as a medical professional and continuing through the present. For each employer, list: (a) the employer's name; (b) your rank and job title; (c) the beginning and ending dates of your employment; (d) the reason for the termination of the employment.

    **Response: This Defendant refers Plaintiff to her resume produced with these responses.**

2.  If you intend to rely upon your own financial limitations as a defense to Plaintiff's claim for punitive damages, state: (a) your current annual salary, as well as gross amount and date of bonuses received; (b) additional income information (other taxable income, untaxed income, etc.) including rental income and gift income since January 1, 2022; (c) amount of cash or savings and banks where such amounts are held; (d) investments; (e) trusts (revocable and non-revocable, and jointly held); (f) vested amounts

in retirement plans (g) home value, debt, purchase year, and purchase price.

**Response: This Defendant objects to this request as not reasonably calculated to lead to the discovery of admissible evidence at a trial of this case. This Defendant and her purported actions are covered under an insurance policy held by NaphCare. If or to the extent this information is required, this personal information is not required to be produced until there is an appropriate showing of liability for punitive damages.**

3. Please identify every person who to your knowledge, information, or belief has investigated any aspect of the occurrence, which is the subject of this litigation, and indicate whether or not each has made a written record of the investigation or any part thereof.

**Response: This Defendant states that upon information and belief, the Rockdale County Sherrif's Office investigated the incident. This Defendant is not the custodian of any such records and does not possess any responsive documents.**

4. Please provide the phone number(s) and carrier(s) of the cell phone you used in July 2024.

**Response: The carrier is MetroPCS. My cell phone number is** ▮▮▮
▮▮▮▮

5. Did you communicate with any person about Ezra Smith's suicide attempt
   from July 8, 2024, through and including your answer to this interrogatory?
   If so, state (a) the date of the communication, (b) the time of the
   communication, (c) the means of communication, and (d) a summary of
   the substance of the communication. For the purposes of this interrogatory,
   you may exclude communications that were solely between you and your
   lawyer.

   **Response: Because this interrogatory unlimited in scope, this
   Defendant objects to this request to the extent it seeks information
   protected against disclosure by the attorney client privilege. Subject
   to said objection, this Defendant states that she informed her
   supervisor of the event after it occurred.**

6. Did you provide any evidence, testimony, or statement to any law
   enforcement agency or prosecutor investigating any aspect of Mr. Smith's
   suicide attempt? If so, state the date and the name of the individuals with
   whom you communicated, and summarize the information that you
   provided.

**Response:** Other than the information provided in these responses and in Plaintiff's medical record, this Defendant is not aware of any statements or in possession of any responsive information or documents.

Respectfully submitted this 15th day of May, 2025.

*{signature on following page}*

HUFF, POWELL & BAILEY, LLC

/s/ *Antonio Veal*
Michael G. Frankson
Georgia Bar No.: 173835
Antonio E. Veal
Georgia Bar No.: 460007
Lindsey K. Adams
Georgia Bar No.: 288816

*Counsel for Defendant Erica Sanchez and Nonparty NaphCare, Inc.*

999 Peachtree Street, NE, Suite 950
Atlanta, GA 30309
Telephone: 404-892-4022
Telefax: 404-892-4033
Email: mfrankson@huffpowellbailey.com
Email: aveal@huffpowellbailey.com
Email: ladams@huffpowellbailey.com