## Page 1

IN THE UNITED STATES DISTRICT COURT
IN THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
                              )
EZRA SMITH,                   )
                              )
         Plaintiff,           ) CIVIL ACTION
                              ) FILE NO. 1:24-CV-05158-TWT
         vs.                  )
                              )
DEPUTY MONIQUE TRACEY, et al, )
                              )
         Defendants.          )
----------------------------/
```

Deposition of MONIQUE WOODS TRACEY, taken on behalf of PLAINTIFF, pursuant to the stipulations set forth below, before Meg Armistead, Certified Court Reporter, at 4330 South Lee Street, Building 400, Suite A, Buford, Georgia, commencing at the hour of 1:00 p.m., Tuesday, September 30, 2025.

BULL & ASSOCIATES, INC.
COURT AND DEPOSITION REPORTERS
315 West Ponce de Leon Avenue, Suite 650
Decatur, Georgia 30030
(404) 256-2886

## Page 2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
    JAMES M. SLATER, Esq.
    Slater Legal, PLLC
    2296 Henderson Mill Road, Suite 116
    Atlanta, Georgia 30345
    Phone: (404) 458-7283
    Email: james@slater.legal
         * * *
    WINGO SMITH, Esq.
    JEFFREY R. FILIPOVITS, Esq.
    Spears & Filipovits, LLC
    315 West Ponce de Leon Avenue, Suite 865
    Decatur, Georgia 30030
    Phone: (404) 407-5418
    E-mail: wingo@civil-rights.law
    jeff@civil-rights.law

FOR DEFENDANT:
    ANTONIO E. VEAL, Esq.
    Huff Powell & Bailey, LLC
    999 Peachtree Street, Suite 950
    Atlanta, Georgia 30309
    Phone: (404) 892-4022
    Email: aveal@huffpowellbailey.com
         * * *
    JASON C. WAYMIRE, Esq.
    Williams & Waymire, P.C.
    4330 South Lee Street
    Building 400, Suite A
    Buford, Georgia 30518
    Phone: (678) 541-0790
    E-mail: jason@wmwlaw.com
         * * *
    ERIC J. O'BRIEN, Esq.
    Buckley Christopher & Hensel, PC
    2970 Clairmont Road, Suite 650
    Atlanta, Georgia 30329
    Phone: (404) 633-9230
    Fax: (404) 633-9640
    Email: eobrien@bchlawpc.com

## Page 3

INDEX TO PROCEEDINGS
EXAMINATION INDEX

WITNESS:                                    PAGE
MONIQUE WOODS TRACEY

                EXAMINATION

EXAMINATION by MR. JAMES M. SLATER        4

EXAMINATION by MR. ANTONIO E. VEAL        86

INDEX TO EXHIBITS

Plaintiff's Exhibit No. 1        10

Plaintiff's Exhibit No. 2        23

Plaintiff's Exhibit No. 3        29

Plaintiff's Exhibit No. 4        32

Plaintiff's Exhibit No. 5        32

Plaintiff's Exhibit No. 6        72

Plaintiff's Exhibit No. 7        82

(In the following transcript, dashes [--] are used to indicate an intentional or purposeful interruption of a sentence, and ellipsis [...] is used to indicate halting speech or an unfinished sentence in dialogue, written material.)

## Page 4

(The Reporter's Disclosure was presented and is attached.)

MONIQUE WOODS TRACEY
having been previously sworn, testifies as follows:
                EXAMINATION
BY MR. JAMES M. SLATER:
    Q   Good morning.  Please state your name for the record

    A   Sure.  Monique Woods Tracey, T-r-a-c-e-y, is my last name.

    Q   Perfect.  Thank you.  Good afternoon.

    A   Good afternoon.

    Q   Do you prefer to go by Ms. Woods or Ms. Tracey?

    A   Monique is fine.

    Q   Monique is fine?

    A   Yes.

    Q   I'm going to be taking your deposition, Monique.  I'm going to be asking you some questions.  This is being transcribed by a court reporter.

    A   Yes.

    Q   Before I get into some of the basics of the a deposition, have you ever been deposed before?

    A   No.

    Q   Have you ever been given sort of testimony

1  outside of a deposition --
2      A  No.
3      Q  But I understand that you've -- in, like, the
4  work context, you had an appeal?
5      A  Yes, in the merit board.
6      Q  You've given some statements there.  Were you
7  under oath then?
8      A  Yes.
9      Q  Okay.  So let me go into the format because
10  this is going a little bit different from the merit
11  board hearing.  I'm a lawyer.  I represent the
12  plaintiff, Ezra Smith.  You are being sued by Mr. Smith,
13  along with several other your former colleagues from the
14  Rockdale County Sheriff's Office as well as Nurse
15  Sanchez.
16      A  Yes.
17      Q  I'm going to ask you some questions.  You're
18  doing great so far because this is being transcribed.
19  So everything needs to be "yes," "no," audible sort
20  spoken-English responses.  Nodding, gesturing -- it's
21  just not something the court reporter can pick up and --
22      A  Understood.
23      Q  -- won't give us a clean transcript.
24          The other thing is -- I'm going to be try to
25  be mindful of this because I have a really awful habit

1  of talking over people.  I just don't know how to stop
2  doing it.  I really wish I could.  So I'm going to try
3  not to talk over you, and I ask that you try not to talk
4  over me.  Again, if we're talking over each other, it's
5  hard for court reporter to get a clean transcript.
6      A  Okay.  Sounds fair.
7      Q  From time to time, you may hear your lawyer or
8  some of the other lawyers object to some of my
9  questions.  Sometimes that might be because they don't
10  think I asked a great question.  There might be a
11  problem with the question.  What they'll do, they will
12  object, and they will allow you to respond to my
13  question.  Unless you hear your lawyer say, "Monique,
14  I'm directing you not to answer Mr. Slater's question,"
15  you have to answer my question; okay?  Does that make
16  sense?
17      A  Yes.
18      Q  Okay.  Great.  With that, I don't know how
19  long we're going to be here for.  I don't think we're
20  going to be here until the sun goes down, but you never
21  know.  If you need a break at any time, you just let me
22  know.  The only thing I'll ask is that if I'm asking a
23  question, just wait until you're finished answering the
24  question, and we'll take that break.
25      A  Sounds good.

1      Q  All right.  Very good.  Before I get into the
2  actual substance of the questions today, are you on any
3  sort of medication or is there any other reason you
4  wouldn't be able to give truthful testimony today?
5      A  No.
6      Q  Great.  Okay.  Let me start with asking you
7  just some basics about this lawsuit.  You understand
8  that you're being sued for the incident that occurred at
9  the Rockdale County Jail on the evening of July 8th and
10  July 9th, leading into July 9th of 2024; is that right?
11      A  Yes.
12      Q  As part of this lawsuit, have you performed
13  any searches of any of your emails or devices for any
14  communications about what happened that night?
15      A  No.
16      Q  Okay.  Would you have communicated by email or
17  text about what happened --
18      A  No.
19      Q  -- that night?
20      A  No.
21      MR. WAYMIRE:  We produced some texts that
22  somewhat relate to the incident.
23      MR. SLATER:  And we have those texts.
24      Q  (By Mr. Slater)  I have some text messages --
25  I believe it's the morning after -- with your

1  lieutenant.
2      A  Mm-hm.
3      Q  Other than those text messages, did you
4  communicate with anyone else at the sheriff's office?
5      A  No.
6      Q  Okay.  What about any of the other officers
7  who were on shift that evening?
8      A  No.  The last communication we had was outside
9  in the parking lot the night of.
10      Q  Okay.  And who was that communication with
11      A  It was the whole shift, basically.  New shift,
12  old shift coming in.
13      Q  Is that, like, a standard thing that happens
14  at the end of the shift?
15      A  If something good or bad happens, yes.
16      Q  And do you -- as best you recollect, tell me
17  what was discussed at the end of shift.
18      A  Everybody say it was a good save, good job.
19  We was still flabbergasted:  What just happened?  Then
20  everyone got in their cars, you know.  Lt. Daniels --
21  because I was still in between.  I said, "I'm going text
22  you in a little bit," and left and went to QuikTrip and
23  texted Lt. Daniels and Corp. Carl because I wasn't
24  feeling like everyone else was feeling.
25      Q  And how would you describe how you were

## Page 9

feeling?

A   I felt happy, but then was little confused. I was a little confused, like -- we'll get to it. I was just not as excited as they were.

Q   Okay. And happy that Mr. Smith survived?

A   Right, happy that he survived and everyone's -- "You did a great job, Tracey." "Oh, my God. That was so good." And I really did not remember, like, his face or anything. It was just -- it just happened so quickly.

Q   Okay. And then so you said you didn't feel as sort of happy, you felt differently. Can you describe that a little bit?

A   Like, what just happened? Hey -- you know, it's, like: Wait a minute. Did this kid, you know -- and I started driving. And I only live ten minutes from home, and I pulled over at QuikTrip. And when I that's when I sent the text messages to my supervisor, saying, "What happened," you know?

The last vision I see is this kid. That was the result for me? And, you know, did I lose my compassion? Because I know how I am. I've been myself for 60 years. I know how I am and felt -- did I say something? I did miss something to let this happen? And that's when any supervisor reassured me, no. It's

## Page 10

nothing you did. Nothing you said. You handled everything the right way.

MR. SLATER: Okay. Let me show you what we'll mark as Plaintiff's Exhibit 1 for your deposition.

(Plaintiff's Exhibit No. 1 was marked for identification.)

MR. SLATER: You folks are going to have to share. Sorry.

MR. ANTONIO E. VEAL: That's fine.

Q   (By Mr. Slater) We were just talking about the text messages that you sent the morning of, and I have here -- it's three pages of screen shots from a phone.

Is this from your phone?

A   Yes.

Q   Okay. And are these the text messages that you're referring to that you sent --

A   Yes.

Q   -- on the way home --

A   Yes.

Q   -- at the QuikTrip?

A   Mm-hm. Yes.

Q   And I see that there's some on page 2. There's a -- Lt. Daniels responds. He says, "It's not you. It's not you."

## Page 11

Do you see that?

A   Yes.

Q   And is that the Lt. Daniels who was working at the Rockdale County Sheriff's Office at the time?

A   Yes.

Q   And that was your supervisor at the time?

A   Yes.

Q   And then I see on the third page, there's a -- it says, "Hall, Corp.," and there's some responses there: Don't hold yourself accountable for his actions."

Do you see that?

A   Yes.

Q   Has that Hall, Corp. worked for the Rockdale County Sheriff's Office at the time?

A   Yes; he's still there. He's sergeant now.

Q   And sitting here today, have these messages been altered or changed in any way?

A   No.

Q   No? Okay. Okay. And I'm going to -- we're going to talk about a lot about what happened that night as you probably imagine, Monique, but before we get into that I kind of just want to learn more about you.

A   Yes.

Q   So where are you from?

## Page 12

A   Brooklyn, New York.

Q   I could tell. You had an accent. Okay.

MR. WAYMIRE: Off real quick.

Q   (By Mr. Slater) Okay. How long did you live in Brooklyn?

A   Most of my life.

Q   Okay. When did you move to Georgia?

A   When I was 21.

MR. SLATER: And I'm just going to ask if you could try to speak up a little. I'm hard of hearing. I know we're really close, but I don't know what's -- I've lost, like, 40 percent of my hearing over the last year. So it's a little tough.

Q   (By Mr. Slater) Okay. So -- and when you moved to Georgia, did you move to the Atlanta area or somewhere else?

A   No; I moved Newton County.

Q   Okay. And how long were you there?

A   Ever since.

Q   Okay. That's where you --

A   Correct.

Q   Okay. And why did you move down here?

A   My brother became Atlanta Police. My parents were selling their home in New York, and we're close, my family. So we all wanted to be in Atlanta together.

Page 13

1   Q   Is your brother still with the Atlanta Police?
2   A   Yes, he is.  He retired twice.
3   Q   That's Atlanta Police?
4   A   Yes; he's fugitive squad.
5   Q   Don't want to mess with him.  Got it.  Okay.
6       And when you moved down here, what were you
7   doing?  Were you in school?  Were you working?
8   A   I started a clothing line, PZI, which -- when
9   I left New York, I was manufacturing Jay-Z Rocawear.  I
10  don't know if you guys know that.
11  Q   Yeah.  So that's PZI like the letters?
12  A   PZI, correct.  And it was a woman's jeans
13  company off of Memorial Drive, and I started that line.
14  That line stayed up for three years.  Then I met Capt.
15  Hall of Rockdale.
16  Q   Okay.  And I'm going to ask you about that in
17  a second, but I want to step back in time a second.
18      Was -- did you go to school for fashion?
19  A   Yes; I went to Fashion Institute of
20  Technology, which is in New York.
21  Q   I've heard of it.  Very good school.
22      When did you graduate?
23  A   I graduated with an associate's in business in
24  '88.
25  Q   '88.  And did you have any other sort of

Page 14

1   post-high school education other than --
2   A   No.  I was SIR classes, which is all honor
3   classes in high school.
4   Q   Before getting into -- after FIT and before
5   getting into PZI, were you working in the industry
6   otherwise?
7   A   Only in the fashion industry, and I spent six
8   months out of the year in Hong Kong.
9   Q   Okay.  How did you like Hong Kong?
10  A   Love it.
11  Q   I've never been.  Okay.
12      And then you met Capt. Hall when you came down
13  here.  So tell me about that.
14  A   I just met him.  And I was saying, you know,
15  I'm tired of doing the PZI.  Maybe I'll do what you do.
16  He said, "Be a cop."  I was, like, heck, yeah.  "You
17  need to," because I always had a way about being.  We
18  didn't grow up in a cop, like, family.  He said, "No.
19  Come down."  And so I said, "I don't think I could do
20  it."  He says, "I'll make a bet with you.  Come down and
21  please take the test."  And I took the test, and 16
22  years later I'm still there.  And I liked it.  It wasn't
23  at all as scary as I thought.  I didn't want to do the
24  street.  Kind of like controlled chaos.  But as far as
25  being indoors, I can handle that.  And he told me.  He

Page 15

1   said, "First time I met you, I knew you could handle
2   it."  And I did.  I enjoy it.
3   Q   The entire time -- so 16 years at Rockdale.
4   So that was your first experience in law enforcement?
5   A   Correct.
6   Q   Okay.  And while at Rockdale, I understand
7   that your last position, you were detention deputy.  Or
8   is that your official rank?
9   A   Yes, and Deputy 2.
10  Q   Deputy 2.  Did you have any other -- in the 16
11  years you were at Rockdale County Sheriff's Office, did
12  you have any other duties?
13  A   FTO trainer, which is a field training
14  officer.  We train new people.  I was also part of
15  hiring board.  I would hire.
16  Q   Would that be just for corrections or for --
17  A   Just for the jail.
18  Q   Just for the jail?
19  A   Just for the jail.
20  Q   Did you have any role outside of jail in your
21  16 years?
22  A   No.  We would do Christmas things and shop
23  with the cop thing but nothing of a role of a police
24  officer.  It would just be being in the community, and
25  we would go to churches and speak to young boys and

Page 16

1   girls who was getting on the wrong track.
2   Q   Sure.  Okay.
3   A   Yeah.
4   Q   I think I've attended one of those.
5       All right.  So you take the test.  Is that the
6   sort of officers examination sort of test?
7   A   Mm-hm.
8   Q   And you begin working at the jail?
9   A   Correct.
10  Q   Okay.  When you -- while -- throughout these
11  16 years at the jail, I understand there's sort of
12  continuing education and things like that.  But have you
13  received any certifications?
14  A   Yes, the CPR.  We have done the pepper spray.
15  That's about it.  Pepper spray and CPR.  That was it.
16  It was mandated thing.  You had to go shooting but pass
17  or not pass, but you had to put in the hours.
18  Q   And then you said it might be scary, but when
19  you got there you realized, right, it wasn't.  Could you
20  tell me about that, what changed your --
21  A   Never been inside of prison, nothing.  You
22  have family that you never really talk to that's been in
23  prison.  You would just think the bad people are in
24  prison.  And I was told by all my sergeants that
25  supervisors.  So he understands, you know, that big guy

Page 17

1  in the corner, 6 feet?  Yeah.  He killed his whole
2  family, but that's all he wanted.  He's good now.  And
3  come to find out, he was.
4        You got to communicate and talk with people.
5  They were really nice, but it was like whoever they
6  wanted to hurt, they already hurt them.  I've never seen
7  anyone in a facility -- I mean if it gang related, it's
8  different.  But they're not really trying to come after
9  you.  You have not personally done anything to them.
10  You can sit down and have a perfectly good conversation
11  with them.  "Do you know what he did to his children?"
12  You don't know till afterwards.  He's speaking like his
13  children were alive.  He said, "No; he killed all his
14  children."
15        You just talk to the person.  You don't judge.
16  Half the time, I don't want to know what you did.  Just,
17  you nice to me:  "Good morning, Ms. Tracey."  "Good
18  morning."  That's it.  "Can I get my cup of coffee?"
19  "You didn't get it yet?  Okay.  I'll bring it back to
20  you."  They're fine, and they treat me the same way.
21  I've never had any incidents.
22     Q   Okay.  Were you -- was there a certain
23  position -- and I understand the Rockdale County jail,
24  there's different areas.  There's booking folks that are
25  there for a longer stretch; right?  Are you sort of --

Page 18

1  does what you're doing there change based -- like on a
2  week-to-week basis?  Or were you sort of put in a place
3  and you were there?
4        Can you walk me through that?
5     A   Yes.  It changes every day.  You can be at the
6  max.  You can be at the minimum.  You can be with the
7  female.  You can be with locked shut in, but they only
8  allow one hour out a day, and that's to shower.  It's
9  the bad ones and the worse ones and then the ones that
10  just want to talk to themselves.  So it's all over.  You
11  get a piece of everything.
12     Q   Okay.  Let me ask you about your on-the-job
13  training.  Could you describe to me how sort of that
14  worked at Rockdale County?
15     A   You pretty much put into a group.  You walk
16  around the facility, and they watch you react.  I didn't
17  really have a reaction.  We always -- I've always felt
18  growing up, in order to do something like a facility or
19  prison, you need heart and you have to be fearless.  And
20  my upbringing, my culture in Brooklyn, I wasn't too
21  much -- not too much frightens me.  Not too many streets
22  I'm afraid to go.  That's part of it.
23     Q   Big-city life?
24     A   Yeah; you're not really afraid.  You have
25  some -- a lot -- even now with the U.S. Marshals, we

Page 19

1  have some come in and they quit within two hours.  They
2  never had a street fight.  That's very important.
3  People don't realize it, people with the sheriff.  And
4  he was asking, "You never had a street fight?  Ever have
5  a street fight?"  And people said, "I never had a street
6  fight," and they will leave.  You can't be in here if
7  you never had a street fight.  You know, not to say in
8  my fifties, I'm doing a street fight.  But if I had to,
9  I could.
10     Q   I hear you.
11     A   Yeah.
12     Q   What about -- so I think you kind of walked me
13  through the initial training.  But I understand that
14  each year, you had to have so many trainings; is that
15  right?
16     A   Right, certifications.  You have to redo a lot
17  of classes:  CPR, intervention, suicide, transporting.
18     Q   Okay.
19     A   It's a whole lot of things up you have to
20  refresh every year.  Every year you have to refresh it.
21     Q   And how are those conducted?
22     A   Considering how long you've been there and
23  what your hours -- because sometimes they'll have the
24  morning watch come in a little bit earlier and do an
25  hour, hour and a half, of a new class of CPR.  Same

Page 20

1  thing with the night shift.  The night shift may come in
2  an hour earlier to do that kind of test again or review
3  it, and a lot of things was done online.
4     Q   Okay.
5     A   A lot of things done online.
6     Q   Was it, like, through your work emails?
7     A   No work email.
8     Q   Okay.  Is that, like, a class you can take it
9  Home, or is it like the --
10     A   I didn't take things home.  I did it during my
11  time there during my lunch hour.  I did it there.
12     Q   And do you know -- you talked about transport.
13  Obviously, suicide is going to be a topic for today.
14     A   And handcuffing.  A lot of that that was
15  taught.  Believe it or not, handcuffing.
16     Q   In person?
17     A   Correct, handcuffing, body shackle, putting
18  them in the chair.  We have a chair -- a restraint chair
19  that was also a class.
20     Q   And for suicide, how you were those trainings
21  conducted?
22     A   Those trainings where you decide who's going
23  to play which role, the turtleneck or the pepper spray,
24  because there's different ways to deal with a suicide.
25  If they're violent, you can't just grab hold to them.

Page 21

1  You have to uneven the battlefield.  And they're either
2  pepper sprayed them and get them down with a clean
3  blanket, a turtle suit, get them to the shower.  The
4  nurse sees them.  Then once they come down, they're put
5  into a clean turtle suit and put into a padded cell.
6      Q    And you folks had a padded cell at the
7  Rockdale County Jail?
8      A    Yes; we have two.
9      Q    Two.  And were they in the booking area --
10     A    Yes.
11     Q    -- or somewhere else?
12     A    Yes.
13     Q    Did the padded cell -- did it have -- like, I
14  know the booking cells obviously have the phone.  Did
15  the padded cell have a phone?
16     A    No; it didn't have a sink or a toilet.
17     Q    Just, like, a drain or something?
18     A    Mm-hm.
19     Q    For suicide you and you talked about sort of
20  the process of going in and getting someone and then
21  taking them after they sort of put on the turtle suit,
22  as you called it, taken to mental health.
23         What about the signs of -- you know, figuring
24  out if you need to take someone to mental health right
25  before they're already in a crisis?  Do you have

Page 22

1  training on that?
2      A    Yes, we do.  What we would do, we will listen
3  to them screaming, screaming and banging.  Most
4  of the time, that's for attention, because you're
5  looking right at them.  They're just kicking, screaming,
6  "I want to get out.  I want to get out."
7         When the word "suicide" pops up, and --
8  "suicide, suicide," you go over, you look:
9         "Let me get you someone to see what's wrong.
10  Tell me what's wrong."
11        "I just -- I need to call my boyfriend."  "I
12  need to call my mother."
13        "Give me a minute.  Let me get the key."
14        Now, normally I can take on any female.  And I
15  do, you know, open the door, come out, get your phone
16  call, go get you a cup, you know.  "I notice your cup is
17  not here.  Let me get you some water," and take it from
18  there.  And we try to handle male on male and female on
19  female.  And we would take care of her.
20        Now, a male -- I've done this before by
21  mistake.  I brought a male out who was in orange.  He
22  was in the green padded suit, younger, smaller.  Thought
23  I could take him.  Padded suit and talked to him very
24  quiet.  They will beat him up, like, for days.  Like,
25  anyone who took him out, he'd fight.

Page 23

1         "Tracey, don't take him out."
2         "I can talk to him."
3         He's listening to my voice:  "Are you going to
4  calm down for ten minutes?  Are you going to come out?
5  I'm going to get you a jumpsuit.  Stop sleeping in your
6  own urine.  Come on.  Act like a person."
7         I unlocked the door.  Two steps, he was on my
8  back, and if I didn't have three of my excellent workers
9  to help me, he would have won.  But they said that's
10  what you get because we told you to leave him in there.
11  Sometimes you would think, why you all just nasty to
12  him?  Nothing for nothing, you looking at it.  Maybe you
13  need to see your sister standing there talking with her.
14  It didn't work.  He was just crazy.  And, unfortunately,
15  that young man became unalive in our jail.  So you try
16  to do male on male, female-female.  So I never did that
17  again.
18         (Plaintiff's Exhibit No. 2 was marked for
19  identification.)
20         MR. SLATER:  Let me show you -- we'll mark
21  this as Plaintiff's 2.  There.  Just -- there you go.
22  Okay.
23     Q    (By Mr. Slater)  Monique, what I'm showing
24  you is a Rockdale County Sheriff's Office jail policy
25  and procedure and says at the top "General Order 5.22."

Page 24

1         Do you see that?
2      A    Yes.
3      Q    And it says, "Effective Date, April 23, 2024;"
4  right?
5      A    Yes.
6      Q    Okay.  Have you seen this before?
7      A    Yes.
8      Q    Okay.  And I understand that is a -- it says
9  "Subject:  Policy on Suicide Prevention and
10  Intervention."  So we were just talking about suicide
11  intervention/ prevention.
12         Is this a policy that you were trained on
13  while you were at the Rockdale County Sheriff's Office?
14     A    Correct.
15     Q    Okay.  And here on the bottom of page 1, under
16  Suicide Response, it's 1-A.  Do you see that?  It says,
17  "Any inmate ..."
18     A    Correct.
19     Q    Okay.  Says, "Any inmate who threatens or
20  attempts self mutilation or suicide will be viewed as a
21  mental health emergency."
22         Do you see that?
23     A    Yes.
24     Q    Is that how you understood the policy when you
25  were working at the Rockdale County Sheriff's Office?

Page 25

1      A   Yes.  But you have to understand, we don't
2   always have mental health professionals on -- in our
3   premises in our building, not 24/7.
4      Q   But someone could be called; right?
5      A   Not from around the building, not around the
6   corner.  He'd have been to be called.  "I'll be in in
7   two hours," or, "I'll be in first thing in the morning
8   at 6:00 a.m."  Very rarely did we have a medical office.
9   "Hey.  Call Dr. Joe.  We have a medical crisis."
10     Q   But you would, have, like nurses on staff,
11  things like --
12     A   Absolutely.  And that would be that job, to
13  call and say, "Hey so and so.  What jail is he in?
14  Could he send his standby?"  You know, to have a
15  mental -- but we have had and kept people in cells for
16  two days waiting to see a mental health person.  The
17  mental health said she's coming tomorrow.  Mental health
18  says she's coming tonight.
19     Q   Would they be, like, in observation or
20  something like that while they were waiting?
21     A   Yes, they would be -- yes.  They would have a
22  15-minute because the medical nurse would relay a
23  message:  Put them on 15-minute check, and that would be
24  a 15-minute check.
25     Q   Okay.

Page 26

1      A   Mm-hm.
2      Q   And I listened to your merit board hearing,
3   and I understood that Sgt. Welsh explained during that
4   hearing that when someone threatens suicide that you
5   didn't have any discretion; you had to go get someone
6   from mental health?
7      A   That we have to get -- I didn't have to get
8   anyone because she was right there.
9      Q   Right.  But someone would have -- when someone
10  threatens suicide, the policy was, you had to treat it
11  as-- you couldn't assess whether it was legitimate or
12  not legitimate?
13     A   Absolutely.  We're not doctors.  Absolutely.
14     Q   Let me ask you -- and we'll probably talk
15  about this again in a little bit, but you don't have to
16  look at it right now.
17         You said you're with the marshal service now?
18     A   Yes.
19     Q   When did you start at the marshal service?
20     A   January 25th of 2025.
21     Q   Okay.  And where are you working with the
22  marshals?  Are you at a facility?
23     A   Lovejoy.
24     Q   Lovejoy.  Is that Robert Dayton --
25     A   Yes, Robert Dayton.

Page 27

1      Q   All right.  I'm familiar with that place.
2   Yes.  So that's -- is that like folks are held pretrial,
3   federal detainees?
4      A   Mm-hm.
5      A   Got it.
6      A   Pretty much sentenced too.  Some of them are
7   sentenced.
8      Q   Some of them are sentenced?
9      A   Yeah.
10     Q   And are you ... and are you serving as a
11  correctional officer there?
12     A   CO.
13     Q   CO?  Okay.  How do you like it there?
14     A   Love it.
15     Q   Love it?  And so you've been there what now?
16  Nine months or so?
17     A   Correct.
18     Q   Okay.  How is it different from Rockdale?
19     A   Not security minded at all.  Way more
20  dangerous.  I've seen more blood than I've ever seen,
21  and it's gang related.  And the difference between
22  Rockdale and U.S. Marshals, we're not allowed to fight
23  them.  When I say that, if he picks up a stick and I
24  pick up a stick, I'm in the wrong.  I shouldn't have
25  picked up the stick.

Page 28

1      Q   What are you supposed to do?
2      A   You're supposed to avoid him hitting you with
3   the stick.  There are no handcuffs.  There's no pepper
4   spray.  There's no batons.  A lot of shanks but no stab
5   vests.  Very new to get into it, but when you realize
6   it, the more you work in there, it's older people.
7          But the young gangs are young gangs.  And when
8   they going after someone, they pretty much want to go
9   after the one they want.  They don't want you to get in
10  the way.  They'll tell me.  They'll give me an eye.
11  Like, you know, I'll turn around, and they got the one
12  they wanted.  It's violent.  Just not security minded as
13  it should be because it's dangerous.
14     Q   And so in contrast, sounds like you're saying
15  Rockdale was more security minded?
16     A   More so.  More so.
17     Q   How so?
18     A   They more so where everyone walked around with
19  handcuffs.  Here, not allowed to handcuff these guys.
20  This guy got two life sentences plus 20 years.  20
21  years.  You want me to take him to medical because his
22  tooth hurts?  I'm getting used to it.  It certainly
23  makes you get your gift for gab.  Everyone has a story.
24  Everybody's like, "Hey, Auntie.  You good?"  I say, "I'm
25  good.  You doing all right?"  So you keep them talking.

Page 29

1    Before you know it --
2      Q    Build rapport?
3      A    Yeah.  If you don't have one, don't go.  Don't
4    go in.  If you have one that looks at you, don't call
5    out.
6      Q    Okay.
7      A    Yeah.  It's never a dull moment.
8        (Plaintiff's Exhibit No. 3 was marked for
9    identification.)
10        MR. SLATER:  I want to show you before we
11    moved onto something else -- just bear with me.  I'll
12    mark these as Plaintiff's 3.
13        THE WITNESS:  I get to keep these; correct?
14        MR. SLATER:  The court reporter will take
15    those.  We can make you copies if you like.  The ones
16    that I have that I gave you with the exhibit stickers
17    are for the court reporter.
18        THE WITNESS:  Okay.
19      Q    (By Mr. Slater)  All right.  I'm showing you
20    a document I've marked as Plaintiff's Exhibit 3.  And
21    this is title Defendant Tracey's Responses and
22    Objections to Plaintiff's First Interrogatories and
23    Request for Production Of Documents.  Do you see that?
24    Just take a minute to look through that.
25        Have you seen the document before, Monique?

Page 30

1      A    No; I don't believe I have.
2      Q    I'll represent to you, this is a document --
3    it's -- the first page is Responses to Interrogatories,
4    and those are basically questions that Mr. Smith has
5    asked you under oath.  And I asked if you had seen it
6    because I have your -- the lawyers will sign it, but
7    also the party -- and you're a party -- are supposed to
8    sign it.  I don't have -- I do not believe I have your
9    signature.  So I was --
10        Well, let's just go through it.  The first one
11    asks about your employment, and we've already covered
12    that.  And you said you're at the marshal service now.
13    For No. 3, it asks about who investigated the
14    occurrence, and "the occurrence" means what happened to
15    Ezra Smith that day in July of 2024.  And here it
16    references that Sgt. Tatum investigated and that there
17    was the merit board hearing.
18        Do you know of anyone else who investigated
19    what happened to Ezra?
20      A    Investigator Ford, F-o-r-d.  He was the first
21    on the scene after Inmate Smith was taken out.  He
22    investigated, myself, and Deputy Sheriff Jackson.
23      Q    Was it, like, turned over to Tatum after that,
24    or is that a separate --
25      A    I don't even know how that happened.  Jackson

Page 31

1    and I were sitting here.  Ford was sitting behind us.
2    He said, "That looks good, girl.  Print it out.  Let me
3    take it."
4      Q    And what looks good?  A report that you were
5    writing?
6      A    A report, just what happened at this time of
7    day.  He started yelling, and it was not even as long as
8    this.
9      Q    And I have some reports that we'll go through.
10      A    Okay.
11      Q    So I'm not going to mark these yet.  We'll get
12    to them in a second, but I have the incident report if
13    you just look at what I'm holding.
14      A    Oh, sure.
15      Q    Would that be the report that you're
16    referencing?  I also have the narrative.  And just hand
17    those back to me when you're done.
18        Are any of those, the report, what you were
19    just talking about?
20      A    That's what I wrote.
21      Q    That report you were talking about with Mr.
22    Ford?
23      A    Yes.
24        MR. SLATER:  I'll mark it now.
25        And what am I?  4, Madam Court Reporter?

Page 32

1        THE COURT REPORTER:  Yes, you are.
2        (Plaintiff's Exhibit No. 4 was marked for
3    identification.)
4        MR. SLATER:  I'll hand that back to you and
5    give your lawyer a copy.  We'll -- that incident report,
6    we'll mark that as 5.
7        THE WITNESS:  This, I don't remember writing
8    it.
9        MR. SLATER:  We'll talk about it.
10        THE WITNESS:  Okay.
11        MR. SLATER:  If you hand it back just so I can
12    make sure it's marked, we'll mark the incident report as
13    Plaintiff's 5.
14        (Plaintiff's Exhibit No. 5 was marked for
15    identification.)
16        MR. SLATER:  You can have that back.
17        Jason, here's a copy.
18      Q    (By Mr. Slater)  So let's actually turn to
19    what I marked as Plaintiff's 4.  It says "Re:  Contact
20    with Inmate Smith, Ezra," and then has his inmate
21    number, looks like.
22      A    Mm-hm.
23      Q    So you were referencing that you were sitting
24    with Ms. Jackson and Mr. Ford and writing something.
25    Can you confirm that this is -- the document that we've

Page 33

1  marked as Plaintiff's 4 is the document that you were
2  writing?
3      A   Yes; I can confirm that.
4      Q   And so when would you have written this?
5      A   This is immediately after this had happened
6  because that's when Ford was sitting behind us.
7      Q   Okay.
8      A   And --
9      Q   But you said "immediately."  Like, 2:00 in the
10 morning, 3:00 in the morning?
11     A   She was actually gone.  No; she was not in the
12 cell.  Smith had already went to the hospital --
13     Q   Okay.
14     A   -- yeah, about 1:00 o'clock and moved the
15 inmate out of the general population.
16     Q   And so when you were writing this, were you --
17 was it an investigation to see what happened?  Or was
18 this a potentially disciplinary investigation?
19     A   No.  Ford wanted to know what happened:  What
20 did this guy do?  Why did he do it?  Who is this guy?
21 And just wanted to know who, why, when, what.
22     Q   Okay.  And we'll talk about that in a little
23 more detail.  Let's turn back to your interrogatory
24 responses.  That's the longer document that we marked as
25 No. 3, the one that's open in front of you.

Page 34

1          So other than -- I don't know if you said
2  "officer" or "sergeant."  I keep calling it Mr. or Mrs.
3  because I can never remember rank.
4      A   Investigator Ford, yes.
5      Q   Investigator is his title?
6      A   Yes.
7      Q   so investigator -- so other than Investigator
8  Ford an Sgt. Tatum, were there anyone who else looked
9  into what happened with Ezra Smith?
10     A   No, not that I know of.
11     Q   Okay.  Okay.  And then turning to No. 6, it
12 starts on page 3.  Yeah.  You see it --
13     A   Mm-hm.
14     Q   -- asks if you communicated with any person
15 about Ezra Smith's suicide attempt from July 8th of 2024
16 up to and including the answer to your interrogatory.
17         And if you turn to page 4, you'll see there's
18 an objection about patient-therapist privilege.  I'm not
19 asking you specifically about any communications with
20 the therapist.  I know from your text messages, you said
21 from Plaintiff's 1, "I have an emergency session with my
22 therapist."
23         Did you go see a therapist after what happened
24 to Ezra?
25     A   Absolutely.

Page 35

1      Q   Okay.  Is this someone that you regularly see?
2      A   Absolutely.
3      Q   Okay.  I'm not going to ask you the specific
4  content but other than to ask if you talked about what
5  happened that night.
6      A   No.  With my doctor and my psychiatrist, they
7  make it very clear they're not interested in what goes
8  on outside of me.  Their main concern is me.
9      Q   Okay.  Have you talked to any mental health or
10 medical provider about what happened with Ezra Smith?
11     A   Could not bring myself to do so.
12     Q   And I know that you talked about speaking with
13 folks in the parking lot at the end of shift; right?
14 And then, obviously, you texted Daniel and Hall at the
15 QuikTrip; right?
16         Other than those communications -- and just to
17 be clear, just before you begin to clarify, I don't want
18 to know anything that you talked about.  I'm not allowed
19 to know about that.  I'm not asking that.
20         Other than what you talked to your lawyer
21 about -- we talked about the parking lot, the text
22 message at the QuikTrip and obviously the merit board
23 hearing.
24         Other than those three things, have you talked
25 to anyone about what happened to Ezra?

Page 36

1      A   No.
2      Q   No?
3      A   No.
4      Q   Okay.  And I think for No. 7, it asks about
5  any statements you've provided.  And, you know, we went
6  over your merit board hearing and your incident reports.
7          But other than merit board hearing or writing
8  a report for your job at the Rockdale County Sheriff's
9  Office, have you written anything about what happened to
10 Ezra?
11         THE WITNESS:  To write to the job?
12     Q   (By Mr. Slater)  So you wrote your incident
13 reports at work; right?
14     A   Right.  Right.
15     Q   And you spoke at the merit board hearing?
16     A   Right.
17     Q   Have you, like, written anything anywhere else
18 about Ezra Smith?
19     A   No.
20     Q   No text messages?  No Facebook posts?
21     A   No, sir.
22     Q   Okay.  I didn't think so, but it's my job to
23 sort of figure that out.
24     A   It's my job to answer.  No.
25         MR. SLATER:  Let the record note an

1    unequivocal "no."  All right.  Very good.
2       Q    (By Mr. Slater)  And I was just asking you
3    about what happened to Ezra; right?  Have you talked to
4    anyone about what happened to you?
5       THE WITNESS:  In regards to my well-being?
6       MR. SLATER:  Your well-being and your job,
7    right.
8       Q    (By Mr. Slater)  I understand you lost your
9    job.
10      A    Yeah.  I didn't talk to anyone about my job
11   or -- my family knows I left from the job, and they
12   wasn't please I even went back.  So they were kind of --
13   what is the word? -- happy but not happy, you know.
14   They were, "Good.  About time to leave those people
15   alone."
16       "No.  You don't really know what happened."
17       I guess when I stayed in my room for a few
18   days, they were, like, "Really, what did they do?"  You
19   know, "Did they stash something on you?  Because you
20   know that guy wants you in handcuffs."
21       "No.  Just something really happened that was
22   bad."
23       They said, "Did you do it?"
24       I said, "No; I don't think I did it, but
25   they're blaming me for it."

1        And before I can get to this point, my family
2    leaves me alone because they know to leave that alone.
3    That's going to be an ever-flowing waterfall.  And, no;
4    I have not spoke to anyone in my family about it.
5       Q    What about outside of your family?
6       A    No.  I mean, I go to church by myself, but
7    that's it.
8       Q    You go to church?
9       A    It's really hard to talk about and think
10   about.
11       MR. SLATER:  I understand.  The whole point
12   today is to talk and think about it.  I apologize for
13   that.  I appreciate you bearing with me and getting
14   through it.
15       Let's talk about -- let's take a five-minute
16   break; okay?  Let's get some water, use the restroom.
17   Let's go off the record.
18       (A recess was taken.)
19       Q    (By Mr. Slater)  All right.  So I understand
20   that as a result of what happened that night, you were
21   fired from your -- we were just talking about that.  You
22   were fired from Rockdale County Sheriff's Office.
23       Do you think that was -- you know, based on
24   everything that happened, was that fair?
25       A    Absolutely not.

1       Q    Tell me about that.
2       A    It was not fair because I know why it was
3    done.  It was not fair because it was four officers that
4    was in the same area.  I for one was not the booking
5    officer.
6       Q    Who was the booking officer?
7       A    Gomez was the booking officer.  Jackson was
8    the movement officer, and I was the kitchen officer
9    where I should not have even been there.  But if you
10   know the layout of our organization, you don't leave one
11   person in booking because it's impossible to do.  So she
12   said, "Well, I'm doing the movement."  She took her
13   movement responsibility, said, "Gomez, you do the
14   movement.  Me and Tracey are going to knock these
15   folders out."  It's a long process to do one of them.
16       Q    How long does it take?
17       A    It can take over an hour to do.  When we got
18   there, the last shift had stacks of folders.  People
19   were there since that morning.  Mind you, we get there
20   at 3:00.  So they'd been there all morning.
21       So we just started sliding them down, doing a
22   little system, you know:  You do the pictures.  I'll do
23   GCI.  So me and Jackson got our groove.  We got the
24   groove, and she looked up:  We need these four guys
25   moved back to the back with -- you know, she was, like,

1    "I can't.  I can't," all frustrated.  We were all
2    frustrated.  We were doing things we are weren't
3    supposed to be doing.  That's not even my job.
4        But I was frustrated because we did work as a
5    team.  I can say it now because I said it to his face:
6    Lazy Gomez.  He did play a part because he did move the
7    guys out.  So we looked.  We was like, oh, shit.  It
8    We got one folder left.  And I kept saying, "Whose
9    folder is this?"
10       And when I say that, there's a blue folder,
11   meaning this person did not have a charge with us.  He
12   was being held for another county.  So I can't -- I
13   said, "Jackson, whose folder is this?"  And she took it.
14   She took it.  She threw it back towards me.  She said,
15   "I'm not doing that folder."  I said, "But you're not
16   even telling me whose folder it is.  We got everybody's
17   done."
18       They look in the back.  We see Smith, and I
19   was, like, "Is this his folder?"  And she says
20   something, like, "I'm not dealing with him.  He's a
21   prick.  He can stay there.  You need to go to the
22   kitchen and just start the kitchen work."  And I said,
23   "What do you mean?"  She said he showed out in court.
24   He did this.  He did that.
25       Okay.  I don't want to hear.  I can't.  Gomez

Page 41

1  had disappeared, and I just -- he started the banging.
2  He started the banging.  I was finishing up the last
3  folder I had, put the last sticker on the last folder.
4  Jackson said, "He can bang all night.  He can do it all
5  night."  I said, "I'm going to get my guys and I'm going
6  to the kitchen."  She said, "Don't worry about it.
7  He'll stop."
8          And, boom, he stopped.  And I said -- I folded
9  up my folder and went to the camera which is right
10 there.  (Witness indicating.)  I said, "What did he stop
11 for?"  She says, "Who knows?"  You know, "Just go to
12 sleep."  I said, "I don't see any water," because that's
13 what they would do, flood water.  I said, "Let me go and
14 look before I go to the kitchen."
15         And I looked and immediately just saw -- or on
16 the camera you just saw his feet.  So I thought maybe he
17 just threw his shoes off and was standing up on the bed.
18 So I went in, and he was purple.  And his eyes was
19 crystal, literally.  I'm not talking light purple.
20 Purple.  Blood out the eyes, the ears.
21         And I yelled for the keys because Jackson had
22 the keys on the other side because she was taking
23 someone else out and yelled, "Jackson.  Jackson.  Keys,
24 keys, keys, keys."  And she got Gomez -- I don't know
25 where he was.  I didn't even look -- and she said,

Page 42

1  "Tracey, grab his feet.  Grab his feet."  And she put
2  him down on the ground, and I froze.  After seeing what
3  I saw, I froze.
4          And she got down, and Sanchez came in there
5  and, you know, just doing the nonsense.  I didn't even
6  know he was in there.  I looked right at him.  No one
7  even told me he was in here.
8          They worked on him.  Thank God for Lt. Daniels
9  who was our lieutenant who has retired.  He came in and
10 took it over.  It was a while before we got him back and
11 he was breathing.  They put him on the gurney, and I
12 pretty much walked in the hallway.  Just stood there.
13         And that's when Gomez walked by, laughing.
14 "What are you laughing for?"
15         He was like, "That shit was crazy.  It was
16 crazy."
17         "What was so crazy about it?"
18         "I can't believe you was just telling him to
19 do it, and he did it."
20         "Who told him to do it?"
21         He said, "You don't -- you told him.  I can't
22 believe he actually would be that dumb enough to do it."
23 I walked away from him because I was never a fan of
24 Gomez, and I walk away.
25         Then I think, actually, we didn't even leave

Page 43

1  the time we normally left.  I think we left 30 minutes
2  prior because Daniels was, like, "You need to get home.
3  You need to go home."  I was, like, "We did all right.
4  He was fine.  He's up he's talking."
5          But he said, you know, "Did you say anything
6  to that kid?"  I told him he's fucking crazy, yeah, the
7  things you would say.  And he says, "He's saying you
8  said something to him."
9          And I said, "I didn't say anything to him."
10 He said, "Because he just said that black bitch told me
11 to do it," because he asked, "What made you do it?  Did
12 you take drugs?  Did someone give you something?"
13         "No.  That black bitch told me to do it.  So I
14 did it."
15         And that's what my lieutenant said, "No more.
16 You will be wearing a box starting tomorrow."
17    Q    Like a camera?
18    A    A camera that has audio.  So everything you
19 say is going to be on the computer because you know your
20 mouth, and they love to catch you with your mouth.  That
21 was that.  That's what they done.
22         I spoke to lieutenants, and the very same day
23 I went home, I didn't sleep.  And then I get a phone
24 call from the -- I don't know what his title was.  He
25 said, "I need you to come up here."  I said this can't

Page 44

1  where a celebratory cake.  I didn't hear any of my other
2  friends say they were going to get cake.
3          And I took everything up.  Like, I knew.
4  Here's your badge.  Here's everything.  You don't know
5  what it's for?  Because you been wanting me out.  You
6  hated that you had to give me that $20,000 two years
7  ago.  You hated it, and everyone knows.
8     Q    What do you mean by that?
9     A    I took the sheriff to court two years prior to
10 that.  And he owed us money, and we got over $85,000.
11    Q    For wages or --
12    A    That he was hiding --
13    Q    Okay.
14    A    -- from the board of commissioners.  And he
15 hated that, and I've never seen him in two years.  I was
16 there for two years, and he had to send me that money.
17 And it was never the same.  It was fine.  I don't care.
18 But it was a thorn in his side.
19         But, yeah; when everything came down and they
20 were, like, "No; he's saying you said 'wrap it around
21 your neck,'" and which for a long time I would -- I know
22 I didn't tell that boy to hang himself.  Saying you
23 start getting into -- you want to remember but you
24 don't, because it's, like, who the fuck said that?
25         I didn't realize when I listed -- like, a

Page 45

1 couple of friends called to see say, "Are you okay?  Are
2 you all right?  That's no what they did to you.  We
3 heard what they did to you."
4        I said we argued.  We argued.  I remember us
5 arguing, and I never knew exactly what was said, you
6 know, "Be a man, do a man or ..."
7        When I went to go -- I went and got the keys,
8 and I went to go put the key in, and he said, "I dare
9 you to put the key in, you bitch.  I dare you."  I said,
10 "Okay.  You're daring me?"  And it becomes a street
11 fight.  Not proud of it.  It became a joining fight.  I
12 said, "What you going to do when I put the key in?"
13        He said, "I'll show you bitch.  Open the door.
14 I'm going to show you."
15        It was, "Okay, the same energy you got, you
16 keep going to keep this same energy when I open the
17 door?"
18        "Mm-hm."
19        He's still kind of kicking.  I think, if I
20 open this door, he's going to kick the door, and the
21 fight is going to be over.  He kept going back:  "you
22 black this.  You black that.  It's okay.  Wait till my
23 boys get here."
24        "I don't want you to talk about it.  No, no,
25 no, no, no.  There's going to be no more talking.  I

Page 46

1 want you to be about it.  Do you know what that means?
2 I want to you to be about it.  Show me.  Clean the floor
3 with this bitch.  Clean the floor."
4        But by the time I walked away -- because my
5 coworkers was, like, "Leave it, Tracey.  Just leave him
6 behind the door.  Forget him."  I was like, "No.  I want
7 to be able to --"
8        Q   When you say your coworkers who?
9        A   Like, Jackson was over there.  She said,
10 "Tracey, just leave.  What are you arguing about?"  She
11 heard us screaming.
12        Q   Right.  And she said just leave it alone?
13 Just don't open the door?
14        A   I'm not opening the door.  Where's Daniels?
15 So when I went -- and that's before I went and looked at
16 the cameras, and Daniels -- he was doing their rounds,
17 you know.  They got to go sign their books.  When Daniel
18 came, he already hung himself because Daniel -- we
19 called him the L Train because he pretty much take you
20 out.  But he didn't get there at that time in time
21 before he hung himself.
22        That's last of it.  And I saw the video when
23 they took him to the hospital.  He was sitting in bed
24 like nothing's wrong.  I said, "That kid was gone," and
25 it scared me.  It sent chills down my spine.  That kid

Page 47

1 was gone.
2        Q   Mm-hm.
3        A   And I never got that out of my brain.  Like,
4 demonic.  I mean, how do you sit up and have a full
5 conversation like nothing was wrong with him?  I don't
6 know.
7        THE WITNESS:  Have you ever seen a dead
8 person?
9        MR. SLATER:  I've seen the video, and it was
10 rough.
11        A   It was rough, and I had to admit it.  I'm glad
12 I wasn't the only one there.
13        Q   (By Mr. Slater)  You said there were four --
14 I think you said you were there four people?
15        A   It was myself, Sanchez -- Jackson was on the
16 podium and Gomez and then Lt. Daniels and Corp. Hall
17 arrived and I want to say three other officers from the
18 back.  I don't know their names.  I just remember them
19 running, and there was no inmates.
20        Q   It was just Mr. Smith?  And you said -- so,
21 you know, you got in trouble.  The other -- Sanchez,
22 Gomez, Jackson.  Did they get in trouble?
23        A   Not to my knowledge because I was escorted
24 out.  But not that night.  I came back to work.  I
25 worked the towers.  But everywhere was really weird with

Page 48

1 me, like, even my friends.  And what's his name, Tatum,
2 was walking around.  He said, "I just want to ask if you
3 need to talk to someone mental."  I said "No; I have my
4 open therapist."  And we talked very little.
5        Did my time.  When I went home -- well, I went
6 back down to see him.  And I said, you know, "I wrote
7 something to my supervisors, and I don't know ... I
8 don't know where to go or who to talk to.  A pastor or
9 somebody?"  That's when -- I'm just using that as an
10 example.  He said, We're sitting here having a good
11 conversation.  Then someone said, "You know, Tracey, her
12 car is parked in your parking spot, and she blew her
13 brains out in your spot.  What did you say her?"
14 Wouldn't you wonder what did I say to her?  You wouldn't
15 think that way?"
16        He said, "Yeah; I kind of would."
17        I said, "That's what kind of what I think.
18 I'm the last person to yell at him and then that
19 happens.  So you don't feel something hanging on you?"
20        Then that day they fired me.  And I first
21 thing I asked, "Where are the other three?  Not them?"
22        Q   You think they should have been disciplined
23 too?
24        A   I said, "Where are the other three?"
25        Q   How come?

1       THE WITNESS: Huh?

2   Q  (By Mr. Slater)  How come?

3       THE WITNESS:  How come what?

4       MR. SLATER:  You think they should have

5  discipline.

6   A  Because we all heard the same thing.  We all

7  heard -- now, I could have done exactly what they did.

8  The begging, begging.  We can hear a mule kicking.  What

9  was that?  That doesn't bother you?  Just kicking with

10  your feet.  When you start using the head, that's my

11  point.  I've seen a head bust open.  So -- "Oh, my God.

12  He's doing it with his head."  "He's got a hard head.

13  He's fine."

14   Q  who's that --

15   A  One of those --

16   Q  -- Jackson or Gomez?

17   A  One or the other.  You can't do that.  By the

18  time -- I've seen it, and it's not a pretty sight.  I

19  said, "Stop banging your head."  That's how I even got

20  close to him in the cell.  "Stop banging your head."  He

21  just kept doing it, kept doing it.

22   Q  Did he say he was going to kill himself?

23   A  He just said, "Let me out."  Let me out.

24  Then he started mule kicking.  He started saying, "I'm

25  going to kill myself, kill myself, kill myself."

1   Q  So he said that after?

2   A  Afterwards he was saying that:  "let me out.

3  Let me out.  I'm going to kill myself," and I was trying

4  to tell him -- this is what he got all screwed up.  I

5  said, "You know, I talked to your mother.  That's why

6  you're over here."

7       "Because you know my mother was going to get

8  in your ass."

9       I said, "No.  Your mother -- I like your

10  mother.  I know your mother.  It's you that's the pain

11  in the ass right now.  She called to check on you."

12       But he took it as, "Oh, you're over here

13  because my mother yelled at you."

14       "Your mother is the nicest person I know."

15   Q  How do you know his mom?

16   A  She was -- she spent five years in Rockdale.

17   Q  Okay.

18   A  And I didn't know her until she called, and

19  she was -- (repetitive noise) -- telling me we had 20

20  people.  And she says, Is this Officer Tracey from New

21  York?  And I said yes.  she said, "This is so and so.  I

22  know don't remember me?  Oh, my God it's been so long.

23  You helped me.  I been clean for five years."

24       I said, "Oh, I'm so happy."

25       She said, You just saved -- you don't know how

1  may girls you have saved."

2       I said, "Okay.  That's really nice.  Let me

3  go.  I got a lot of stuff to do.  Good hearing from you.

4  Stay clean."

5       "But you know my son?"

6       I said, "That's the one that's standing in the

7  window?  I said, Let me finish up with admin.  It's,

8  like, swamped here right now.  I said, "But it's so good

9  talking to you."

10       "I can't wait to tell the girls I've seen

11  you."

12       That was it.

13   Q  Did she say anything about him having any

14  mental health issues or anything like that?

15   A  No; she said -- I didn't hear anything because

16  like I said, when she was talking, I was over there.

17  But she was on speaker, and the phones was ringing.

18       She did -- I thought she mentioned about a

19  kid.  Someone took her kid from her.  I don't know if he

20  has a kid or if he's fighting for the kid.  The girl

21  don't let him see the kid, I thought.  That couldn't

22  have been the line of the conversation.  She didn't say

23  anything about -- he's in and out of something, no.

24  Like I said, my -- I'm guilty.  I didn't -- I wasn't

25  listening.  My full attention was not on her.

1   Q  Do you know when she called?

2   A  No.  No.  That whole one day was a big blur.

3   Q  Okay.

4   A  It was a big blur.  I know I talked to her

5  once.

6   Q  Was it a speaker?

7   A  It was a speaker.

8   Q  Was anyone around when she called?

9   A  It was on speaker.  Four of us -- all of us

10  was around, but we don't hear.  If Jackson's sitting

11  next to me, she's answering on speaker.  I'm up.  I'm at

12  the copier.  I'm taking pictures.  I'm not listening to

13  her phone call.

14   Q  But she was next to you when Ms. Pittman

15  called?

16   A  I couldn't tell you where she was.  Sometimes

17  you can be working on something, you won't even answer

18  the phone -- let me just get this done -- because

19  whoever is here is going to want me to look for

20  something else.  Let me finish what I'm doing right now,

21  and that person will call back.  That's how we try to --

22  we'd never get anything done if we stop.

23   Q  That makes sense.  It's a busy place.

24       You were talking about this blue folder;

25  right?

1    A    Mm-hm.
2    Q    I think you said something to the effect that
3    Jackson said he showed out in court?
4    A    Yeah.
5    Q    What does that mean?
6    A    He went to court -- and I wasn't there so I'm
7    just going by his saying. He went to court and showed
8    out where they had to put hands on him in court.
9    Now, the blue folder is when he does not have
10   charges with us. We have manila folders. They belong
11   to us. Red folders mean they're hot. They're murderers
12   that I have to make sure they don't get out by no means
13   necessary. And blue folder is where you holding him for
14   Fulton County. We're holding him for shoplifting, but
15   he's not our inmate. So they want to come get him, they
16   can come get him.
17   Q    But you still have to process --
18   A    Yeah. He has to be processed because he's in
19   our house. So they call and say is so and so -- "Yeah;
20   he's here. We're holding him for you. You want us to
21   keep him?"
22   "You know what? Turn him loose. When he
23   crosses the bridge, we'll pick him up again."
24   Q    Who's this blue folder?
25   A    The blue folder is going from table to table.

1    I just keep seeing it, and I was over there. And she
2    said, Just leave it. Just leave it. That's that
3    prick's folder.
4    I said, "What he is? Who is he?"
5    She said, "You know that's the guy that showed
6    out in court. Somebody had jacked him up, and he got in
7    front of the Court and started acting stupid."
8    I said, "Okay. I don't know. Are you doing
9    it?" And she said, "Just leave it there."
10   Q    Okay.
11   A    She said, "You just need to go to the -- get
12   the kitchen because we're behind."
13   Q    Did Jackson say anything about Mr. Smith that
14   you remember?
15   A    No. She just told me he was a prick.
16   Privileged. Privileged.
17   Q    Privileged?
18   A    Privileged prick.
19   Q    What kind of privilege?
20   A    White privilege prick. I don't know.
21   Whatever she felt he was, the way he behaved in court.
22   Q    That wasn't about --
23   A    Not what he was doing there.
24   Q    Do you know that for sure or not?
25   A    Because she said he was acting like a white

1    privileged prick in court.
2    Q    Got it. Okay.
3    A    She said, "I have nothing else to do with him.
4    I have nothing else to say to him."
5    Q    Did she say anything about him threatening
6    suicide or anything like that?
7    A    Not in court.
8    Q    Well, outside of court that night?
9    A    unh-unh. No, not until after it happened. My
10   lieutenant -- oh, I think Jackson then stated, "You
11   don't remember when he did that before?"
12   I was, like, "How did he do that with the
13   court?"
14   It was, like, "Tracey, you wasn't here. He
15   did it in Cell 6."
16   I said, "Cell 6?"
17   They was, like, "He did the same thing. He
18   wrapped it --"
19   I said, "I don't remember. I wasn't here."
20   They was, like, "I can't believe you wasn't
21   here. He did the same thing and climbed --"
22   My sergeant who's now a lieutenant -- he said,
23   "Yes. He went in there and showed me." He was, like,
24   "He put it here. Then he drops his weight almost like,"
25   he said, "They're dead. By the time you realize, 'Oh, I

1    want to get back up. Oh, I want to get back up,' your
2    legs are too weak to pull you back up."
3    I said, "Oh, my God. I got to go."
4    That's when I discovered he tried it before,
5    and I didn't know.
6    Q    And when Jackson said that, was that when
7    Inspector Ford was there or different time?
8    A    This is a different time. Ford wasn't there.
9    Q    Okay. Same shift or different shift?
10   A    Ford is investigator. So when something like
11   this happens, he comes within five minutes, no matter
12   where he is, because he wants it fresh. He wants it
13   now. So he comes right behind you, "Type what you told
14   me. Type what you saw. Let me take it." He said,
15   "Good job, ladies. I'm going back home."
16   Q    Okay. But when Jackson said something about
17   him doing the same thing in Cell 6, was that the same
18   shift that she said that?
19   A    That's the same shift because that's when
20   everybody starts -- (unintelligible). I said, "I don't
21   remember, y'all. I didn't even know you can do it."
22   I remember back in the day with Rockdale, they
23   had longer court, but they made them shorter. They said
24   years ago, years ago somebody -- someone retired and
25   hang themselves on a cord. So they made the cord this

Page 57

1   long from the phone. But somehow, they get that one
2   rack and drop.
3       Q   Do you know if the phones in Cell 6 were the
4   same in -- you know, two years, three years before?
5       A   Yeah. They been the same. They've been the
6   same.
7       Q   I watched -- I listened through the merit
8   board hearing, and I remember at one point -- I'm going
9   to represent that you said something to the effect that
10  Jackson said, "All he's going to do is cry 52. I'm not
11  dealing with him."
12      Do you remember that?
13      A   Correct.
14      Q   She said that?
15      A   Correct.
16      Q   When did she say that?
17      A   When he was in the cell with the other guys.
18  And she said, you know, when the guys was laughing and
19  joking and he was in the back doing the same thing, and,
20  you know -- "He's going to kill himself. This white guy
21  says he's going to kill himself."
22      I said, "Come on, man. You see how much work
23  we got to do? Don't start that."
24      He said, "No, I didn't. No, I didn't. I
25  didn't say. I didn't say that."

Page 58

1       "Like, you going to do this all day? You're
2   going to cry 52 all day? I'm, like, come on brothers.
3   Give me a break."
4       It was, like, "No, no, no, Auntie. The white,
5   the white dude."
6       He was, like, "No, no, no. Don't know what
7   you're ..."
8       MR. SLATER: Just for the record, Ms. Tracey
9   is sort of putting her hand under her neck saying
10  "no" --
11      THE WITNESS: Right. Right.
12      MR. SLATER: -- and --
13      THE WITNESS: Disagree. Disagree.
14      MR. SLATER: -- just because we're not on
15  video or anything like that.
16      MR. WAYMIRE: To be clear, Mr. Smith was
17  denying something; is that right?
18      THE WITNESS: Yes.
19      Q   (By Mr. Slater) When that was? When that was
20  happening in the cell?
21      A   It was earlier in the cell because that's --
22  we must have had nine, ten males in the cell. So it was
23  earlier in the day.
24      Q   Was it still daytime?
25      A   It was still daytime. Mm-hm.

Page 59

1   after?
2       Q   Do you know if it was before his mom called or
3       A   This was before his mom called. When his mom
4   called, the cell was starting to empty out.
5       Q   -- and sort of, like, where you were when
6   that happened?
7       THE WITNESS: When the mom called?
8       MR. SLATER: No, the earlier time.
9       THE WITNESS: When he was saying he was going
10  kill himself.
11      MR. SLATER: Yeah.
12      Jackson both -- there's an intercom that's
13  behind the desk.
14      Q   (By Mr. Slater) Okay.
15      A   And just heard that banging. And I looked,
16  and I said, "What is it?"
17      "Yo, yo. The white guy say he's going to kill
18  himself."
19      And Jackson's, like, "Y'all, we ain't got time
20  for this. We don't have time?"
21      "No, no, no. That ain't me. That's not me."
22      I said, "Look. If none y'all in there are
23  going to let him kill himself, then what is that going
24  to make you? I will say stop playing with the button.
25  Or y'all want to get out? Everybody want to get out?

Page 60

1   You cannot keep interrupting. This is not going to
2   happen. So stop playing games."
3       Q   Right.
4       A   And Jackson was -- "I know what he's doing.
5   He's going to keep pressing that button and yell 52 all
6   day." Cry wolf, suicide.
7       Q   Like cry wolf, cry suicide?
8       A   I'm 52, 52.
9       Q   Does that come from this General Order 5.22?
10      A   It's just a code.
11      Q   Okay. Did you go up to the booking cell to
12  look in to see what was going on?
13      A   No. They were all clowning. They were all
14  laughing.
15      Q   Jackson go up and talk to him?
16      A   No. We stayed on the platform. We was just
17  that swamped. We stayed on the platform because he
18  literally playing cards, jumping around. I eventually
19  told them stop jumping. There was a wall in between:
20  Stop sitting on the wall, playing on the wall. Somebody
21  might fall. I don't want to be the one who writes the
22  incident report. Just sit down. I gave y'all cups. I
23  gave you sandwiches, and I gave you Gatorade. Just sit
24  down. Give me some peace so I can at least get five of
25  you out."

Page 61

1  We just got into the groove of things.  We got
2  things moving.  Before you knew it, we had everybody out
3  except him.
4      Q   Okay.  All right.  And then I understand that
5  was because Dep. Jackson was moving him?
6      A   And like I told Lt. -- I didn't want it to
7  look like it was done purposely because, you know, nine
8  black dudes in there and him.  I said, "You know, he
9  could be ad with us."  It wasn't done purposely.  It's
10  just, you know, at the time we talked about it --
11  because even Tatum kept saying, "Y'all kept saying
12  something about a blue folder, blue folder."
13      His was the blue folder because he didn't
14  belong here.  He was just being held.  anytime I looked
15  at the blue folder, looked at what GCI said.  I then
16  look at the photograph.  I look in booking.  He was down
17  there.  I grabbed one of the folders, and I said, "Okay.
18  how far did this one get.  Okay.  I'm going to finish
19  this one".  Whatever was put in front of you, you
20  started.  You finish.  You stamped it.  You sign.  You
21  come out.  Sign this, sign that.  Get a blanket.  Get a
22  towel.  Get a cup.  Lean up against the wall.  He's
23  ready.  You get another one.  You start again.  Somehow
24  you look and be, like, everything's -- oh, my God.
25  There's that blue one.  You're, like, not through the

Page 62

1  blue one.  So that's how the blue one ended there, and
2  he ended there.
3      Q   Did you talk to Gomez at all about Mr. Smith's
4  folder?
5      A   He wasn't doing anything.  He doesn't know how
6  to do anything.  That's why.
7      Q   What you mean by --
8      A   He doesn't know how to do anything.  He
9  doesn't know the beginning.  If you give him a fielder
10  and say -- because the folder start with one piece of
11  paper, which is his arrest violation, his arrest
12  warrant.  And a folder starts this on the computer.  He
13  doesn't know how to do it.  What am I supposed to do
14  with it?  He doesn't know how to do it.  I mean, I tell
15  people that.  And, you know, they -- what you mean, he
16  doesn't know how to do it?  It's a lot of steps into
17  booking.  It's a lot of steps to do anywhere in this
18  job.  You can't just walk the hallways sucking on a
19  lollipop, laughing with the inmates, and that's what he
20  does.  That's all he does.
21      Q   I don't think it's that clear.  But I think
22  you said he laughed after Mr. Smith --
23      A   He laughed.  He laughed.  He thought it was
24  hilarious with Smith, and I'm still trying to put it
25  together.  And he's there having everyone else laugh.  I

Page 63

1  was, like, "Why are y'all laughing?"
2      Q   That must have been really difficult for you,
3  how traumatic it was for you?
4      A   And he took it outside.  He was laughing.  And
5  I have not spoken to anyone and, you know -- and one
6  time when I saw someone, and I was -- I think it was,
7  like -- don't even.  Monique, he's a kid.  He's a kid.
8  What do you expect?  I said, But, man, you know, I think
9  he's made something that made me look bad.  You know,
10  he's laughing.
11      Q   That's a real job; right?
12      A   This makes people think I'm laughing.  I said
13  I'm traumatized, and he's laughing, you know, and y'all
14  out there carrying on with him.  He said Tracey -- he
15  said, "He's a kid.  Give him a break.  He's a good kid."
16      I don't like working with children.  I told
17  you before, I didn't like him.  I never liked him.  He
18  doesn't take this seriously.  I said that he doesn't
19  take seriously.  And, you know, the longer it got, I'm
20  getting in more and more trouble.  And like I said, when
21  I asked how come these three wasn't reprimanded.  If
22  anything my lieutenant said, "If it wasn't for you, he
23  would be dead because you went on and did your post that
24  I you told you to do."
25      And they would have found that boy at

Page 64

1  7:00 a.m. because they had no intentions on looking back
2  on him.  Jackson was on CGIC.  Gomez was going through
3  the hallway.  And no one looked on him.  He said, "If
4  you didn't get up and just say, 'Let me see what this
5  idiot is doing' -- whatever want to say -- 'Let me see
6  what he's doing.  Quick, somebody come help.'"
7      So that's when my supervisor is, like, "Stop
8  blaming yourself because if not, it would be in the
9  paper for a different reason.  He would have been dead,"
10  he says.  And I said, but that's the understanding,
11  y'all coming after me like I did something wrong.  I had
12  a shit matching with him.  We argued.  I never said,
13  "Yeah.  Do it.  Do it."  Fighting, yeah.  You want to
14  come out, you think you can take me?  Yeah, come on.
15      But never did I tell that kid to do that.  And
16  if you think I told him to do it, why would I go back?
17  To see if he did it?  I said, you know, I was just as
18  shocked and pushed back and, you know, afraid when I saw
19  it.
20      And then you go to the merit board.  You're
21  asking, "What happened to you?  Was you reprimanded?"
22      And Gomez says, "What does 'reprimand' mean?"
23  He said, "What do you mean?"
24      And they asked, "Was you disciplined in any
25  way?"

Page 65

1    "Disciplined by what?"
2    "So in other words, no one said anything to
3    you?"
4        Jackson went on to be a sheriff's deputy.  She
5    got promoted.  And Gomez still has his job.  And Sanchez
6    is still running around, having affairs with inmates.
7    So I, who did all my jobs right -- and I know it's
8    irrelevant.  I have three accommodations of medals for
9    lifesaving procedures that I done in the jail and CPR
10    and helping people.  So you all forgot that?  Y'all for
11    all that?  But you take people who just got here?
12    Jackson ain't been there two years.  Gomez --
13        Q    She was promoted?
14        A    To deputy sheriff.
15        And Gomez ain't been there six months, and
16    he's there.  But me, 15 years, three medals of
17    accommodations, come on.  And that's what you do to me?
18    So, yeah; it was bitter.  But, you know, you always try
19    to -- you take it as you get it.
20        Q    Did Jackson tell -- do you remember her
21    telling Gomez anything about processing Ezra's file?
22        A    I didn't talk to them at all when I walked out
23    the door.  I never spoke to them again, not at all.  Not
24    at all.  Even the people who was part of our circle,
25    I've never spoken to them since.

Page 66

1        Q    No.  I mean the night of, when the -- when Mr.
2    Smith's blue folder kept getting moved around, do you
3    remember them talking about -- do you remember Jackson
4    telling Gomez anything about the folder?
5        A    No.  They were heard saying he's going to have
6    to do it.  Again, I was dog tired, and it was literally
7    one folder with one piece of paper in it.  I was not --
8    and my time was up to leave that area to go the kitchen
9    to get breakfast started.  And I said, "Okay.  Y'all
10    still got that folder."  And she said he's going to have
11    to do it.  And by the time I went and checked on them,
12    all hell broke lose, and that was it.
13        Q    When there's -- I think you said there's,
14    like -- sometimes there's folders lying around.  Some
15    might be partly processed different stages.  Is that,
16    like, a rule of thumb?  You know, do you start by going
17    to the person who's been there longest to finish their
18    folders, or did you just pick one?
19        A    Yeah, because normally when things are not
20    completed because time has run out.  You got to clean
21    up.  You have folders laid out, and you put stickers
22    saying "needs complete booking."  There's nothing in it
23    but the piece of paper and the folder.  And this one
24    needs pictures only.  This one needs fingerprints.
25    Sometimes you also write it on the board, and you have

Page 67

1    that stating what needs to be done.
2        Some, you just coordinate:  Oh, this is
3    Allison.  She just needs her picture taken.  This is
4    Joe.  He just needs to be dressed out.  So that's how we
5    pass it on to the next shift --
6        Q    Okay.
7        A    -- so they'll know.
8        Now, the blue folder left out with him because
9    Lt. Daniels just took the folder and just put it out and
10    left it there.  He didn't do anything with it.
11        Q    You mean after the incident?
12        A    Yeah, after they put him on the gurney, he
13    just took his clothes and everything.  He said, "Get him
14    out of here," and everything.  That was it
15        Q    Okay.  I want to go through -- we've already
16    marked these.  Let's go to -- you should have in front
17    of you Plaintiff's 4.  It should say P4 at the bottom.
18    It's titled, "Re:  Contact with Inmate Smith."
19        THE WITNESS:  I have 3, and it jumps to 5.
20        MR. SLATER:  Is it in there, Jason?
21        MR. WAYMIRE:  She's got it.
22        Q    (By Mr. Slater)  I think we discussed this is
23    reports you wrote while Inspector Ford was there; right?
24        A    Mm-hm.
25        Q    It was typed up on the computer?  Or was it

Page 68

1    handwritten and later typed up on that computer right
2    away?  Was it typed on the computer?  Or did you
3    handwrite it first?
4        A    No; it was typed.
5        Q    Okay.  Take a minute to read through it.
6        A    Okay; I read it.
7        Q    Let's talk about it a little bit.  So in here
8    it talks about -- I think it's kind of like the third
9    paragraph:  "The only person left in Cell No. 7 was
10    Inmate Smith.  I began to look for his folder to get him
11    processed."
12        And this is at 1:00 a.m.?
13        A    Correct.
14        Q    Prior to 1:00 a.m. we talked about his folder
15    getting moved around and Jackson saying she wasn't going
16    to process it; right?  Was that before 1:00 a.m.?
17        A    That's pretty much been all day.
18        Q    All day.  Okay.  And during the day, the
19    folder was somehow neglected because Jackson said she
20    wasn't going to do it; right?
21        A    Yes.
22        Q    Okay.  Sorry.  Okay.  And in the next
23    paragraph you said you told him, "We're okay on your
24    folder now."
25        Do you see that?

Page 69

```
 1        A   Mm-hm.
 2        Q   And then in the last paragraph it says, "I
 3   walked away.  He continued to kick the door.  While I
 4   was processing his folder, the kicking stopped."
 5           Did you go back and start working on his
 6   folder?
 7        A   I did.  I wanted to see what was in it.
 8        Q   And then the next sentence says, "I remembered
 9   a deputy saying Inmate Smith had a habit of calling
10   suicide every time he's here."
11           Is that when you talked about Jackson saying
12   he's going to cry 52 all day?
13        A   He cries 52.
14        Q   Is that because he remembered he had tried to
15   commit suicide a couple of years before?
16           MR. WAYMIRE:  Object to form.
17           MR. SLATER:  You can answer.  He didn't like
18   my question.
19           THE WITNESS:  What's the question?
20        Q   (By Mr. Slater)  Did she say that because he
21   had tried to kill himself a few years before at the
22   jail?
23        A   I would think so because she was aware of the
24   52s.  I was unaware that he attempted before.
25        Q   Okay.  All right.  Let's turn now to
```

Page 70

```
 1   Plaintiff's Exhibit 5.  That's -- you should have it,
 2   Monique.
 3        A   I have it.
 4           MR. SLATER:  It's -- okay.  This is -- it's a
 5   document.  It's four pages, and it's called Inmate
 6   Incident No. 24J-000442, for the record.
 7        Q   (By Mr. Slater)  And have you -- I know -- I
 8   think you said you may not have seen this, but does this
 9   document look familiar?
10        A   Yeah; I think it's a document that we generate
11   out of the Odyssey.  That is not something I've done.
12        Q   And what is Odyssey?
13        A   Odyssey is the system program that they used
14   to generate incident reports.
15        Q   Okay.
16        A   But most of the supervisors do this.
17        Q   Okay.
18        A   We've never done that.
19        Q   Okay.  I'm looking here on the bottom of the
20   page -- so the top of page 1 it says, Smith, Ezra.  It
21   has some information about him.  And then under Incident
22   Information, it says, "Officer named Tracey, Monique.
23   Violation type:  Serious incident attempted suicide."
24           52 attempted; right?  And we established 52 is
25   a code for suicide and -- right?
```

Page 71

```
 1           There's a narrative.  Do you see that?
 2        A   Correct.
 3        Q   Okay.  And it says -- it's, like, a paragraph
 4   long and starts, "On 7/8/2024, approximately 2000 hours,
 5   Inmate Smith was being held in Holding Cell 7 along with
 6   five other inmates."
 7           And then it goes on.  And at the top of that,
 8   time, 3:28 a.m.  Do you see that?
 9        A   Yes.
10        Q   Would this have been something you had written
11   in the system?
12        A   Unh-unh.
13        Q   Do these look like your words?
14        A   No.
15        Q   No?  Okay.  We already talked about what I
16   marked as Plaintiff's 4, the type under Narrative,
17   Monique, that I'm holding up, and those were your words?
18        A   Correct.
19        Q   But this, you're not sure about?
20        A   Right, because I don't get in the system to do
21   this kind of report.
22        Q   Okay.  Could it have been that another officer
23   wrote that up for you?
24        A   It could have been a supervisor.
25        Q   Okay.  Now, look below that, there's one for
```

Page 72

```
 1   Ms. Jackson?
 2        A   Yeah, notes in this.
 3        Q   And then one from Lt. Daniel and then Hall?
 4        A   Yeah.  See, this was all done when I wasn't
 5   there.
 6        Q   Okay.  Okay.  Okay.
 7        A   Yeah.
 8           MR. SLATER:  Okay.  I want to show you what
 9   we'll mark as Plaintiff's 6.
10           (Plaintiff's Exhibit No. 6 was marked for
11   identification.)
12        Q   (By Mr. Slater)  There you go.  Okay.  This is
13   a document, and I'll tell you, Monique, this was
14   produced to us in the case.  It's a one-page document,
15   for the record.  It's not Bates-stamped, but it says at
16   the top "Joshua Daniel."
17           Is that Lt. Daniel?
18        A   Yes.
19        Q   And it has an email address of
20   rockdalecountyga.gov email address.  Do you see that at
21   the top?
22        A   Yes.
23        Q   Is that Lt. Daniel's email?
24        A   Yes, it is.
25        Q   Then it says "to Kevin Tatum."  Is that Tatum,
```

Page 73

```
 1   the sergeant who was investigating?
 2        A   Yes.  Correct.
 3        Q   And it has an email address.  Is that his
 4   email address?
 5        A   Yes, it is.
 6        Q   And there's narrative.  It says at the very
 7   bottom, "Lt. J. Daniel, 7/10/24."
 8        Do you see that?
 9        A   Correct.
10        Q   Have you seen this before?
11        A   No.
12        Q   Okay.  Take a minute to look through it.  I
13   have a few questions about it.  Just let me know when
14   you're done skimming through it.
15        A   Okay.
16        Q   Okay.  So there's some -- there's -- this
17   appears to be a statement from Lt. Daniel, and it talks
18   about some things that you purportedly said.  And I want
19   to go through some of that with you.  It talks in the
20   second paragraph -- or the first paragraph that Corp.
21   Hall said that Smith told him that you dared him to kill
22   himself.  We don't have to talk about that again.
23        But second paragraph, it talks about what
24   happened earlier when they kept hitting the emergency
25   button, right, when they said he was going to kill
```

Page 74

```
 1   himself.  And they were laughing; right?
 2        And here in the last sentence, she said -- I
 3   think that's you -- she responded by asking if they were
 4   his lawyer and if he had rope and to knock it off.
 5        Do you know what that's about?
 6        A   Did he have rope?  No; I asked them, "Are you
 7   his lawyer?"
 8        Q   You asked who that?
 9        A   I asked both black dudes, "Are you his
10   lawyer?"  And they said no.  I said, "Knock it off."  I
11   don't recall saying anything about a rope.
12        Q   And I'm just -- so they were saying he's going
13   to kill himself, and you're on the intercom.  Why were
14   you asking if they were his lawyer?
15        A   Because some -- you always get detainees that
16   want to speak for other detainees.  "You his lawyer, you
17   telling me?"  Why are you even talking about him?"
18        Q   Got it.  Okay.  Understood.  And the rope
19   thing, you don't --
20        A   There wasn't no rope.
21        Q   And the second -- the second -- the final
22   third paragraph says, "Medical was not notified about
23   the incident when it happened because deputies did not
24   think it was a serious threat or attempt."
25        And then at the very bottom it talks about his
```

Page 75

```
 1   mother calling, which we have already talked about.  It
 2   says you spoke to her on the phone for almost 40
 3   minutes; is that right?
 4        A   I don't recall 40 minutes.
 5        Q   Was it maybe --
 6        A   It wasn't -- I couldn't say 40 minutes unless
 7   I kept her on speaker for 40 minutes.  I don't talk to
 8   people more than five minutes, I mean, intentionally.  I
 9   don't talk to them.
10        Q   And then it says in the last sentence, "She
11   said --" and this is you -- "She told Dep. Jackson after
12   she hung up that Inmate Smith is what happens when your
13   mom and dad are brother and sister but did not say that
14   to Ms. Smith where she thought he could hear."
15        THE WITNESS:  She said.  What does that mean?
16        MR. SLATER:  I think she said it's you.  So
17   Tracey said she told Dep. Jackson --
18        A   "Tracey told Dep. Jackson after she hung up
19   that Inmate Smith is what happens when your mom and dad
20   are brother and sister but did not say that to Inmate
21   Smith or where she could ..."
22        I don't recall that.
23        Q   (By Mr. Slater)  Okay.  But I think -- did
24   you talk to Jackson after his mom called?
25        A   No.  I mean, I said, "That's his mom."  That
```

Page 76

```
 1   was his mom, and I pulled her picture up.  I said,
 2   That's his mom," and she just blew it off.
 3        Q   Jackson?
 4        A   Yeah, because you see them all the time.  But,
 5   no, that's about it.  This lady was respectful.  She's
 6   always been respectful.
 7        Q   Not Jackson?
 8        A   I mean, Jackson's a coworker.  Not always, but
 9   these inmates -- she told the woman she got drug
10   problems and meth problems.  They've always been kind.
11        MR. WAYMIRE:  You talking about the mom or
12   Jackson?
13        THE WITNESS:  Talking about the mom, that the
14   mom has been -- always been kind.
15        Q   (By Mr. Slater)  Did Jackson have a good
16   temperament with the inmates at the jail?
17        A   Jackson.
18        MR. WAYMIRE:  that's Jackson?
19        THE WITNESS:  Yeah.
20        MR. SLATER:  You worked with her.  I barely
21   know her.  That's fine.
22        Q   (By Mr. Slater)  What about Gomez?
23        THE WITNESS:  What about him?
24        Q   (By Mr. Slater)  Was he -- did he get on well
25   with the inmates?
```

1    A   Yeah, because he's afraid of them.  So, yes.
2    Q   What do you mean, he's afraid of them?
3    A   He wants to be their friend.
4    Q   Why do you think that?
5    A   Because he's afraid of them.
6    Q   Like, he's afraid of being hurt?  I don't know
7  what that means.
8    A   I just don't see a man walking around
9  grinning, grinning, grinning all time with men.  And
10  men -- they call him out of his name.  They call him all
11  kinds of Spanish names:  Hondurez and things like that,
12  and he answers.  Certain things we learn as being
13  officers, you don't -- that's a sign of disrespect.
14    Q   Calling you a nickname?
15    A   Guido and Gomez and Guido, and he answers.
16  Yeah; that's the first sign of weakness.
17    Q   Okay.
18    A   Doesn't seem to bother him or his coworkers,
19  but I make it a point not to work with him.
20        MR. SLATER:  Let's -- what time is it?  Let's
21  take another five-minute break.  Let's go off the
22  record.
23        (A discussion was held off the record.)
24    Q   (By Mr. Slater)  Monique, I was asking a lot
25  today about what happened to you.  And we talked a lot

1  about Deputies Jackson and Gomez.  I understand the
2  nurse -- you briefly talked about Nurse Sanchez.  She
3  was there.
4        How long have you worked with Nurse Sanchez?
5    A   Maybe two years.
6    Q   Okay.  What was your rapport like with her?
7    A   Cordial.
8    Q   Cordial?  Okay.  I think you said something
9  about her relationships with inmates.  Could you go into
10  that?
11    A   Just knew exactly what everyone else seems to
12  know, that she was involved.  She was picked up with an
13  inmate that had three strikes and had guns in the car,
14  and they remained involved.
15    Q   While he was incarcerated?
16    A   Correct.
17    Q   Was he incarcerated at the Rockdale County
18  jail?
19    A   Correct.
20    Q   But just that person?
21    A   That's all I know.
22    Q   Okay.  And she was there the night that the
23  incident happened?
24    A   Yes.
25    Q   Okay.  Did you see her working that night?

1        THE WITNESS:  The night of Mr. Smith?
2        MR. SLATER:  Yeah.
3    A   Yeah.
4    Q   (By Mr. Slater)  When did you see her?
5    A   I saw her all day.
6    Q   All day?
7    A   Mm-hm.
8    Q   Okay.  Was she around when you went -- they
9  called on the intercom earlier in the day?
10    A   Yes, she was.
11    Q   Where was she?
12    A   She was in the booking area at the time.
13  Like, this is the booking area, and this is her office.
14  And she slides back, and she looks at all of them.  Then
15  she slides back to her office -- I mean to her desk.
16    Q   Okay.  So she was around during the intercom
17  call.  Okay.  How loud is that call when someone calls
18  from the intercom?  Can you hear it across the booking
19  area?
20    A   Completely.
21    Q   What about when Mr. Smith's mother called?  Do
22  you know if she was around then?
23    A   She couldn't have heard that because that's
24  only one end of the table that's on speaker, and there
25  was, like, 20 people speaking.  She couldn't -- she

1  would not be able to tell who was talking to who.
2    Q   Understood.  And then later when Mr. Smith was
3  kicking at the door and banging at the door and you went
4  over there, do you know if she was around then?
5    A   Yes.  Everyone could hear it.  You could even
6  hear the mule kicking.  You could hear down the hallway.
7  You could hear across the kitchen.  You could also hear
8  across the medical, and at the time he was mule kicking
9  here, she was here.  (Witness indicating.)
10    Q   Okay.  Do you remember her saying anything?
11    A   She slid her desk -- her chair back, and she
12  moved back up.
13    Q   Okay.  It's, like, a rolling chair?
14    A   Mm-hm.
15    Q   So she rolled out so that --
16    A   Looked.
17    Q   Looked at what Mr. Smith was doing --
18    A   Mm-hm.
19    Q   -- and rolled back?
20        Did she say anything?
21    A   (Nonverbal response.)
22    Q   Do you remember anything else she said about
23  that night?
24    A   No.
25    Q   I want to go back to the folders.  I've talked

Page 81

1  a lot about the folder, but it's there all day?
2       A   Mm-hm.
3       Q   That's not normal; right?
4       A   No.
5       Q   The only way a folder is like that all day is
6  if someone's purposely not trying to pull it through,
7  right, to finish it?
8       A   Correct.  Sorry.  Sorry.
9       Q   That's okay.  That's all right.  And from your
10  testimony sounds like that was --
11      A   Correct.
12      Q   -- Jackson didn't want it to go through?
13      A   Correct.  Yes.
14      Q   To have him wait until the next shift?
15      A   Yes.
16      Q   Is there -- I think we talked -- kind of
17  talked about -- I want to get it straight in my head.
18  In the process of doing the folders, is there, like, a
19  rhyme or reason?  First come, first served?  Is it
20  just -- you know, I'm sitting at this CGIC computer.
21  Let me see which folders are sitting here and do those?
22      A   You pretty much grab a stack.  You, like,
23  okay.  I'm going to do these three.  Gets those away
24  from me and let me just concentrate on this.  And you
25  start doing that.  A, B, C.  Okay.  These are done.

Page 82

1  What are you working on?  Give me three more.
2       That's how we normally operate.  I'll do her.
3  She looks.  She says, "He looks easy.  I'll do him."
4  It's not like that.
5       MR. SLATER:  Okay.  I think this is the last
6  document I'm going to show you.  Almost done here.  Time
7  to get home for dinner, hopefully.
8       Q   (By Mr. Slater)  I guess you're pretty far,
9  though; right --
10      A   Yes.
11      Q   -- down in Newton?  All right.
12          (Plaintiff's Exhibit No. 7 was marked for
13  identification.)
14      Q   (By Mr. Slater)  Let me show you a document.
15  It's called a Rule 68 Offer of Judgment.  Take a minute.
16  It's very short.  It's just one paragraph.  Take a
17  moment to look at it.  You just let me know when you're
18  done.
19          Have you seen this before, Monique?
20      A   No.
21      Q   Do you know what this is?
22      A   No.
23      Q   It's pursuant to a Rule of Federal Procedure.
24  I'm not going to get into that, but it's offering to
25  settle all claims against you and Jackson and Gomez by

Page 83

1  having judgment entered against you in the amount of
2  $50,005.  And says that if plaintiff accepts, all claims
3  against Tracey, Gomez, and Jackson will be settled and
4  Plaintiff may petition costs as of the date of the
5  offer.
6       Were you aware that you made an offer to
7  settle this case where you would -- where judgment would
8  settle for Jackson, Tracey -- you're Tracey.  Sorry --
9  Jackson, Gomez, and you by having a judgment solely
10  against you?
11      MR. WAYMIRE:  So I mean any discussions
12  between you and me, I don't want you to disclose
13  anything that was said.  He's not asking that.
14      MR. SLATER:  No.
15      MR. WAYMIRE:  He's asking:  Are you aware that
16  this was sent, I guess.
17      Is that right?
18      MR. SLATER:  That's my question.  Yeah.
19      MR. WAYMIRE:  That's his question:  Were you
20  aware of that or not?  That's his question.
21      A   I don't remember.
22      Q   (By Mr. Slater)  You don't remember?
23      A   Unh-unh.
24      Q   Would you have agreed to have a settlement in
25  this case where you, Jackson, and Gomez would be settled

Page 84

1  but judgment would be entered only against you?
2       MR. WAYMIRE:  Don't answer.  That goes into
3  attorney-client privilege discussion.
4       Q   (By Mr. Slater)  Do you think it's fair that
5  Jackson and Gomez weren't disciplined?
6       THE WITNESS:  Do I think it's fair?
7       MR. SLATER:  Yeah.
8       A   Of course not.
9       Q   (By Mr. Slater)  Yeah.  You knew that the
10  booking cells -- these are the only cells with these
11  pay-phone type phones; right?  And and I think you said
12  that --
13      A   Yes.
14      MR. SLATER:  Okay.  I just thought I didn't
15  hear it, which -- and I saw the nodding.  So I thought
16  he she must have said -- I'm sorry.  Yeah.
17      Q   (By Mr. Slater)  Okay.  So -- and I think you
18  testified that they shortened the cord at some period?
19      A   Way before I got there.
20      Q   And you were there 16 years?
21      A   Yeah.
22      Q   So way, way before the incident; right?
23      A   Correct.
24      Q   Okay.  Great.  And do you know -- and I think
25  you said that Jackson knew that Mr. Smith had attempted

Page 85

1  suicide in Booking Cell 6 a few years earlier?
2      A   From my knowledge, yes.
3      Q   Are the phones in Cell 6 and Cell 7 the same?
4      A   From my knowledge, yes.
5      Q   Okay.
6      A   I haven't been there since this happened.
7  They may have been changed.
8      Q   But at the time in July of 2024 --
9      A   Yes.
10     Q   -- the phones in 6 and 7 were the same?
11     A   Yes.
12     Q   Okay.  And you said they were shortened, but
13  you can still loop it one time around the neck?
14     A   Apparently, yes.
15     Q   Is there anything about what happened to Mr.
16  Smith or about what happened with your termination from
17  the sheriff's office that I haven't asked you about that
18  you want to talk about?
19         MR. WAYMIRE:  Object to the form of the
20  question.  Don't --
21         MR. SLATER:  You can answer.  I'm going to --
22         MR. WAYMIRE:  That's unreasonable.  That's an
23  unreasonable question:  Is there anything about the
24  incident that I haven't asked you?
25         MR. SLATER:  That's fine.  You can object to

Page 86

1  the form.  You did that.
2         You can answer, Ms. Tracey.
3      A   I'm good.
4      Q   (By Mr. Slater) You're good?  Okay.
5         Is there anything that anyone said -- let's say,
6  Jackson -- on the night of July 8th/morning of July 9th
7  that you remember that I haven't asked you about?
8      A   No.
9      Q   Okay.  Same question for Gomez.
10     A   No.
11     Q   Same question for Sanchez.
12     A   No.
13         MR. SLATER:  Okay.  I have nothing further
14  you, Monique.  The other lawyers may have some questions
15  for you.  If not, we'll be done today.
16         MR. VEAL:  I have a couple.  It's not going to
17  take long.
18         I represent Ms. Sanchez.  My name is Antonio
19  Veal.  I have a few questions.
20             EXAMINATION
21  BY MR. ANTONIO E. VEAL:
22     Q   There are some questions earlier about what,
23  if anything, you believe Ms. Sanchez could have heard.
24         Do you recall that exchange?
25     A   Yes.

Page 87

1      Q   Regardless of what you think she could have
2  heard or seen, you do agree that based on your
3  interaction with Mr. Smith, you did not think he was
4  legitimately going to commit suicide, did you?
5         MR. SLATER:  Object to form.
6         You can answer.
7         MR. VEAL:  If I can correct it, I'll correct
8  it.
9         THE WITNESS:  Can you repeat your question?
10     Q   (By Mr. Veal)  You would agree that you did
11  not think Mr. Smith was going to legitimately try to
12  commit suicide when you were having your interactions
13  with him, do you?
14     A   I don't want to presume to think anything.
15     Q   So you didn't?
16         THE WITNESS:  The first time?
17         MR. VEAL:  Right.  That's what we're talking
18  about.
19         THE WITNESS:  With the eight people in the
20  cell?
21     Q   (By Mr. Veal)  So there was nothing that led
22  to you believe he was going to commit suicide?
23     A   Correct.
24     Q   And because you didn't think he was going to
25  commit suicide, there was nothing else to do in that

Page 88

1  circumstance, was there?
2      A   Correct.
3         MR. SLATER:  Object to form.
4      Q   (By Mr. Veal)  And Ms. Sanchez.  She could
5  not open up any of the cells, could she?
6      A   No, she cannot.
7         MR. VEAL:  Okay.  All right.  That's all I
8  have.  Thank you.
9         MR. O'BRIEN:  I don't have any additional
10  questions.
11         THE COURT REPORTER:  Transcribed?
12         MR. SLATER:  We'll take an electronic, please.
13         MR. WAYMIRE:  Yeah; I need a copy.
14         MR. O'BRIEN:  Electronic.
15         MR. VEAL:  Electronic.
16         (Deposition concluded at 3:11 p.m.)
17
18
19
20
21
22
23
24
25

Page 89

JURAT

_____

MONIQUE WOODS TRACEY

_____

Notary Public

Sworn and Subscribed to me

This _____ day of _____.

---

Page 91

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of BULL AND ASSOCIATES, INC.

Bull and Associates, Inc. was contacted to provide court reporting services for this deposition. Bull and Associates, Inc. will not be taking this deposition under any contract that is prohibited by O.C.G.A 9-11-28 (c)., O.C.G.A. 15-14-37(a) and (b).

Bull & Associates, Inc. has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Bull & Associates, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

OFFICIAL CODE OF GEORGIA ANNOTATED 15-14-37

(a)    Contracts for court reporting services, not related to a particular case or reporting incident, between a certified court reporter or any person with whom a certified court reporter has a principal and agency relationship and any attorney at law, party to an action, or party having a financial interest in an action, are prohibited. Attorneys shall not be prohibited from negotiating or bidding reasonable fees for services on a case-by-case basis.

(b)    In order to comply with subsection (a) of this Code Section, each certified Court Reporter shall make inquiry regarding the nature of the contract for his or her services directed to the employer or the person or entity regarding said Court Reporter's services as an independent contractor.

---

Page 90

CERTIFICATE

GEORGIA:

FULTON COUNTY:

I hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption, and the colloquies, questions and answers were reduce to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of BULL AND ASSOCIATES, INC., Certified Court Reporters, and the signature and original seal is attached thereto.

I further certify that I am not a relative, employee, attorney or counsel of the parties, nor am I a relative or employee of such attorney or of any party, nor am I financially interested in the outcome of the action.

This 28th day of October, 2025.

_____

MEG ARMISTEAD
Certified Court Reporter ((B-2011)
My commission expires March 31, 2026

12:57      .ıl 5G ⬜

**New Group Message**     Cancel

**To:** Lt Daniels, Hall Corporal

> On my way home I got a nasty feeling in my stomach. Did my tone towards that inmate really convinced him to attempt suicide?? Could I have said or done something with alittle more compassion?? Am I that "person"? I have made an emergency session with my therapist tmw. If possible I would like a brief meeting with you sometime tonight. I have to see how I missed something to cause such damage. Thank you

Lt Daniels

+    Text Message · RCS    🎤

**EXHIBIT**

P 1

**12:57**

**New Group Message**    Cancel

To: Lt Daniels, Hall Corporal

~~one meeting with you~~ sometime tonight. I have to see how I missed something to cause such damage. Thank you

Lt Daniels

It's not you. It's NOT you.

Thank u LT ✌️

Lt Daniels

This guy has tried this before. You can't be accountable for his choices

You did good. If not for you he would be dead

Hall Corporal

Text Message • RCS

12:58    ‖‖ 5G 🔋

**New Group Message**    Cancel

To: Lt Daniels, Hall Corporal

Lt Daniels

> This guy has tried this before. You can't be accountable for his choices

> You did good. If not for you he would be dead

Hall Corporal

> Yes, don't hold yourself accountable for his actions. He is the only that is accountable for his actions.

I really do appreciate your leadership. See you later in roll call 😊

Thu, Aug 8 at 3:41 AM

+    Text Message · RCS    🎤

| ROCKDALE COUNTY SHERIFF'S OFFICE | | | | | | JAIL POLICY AND PROCEDURE | |
|---|---|---|---|---|---|---|---|
| GENERAL ORDER NO: | 5.22 | EFFECTIVE DATE: | APRIL 23, 2024 | REVISION DATE: | | RESCINDS: | |
| SUBJECT: | | SUICIDE PREVENTION AND INTERVENTION | | | NO OF PAGES: 3 | REFERENCES: 5-ALDF-4C-05,31, & 32 | |

BY ORDER OF THE SHERIFF

ERIC J. LEVETT, SHERIFF OF ROCKDALE COUNTY

## PURPOSE:

The purpose of this policy is to ensure that all inmates admitted to the Rockdale County Jail are screened in order to identify those inmates who may require immediate mental health or who pose a health or safety risk to themselves or others.

## POLICY:

It shall be the policy of the Rockdale County Sheriff's Office (RCSO) to provide procedures that define the specific mode of prevention, intervention and response necessitated by the occurrence of a Mental Health related crisis and/or demonstration of suicide ideation by an inmate.

A suicide prevention program is approved by the Medical Provider and reviewed by the facility or program administrator. It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate and is signed and reviewed annually. The program includes staff and inmate critical incident debriefing that covers the management of suicidal incidents, suicide watch, and death of an inmate or staff member. It ensures a review of critical incidents by administration, security, and medical services. All staff with responsibility for inmate supervision are trained on an annual basis in the implementation of the program. Training includes but is not limited to:

- A.    Identifying the warning signs and symptoms of impending suicidal behavior.

- B.    Understanding the demographic and cultural parameters of suicidal behavior.

- C.    Responding to suicidal and depressed inmates.

- D.    Communication between Jail Administration and Medical Provider.

- E.    Using referral procedures.

- F.    Housing observation and suicide watch level procedures.

- G.    Follow-up monitoring of inmates who make a suicide attempt.

- H.    Population specific factors, pertaining to suicide risk in the facility.

I. **Suicide Response:**

- A.    Any inmate who threatens or attempts self-mutilation or suicide will be viewed as a MENTAL HEALTH EMERGENCY. Upon notification, the Mental Health Professional will provide a face-to-face interview with the inmate. Additionally, the inmate's mental health and/or medical chart(s) will be reviewed as part of the initial assessment.

    - 1.    The assessment will be completed in a timely manner during normal working hours after receiving notification.

RCSO JAIL POLICY 5.22 – PAGE 1 OF 3

EXHIBIT

P2

2.    At times other than normal working hours, Jail staff will notify the Medical Department which will provide immediate medical intervention. The Medical Staff will contact the on-call Mental Health Professional for notification purposes.

B.    Based upon the inmate's assessment, a decision will be made by Mental Health Professional regarding the appropriate housing for the affected inmate. Options for appropriate housing may include:

1.    Maintenance within the currently assigned Housing Unit

2.    Relocation to the Booking/Medical Unit

3.    Transport to outside medical facility (ER Unit)

4.    Following review and medical clearance may be transferred to an offsite facility to meet the current mental health needs of the inmate in crisis. (i.e. Georgia Regional Hospital)

C.    If the use of restraints is indicated, then the restraints will be applied as provided for by existing policy.

D.    The inmate may also be placed on a "Suicide Watch" to monitor his/her behavior. The frequency of the "Special Watch" may be staggered in person checks not to exceed 15-minute intervals. The watch is conducted to assure the continued well-being of the inmate. The watch will be documented by Detention staff on the appropriate "Suicide Watch" forms, as well as in Eagle. Notations will be made of any abnormal behavior observed. The watch will be reviewed by the medical staff to determine the need for continuance, at a minimum of every twelve (12) hours.

E.    When standard issued clothing presents a security or medical risk the inmate is supplied with a security garment that promotes inmate safety and prevents humiliation and degradation.

F.    When a "Suicide Watch" is initiated, the inmate will be placed in an observation (booking/medical/segregation) cell without any of their personal possessions, clothing and/or linen from the bedding to prevent the use for self-injury. The use of safety garments will be provided to the inmate to prevent additional self-injury. Inmates are protected from humiliation and degradation.

The decision to return any items will rest on the Mental Health Professional, or their designees. This decision will be documented on the appropriate forms.

**ONLY DETENTION STAFF WILL ENTER THE INMATE'S ROOM/CELL TO REMOVE THESE ITEMS.**

G.    Inmates placed on Suicide Watch will be evaluated by a Mental Health Professional for an alternative safety meal (Nutra-Loaf). The alternative safety meal must be approved in writing by the medical provider or their designee. All meals will meet basic nutritional requirements and occur with the written approval of jail administrator or their designee and the Medical Authority. Alternative safety meals will not exceed seven days.

H.    If and when any of the items are returned to the inmate, the inmate will be closely monitored. The returns of any possessions are solely at the discretion of the Mental Health Professional.

I.    Inmates shall also be afforded the opportunity to utilize showers. (Daily, based on the

Mental Health Professional authorization and the behavior of the inmate).

**II.    POLICY REVIEW:**

This policy and procedure will be reviewed and updated as needed.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**EZRA SMITH, Plaintiff,**                )    **CIVIL ACTION FILE NO.**

    **vs.**                                )    **1:24-cv-05158-TWT**

**MONIQUE TRACEY, *et al.*,  Defendants.)**

### DEFENDANTS TRACEY'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW DEFENDANT MONIQUE TRACEY and provides her responses

and objections to Plaintiff's first Interrogatories and Request for Production of

Documents.

### RESPONSE TO INTERROGATORIES

1.

State your employment history beginning from your first employment as law

enforcement officer and continuing through the present. For each employer, list: (a) the

employer's name; (b) your rank and job title; (c) the beginning and ending dates of your

employment; (d) the reason for the termination of the employment.

**RESPONSE:  Rockdale County Sheriff's Office, detention officer, began in 2010**

**and employment ended as detailed in Sheriff's Office materials.**

**January 2025 to present, correction officer employed by United States Marshal**

**Service.**



EXHIBIT

P3

2.

If you intend to rely upon your own financial limitations as a defense to Plaintiff's claim for punitive damages, state: (a) your current annual salary, as well as gross amount and date of bonuses received; (b) additional income information (other taxable income, untaxed income, etc.) including rental income and gift income since January 1, 2022; (c) amount of cash or savings and banks where such amounts are held; (d) investments; (e) trusts (revocable and non-revocable, and jointly held); (f) vested amounts in retirement plans; (g) home value, debt, purchase year, and purchase price.

**RESPONSE: At the time of this response Defendant does not intend to rely upon her financial condition in relation to the Plaintiff's punitive damages claim. If that position changes then Defendant will provide responsive information.**

3.

Please identify every person who to your knowledge, information, or belief has investigated any aspect of the occurrence, which is the subject of this litigation, and indicate whether or not each has made a written record of the investigation or any part thereof.

**RESPONSE: Sergeant Tatum (Rockdale County Sheriff's Office) investigated the incident, and persons involved in the merit board process could be construed as having investigated the incident. Tatum's report and a recording of the merit board proceedings will be produced.**

2

4.

Please provide the phone number(s) and carrier(s) of the cell phone you used in July 2024.

**RESPONSE: T-Mobile,** ▮▮▮▮▮▮**.**

5.

For each subject in which you claim to possess "technical and/or specialized knowledge within the realm of law enforcement and/or investigations" such that you are qualified to testify as an expert, state: (a) the subject matter; (b) each aspect of your training and experience which you will rely upon to establish your expertise for that subject; (c) a list of all criminal and civil cases which you have been offered as an expert; (d) a list of all criminal and civil cases in which you have testified as an expert; (e) all materials, including but not limited to training materials, academic studies, industry publications, which you intend to rely upon in formulating any expert opinion.

**RESPONSE: Defendant has worked in the detention field since 2010 and has expertise from her particular job experience. Without minimizing the expertise accumulated due to employment history, Defendant does not hold herself out as a litigation expert within the scope of Rule 26 (a)(2).**

6.

Did you communicate with any person about Ezra Smith's suicide attempt from July 8, 2024, through and including your answer to this interrogatory? If so, state (a) the date of the communication, (b) the time of the communication, (c) the means of

3

communication, and (d) a summary of the substance of the communication. For the purposes of this interrogatory, you may exclude communications that were solely between you and your lawyer.

**RESPONSE: Defendant objects to these interrogatories to the extent they seek information protected by the patient-therapist privilege. See *Jaffee v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923 (1996). Subject to the foregoing, nonprivileged communications are: (1) Defendant's text messages relating to the incident will be produced; (2) Defendant explained the general nature of the incident with the focus on the employment aspect on a date(s) and time(s) she cannot recall; (3) other communications are outlined in the response to interrogatory 7 below.**

7.

Did you provide any evidence, testimony, or statement to any law enforcement agency or prosecutor investigating any aspect of Mr. Smith's suicide attempt? If so, state the date and the name of the individuals with whom you communicated, and summarize the information that you provided.

**RESPONSE: Defendant cooperated with Sergeant Tatum when he investigated the incident, and Defendant participated in the merit board process relating to the incident. Tatum's report and a recording of the merit board proceedings will be produced.**

4

## RESPONSES TO REQUESTS TO PRODUCE

1. Copies of correspondence to or from you, whether digital or physical, discussing Ezra Smith or the investigation of his suicide attempt. This includes but is not limited to any electronic messages, such as emails, texts, chats, posts to social media services, or direct messages. This does not include any correspondence with your lawyer about your case.

**RESPONSE: Non-privileged responsive materials relating to the incident will be**

**produced. (Privileged materials are those solely between attorney and client, which**

**are excluded from the scope if this request.)**

2. Produce any reservation of rights letter and any other communication directed to you or your attorney from any entity that is providing insurance coverage to you for this lawsuit.

**RESPONSE: A copy of any responsive document will be produced.**

3. Provide copies of each and every document you consulted or referenced in your responses to Plaintiff's interrogatories.

**RESPONSE: Responsive materials will be produced.**

4. Provide copies of any documents or records you or your counsel has obtained from third parties since the filing of this lawsuit related to any claims or defenses in the lawsuit.

**RESPONSE: Defendant objects to this request to the extent that it seeks materials**

**from Defendant's indemnitor ACCG-IRMA, as such materials are protected by the**

**privileges governing communications between counsel for an insured and the**

**insurance provider. Subject to that objection, Defendant will produce responsive**

**nonprivileged materials.**

5

5. Produce any document you intend to rely upon at trial.

**RESPONSE: Materials submitted for trial will be determined by counsel in the time frame of trial. The set of materials from which trial evidence may be submitted will be produced.**

6. Produce all documents referenced in your initial disclosures.

**RESPONSE: Copies of the referenced materials will be produced.**

WILLIAMS & WAYMIRE, LLC

/s/ Jason C. Waymire
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorney for Defendant Tracey

Building 400, Suite A
4330 South Lee Street, NE
Buford, Georgia 30518
(678) 541-0790
(678) 541-0789
jason@wmwlaw.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **EZRA SMITH, Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| **vs.** | ) | **1:24-cv-05158-TWT** |
| **MONIQUE TRACEY,** *et al.*, **Defendants.** ) | | |

## CERTIFICATE OF SERVICE

I hereby certify that I have served the within and foregoing DEFENDANT TRACEY'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION to all parties via electronic mail per agreement of the parties, as follows:

| | |
|---|---|
| Wingo Smith, wingo@civil-rights.law<br><br>Jeff Filipovits, jeff@civil-rights.law<br><br>James Dixon,<br>dixonjames@dixonjameslaw.com | Timothy J. Buckley, III<br>Kelly L. Christopher<br><br>tbuckley@bchlawpc.dom<br><br>kchristopher@bchlawpc.com |
| Antonio Veal,<br>AVeal@huffpowellbailey.com | |

This 15 day of May, 2025.

WILLIAMS & WAYMIRE, LLC

/s/ Jason Waymire
JASON WAYMIRE
Georgia Bar No. 742602

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
678-541-0790

678-541-0789
jason@wmwlaw.com

8

**RE: Contact with Inmate Smith, Ezra  SO #164822**

On July 9th 2024 I was working booking. Booking area was extremely busy with an overflow of releases, new lockups, and medical clearances. During the night, there were approx... 7 male inmates being processed while being held in holding cell #7. These males have been brought in the jail as early as 1300.    Amongst the males was Inmate Smith. Sometime during the night, one of the inmates (black male) pressed the intercom and said, "Yo, this white boy said he's about to harm himself." When I looked in the cell, Inmate Smith and other inmates were standing there laughing. I continued back working.

Later that shift, approx... 0100, we began to move inmates out of booking to general population.

The only person left in cell #7 was Inmate Smith. I began to look for Inmate Smith's folder to get him processed. During all the working, his folder was somehow neglected.

Inmate Smith became angry and started yelling and asking why is he still here. He was yelling that he had been here longer than those guys. He then began to hit the door, bang the door with his fist and banging his head on the window. After 10 minutes of this rant, I went down to the door and told him to stop the noise and have a seat. I told him, we are working on your folder now. He yelled that he has been here for 12 hours. I said, "Acting like a spoiled asshole, you can be here another 12, so sit down and wait.    I had told him that his mother called. He felt that he wasn't being processed because his mother called and made me mad. I told him, "No, I know and actually like your mother, it's YOU that's working my nerves by trying to act crazy."

When I walked away, he continued to mule kick the door. While I was processing his folder, the kicking stopped. I remembered, a deputy saying earlier that Inmate Smith has a habit of calling suicide every time he's here. So when he became silent, something told me to check on this idiot. When I looked at the camera, I didn't see him so I proceeded to the cell. That's when I noticed he was on his knees with phone cord around his neck. I yelled for keys! I yelled for medical! Nurse Sanchez came running and Deputy Jackson came running with the keys. We placed Inmate Smith on his back and began chest compressions. He was purple at this time and did not have a pulse.   After additional nurses came in to assist, he started breathing.

Inmate was taken to hospital via EMS.



EXHIBIT
P 4

## Inmate Incident # 24J-000442
### Booking Number: 242425

### Inmate Information

| | | | |
|---|---|---|---|
| Name: | Smith, Ezra | | |
| Date of Birth: | ███████ | SO Number : | 164822 |
| Gender: | Male | Social Security: | ███████ |
| Race: | White | Driver's License: | ███████ |

### Incident Information

| | | | |
|---|---|---|---|
| Date: | 07/09/2024 | Time: | 1:30 AM |
| Badge #: | 2548 | | |
| Officer Name: | Tracey, Monique | | |
| Violation Type: | Serious | Location: | Booking Holding Cell 07 |
| Incident Type: | Attempted Suicide | | |
| Comment: | 52 attempt | | |

| Party | Connection | Violations |
|---|---|---|
| Smith, Ezra | Inmate | |

### Incident Report # 24R-000554

| | | | |
|---|---|---|---|
| Date: | 07/09/2024 | Time: | 3:28 AM |
| Badge #: | 2548 | Officer Name: | Tracey, Monique |
| Report Type: | Incident | | |
| Status: | New | | |
| Status Badge #: | 2548 | Status Officer Name: | Tracey, Monique |

Narrative:  On 7/8/2024, approx 2000, Inmate Smith, Ezra, was being held in Holding #07 along with (5) other inmates. One of the inmates, pressed the button and said, "this white guy says he wants to kill himself." I looked in the cell and inmates, including Smith began to laugh. At approx 0135, Inmate Smith, was still in cell awaiting to be processed.
He began to kick the door. When I approached I told him to sit down and relax, we are working on his folder now. Approx 0140, I went over to the cell because the kicking had stopped. When I looked thru the window, inmate Smith was hanging from telephone cord. Medical and EMS was called and chest compressions were performed. Inmate Smith was taken to hospital via EMS.

### Incident Report # 24R-000559

| | | | |
|---|---|---|---|
| Date: | 07/09/2024 | Time: | 11:09 PM |
| Badge #: | 2907 | Officer Name: | Jackson, Shenequa Raychell |
| Report Type: | Supplemental | | |
| Status: | New | | |
| Status Badge #: | 2907 | Status Officer Name: | Jackson, Shenequa Raychell |



EXHIBIT
P5

Narrative: On July 8, 2024, I, Deputy Jackson #2907, was assigned as the Kitchen Deputy on Jail Team B. At the beginning of shift I was instructed by Lt. Daniel #2324 to assist in Booking, because it was very busy. Deputy Tracey #2548, Deputy Gomez #3062, and I were working in Booking. There were multiple inmates to be released and a couple of inmates that needed to complete the booking process. While we were working on the Booking platform multiple men in Booking cell #7 were yelling at us. One of the inmates in Booking cell #7 stated, "this white boy is going to kill himself." When we looked in the cell all the men were laughing including the white male who he was talking about. The white male in Booking cell #7 was later identified as Ezra Smith SO#164822. We continued to release and clear people out of booking. Inmate E. Smith asked, "What was taking so long?", while I was removing an inmate from the cell. I told him I wasn't sure we were just picking up folders and clearing them out of Booking. He began to kick and bang on Booking cell #7 door. Inmate Smith was told by Deputy Tracey that he needed to get cleared before he went to general population. Inmate Smith then continued to bang and kick on the Booking cell #7 door.

Deputy Tracey noticed that Inmate Smith stopped banging and decided to go check on him at approximately 0133 hours. As Deputy Tracey approached the door, she stated that she needed help. I grabbed the keys from the Booking platform and went to Booking cell #7. When I opened the cell door Inmate Smith was kneeling at the telephone. I called his name and went to pull him away from the phone. When I pulled Inmate Smith away, I immediately noticed that his face and head was purple. Inmate Smith had wrapped the phone cord around his neck by using the phone cord inside Booking cell #7. I unwrapped the phone cord from his neck and noticed there was blood on the bench. Deputy Tracey immediately screamed for a nurse. Nurse Sanchez immediately came, and we pulled him back to lay him on his back. Nurse Sanchez immediately began CPR chest compressions. She said that EMS needed to be called. EMS was called. The assistance of additional deputies and additional nurses was requested. Nurse Sanchez began to tire from the chest compressions, so I began to do chest compressions. Nurse Napier, Nurse Smith, and additional deputies arrived afterwards. Nurse Napier relieved me and began chest compressions at that time. Nurse Smith instructed me to go get the AED. I grabbed the AED from the Booking platform and brought it to the nurses. At that time Inmate Ezra was receiving oxygen from the nurses and they stated that they didn't need the AED. Lt. Daniel then instructed me to check Inmate Smith HOLDs information through GCIC. While I was doing so, EMS arrived. Inmate Smith left with EMS and D.S. Little #2141.

My Axon issued camera was activated during this time.

_____

S. Jackson #2907

Incident Report # 24R-000555

| Date: | 07/09/2024 | Time: | 6:17 AM |
|---|---|---|---|
| Badge #: | 2324 | Officer Name: | Daniel, Lt. J. |
| Report Type: | Supplemental | | |
| Status: | New | | |
| Status Badge #: | 2324 | Status Officer Name: | Daniel, Lt. J. |

Narrative: Inmate Ezra Smith was in Holding Cell 7 when we came on shift for a hold for Baldwin Co. S.O. There were several releases and several inmates on the bench when we took over. I told the deputies to prioritize the releases, then the inmates on the bench, and then we

would finish up the inmates in Holding Cell 7. As the night went on the deputies booked in the inmates who were on the bench and started finishing up the ones in Holding Cell 7 until there were just two inmates left, inmate Smith and inmate Martinez. Deputies worked on inmate Smith until inmate Martinez's family arrived to post bond. At that point, they worked on inmate Martinez so that he could be released.

Inmate Smith became unruly, kicking the door and yelling at deputies. Dep. Tracey attempted to calm him down but he was still upset and would kick the door and then stop. A short time later I was in the Booking Supervisor's Office when I heard Dep. Tracey call for help in Holding Cell 7. She and Dep. Jackson was already in there and Nurse Sanchez went running to the cell. I saw Nurse Sanchez start CPR and the other nurses were called for. I radioed for an ambulance and told Cpl. Hall and Dep. Little to meet in Booking. As the nurses got tired a deputy would swap doing CPR with them until inmate Smith had a pulse and began breathing. He had wrapped the telephone cord in the cell around his neck and dropped his weight so that he would asphyxiate. Blood had started coming out of his nose and was starting to pool on the bench under the phone. His face was a purple color and his eyes were bugged out of his head and he had urinated on himself. Once breathing he was given oxygen and the fire dept. and EMTs arrived. At this point, inmate Smith was moving around on the ground. He was placed on a gurney and moved to the back of the ambulance. Dep. Dieudonne rode in the ambulance and Dep. Little followed in a patrol car. After watching the camera, it appears inmate Smith was in a position where he couldn't breathe for 2-3 minutes. I took photos of the phone and blood in the cell.

Major Welch was contacted about the situation and Baldwin Co. S.O. was contacted about their hold. I was told by phone that they were dropping their hold. Inmate Smith was released and his paperwork and clothing were taken to the hospital. I sent Cpl. Hall with his belongings. When he returned he said that inmate Smith was speaking and seemed to be ok. He spoke with him concerning the incident which was recorded on his body camera.

Due to inmate Smith being the only inmate in the cell at the time I did not contact CID but Inv. Fort arrived and took statements from Dep. Tracey and Dep. Jackson. The video of the inside of the cell was pulled for Inv. Fort and sent by interoffice mail.

Incident Report # 24R-000560

| | | | |
|---|---|---|---|
| Date: | 07/09/2024 | Time: | 11:13 PM |
| Badge #: | 2383 | Officer Name: | Hall, Adrian Bryan |
| Report Type: | Supplemental | | |
| Status: | New | | |
| Status Badge #: | 2383 | Status Officer Name: | Hall, Adrian Bryan |
| Narrative: | | | |

On July 8, 2924 I, Cpl. Hall was assigned as the Supervisor for ISD Housing Pod. During the process of locking down inmates in 4E who were yelling and being verbally irate. Lt Daniel called for Deputy Little and I to rush Booking.

Once I entered Booking, I observed Deputy Jackson on the Booking platform. I continued to look around Booking to located Lt. Daniel. As I looked over to Booking cell #7, I observed that the cell door was open with deputies and nurses inside the cell. I went to the cell and observed Lt. Daniel preforming CPR (cardiopulmonary resuscitation) on an inmate. The inmate was later identified as Inmate Ezra Smith SO#164822.

Deputy Jackson returned to the cell with an AED (automated external defibrillator). The AED was handed to Deputy Little, he opened it, and began the process of using it. When

the AED advised for the pads to be placed on the person Deputy Little began moving towards Inmate Smith. Lt. Daniel had stopped CPR. Nurse Napier stated to wait that the AED is not needed at this time. I observed Inmate Smith taking deep breaths and his face was of a purplish color.

Rockdale EMS and Rockdale Fire were on scene. Lt. Daniel stepped out of the cell to advise me of the situation and gave me tasks that needed to be completed. Deputy Little was advised that he would be driving a patrol vehicle to the hospital and Deputy Dieudonne was riding in the ambulance with Inmate Smith.

Inmate Smith is currently being housed in the Rockdale County Jail for a warrant out of Baldwin County in Georgia. Teletype messages and phone calls were made to Baldwin County in reference to Inmate Smith s hold. Baldwin County advised that they are not coming to pick-up Inmate Smith.

After receiving that information Lt. Daniel advised me to collect Inmate Smith s personal property and RCSO paperwork to be released from the RCSO Jail. I drove to Rockdale Piedmont Hospital, went to ER #15 where Inmate Smith is receiving medical treatment, and Deputy Little & Deputy Dieudonne were on security detail.

As I was explaining to Inmate Smith that was being released from the Jail what was the reasons, he tried kill himself. Inmate Smith stated that he had been in the cell since 1pm, tired, hungry, and that lady on the platform. The lady he is referring to is Deputy Tracey. Inmate Smith stated that Deputy Tracey, told him to kill himself. Inmate Smith also mentioned that Deputy Tracey made a gesture as if to wrap something around his neck. I then cut Inmate Smith s property bag and it was given to him. As I was given Inmate Smith his property the nurse advised that he cannot put on his personal clothing, because there are several tests that need to be completed. Inmate Smith was given a hospital gown to change into as the inmate uniform was being removed.

I left the Rockdale Piedmont Hospital and headed back to the RCSO Jail with the release paperwork. Deputy Little & Deputy Dieudonne collected the RCSO property and returned to the Jail.

I advised Lt. Daniel of what my conversation with Inmate Smith was about.

During this active suicide attempt, I activated my Axon body camera, and portions of this incident can be reviewed.

During this incident I did not sustain any injuries.

## Lt. Daniel statement

Joshua Daniel <Joshua.Daniel@RockdaleCountyGA.gov>

Wed 7/10/2024 4:48 AM

To:Kevin Tatum <Kevin.Tatum@RockdaleCountyGA.gov>

On 7/9/24 after Cpl. Hall returned from the hospital where he released inmate Ezra Smith and gave him his property, I spoke with him in the Booking Supervisor's office. I had asked Cpl. Hall to ask inmate Smith why he had tried to kill himself, since he didn't have charges with Rockdale and his charges with Baldwin County S.O. were only misdemeanor charges. Cpl. Hall told me that inmate Smith told him he tried to kill himself because a deputy had dared him to. He said it was Dep. Tracey.

I called Dep. Tracey into the office and told her from now on she would wear a body camera. For nothing else, it will protect her because the inmate at the hospital was saying that she had told him to kill himself and that's why he did it. She told me no, what he said wasn't true. She said the inmates in Holding Cell 7 kept hitting the emergency call button. When a deputy asked them what was going on the inmates responded that the white inmate said he was going to kill himself, but they said it while laughing. She said she asked who and inmate Smith came to the door but he was also laughing and goofing off. She said she responded by asking if they were his lawyer or if he had rope and to knock it off.

Medical was not notified about the incident when it happened because deputies did not think it was a serious threat or attempt. Deputy Tracey told me that she did not think about her comment when Inv. Fort had asked her for a statement and asked how to add it. I told her to include it in her Odyssey report. She told me that he made it seem like they were leaving him in Holding Cell 7 because he was white and the deputies were black. She told me that his mother had called and she spoke to her on the phone for almost 40 min. She said she told Dep. Jackson after she hung up that (Inmate Smith) is what happens when your mom and dad are brother and sister but did not say that to inmate Smith or where she thought he could hear it.

Lt. J. Daniel     7/10/24



EXHIBIT

P 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| EZRA SMITH, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 1:24-cv-05158-TWT |
| MONIQUE TRACEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### RULE 68 OFFER OF JUDGMENT

COME NOW DEFENDANTS TRACEY, JACKSON AND GOMEZ and pursuant to Rule 68 of the Federal Rules of Civil Procedure, hereby offer to settle all claims against Defendants Tracey, Jackson and Gomez by having judgment entered against Defendant Tracey in the amount of Fifty Thousand and Five ($50,005) Dollars, with costs then accrued as of the date of this offer. If Plaintiff accepts this offer of judgment, then all claims against Defendants Tracey, Jackson and Gomez in this action will be settled, and Plaintiff may petition for costs through the date of the offer, as provided by Rule 68.

This 3d day of April 2025

| WILLIAMS & WAYMIRE, LLC | BUCKLEY CHRISTOPHER & HENSEL, P.C. |
|---|---|
| */s/ Jason Waymire* | */s/ Timothy Buckley* |
| JASON C. WAYMIRE | Timothy J. Buckley III     (by JCW with |
| Georgia Bar No. 742602 | Georgia Bar No. 092913 express permission) |

**EXHIBIT**

tabbies

P 7

| Attorney for Defendant Tracey | Attorneys for Defendants Gomez & Jackson |
|---|---|
| Bldg. 400, Suite A | 2970 Clairmont Road, NE |
| 4330 South Lee Street | Suite 650 |
| Buford, GA 30518 | Atlanta, Georgia 30329 |
| (678) 541-0790 | (404) 633-9230 |
| (678) 541-0789(f) | tbuckley@bchlawpc.com |
| jason@wmwlaw.com | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing Rule 68 Offer of Judgment upon counsel for Plaintiff via U.S. mail and email, as follows:

| James M. Slater | Jeff Filipovits |
|---|---|
| james@slater.legal | jeff@civil-rights.law |
| SLATER LEGAL PLLC | Wingo Smith |
| 2296 Henderson Mill Rd. NE #116 | wingo@civil-rights.law |
| Atlanta, Georgia 30345 | SPEARS & FILIPOVITS, LLC |
| | 315 W. Ponce de Leon Ave., Ste. 865 |
| | Decatur, Georgia 30030 |

This 3d day of April, 2025.

WILLIAMS & WAYMIRE, LLC

/s/ Jason Waymire
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorney for Defendant Tracey

2