Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3

 4   EZRA SMITH,                    )
                                    )
 5             Plaintiff(s),        )   Civil Action
                                    )
 6   v.                             )   File No. 1:24-CV-05158-TWT
                                    )
 7   DEPUTY MONIQUE TRACEY, et      )
     al.,                           )
 8                                  )
               Defendant(s).        )
 9   _____)

10

11

12       Video Zoom Deposition of Carmen Pittman George

13             (Signature is reserved.)

14                 October 13, 2025

15               1:01 p.m. - 3:12 p.m.

16

17               Video Conference

18       Reported by Kelley Marie Nadotti, RPR, CCR
                 CCR 6256-8388-8026-4192
19   _____

20          THOMPSON REPORTING SERVICES, INC.
                  Post Office Box 792
21          Powder Springs, Georgia  30127-0792
               www.thompsonreportingservices.com

22

23

24

25
```

Page 2

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of Plaintiff(s):
     (By Video Conference)
 3
             James Murray Slater
 4           Jeff Filipovits
             Attorneys at Law
 5           SLATER LEGAL PLLC
             2296 Henderson Mill Road NE #116
 6           Atlanta, GA 30345
             404.458.7283
 7           James@slater.legal
             Jeff@slater.legal
 8

 9   On behalf of Defendant Tracey:
10   (By Video Conference)

11           Jason C. Waymire
             Attorney at Law
12           WILLIAMS & WAYMIRE, LLC
             Building 400, Suite A
13           4330 South Lee Street
             Buford, GA 30518
14           678.541.0790
             Jason@wmwlaw.com
15

16   On behalf of the Defendant Sanchez:
17   (By Video Conference)

18
             Antonio Eugene Veal
19           Attorney at Law
             HUFF, POWELL & BAILEY, LLC
20           999 Peachtree Street NE
             Suite 950
21           Atlanta, GA 30309
             404.892.4022
22           Aveal@huffpowellbailey.com

23

24

25
```

Page 3

```
 1   APPEARANCES OF COUNSEL: (cont'd)

 2   On behalf of the Defendants Gomez and Jackson:
     (By Video Conference)
 3
             Timothy Joseph Buckley, III
 4           Attorney at Law
             BUCKLEY, CHRISTOPHER & HENSEL, PC
 5           2970 Clairmont Road NE
             Suite 650
 6           Atlanta, GA 30329
             404.633.9230
 7           Tbuckley@bchlawpc.com

 8

 9   Also Present:

10           Mamie Kimbrell, Thompson Reporting

11                 - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                    INDEX

 2   WITNESS                                    PAGE

 3   Carmen Pittman George

 4     Reporter Disclosure of No Contract        5

 5     Firm Disclosure of No Contract            6

 6     Examination By Mr. Waymire                7

 7     Examination By Mr. Buckley               58

 8     Examination By Mr. Veal                  63

 9     Examination Continued By Mr. Waymire    106

10     Certificate                             108

11     Errata                                  109

12

13                  EXHIBITS

14   DESCRIPTION                                PAGE

15   Defendant Tracey's:

16   1   Screenshot                             34
         (ESmith0001)

17

18

19

20

21

22

23

24

25
```

Page 5

REPORTER DISCLOSURE OF NO CONTRACT

1
2    I, Kelley Marie Nadotti, Certified Court
3    Reporter, do hereby disclose pursuant to Article
     10.B of the Rules and Regulations of the Board of
     Court Reporting of the Judicial Council of Georgia
4    that I am a Georgia Certified Court Reporter.
     Thompson Reporting Services, Inc./I was contacted by
5    the party taking the deposition to provide court
     reporting services for this deposition; Thompson
6    Reporting Services, Inc./I will not be taking this
     deposition under any contract that is prohibited by
7    O.C.G.A. 15-14-37(a) and (b); or Article 7C of the
     Board; and I am not disqualified for a relationship
8    of interest under the provisions of O.C.G.A.
     9-11-28(c).
9
         There is no contract to provide reporting
10   services between myself or any person with whom I
     have a principal and agency relationship nor any
11   attorney at law in this action, party to this
     action, party having a financial interest in this
12   action, or agent for an attorney at law in this
     action, party to this action, or party having a
13   financial interest in this action.  Any and all
     financial arrangements beyond my/Thompson Reporting
14   Services, Inc.'s usual and customary rates have been
     disclosed and offered to all parties.
15
         This, the 3rd day of November, 2025.
16
17
18       KELLEY MARIE NADOTTI, RPR, CCR
19       Certified Court Reporter
         CCR 6256-8388-8026-4192
20
21
22
23
24
25

Page 6

FIRM DISCLOSURE OF NO CONTRACT

1
2    I, Thompson Reporting Services, Inc., do hereby
     disclose pursuant to Article 10.B of the Rules and
3    Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia that Thompson Reporting
4    Services, Inc., was contacted by Williams & Waymire,
     LLC firm to provide court reporting services for
5    this deposition and there is no disclosed contract
     that is prohibited by O.C.G.A. 15-14-37(a) and (b)
6    or Article 7C of the Rules and Regulations of the
     Board for the taking of this deposition.
7
         There is no contract to provide reporting
8    services between Thompson Reporting Services, Inc.,
     and Williams & Waymire, LLC or any person with whom
9    Thompson Reporting Services, Inc. has a principal
     and agency relationship nor any attorney at law in
10   this action, party to this action, party having a
     financial interest in this action, or agent for an
11   attorney at law in this action, party to this
     action, or party having a financial interest in this
12   action.  Any and all financial arrangements beyond
     Thompson Reporting Services, Inc.'s usual and
13   customary rates have been disclosed and offered to
     all parties.
14
         This, the 3rd day of November, 2025.
15
16
17
18       THOMPSON REPORTING SERVICES, INC.
19
20
21
22
23
24
25

Page 7

1    Thereupon,
2             Carmen Pittman George,
3    acknowledged having been duly sworn or affirmed to tell
4    the truth and testified upon her oath as follows:
5         THE WITNESS: I do.
6             EXAMINATION
7    BY MR. WAYMIRE:
8    Q   Hi, ma'am. I'm Jason Waymire and I represent
9    Officer Tracey in this lawsuit that your son has filed.
10        I wonder if you will first tell us your full
11   name and then tell me how you want me to address me
12   here.
13        Maybe Ms. George or Ms. Pittman, however you
     want me to.
15   A   My full name is Carmen Christie Pittman George.
16   And you can call me Ms. George.
17   Q   That's what I'll do then.
18        All right, ma'am. What year were you born?
19   A   '75.
20   Q   And where do you currently live?
21   A   In Covington.
22   Q   What's your address?
23   A   10 Abbey Court, Covington, Georgia 30016.
24   Q   All right. And do you have a phone number,
25   more than one phone number?

Page 8

1    A   No. Just one.
2    Q   Just one. And is it a cell phone?
3    A   Uh-huh.
4    Q   Yes?
5    A   Yes.
6    Q   What is that cell phone number?
7    A   (470)914-1306.
8    Q   Was that -- is that the same number that you
9    had in July of 2024?
10   A   I believe so, unless you have my husband's
11   phone number.
12   Q   All right. Who is your husband, while we're
13   talking about him?
14   A   Ricky George. Or Charles George.
15   Q   When were you married?
16   A   August 4, 2023.
17   Q   And the address you gave us, you live there, I
18   guess, there with your husband Mr. George?
19   A   Right now, yes.
20   Q   Has your son Ezra ever lived there with you?
21   A   No.
22   Q   When was the last time Ezra lived with you?
23   A   Ezra stayed with me in 2023, but that was at a
24   different address.
25   Q   What was the time frame that he stayed with you

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 9

1  in '23?
2      A   I don't know.  Maybe about two months in the
3  summer.
4      Q   And then going backwards in time from there --
5      A   No.  It was 2024, not '23.  I'm sorry.
6      Q   Thanks for that correction.
7          So you think the summer of 2024 Ezra was
8  staying with you?
9      A   Yes.
10     Q   What was the address then, if you can remember?
11     A   545 Cedar Drive, Covington 30016.
12     Q   What was the occasion that caused him to be
13  staying with you?
14     A   In his mental state.
15     Q   What -- what particularly about his mental
16  state?
17     A   He had just gotten out of the crisis center.
18  His wife left him.
19     Q   The incident that we're going to talk about or
20  that Mr. Smith filed his lawsuit about happened
21  July 8/9th of 2024.  Did he stay with you before or after
22  that?
23     A   He was staying with us for about a week before
24  that.  And he stayed with us for about a month and a half
25  or so after that.

Page 10

1      Q   I see.
2      A   He had no power or anything at his house.  He's
3  got his own house, but all of that -- we couldn't pay all
4  of that.
5      Q   I see.  So about a week before the jail
6  incident and about a month and a half after?
7      A   Right.
8      Q   Got it.  We'll talk more about that later.
9          Can you tell us a little bit more about
10  yourself, like how far you went in school?
11     A   I graduated high school.  I have an associate's
12  degree.
13     Q   An associate's degree in what?
14     A   Accounting.
15     Q   From where?
16     A   It was Inter- -- oh, my goodness.  It has been
17  so long.  Intercontinental.
18         I don't even know if it's a school anymore.  It
19  was online.  American Internet Continental -- it's been
20  forever.  I can't even tell you.
21     Q   Have you worked in the accounting field?
22     A   No.
23     Q   Ever?
24     A   I just got it for business purposes because I
25  was starting my own business.

Page 11

1      Q   I see.  In terms of employment and what kind of
2  your work you've done over your life, what is that?
3      A   I did restaurant management for years.  And I
4  had my own cleaning business for about 12 years.
5      Q   I see.  When did that end?
6      A   About a -- it's really not ended.  I still have
7  a couple here and there, but I take care of my disabled
8  husband.
9      Q   I see.  So your work from at least 12 years ago
10  until now has been housecleaning and running your own
11  business; is that right?
12     A   Yes.
13     Q   Got it.
14         Okay.  You have two children, is that right, or
15  more?
16     A   Two.
17     Q   Two.  And one is Ezra and one is a daughter?
18     A   Uh-huh.
19     Q   And that daughter, how old is that daughter?
20     A   She's 28.
21     Q   What is her name and where does she live?
22     A   Her name is Destiny Pittman and she lives in
23  Stone Mountain.
24     Q   Is that DeKalb County?
25         Am I right on that?

Page 12

1      A   Is Stone Mountain DeKalb?
2          MR. SLATER: Wait.  Sorry. I can't --
3          THE WITNESS: Yeah.  Wait.  I'm not sure what
4  Stone Mountain -- what county.
5  BY MR. WAYMIRE:
6      Q   It's fine.  Yeah, if -- if you don't know the
7  answer to a question, that's fine.  I just think Stone
8  Mountain might straddle --
9      A   It's like Annistown Road.  So, I mean, whatever
10  county that is, I'm not sure.  I've never mailed her
11  anything.  I just know how to get there.
12     Q   You said Innistown Road; is that --
13     A   Annistown Road.
14     Q   Annistown Road.  I got you.
15         All right.  Do you think that she would know
16  anything about Ezra and his jail incident in July of
17  2024?
18     A   No.
19     Q   Is she close with Ezra?
20     A   No.
21     Q   Do you mind giving us background on your son
22  Ezra; where he grew up, how he grew up, how he got to the
23  point where he was in the jail in July of 2024?
24         I know that's a lot of -- that's multiple
25  questions in one and I can break it down, but that's

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 13

1  generally what I'm looking for.
2      So let's go to Ezra's childhood. Explain that
3  for me.
4      A   Okay. Like what part of his childhood?
5      Q   Did he go to school normally; went through high
6  school?
7      A   Yeah, he went to school. He graduated high
8  school. I mean, he's went through some ups and downs.
9  His dad had some issues, so we had to get through that.
10     But, I mean, he graduated high school. He was
11 a little -- couple of years behind, but he went back on
12 his own accord and got his diploma and walked.
13     Q   Yeah. And did he grow up in Rockdale County?
14     A   Yes. For the most part. We -- he was in
15 Covington for about two years with me.
16     Q   All right. Did you and your husband live
17 together?
18     A   Not since 2009.
19     Q   All right. So you were separated in 2009. Did
20 Ezra primarily live with you?
21     A   Yes.
22     Q   And as I understand it, Ezra's father took his
23 own life in 2019?
24     A   Yes.
25     Q   Is that the ups and downs that you just

---

Page 14

1  mentioned or was there more than that?
2      A   Well, that's -- his dad had a lot of mental
3  health issues. So he kind of drug Ezra through the mud.
4  But, yeah.
5      Q   When you say kind of drug Ezra through the mud,
6  what do you mean on that?
7      A   He took off to Florida and didn't tell anybody
8  where he was. And he would call Ezra and promise him
9  things and never follow through. And I had to deal with
10 the backlash.
11     Q   Got it. What was that gentleman's name?
12     A   Shane Smith.
13     Q   Was Ezra close with him?
14     A   He tried to be, but no. I mean, Shane was
15 always an absentee parent. Even when he was -- we were
16 still together, he was never there as a parent.
17     Q   So Ezra lived with you primarily when he was
18 growing up?
19     A   Yes.
20     Q   In terms of mental health issues, diagnosis,
21 tell us about that, what you know about Ezra.
22     A   Well, when he was younger, he was diagnosed
23 ADHD. So we dealt with that coming up through school.
24 And then after probably about two years before his dad
25 did what he did, he was diagnosed schizoaffective.

---

Page 15

1      And the current issues, which, I mean,
2  that's -- it's not -- he's doing a lot better now. But
3  at the time it was a roller coaster.
4      Q   So at what time are we talking about that it
5  was a roller coaster?
6      A   It's been a roller coaster, but since he got
7  married to that girl and she took off and left
8  everything -- took everything and drug him through the
9  mud, he just kind of went on a roller-coaster ride.
10     Q   All right. So I have -- I've looked at certain
11 medical records and I've seen ADHD you said when he was
12 young. How old was he when that diagnosis was --
13     A   ADHD?
14     Q   Yes, ma'am.
15     A   Oh, probably six or seven, maybe younger. He
16 had -- I had him a therapist and psychiatrist from the
17 time he was in first grade up until he decided to try to
18 go live with his dad at 14. And at 14, you can't tell
19 them no. So he went and then his dad took off. So he
20 came back to me.
21     Q   You mentioned schizoaffective disorder?
22     A   Right. But Ezra was 17 and was seeing a doctor
23 on his own when he got diagnosed with that. So I don't
24 have any of those medical records.
25     Q   Sure. And I know you're not a psychiatrist.

---

Page 16

1  And I'm not either.
2      I'm just -- I'm wondering what are the symptoms
3  or manifestations of schizoaffective disorder in Ezra.
4      A   Well, he thinks things and he knows that it's
5  not true, kind of like -- it's a form of schizophrenia,
6  but it's not as serious to the point. But then it can be
7  because there's not a lot of medical treatments, like
8  medications and stuff, that actually help with it because
9  it's so off the spectrum.
10     He don't see things and he don't hear things.
11 He just has thoughts that this is against him. And it's
12 like -- I looked at it more as severe depression because
13 that's the spectrum I saw of it. But I could talk him
14 down, if that makes sense.
15     Q   It makes some sense. So in terms of what you
16 see, you see symptoms of -- it sounds like kind of
17 paranoia?
18     Like he thinks things are -- people are against
19 him when you don't really think that's true?
20     A   Yeah. And it really -- it's when -- you know,
21 when things feel like they're falling apart around him.
22 He feels he has no control of anything and he doesn't
23 know where to grasp to get control.
24     Q   I've also seen certain records that say
25 bipolar I disorder?

---

Thompson Reporting Services, Inc.
(678) 483-0600

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 17

1    A    Yes.
2    Q    Now, do you know anything about that?
3    A    That's probably been here lately.  I mean, that
4    was -- well, bipolar is -- you know, like I say, I --
5    yeah, the severe ups and downs, the roller-coaster ride.
6    That's the best way to describe bipolar.
7    Q    So if you had been seeing symptoms like that
8    with Mr. Smith or with Ezra, how long has that been going
9    on?
10    A    He has been -- like I said, he has been seeing
11    therapists and psychiatrists since he was a child.  And
12    he's been hospitalized, you know, short stays, but then
13    he was in the crisis center for ten days, two days before
14    this situation happened.
15    Q    Was that the first time he was hospitalized for
16    any kind of mental health problem or disorder?
17    A    No.
18    Q    How many other hospitalizations do we have
19    before that?
20    A    Two, but they weren't as long of stays.
21    Q    So up to the point of the Rockdale County Jail
22    incident, there had been three mental health
23    hospitalizations?
24    A    Yeah.  The last one was two days before.
25    Q    I understand.  And then had there been any

Page 18

1    afterward?
2    A    No.
3        MR. SLATER:  I can't answer any of these.
4        THE WITNESS:  Yeah, he hasn't been in a mental
5    hospital since then.
6    BY MR. WAYMIRE:
7    Q    Very good.  And was it the same hospital all
8    three times?
9    A    Well, no.  Because they never sent him to the
10    same one.  He was in Lawrenceville this last time.  A
11    time before that -- I can't even remember how long ago it
12    was -- he was -- he might have been 15 or 16 maybe.  It
13    was down in Valdosta.  And the other one was just an
14    overnight stay, I think, at the hospital where they ended
15    up not transferring him out anywhere.
16    Q    By a hospital, you mean a local -- just a local
17    hospital like --
18    A    Rockdale.  They all start out at Rockdale
19    hospital where they decided -- except this last one.
20    That was at View Point.  But that's not a hospital.  It
21    is just a mental health office.
22    Q    All right.  The one in Lawrenceville, is that
23    the View Point one?
24        Is that what you're talking about?
25    A    That's where -- View Point sent him to the

Page 19

1    crisis center in Lawrenceville.
2    Q    And I've got one called Riverwoods.  Is that
3    the one in Lawrenceville or is that somewhere else?
4    A    It might be the one that was in Lawrenceville.
5    It was across the street from the Gwinnett County
6    Hospital -- or Northside Hospital.  Northside Hospital.
7    Q    Okay.  And I take it View Point is a mental
8    health provider, but not an in-patient facility; is that
9    the way it works?
10    A    Yeah.  I believe -- they might have some
11    facilities, but that place -- it was just where they
12    needed a crisis center for him at the time.
13    Q    Okay.  Are you aware of any incidents during
14    Ezra's childhood or young adulthood that were traumatic
15    for him?
16    A    No, not really.
17    Q    Nothing whatsoever comes to mind?
18    A    No.
19    Q    Okay.
20    A    Just his dad in and out.
21    Q    I'm sorry?
22    A    Just his dad in and out.
23    Q    All right.  In terms of your relationship with
24    Ezra, it wouldn't surprise me if you said it was kind of
25    up and down, too.  But, you know, parents, moms and sons,

Page 20

1    typically have a close relationship.  I don't know.
2        How would you describe that?
3    A    Ezra and I have a close relationship.
4    Q    All right.
5    A    We did before this all happened and we have
6    since then, so...
7    Q    I gotcha.  Are you one of the people that he
8    leans on and confides in when he has problems or issues
9    or distress?
10    A    Always.
11    Q    Okay.  You said that his wife left him.  Is
12    that still the case?
13        Are they separated?
14    A    Yeah.  They're separated.
15    Q    Okay.  And does he have any children of that
16    lady?
17    A    No.
18    Q    Does he have any children whatsoever?
19    A    No.
20    Q    In terms of suicidal statements, suicide
21    attempts, anything having to do with suicide, tell us
22    about Ezra and the first time that anything like that
23    came up.
24    A    The suicide was when he ended up in the crisis
25    center.  That was the suicide.  Every other time, it was

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 21

1 just he didn't -- he told me he needed help and we went
2 to see somebody.
3         And it was referred that he go to a hospital to
4 try to get stabilized on medication and then he came home
5 within a few days.  But this last one was a crisis center
6 because he was talking about killing himself.
7     Q    So if the incident in Rockdale County Jail was
8 the night of July 7th and 8th of 2024, did he go to the
9 crisis center before that?
10    A    He got out of the crisis center on either -- I
11 think it was the 6th.  It was the Saturday before that
12 Monday.
13    Q    Okay.
14    A    Because that was Monday that they locked him
15 up.
16    Q    I gotcha.  And he had gone to the crisis center
17 because of suicidal statements?
18    A    Yes.  He had gotten refused to be taken into
19 the jail over the same warrant.  The nurse turned him
20 away and said:  That we can't take him.  He needs help.
21        And they took him back to View Point where we
22 scheduled the first place we could find, which was the
23 crisis center in Lawrenceville.
24    Q    Okay.
25    A    And I took him and ten days later they called

---

Page 22

1 and told me to come and get him, that he was good.  And
2 then he had court Monday morning and they took him back
3 to jail over the warrant.
4     Q    I see.  So the suicidal statements or gestures
5 or whatever happened, describe that for us that led
6 him -- you taking him to View Point.
7     A    Well, his wife had left him and he disappeared
8 that morning.  And we thought he was handling it and he
9 disappeared.  And come to find out, he was going to meet
10 a lady that he had been scheduled through the judge to
11 talk to about his mental health to get on the mental
12 health track.
13        And a police officer rode through the parking
14 lot -- because he was waiting on the doors to unlock and
15 the lady to come, you know, say that she was there -- and
16 picked him up on the warrant out of Milledgeville.  So, I
17 mean, he was trying to get the mental health he needed
18 and everything just went upside-down.
19    Q    So that sounds like the incident where he was
20 taken to court; is that right?
21    A    That was why he ended up in the crisis center
22 because he went to see -- because he already had a court
23 order to get his mental health evaluated.  So that's what
24 he went for to get his mental evaluation.
25    Q    I gotcha.  Okay.  I'm with you now.  I'm sorry.

---

Page 23

1     A    Yeah.
2     Q    I lost the track.
3         Okay.  So he got picked up, then he was turned
4 away from the jail.  And then he went to View Point.
5         Is it that he was making suicidal statements or
6 he did some kind of act?
7     A    I'm not sure what happened with the police
8 officers or what happened before I got to View Point.
9 But I showed up within 30 minutes because of where I was
10 at.
11        And by the time they called me to tell me what
12 was going on, they had already taken him to the jail and
13 turned him away from the jail.  And I met them back at
14 View Point.
15    Q    I see.  Did you ever learn from Ezra or anybody
16 else what --
17    A    Just what I told you.  I mean, he -- they said
18 he was acting erratically in the parking lot.  He tried
19 to tell them there he was there for a mental health
20 evaluation.  And they said they don't do mental health
21 evaluations here.
22        When -- later they figured out when the lady
23 showed up over at View Point and she corrected them and
24 said:  Yes.  That's -- my office is there.  And, yes, we
25 do do mental health evaluations.  So...

---

Page 24

1     Q    All right.  So that was the first time that
2 you've ever heard of anything about suicide with regard
3 to your son Ezra?
4     A    Right.  The suicide. yeah.
5         I mean, he had had depression, but he never
6 talked about killing himself or trying to kill himself.
7     Q    Okay.  And did you talk to Ezra about the
8 situation and whether he was really suicidal or what was
9 going on?
10    A    Well, of course we've talked about it.  And,
11 you know, we thought that he was in a better head state.
12 He was supposed to wait on me and my husband to take him
13 that morning.
14        And he just woke up thinking that he was going
15 to handle it himself, I guess.  I don't -- it's hard to
16 say exactly what's going on in somebody's mind.  Of
17 course, he regretted it later.
18        But -- and his wife just left him and took
19 everything and accused him of a bunch of lies.  So...
20    Q    So it sounds like when he went to View Point
21 and then later to the in-patient facility before he got
22 to the Rockdale County Jail, there was -- there was some
23 manifestation of mental disorder or mental health issues,
24 but you didn't hear anything about suicide or wanting to
25 take his own life or hurt himself; is that true?

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 25

1    A    Right.
2    Q    Got it.  So up to this point in his life, you
3  had never heard anything about him being suicidal or
4  wanting to hurt himself; is that right?
5    A    Right.
6    Q    Got it.  Now, I think that you -- and I'm
7  not -- I'm not trying to embarrass you at all, but I
8  think you know Officer Tracey from having been in the
9  jail -- in the Rockdale County Jail before; is that
10  right?
11    A    Right.
12    Q    Got it.  Can you tell us about that, like how
13  long you were there, how you got to know her?
14    A    I was there for six months over a $25 failure
15  to pay child support for my daughter.  And that's a whole
16  other story that I'm not going to get into.
17    Q    So six months -- what kind of frame are we
18  talking about?
19        Like, what year; do you recall?
20    A    2014, I think.  From -- it was after
21  Thanksgiving that I got out.  I think I went in, I guess,
22  around April or so.  It was close to Christmas when I got
23  out.  I don't remember the exact dates.
24    Q    It was roughly 2014.  And that was the context
25  in which you met Monique Tracey?

---

Page 26

1    A    Yes.
2    Q    And while I'm asking about different officers
3  here, Shaniqua Jackson, did you ever know her?
4        Have you ever met her?
5    A    No.
6    Q    Don't know her at all.
7        And then Raul Gomez, do you know him?
8    A    No.
9    Q    Nurse Sanchez, did you ever deal with her or
10  know her?
11    A    No.
12    Q    All right.  So Tracey -- tell me about meeting
13  Tracey and just any kind of interactions that you had,
14  your impressions of her.
15    A    Well, when I was locked up I didn't have any
16  issues with her, which is why when she answered the phone
17  that night I talked to her about what he had been going
18  through and asked her to look out for him.
19    Q    Yeah.  So going back in time to roughly 2014,
20  you say you didn't have any issues with her?
21    A    Huh-uh.
22    Q    Did you -- what was your interaction like with
23  her?
24        Was it just she'd hand off meals to you or did
25  you have any kind of extended discussion or -- you know,

---

Page 27

1  just tell me what you can remember.
2    A    I don't remember any officers having too many
3  extended discussions.
4    Q    All right.  So you say you had no problem with
5  her in roughly 2014 when you were there.  Did you have
6  any impressions of her whatsoever?
7    A    I mean, I liked her enough to feel confident
8  enough to ask her to look out for my son while he was
9  there.  Because the mental state that I knew he was in is
10  why I called like every hour on the hour while he was
11  there.  And he shouldn't have been there after a certain
12  time because Milledgeville refused to come and get him.
13    Q    How did you learn that Ezra was in the Rockdale
14  County Jail?
15    A    Because I took him to court that morning for
16  the -- a court -- we went to court that morning and they
17  took him from court.
18    Q    I see.
19    A    I was right there with him.
20    Q    I see.  Was it the kind of thing that the judge
21  or somebody recognized:  Oh, there's a warrant and so
22  there's an arrest that's going to happen here, or was it
23  there is some kind of other drama that went with it?
24    A    No.  It was a warrant that they took him and --
25  from Milledgeville.

---

Page 28

1    Q    Gotcha.  Do you know what that was for, by
2  chance?
3    A    Violating the TPO.
4    Q    I see.  Was it a TPO with his wife?
5    A    Yes.
6    Q    All right.  Do you know anything about that
7  incident that led to the TPO?
8    A    I do.  And I know that it's been dropped out of
9  Rockdale County.
10    Q    Was it filed in Rockdale County?
11    A    It was.
12    Q    And then, I guess, his wife must have gone to
13  Baldwin County and claimed that he violated?
14    A    She -- right.  She claimed that he violated the
15  TPO.
16    Q    I see.  By what; contacting her or something
17  like that?
18    A    That's -- I -- yeah, that's what she claimed.
19    Q    Okay.  So on the morning of July 8th, your son
20  Ezra gets arrested in court and then he's in the Rockdale
21  County Jail.  Did you have any contact with him that day?
22    A    Yeah.  I talked to him a couple of times
23  earlier in the day, but we didn't have the money to put
24  on the phone for him to call me or anything like that.
25  So I think I was only able to talk to him, like, twice

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 29

1 for short periods. And I let him know just, you know, we
2 were going to get him out. We were going to figure this
3 out.
4    Q   All right. So is this two telephone calls from
5 the jail where he's in jail?
6    A   I think so. I mean, I can't -- I can't
7 remember that part. I just know that I called up there
8 so many times. I couldn't tell you. I think I only
9 talked to him once or twice, though.
10    Q   I gotcha. And would that have been a call from
11 him to you or from you to him?
12    A   Well, I can't call the jail to talk to him
13 personally. He would have to call me.
14    Q   Got it. And so can you tell us -- you had two
15 calls. We're talking about, what, a minute per call or
16 something like that?
17    A   Maybe.
18    Q   Do you remember the substance of what you
19 talked about on this call?
20    A   I had enough time to tell him that, you know, I
21 was trying to get the information to find out what we had
22 to do to get him out. And every time I called up there,
23 they had no answer to give me because they claimed that
24 they had not talked to Milledgeville yet.
25    Q   Was --

Page 30

1    A   But there was no bond. We expected him to be
2 transferred to Milledgeville and then I would have to go
3 there to bond him out. That's what we expected, but it
4 never worked that way.
5    Q   Okay. So your -- it sounds like your
6 discussions -- your two discussions with Ezra consisted
7 of logistics and you're telling him information about how
8 the charges are going to work and how you're going to try
9 to get him out; is that right?
10    A   Right.
11    Q   Was there anything else?
12        For example, he's telling you how it's going or
13 he's suicidal or anything like that?
14    A   No. Because it was earlier in the day that I
15 talked to him. And I had gotten him pretty calmed down
16 before they put him in the handcuffs and he was feeling
17 pretty reassured. But then, I guess, sitting there all
18 day long and half the night, you know, well, they -- I
19 can't remember. It was about 10:00 when they put him in
20 handcuffs and this all happened around -- I got the phone
21 call about 1:30 in the morning that he was at the
22 hospital.
23    Q   Okay. In terms of medications, do you know
24 anything about Ezra's medications in July of 2024?
25    A   I don't know the names of anything that he was

Page 31

1 taking. I mean, he's -- you know, 23 years old at the
2 time. So nobody handed me anything and said: Hey, make
3 sures he takes these.
4    Q   I understand. I'm only asking because I don't
5 know the answer ahead of time. I don't -- you know, I
6 don't know to what extent you know his medications or
7 whether he took them or not. But I'm just asking the
8 questions.
9        So in terms of any kind of medications, you say
10 you don't know the names of them. Do you know that he
11 was on -- he was prescribed certain medications in July
12 of 2024 before this incident in the jail?
13    A   I don't know what they prescribed him to take
14 from the crisis center. Because everything went so fast.
15 I never got a chance to even go there, if that makes
16 sense.
17    Q   It does.
18    A   Okay.
19    Q   And do you know -- supposing that he had
20 medications, do you know whether he was taking those or
21 maybe he told you, "I don't like that. I don't like the
22 way it makes me feel," or anything like that?
23    A   No.
24    Q   So you just don't have any information about
25 whether he was on medication; is that true?

Page 32

1    A   Right.
2    Q   And if he was, you don't know what it was or
3 whether he was compliant with it; correct?
4    A   Right.
5    Q   Okay. Sometimes folks who are -- you know
6 another person can tell a difference in that other person
7 when they're on medication or not on medication. Is that
8 any part of your experience with your son Ezra?
9    A   When Ezra was growing up, it -- and coming
10 through all the medications they tried him on, they tried
11 him on different stuff. It never was for very long.
12        We were able to maintain it in other ways, like
13 take long hikes and get out of the house and not sit
14 around the house and keep his mind off of things. It
15 worked better for him, if that -- I don't know if that
16 makes sense.
17    Q   It does. In the morning before the court
18 hearing, you said you were able to calm him down or get
19 him in a state where you felt like he could handle the
20 court appearance.
21    A   Oh, no. It was after court. Like after
22 everything went on with the court and they came and said
23 that there was a warrant on him, he started to freak out.
24 And me and my husband were able to get him to calm down
25 and not, you know, fight or anything for them to go to

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 33

1 the jail and say: You know, Ezra, we'll have you out by
2 tonight. Don't worry about it. You'll get over there.
3 They'll take you to Baldwin and we'll pick you up in
4 Baldwin.
5      I was pretty sure that's how it would go. And
6 Baldwin decided they were not going to extradite. So for
7 whatever reason, they held him in Rockdale County after
8 the fact.
9   Q   That's the first time I've heard about Baldwin
10 not wanting to come get him or something like that. So
11 let me get you to elaborate a little bit on that.
12      Can you tell me where you got that information?
13   A   I got it from one of the officers that I talked
14 to after the fact and -- sitting there at the jail. And
15 then we had a detective out of Rockdale County that took
16 Ezra to Rockdale County to turn himself in on the warrant
17 so we could get it dealt with and he -- we turned him in
18 and he spent less than three hours there. And me and my
19 husband went and got him.
20   Q   I see. How long after July 9th was that, the
21 trip to Baldwin County?
22   A   Oh, I can't remember.
23   Q   You can estimate. I mean, was it like a couple
24 weeks later?
25   A   Maybe. I mean, I would literally -- I don't

Page 34

1 know.
2   Q   All right. I'm going to show you a document.
3 This is a document that the lawyers provided to me and it
4 looks to me -- we're going to call this Defense
5 Exhibit 1.
6      (Defendant's Exhibit No. 1 was marked for
7 identification.)
8 BY MR. WAYMIRE:
9   Q   It looks to me like a screenshot from your
10 phone. Do you agree with that?
11   A   Maybe, yeah. Because that 10:30 call was -- so
12 is it from my phone? Yeah. That's when I called.
13      There's a couple of times I called from my
14 husband's phone, too. But, yeah, that last call was when
15 I called and talked to Tracey.
16   Q   And by the last call, you mean the one that
17 says 10:33 p.m.?
18   A   Right.
19   Q   So that says 9 minutes and 16 seconds. Is that
20 an accurate length of that call to Tracey?
21   A   I guess. I mean, during the time all that
22 happened, things feel like longer, sometimes they feel
23 shorter. The other calls was me being put on hold.
24   Q   I see. There's only one call where you talked
25 to Tracey; correct?

Page 35

1   A   Yes.
2   Q   And that was the 10:33 p.m. call?
3   A   Uh-huh.
4   Q   And I'm going to do it here. Is there -- is
5 that a yes?
6      That's a yes for us; right?
7   A   Yes.
8   Q   Okay. So the 5:36 p.m. call, that was
9 57 seconds and you were put on hold; is that right?
10   A   That one I think I tried to call and it -- the
11 call dropped. It was either my phone dropped it or
12 somebody else's. That's why I turned around and called
13 right back and got put on hold again.
14   Q   I see. So in the two calls, 5:36 and 5:37, did
15 you talk to anybody about anything of substance?
16   A   Nope. I was put on hold.
17   Q   Just put on hold. And then for the 10:33 p.m.
18 call that lasted about 9 minutes and 16 seconds, let's
19 talk about that.
20      If you want to see this again, I will be happy
21 to let you see it. But I was just kind of jogging your
22 memory here. So I'm going to stop sharing that.
23      So let's talk about that call. You called and
24 what was the purpose of your call?
25   A   To see what was going on with my son, if they

Page 36

1 had transferred him to Baldwin County yet or if they were
2 going to let him go. And she said he was still there,
3 that he was fine and that -- I told her that I was
4 worried about him and gave her kind of the backdrop on
5 everything that led up to this from April until then with
6 the wife.
7   Q   Okay.
8   A   That I was worried about him, that he had just
9 gotten out of the crisis center and to please look out
10 for him because I did not feel that he was incapable of
11 not hurting himself there, even know he's supposed to be
12 in a place that he can't hurt himself.
13   Q   So you called. Was Tracey the first person
14 that you talked to?
15   A   That I actually spoke to about anything, other
16 than, "I don't know," put you on hold, yes.
17   Q   Okay. Were you put on hold for that call?
18   A   No. She answered and I spoke to her.
19   Q   I see. Did you recognize her right away?
20   A   I -- like I said, I can't remember if I
21 recognized her voice or if I recognized who it was when I
22 heard her name. I don't know if she said Tracey or -- I
23 don't think she answered it. If she said her name, it
24 was Tracey.
25      If not, I might have asked her who she was.

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 37

1 But I think I recognized her voice when she answered the
2 phone. And I asked her how long she had been in there
3 and she said a while back. And I was like: You might
4 remember me from 2014.
5 **Q   And so you explained to her that you knew her**
6 **and you had some history there; right?**
7 A   Right.
8 **Q   I gotcha. Did you go into that to any great**
9 **extent?**
10     **I mean, or was that just --**
11 A   That was just a brief --
12 **Q   -- 20, 30 seconds?**
13 A   Yeah. That was about 20 or 30 seconds of the
14 call. The rest of it was pertaining to Ezra.
15 **Q   And so tell us -- just give us kind of maybe**
16 **bullet points or however it makes sense to you the**
17 **substance of what you communicated to Tracey.**
18 A   That his wife had just left him after putting
19 false charges against him and that he was really going
20 through it. And he just got out of the crisis center and
21 could she please look out for him and keep me informed or
22 something or I would call back. And she said that she
23 would.
24 **Q   Did you provide Tracey with any specifics about**
25 **any kind of suicidal thoughts or actions or threats by**

Page 38

1 **Ezra?**
2 A   Well, I told her that she's just -- he had just
3 gotten out of the crisis center for, you know,
4 threatening suicide, that he was -- you know, didn't feel
5 like he had a reason to go on and whatnot. I told her
6 that. That's why he was in the crisis center. They
7 don't put someone in the crisis center, unless it's a
8 suicidal issue.
9 **Q   Well, it seems like you told me earlier that**
10 **you hadn't heard anything about suicide from Ezra ever?**
11 A   Up until this. That's why they put him in the
12 crisis center because of the suicidal -- not tendencies,
13 but the fact that he felt worthless and there was no
14 reason to go on. And once you say stuff like that,
15 that's, you know, kind of hinting around that you don't
16 want to go on anymore.
17     Most people that are going to kill themselves
18 don't come out and say: I'm going to go kill myself
19 right now.
20 **Q   Was that something --**
21 A   That's not what you look for.
22 **Q   I'm sorry. I want to let you finish.**
23 A   I'm done.
24 **Q   Okay. Is that something that Ezra said to you;**
25 **that he didn't want to go on anymore?**

Page 39

1 A   He said it at View Point before we took him to
2 the crisis center, which is why we took him to the crisis
3 center. I don't know what was said at the jail when they
4 turned him away from the jail. But it was obviously
5 serious enough that they were not going to allow him to
6 come in there in the mental health state he was in.
7 **Q   I gotcha. And what I'm trying to figure out is**
8 **how you got the information about that type of statement.**
9 **Is it like you were in the room or some medical**
10 **professional told you that he'd said that?**
11 A   I was in the room with him and his counselor
12 before we took him to the mental health hospital.
13 **Q   And he made the statement he didn't want to go**
14 **on anymore?**
15 A   Right. I don't know what was said at the jail.
16 I don't know what was said to the officers or at View
17 Point before I got there because I didn't witness it. I
18 just know the situation right at the beginning, which
19 is -- you know, and then, of course, I was in the car
20 with him for an hour on the way up there.
21     And it was more or less me just saying: Ezra,
22 we've got to do this. You've got to do this. You've to
23 get your head straight and this is the only way to start.
24 **Q   Yeah. In that one-hour car trip, did Ezra say**
25 **anything about wanting to take his own life?**

Page 40

1 A   He cried and he was upset and then he was
2 scared and -- you know, but that's why I said mostly it
3 was me being an annoying parent saying: You've got to do
4 this. You can't back away from this. This is something
5 you have to do for all purposes.
6     You need help and there's help that I can't
7 give you right now. And this is where you need to go to
8 get a basis to the help.
9     So, I mean, we got him there and he agreed on
10 it. Took him clothes and everything he was allowed to
11 take in there. And they kept him there for seven days
12 before -- they don't even let you make a phone call for
13 seven days.
14     And then I talked to him the next three days
15 where he was wanting to come home. And it's like: Well,
16 you've got a couple more days and we'll get you home.
17 **Q   Okay. The nature of Ezra's lawsuit here**
18 **centers on what happened at the jail on the night of**
19 **July 8th and 9th of 2024. I know you weren't there.**
20     **I know you had the phone call and that was the**
21 **last thing you heard from anybody until you hear he's in**
22 **the hospital, is that true?**
23 A   Right.
24 **Q   And then you went to the hospital; is that**
25 **right?**

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 41

1    A    I did.
2    Q    Okay.  And did you talk to Ezra there?
3    A    I -- yeah.
4    Q    All right.  What did Ezra tell you about what
5    happened?
6    A    Well, I mean, he was still kind of not all
7    there.  I mean, he was -- I don't -- he just told me
8    that -- the biggest thing he was concerned with:  I can't
9    believe someone would tell you to go do that.
10        And I -- you know, I knew what he was talking
11   about.  So I didn't have him, you know, dive into it and
12   explain every corner of it.  I knew what he was talking
13   about.
14        I didn't know who he was talking about at
15   first.  I didn't find that out until later.
16   Q    How would you know what he was talking about if
17   he just made a statement like that?
18   A    Because -- well, when -- he said, "I can't
19   believe someone would tell you to do that," when someone
20   says, "Well, if you're going to do it, be a man about
21   it," and makes the -- act like they're holding a rope up
22   around their neck.
23        That had come out.  And I was like, you know --
24   and he kept saying:  I can't believe somebody would tell
25   somebody to do that.

---

Page 42

1    Q    All right.  Well, let's go from the beginning
2    of when he first started talking to you and get you to
3    tell us about the details of what exactly he explained to
4    you about what happened.
5    A    It was bits and pieces.  It wasn't a long
6    explanation.  It's -- and they wouldn't let me sit in the
7    hospital room for very long.
8        I was in the room with him for about five
9    minutes.  There was a nurse in there with us the whole
10   time.  And, you know, it was kind of scattered.
11        But, I mean, I know my son.  And, you know,
12   part of it was -- I think one of the -- the doctor or
13   someone caught me before I went in the room and explained
14   to me that -- something along the lines had happened.
15   And I can't remember the exact details of that day.
16        Looking at my son and his eyes are as red as
17   they were and this mark around his neck that lasted for
18   three weeks after and his eyes were, like, the same, it's
19   -- if you're a parent and you ever witnessed your kid
20   that close to death, there's a lot that -- I guess you
21   would have to be there.
22   Q    What I'm trying to figure out is what
23   information Ezra actually gave to you when you were
24   there.  What came out of his mouth?
25   A    The biggest parts came out after he came home

---

Page 43

1    where he told me:  You know, she must have really hated
2    you, mom.  She came to the door, you know, saying:  I
3    just got off the phone with your mom, you know.
4        And that was the biggest thing about that.
5    Other stuff is what I read in the statements.
6    Q    Okay.  Well, let's focus on what Ezra actually
7    told you, not what anybody wrote or what you've read.
8    A    Right.  I've told you what -- I've told you
9    what Ezra told me.  I mean, I -- I can't tell you any
10   more details, other than that.  I mean --
11   Q    So in the five-minute conversation, was there
12   any content about what actually happened in the incident?
13        Did Ezra tell you about -- anything about what
14   happened in the incident?
15   A    Not then.
16   Q    Not then, okay.
17        Later he told you and he said that you -- she
18   must have really hated you and she mentioned -- Tracey
19   mentioned that she had a conversation with you on the
20   phone?
21   A    Right.  And Ezra and I would sit down and we
22   would talk about it for a little while.  But at the time
23   his conversations would go back to the wife.  So
24   everything that Ezra has told me has been in bits and
25   pieces.

---

Page 44

1        Which I know the story now, but I've had to
2    piece a lot of it together through him and -- when he's
3    telling me about it.  So nothing all came out in one
4    conversation.
5        Does that make sense?
6    Q    It does.
7    A    You're asking me about a specific conversation.
8    And there wasn't a lot of detail that I knew that night,
9    other than:  How could somebody tell me -- tell somebody
10   to do that?
11        And then later he tells me what she said to him
12   before he did it.
13   Q    Okay.  What is it that she said to him before
14   he did, according to Ezra?
15   A    If you're going to do it, be a man about it.
16   And holds her hand up like she's holding a rope.
17   Q    Anything else?
18   A    That's the biggest part of that conversation,
19   as far as he tells me, with her.
20   Q    Okay.  Was there any other detail about that
21   discussion?
22   A    The fact that she said that she had spoke to
23   me.  And he said:  She must not like you very much, mom.
24        And I was like:  I don't know.  I thought she
25   was a person that I could kind of -- since I can't be

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 45

1  there with you to hold your hand.
2       But this -- that part of the conversation was
3  probably two months after the whole situation.
4    Q  Okay.  Did you ever get the sense that Ezra
5  doesn't have a real memory about what happened?
6    A  I think he -- his memories -- I'm sure he has a
7  memory about what happened because -- I don't understand
8  what you're trying to ask me.
9       I mean, it's hard.
10   Q  Well --
11   A  I mean, of course, what happened in the
12  beginning, I'm sure he knows what happened.  And then
13  when he woke up, I'm sure some of it's kind of hazy.
14      So a lot of it's got to do with reading the
15  statements that were written out.
16   Q  And that's what I'm wondering.  There is --
17  there is what other people say and then there's real
18  memory, something that somebody really remembers.
19      And I'm just wondering:  Is there real memory
20  there with Ezra and how much of it is there?
21      Because if somebody loses consciousness,
22  obviously they don't have a memory of what's happening
23  then.  And they may lose memory before that.  You see?
24      MR. SLATER:  I'm going to object here, Jason.
25  What you're asking her is outside the scope of a

Page 46

1  layperson's testimony.
2       MR. WAYMIRE:  All right.  Your objection is
3  noted.
4  BY MR. WAYMIRE:
5    Q  I'm just asking you about what Ezra has told
6  you.  Has he ever told you, "I don't really remember
7  this," or, "This is all I remember"?
8    A  No, he's never told me that.  He's never said
9  he don't remember it.
10   Q  All right.  Has he ever said:  Oh, I just
11  remember bits and pieces?
12   A  No.
13   Q  But it seems like he's never given you a clear
14  narrative about step by step what happened; is that
15  right?
16   A  Because I don't push Ezra to tell me
17  everything.  He will tell me things when he's ready to
18  tell me.  And I've learned this over the years dealing
19  with my son.
20      And for our relationship to be what it is,
21  I'm -- he has to come to me when he's ready.  And when
22  you deal with somebody with mental health issues, you've
23  got to know that you can't back them in a corner.
24   Q  Okay.
25   A  So I can't give you a timeline on things that

Page 47

1  happened and what happened.  Because, I mean, there's
2  only so much time things that can happen.  And I've been
3  in jail before.
4       And when you're in jail and you're in a holding
5  cell, the officers really don't have too much interaction
6  with you, unless they don't like you for some reason and
7  they're just going to make the time you got terrible.  Or
8  if you can make friends with them, then it's not so bad.
9  They don't mess with you.
10   Q  All right.  If my memory is correct, you told
11  me that for about a month and a half after the incident
12  in the Rockdale County Jail Ezra lived with you and your
13  husband; is that correct?
14   A  Yes.
15   Q  Tell us about any kind of impact that this --
16  this attempted suicide had on Ezra that you saw when you
17  were living with him.
18   A  It scared him.  He's scared to realize that it
19  could happen so quick.
20   Q  Is there any other impact that you can think of
21  that you observed?
22   A  The biggest -- I don't -- I mean, he's doing
23  better now, but he's been working.  He still talks to a
24  therapist.  So, I mean, he -- he's trying.
25      I don't -- I don't know exactly what you're

Page 48

1  looking for.  I mean, yeah, his head still goes
2  somewhere, but he's got support.  And he realizes it now;
3  whereas, during the midst of all this and this girl doing
4  what she did to him, which was to play the same games
5  with him that his dad did for years, it's taken him a
6  minute to come back from it.
7    Q  All right.  Were there any physical injuries?
8    A  Well, I mean, what do you mean physical
9  injuries?
10   Q  Well, if I were to get in a car wreck and break
11  my arm, that would be a physical injury.  That's just an
12  example.
13      I'm wondering:  Was there any type of physical
14  injury in connection --
15   A  Well, he had a physical mark around his neck
16  that lasted almost a month that was obvious there was
17  something around his neck very tight for a good amount of
18  time.  And his eyes were not bloodshot.  They were filled
19  with blood.
20      Let's put it to you this way, what you see on
21  TV when somebody hangs themself is not what my son looked
22  like after that.
23   Q  How did he look?
24   A  He looked like he had -- the blood was ready to
25  just come out of his eyes.  His -- the whites of his eyes

Page 49

1  were red. Not bloodshot red, but red. Red, red, red.
2  Even the blue was red.
3        And he had a dark, which was super thick, mark
4  around his neck. It was an imprint for a minute and then
5  it was a bruise. For probably about three or four days,
6  you could still see the indention of the rope.
7        And then after that, for three weeks, maybe
8  even a month, he had -- you know, which it started to
9  fade. But it was about a month before it was completely
10  gone. A dark bruise. And it was purple in the beginning
11  and went from purple to bruised.
12    Q  Yeah. Did he ever tell you about any kind of
13  -- or did you get the impression that he had discomfort
14  from either of these conditions that you've described?
15    A  Yeah. He was like: Mom, my neck hurts.
16        I was like: Well, son, I don't know what to
17  tell you.
18        And he gets headaches. And I'd give him Advil
19  or Motrin and tell him that's -- you need to take that
20  when it hurts. I mean, he doesn't complain about his
21  neck as bad now, but he still gets headaches.
22        I can tell you that. I don't know if he's told
23  anybody. But he does get headaches pretty regularly now,
24  which he didn't before.
25    Q  By pretty regular, you mean what?

Page 50

1    A  Like migraines that will make you sick to your
2  stomach and you can't get out of bed because you're so
3  sick. I just -- last week I had to take some medicine to
4  him.
5        Not medicine. I say medicine. But they didn't
6  have a ride to the store, so I had to take him some
7  Motrin.
8    Q  Is there any reason that you connect that to
9  his suicide attempt?
10    A  Because he never complained of headaches
11  before.
12    Q  When did this first -- when after the suicide
13  attempt incident did the first serious headache occur?
14    A  Pretty soon after. I mean, I didn't put the
15  two together until -- really until we're right here
16  talking. But, I mean, you've got a head injury or
17  something that deals with your head and your blood being
18  cut off, I guess that would cause it.
19        I didn't relate the two because I had migraines
20  from a car accident that I had years ago. So, I guess, I
21  didn't really put that together with that, but --
22    Q  I understand.
23    A  I'm not a doctor. So I can't tell you.
24    Q  I know. I'm not either.
25        So how long after the incident are we talking

Page 51

1  about that you first learned of any kind of headache?
2        Are we talking about months?
3    A  No. He was staying with me. And when he said,
4  "Mom, I got a headache," I would give him Motrin or
5  Tylenol.
6        Now they have a Motrin and Tylenol that works
7  pretty good. So I've been getting him those when he
8  needs them.
9    Q  How often, so far as you know, does he have any
10  kind of headache like this?
11    A  I don't live with him. So he doesn't call me
12  every time he gets a headache anymore. But, you know, if
13  it's real, real bad, he'll call me, I guess. Or if
14  they're out of something and I have to go to the store
15  for him and take him something. So that's maybe once a
16  month.
17        But he's got friends that, you know, can
18  occasionally take him or might have something, you know,
19  for him to take for a headache. So it's not like we live
20  next door to each other. He's a grown man. So he
21  doesn't call me crying every time he gets a headache.
22        How about that?
23    Q  That's fine. I'm just trying to figure out how
24  many -- how many of these headaches you know about.
25        I mean, are we talking about a handful?

Page 52

1    A  No. He gets them quite regular. I mean, some-
2  -- sometimes it's just, you know, minor headaches that,
3  you know, just kind of achy through the day.
4        And then the ones that put him down, maybe
5  every couple of weeks. Maybe. I mean, I don't -- like I
6  said, I don't know. He doesn't call me crying about them
7  all the time anymore.
8        I mean, when he lives with me, that was one
9  thing. And then when he needs something, that's one
10  thing, but --
11        MR. WAYMIRE: All right. What do you say we
12  take a five-minute break. We've been going for
13  about an hour. I mean, I don't have much more.
14  Is that okay with you?
15        THE WITNESS: Okay.
16        MR. WAYMIRE: All right. That's what we're
17  going to do.
18        Off the record.
19        (A recess was held from 1:59 p.m. until 2:06 p.m.)
20        MR. WAYMIRE: Back on the record.
21  BY MR. WAYMIRE:
22    Q  Like I said, I don't have much more and -- but
23  these other lawyers may. So stand by.
24        Let's talk about your son Ezra's use of any
25  kind of alcohol or drugs. What do you know about that?

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 53

1   A   I mean, he -- he don't really drink now.  I
2   mean, he don't -- he's not been big -- his dad was a bad
3   alcoholic and with drugs.  So he tries not to.  But, you
4   know, any kid, I guess, is going to experiment to a
5   point.
6   Q   So in terms of Ezra's alcohol consumption, has
7   it ever been excessive, heavy?
8   A   Well, I mean, I've heard of him being drunk,
9   but I don't buy him alcohol and I'm never around with him
10  drinking because I don't like to be around people
11  drinking and he knows that.  So I'm not the person to
12  answer that.
13  Q   Have you ever regarded Ezra as having had an
14  alcohol problem, a drinking problem?
15  A   Not really.  Not when he's around me.  I mean,
16  if he did, he hid it.  My dad was an alcoholic for years
17  and I didn't know it until I was almost an adult.
18  Q   Have you ever talked to Ezra about he had an
19  alcohol problem and he needed to get some help for it or
20  anything of that nature?
21  A   Not -- not for the alcohol.  My issues was with
22  the mental health, issues that I've dealt with him, you
23  know, forever.  But, like I said, it wasn't suicidal.
24      I mean, yeah, he would get down on himself, but
25  he wouldn't talk about wanting to die or anything or just

---

Page 54

1   letting go until all this.
2   Q   In terms of use of illegal drugs, are you
3   familiar with anything like that with Ezra?
4   A   I'm -- I know he smoked pot occasionally.  But,
5   like, I don't hang around with him and he don't do drugs
6   around me.  So, again, I'm not the one to answer that
7   question.
8   Q   Have you ever had any discussion with him or
9   talk about that?
10  A   No.
11  Q   Okay.  Has the subject of marijuana or vape
12  pens or anything like that come up with him?
13  A   No.  Not a discussion, no.
14  Q   Comments, anything like that?
15  A   Not -- not from me, no.
16  Q   All right.
17  A   I mean, I don't smoke pot or use drugs, but I
18  don't really see a problem with marijuana, really.  I
19  just -- I have issues with alcohol and other drugs.
20      But, again, no, we've never had a discussion
21  about vape pens or nothing else.
22  Q   Okay.  Any other kind of drugs that you're
23  familiar with him having used or experimented with?
24  A   No.
25  Q   Okay.  It seems to me that you would want to

---

Page 55

1   know why he tried to take his own life.  Did that subject
2   ever come up between you and Ezra?
3   A   Well, I mean, that's a -- a big thing.  I mean,
4   he's -- his wife just left him, took everything, filed a
5   false claim against him for -- claiming she abused him
6   [sic], which has been dropped because it was a fault
7   claim, and stole everything from him.  And even tried to
8   put a child abuse case against him, which also got
9   dropped.
10      And she's lost that child because of the whole
11  thing.  Because it was proven that Ezra had nothing to do
12  with any of what she was claiming out of Rockdale County.
13  So, I mean, it's a lot.  He's been a through a lot.
14      She played the same games with him his dad --
15  up and down, you know, dragging him through the mud.  And
16  then she just ripped the rug out from underneath him.
17  Q   Let me frame it a little bit differently.  If I
18  were -- if my child attempted suicide, I would ask
19  directly:  Why did you do this?  What's going on?
20      Did you ever have that kind of discussion with
21  Ezra?
22  A   Did I ask him that question?  No.  I let Ezra
23  tell me what he wants to tell me when he's ready to tell
24  me.  We talk about things.  And I know, you know, the
25  important things in his life.

---

Page 56

1   I mean, he talks to me about -- he comes to me
2   for everything.  But I don't back him in a corner and
3   say:  You have to tell me this.
4       I mean, have you ever sat down and tried to
5   talk to someone and get details on anything in this
6   subject or have you ever dealt personally with anybody
7   with the same mental health issues?
8       And no one mental health issue is the same,
9   even if it is the same diagnosis from one person to the
10  next.  It's -- that is a big broad question you're trying
11  to get a detailed to, but there's no detailed answer that
12  I can give you.
13      How about that?
14  Q   Well, did you ever actually ask that question?
15      I mean, not in those specific --
16  A   I'm sure I did.
17  Q   -- words necessarily.
18  A   I'm sure I did.  But it comes out, you know.
19  I'm sure I said:  Ezra, why would you do this?
20      And I'm sure I said it at the hospital.  And
21  that might have been when he came to me and said:  Why
22  would somebody tell you to do this?
23      And when you're at the hospital for hanging
24  yourself, why would you not assume they're speaking about
25  someone telling you to do it?  That's the only issue that

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 57

1  was going on.
2          So he had a lot going on. He didn't know how
3  to handle it. And in his mind -- in his sick mind at the
4  time, his only way to not have to deal with it was to
5  escape from it.
6          And that was the only thing he knew to escape
7  from it, which is not the correct way to feel. And he
8  knows now that he's got more on his side than what he
9  thought he did.
10  Q  I want to let you talk as long as you want to.
11  A  I'm good.
12  Q  Okay. All right. So let me just ask this.
13  It's not a fun part of my job, but it's part of my job.
14          I wonder: Do you have any convictions?
15  A  Yeah.
16  Q  All right. Are they felony convictions?
17  A  I have one felony conviction.
18  Q  Tell us about that.
19  A  Possession of methamphetamines about 20 years
20  ago, I guess. I don't know the exact date. I dealt with
21  all of that. And I'm -- yeah. That's the only felony.
22  Q  Was that out of Rockdale County?
23  A  Yes.
24  Q  And it was -- it was roughly 20 years ago, you
25  think?

---

Page 58

1  A  Right.
2  Q  Under what name?
3  A  Carmen Pittman.
4  Q  Okay. Do you have any other misdemeanor
5  convictions that don't have to do with traffic?
6          I don't care about traffic violations, but
7  shoplifting, anything like that?
8  A  No, no.
9  Q  So no misdemeanors whatsoever?
10  A  Not that didn't deal with traffic, no.
11     MR. WAYMIRE: Okay. All right. I'm going to
12  leave it right there and let another lawyer ask
13  questions if they want to.
14          Thank you for taking time and talking to us
15  here today.
16     THE WITNESS: You're welcome.
17     MR. BUCKLEY: I'm happy to go next if that's
18  all right.
19     MR. VEAL: That's fine.
20     MR. BUCKLEY: All right.
21          EXAMINATION
22  BY MR. BUCKLEY:
23  Q  Ms. Pittman, my name is Tim Buckley. I
24  represent Deputies Jackson and Gomez. I have a few
25  follow-up questions.

---

Page 59

1          Can you hear me all right?
2  A  I can.
3  Q  To your knowledge, have you ever spoken to
4  Deputy Jackson?
5  A  Who is Deputy Jackson?
6  Q  My client.
7  A  Well, is there a first name?
8          Because I don't know anybody's last names.
9  Q  Well --
10  A  That's not Tracey; right?
11  Q  No, that's not Tracey.
12  A  Okay. So then no.
13  Q  Deputy Gomez is a man and he's not Tracey.
14          Have you ever spoken to my client, Deputy
15  Gomez?
16  A  Right. Yeah. I don't know him either.
17  Q  All right. And you don't have any personal
18  knowledge of anything they did or didn't do during the
19  time your client was -- your son was in jail; right?
20  A  No.
21  Q  Since you don't know them?
22  A  Nothing hands-on that I talked to them or none
23  of that, no.
24  Q  And when I said the names Deputy Jackson and
25  Deputy Gomez, that didn't trigger anything in your mind

---

Page 60

1  that Ezra told you about something they did, said, or
2  were involved with; right?
3          You don't know -- you don't have any database
4  of information about those deputies; right?
5  A  Nothing, other than, you know, just I've heard
6  their names. But I don't -- I can't put a -- you know, a
7  face on them. I just heard the names in the discussion
8  of all of this and when I read the statements.
9  Q  Right. Okay. You are not a doctor?
10          We established that; right?
11  A  Right.
12  Q  You are not an expert in corrections or proper
13  law enforcement procedure; right?
14  A  Not on your side.
15  Q  Oh, I don't understand what that answer means.
16  Are you an expert --
17  A  Not from a lawyer's standpoint or the jailer's
18  standpoint. How about that?
19  Q  You mean from a defendant's standpoint; is that
20  what you're saying?
21  A  No, no, no. I mean, like I know -- I've made
22  my mistakes. I know from being in jail --
23  Q  Okay.
24  A  Not getting paid to go to jail. How about
25  that?

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 61

1    Q    That's what I thought you meant.
2    A    Yes.
3    Q    But in terms of this case, you don't anticipate
4    getting on the stand at trial and giving expert opinion
5    about what any law enforcement person should or shouldn't
6    have done on the night of the incident from an expert's
7    perspective; right?
8    A    Not unless I find a quick college, I guess, no.
9    Q    Gotcha.  You were asked some questions about
10   Ezra's alcohol and drug use.  Prescription medications
11   often come with a contract about how much you use them
12   and not getting extras of it and psychotropic drugs and
13   so forth.
14        Are you aware of that idea generally?
15   A    In general, yeah.
16   Q    Are you aware anecdotally or otherwise of any
17   incident where Ezra was taking too much of his
18   medication, selling it, trading it, anything like that?
19   A    Oh, no.
20   Q    Okay.  Based on your conversations with your
21   son, do you have an opinion one way or the other whether
22   in the absence of someone saying something like, "Be a
23   man and do it," he would have attempted suicide that
24   night?
25        MR. SLATER: Object to the form.

---

Page 62

1        THE WITNESS: I don't know.  I wasn't there so
2    I can't say.  And I didn't talk to him after --
3    earlier in the day.  So I can't say.  I -- I don't
4    know what went on in the jail.
5    BY MR. BUCKLEY:
6    Q    All right.  You would agree that the way his
7    wife treated him in the context of what was going on at
8    that time was highly upsetting to him?
9    A    Right.
10   Q    And impactful to him?
11   A    Yes.
12   Q    In your discussions with him about why he tried
13   to kill himself, I understand there is this line of
14   discussion about:  Why would someone tell me to go ahead
15   and try that?
16        Would you agree with me that your sense was
17   that he was saying, "I'm thinking about killing myself,"
18   at the beginning based on what was happening between him
19   and his wife?
20   A    Well, he must have been saying something in the
21   jail for somebody there.  But when I spoke to her, there
22   was never any statement from her saying that he was
23   threatening anything.
24   Q    Understood.  I'm saying based on what you know
25   about him, would you agree that you got the sense that

---

Page 63

1    what was at the core bothering him was what his wife was
2    doing to him and then someone said this thing to him
3    like, "Well, go ahead and try it then"?
4        Was that your sense?
5        MR. SLATER: Object to form.
6        THE WITNESS: I don't know.
7        MR. BUCKLEY: That's all the questions I've
8    got.  Thank you.
9            EXAMINATION
10   BY MR. VEAL:
11   Q    All right.  My name is Antonio Veal.  I
12   represent Erica Sanchez.  She is a LPN who worked at the
13   Rockdale County Jail.
14        Does that name ring a bell to you at all, Erica
15   Sanchez?
16   A    I never spoke to her.  I just read in the
17   statements.  I've seen her name.
18   Q    All right.  Good deal.
19        So I have -- I just want to make sure I clarify
20   some things because I think either I may have misheard
21   and I just want to make sure I understand the -- what
22   happened correctly.
23        What -- is it fair that at some point prior to
24   July 8th and 9th, 2024, you took Ezra to View Point; is
25   that right?

---

Page 64

1    A    He had a -- he got taken by the police officers
2    to View Point initially.  He went to talk to a counselor,
3    which was court ordered via the TPO out of Rockdale
4    County.
5    Q    Okay.
6    A    And that's what started the whole thing.
7    Q    Gotcha.  So let me ask you, do you know what
8    date that was that he went to speak with the mental
9    health person pursuant to the court and he was picked up
10   and taken to View Point?
11   A    I would have to look at a calendar.  I mean, it
12   was -- he was -- court was, what, on the 8th when they
13   took him to the jail?
14   Q    Right.
15   A    On the 8th, correct?  He got then out on the
16   6th because it was Saturday that we picked him up.  So
17   ten days before that.
18   Q    So ten days before July 6th?
19   A    Right.
20   Q    Is that fair you think?
21   A    Ten days, yep.
22   Q    Okay.  Give me one second.
23        So ten days before July 6th could be on or
24   about June 26th or 27th.  Does that sound right to you?
25   A    I -- I guess.  I mean, like I said, I would

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 65

1  have to look at a calendar.
2  **Q   If you're not sure, that's fine.**
3  A   Maybe -- I guess maybe the Wednesday or
4  Thursday.  Seems that would be about ten days; right?
5  Maybe Thursday.
6  **Q   That would have been June 26th of 2024,**
7  **assuming that's correct.  I'm not going to hold you to**
8  **it.  I'm just trying to make sure I get a time frame a**
9  **little bit.**
10  A   Okay.
11  **Q   So what I'm understanding from you is whenever**
12  **that time frame was, ten days before the 6th, Ezra was**
13  **picked up trying to go to his mental health provider --**
14  **kind of counselor through the court; yes?**
15  A   Right.  For his evaluation.
16  **Q   For his evaluation.  He was taken to the jail;**
17  **yes?**
18  A   Uh-huh.
19  **Q   The jail said:  We can't take him?**
20  A   Right.  His mental health -- the nurse that was
21  there said no.
22  **Q   Okay.  And then from --**
23  A   Took him back --
24  **Q   I'm sorry.**
25  A   That's when they took him back to View Point

Page 66

1  and we met them back at the View Point.  And I was there
2  with him until they found him a bed at the crisis center.
3  And then me and my husband took him straight there.
4  **Q   Okay.**
5  A   Let me take that back.
6  **Q   Okay.**
7  A   I left long enough to go get him clothes to
8  take with him.
9  **Q   Okay.**
10  A   But I left him with the counselors there at
11  View Point to go get his clothes because they could not
12  find him transportation.  And we didn't want -- I didn't
13  want him to be at Rockdale Hospital, unless it was
14  necessary.  So we did everything we could to get him
15  there that night.
16  **Q   Okay.  So View Point -- the crisis center is a**
17  **different facility than View Point; correct?**
18  A   Right.
19  **Q   What is the -- do you know the full name?**
20  **Is it just called the crisis center or is it**
21  **called something else; do you know?**
22  A   Yeah.  I don't know the exact name of it.
23  **Q   That's fine.**
24  A   It was -- it was the crisis center in
25  Lawrenceville.  And I can tell you it is off the main

Page 67

1  street on the left-hand side.  Right across from
2  Northside Hospital.
3  **Q   All right.  Good deal.**
4  **Okay.  So he's being taken to the crisis**
5  **center?**
6  A   Uh-huh.
7  **Q   Now, if I understood your testimony correctly,**
8  **when he is taken from the jail to View Point, you are**
9  **present with him when he's talking to somebody at that**
10  **facility and he said something to the effect of:  There's**
11  **no reason to go on; is that fair?**
12  A   Yeah.  Along those lines.  I mean, I --
13  **Q   Something like that?**
14  A   Yeah.  Not verbatim.  So -- but, yeah, along
15  those lines.  I mean, you can read between the lines when
16  your child is -- I mean he was upset.  He was crying.  He
17  was scared.  He was terrified.
18  **Q   So what exactly -- well, let me ask you this**
19  **question first.  When he was at the jail, though, before**
20  **coming to View Point, you weren't present for anything he**
21  **said there; right?**
22  A   No.
23  **Q   Okay.**
24  A   No.
25  **Q   So let me put you back to the conversations at**

Page 68

1  View Point; okay?
2  A   Uh-huh.
3  **Q   It sounds like because you know Ezra --**
4  A   Uh-huh.
5  **Q   He's your son.  You probably know him better**
6  **than most people.  Based on what he was saying, whatever**
7  **that was -- I know we don't know verbatim.**
8  **You could tell something was different about**
9  **him, about what he was saying; yes?**
10  A   Right.
11  **Q   Okay.  Did you communicate that to the folks at**
12  **View Point?**
13  A   Yes.
14  **Q   Okay.  Do you recall what, if anything, else**
15  **you told the people at View Point at this July 26th or**
16  **27th, 2024 time period?**
17  A   That I just wanted my son to be better.  I
18  wanted -- and I was going to do whatever I could to make
19  sure he was going to be okay.  And they --
20  **MR. SLATER:** Sorry to interrupt.  You said
21  July, not June.
22  **MR. VEAL:** Did I say July?  I meant June.  I
23  think we're -- we're at the same --
24  **BY MR. VEAL:**
25  **Q   Were you at View Point in June?**

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 69

1    I think that's what we're talking about and
2  that's what you're talking about; is that fair?
3    A  Right, right.
4    Q  Okay. Go ahead.
5    A  Yeah. I mean, yeah. View Point is when I
6  spoke to the therapist that he was supposed to do his
7  intake with. And she was -- you know, they still talk.
8  And her and I talked a couple times here and there, you
9  know, to check on -- she would call me to check on him.
10  And I would call her if I wasn't sure about something.
11    And when all of -- with court to make sure --
12  because since that's got dropped, I don't have too much
13  to do with her anymore. But I would talk to her at court
14  when he'd go for the TPO stuff until it got dropped,
15  which is what created all of this.
16    Q  What's her name; do you recall?
17    A  Don't let me lie. I can't remember her name.
18    Brenda maybe.
19    Q  I don't want you to lie either, so...
20    A  Brenda maybe. Maybe Brenda. Maybe. But I
21  can't verify that.
22    Q  That's fine.
23    A  I knew her by first name. I couldn't tell you
24  last name. I never knew her by last name.
25    Q  That's no problem.

Page 70

1    A  I think it was Brenda. I think.
2    Q  Okay. And you think he was at View Point for
3  about seven days maybe?
4    A  No. He was at the crisis center for ten days.
5    Q  That's right. I'm sorry.
6    So he goes from View Point to the crisis center
7  that same day that you talked to his therapist?
8    A  Right.
9    Q  Okay.
10    A  It took them until just before dark to find a
11  bed for him somewhere. And it was about an hour away.
12  And by the time we got there, it was dark.
13    Q  Okay. And then after ten days, he's released
14  from the crisis center?
15    A  Uh-huh.
16    Q  Yes?
17    A  Yeah.
18    Q  Does he -- is he released to you?
19    A  Yeah. I'm the one who went and picked him up.
20    Q  Okay. So you pick him up, then where do you
21  go?
22    A  He came home with me because we knew we had
23  court Monday morning for the TPO.
24    Q  Okay. Gotcha.
25    A  Which from there is when he went to jail.

Page 71

1    Q  Okay.
2    A  That's the date all this happened.
3    Q  So July 8th, Monday morning, based on your
4  recollection, you take him to court. He's taken into
5  custody in court?
6    A  After court. We were in the hallway about to
7  leave when they came up.
8    Q  Okay. So he was in court for -- do you know
9  why he was in court on the 8th?
10    A  For the TPO. To make sure he was doing what he
11  is supposed to via the TPO that his wife put against him.
12    Q  Okay. But then after that's done, he gets
13  picked up on a warrant out of Baldwin County?
14    A  Right.
15    Q  Yes?
16    A  Where had claimed he violated that TPO out
17  of Rockdale County.
18    Q  Okay. All right.
19    A  But she filed it through Baldwin County.
20    Q  Is that where she lives or do you know?
21    A  We don't know where she lives now.
22    Q  Okay. All right.
23    Okay. Now, if I -- I thought I heard you
24  correctly. Ezra does not have children?
25    A  No.

Page 72

1    Q  Or does he?
2    Okay. He does not. Does his wife have
3  children?
4    A  She has a little girl that's three now.
5    Q  Okay.
6    A  But she does not have custody of her. The
7  baby's daddy has him -- has her.
8    Q  Gotcha. Now, when you said something about a
9  false allegation of child abuse, was that related to that
10  daughter?
11    A  Yes.
12    Q  Okay. After Ezra was -- well, it's my
13  understanding he gets picked up in July -- well, not
14  picked up.
15    He gets arrested or taken into custody
16  July 8th, this incident occurs in the early morning hours
17  of July 9th. Is that your understanding?
18    A  Uh-huh.
19    Q  Yes?
20    A  Yes.
21    Q  Okay. He goes to Piedmont and he's in Piedmont
22  until July 11th. Does that sound right?
23    A  Right. Yes.
24    Q  And from Piedmont, he's discharged to
25  Riverwood?

Thompson Reporting Services, Inc.
(678) 483-0600

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 73

1    A    Okay.
2    Q    Does that sound right or do you know?
3    A    Yeah.  That might have been when he went to
4  Riverwood.  But I don't think he was in Riverwood long.
5  I can't remember.
6    Q    If I were to -- let's see if I have something
7  for you to help with that.
8    A    Yeah.
9    Q    If he -- let me see.  Would it -- if he left
10  Riverwood on July 16th, so about five days, does that
11  sound right to you?
12    A    Yeah.  Maybe.
13    Q    Okay.  But it wasn't that same -- regardless of
14  how long it was, it was not that same ten-day time period
15  for the crisis center.  It was something shorter than
16  that; is that fair?
17    A    Yes.
18    Q    Okay.  When he's released from Riverwood, is he
19  released to you in your home or do you know?
20    A    I don't remember how he got back to Rockdale.
21  Because they wouldn't even tell me where he was because
22  they took him straight from the hospital.  They only let
23  me see him for about five minutes when he was at Rockdale
24  hospital.
25       So from there to the other place, I think they

Page 74

1  brought him back -- but I don't know who it was.  I don't
2  -- maybe my husband went and got him.  I don't know.  I
3  don't know.
4    Q    I will represent to you that if anybody has a
5  question about it, you can let me know.  But I will just
6  represent this to you is that for the support -- there's
7  a line on the record from Riverwood that says:  For
8  support system, call George Pittman.
9    A    That's me.
10    Q    Okay.  That's you?
11    A    Uh-huh.
12    Q    Okay.  All right.  Do you remember signing any
13  documentation at Riverwood?
14    A    No.  I think my name was just put on there as
15  an emergency contact because I'm his mom.
16    Q    Okay.  Got it.  Let me go through.
17       But whether we know how he got -- or how he
18  left Riverwood, did he come to your home after leaving
19  Riverwood?
20    A    Yes.
21    Q    How long was he -- how long did he stay in your
22  home after he was discharged from Riverwood?
23    A    Maybe a month or so.  However long it took for
24  us to get -- for me to get his house cleaned up and the
25  power turned back on.

Page 75

1    Q    Okay.  All right.  Now, you stated just a
2  second ago that you were at the hospital at Piedmont on
3  July 9th -- sometime between July 9th and July 11th, when
4  he was discharged for a short period of time; is that
5  accurate?
6    A    Yes.  They let me --
7    Q    You don't know when, okay.
8    A    Right.  They let me come up there for just a
9  few minutes and then I left.
10    Q    Okay.  You talked --
11    A    And they wouldn't let him have his --
12    Q    I'm sorry.
13    A    They wouldn't let him have his cell phone or
14  anything.  So I didn't talk to him again until maybe the
15  day before he got out of the other hospital.  I'm not
16  sure.
17    Q    Okay.
18    A    I'd completely forgotten about Riverwoods and
19  him going from there to the other place.
20    Q    Okay.  So the little bit of time -- I think you
21  kind of referred to it as kind of a five-minute maybe
22  discussion with Ezra while he was at Piedmont during --
23  between July 9th and 11th.  I think that's what you
24  phrased it as earlier.
25    A    Right.

Page 76

1    Q    Is that accurate; a short conversation?
2    A    Yeah.  It was -- I had to go in there.  And,
3  you know, when you hear something terrible about your
4  child, you have to --
5    Q    Right.
6    A    -- lay eyes on them.  But they weren't going to
7  let me stay long anyway.  And there was somebody in the
8  room the whole time.
9       So we didn't have much discussion in there.  It
10  was more or less me going in there and -- I think I held
11  him more time -- threw my arms around his neck and held
12  him for more than any words we said, to be honest.
13    Q    Okay.  That's fine.
14       But during that time period, I don't think --
15  it doesn't sound like you-all had time to talk about what
16  happened in detail or why it happened; is that fair?
17    A    Okay.  That's fair.
18    Q    Okay.  And what -- so what I understood is that
19  the bulk of the information you have or that you received
20  from Ezra about what happened would have been received
21  likely after he was released or discharged from
22  Riverwood; is that fair?
23    A    Yes.
24    Q    Okay.  By September of 2024, do you think he
25  was back at his own home?

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 77

1    A    Yes. I think he was. He might would come and
2  stay the night with us a couple of nights here and there.
3  But for the most part, yeah, he was back in his own home.
4    Q    Okay.
5    A    And then my husband and I would go there and
6  stay with him every once in a while just to make sure,
7  you know, he was okay.
8    Q    Between the time he left Riverwood and, let's
9  say, he moved -- he went back to his home --
10   A    Uh-huh.
11   Q    What, if any, concerns did you or your husband,
12 to the extent you know, have about Ezra potentially try
13 to die by suicide again or did you have any concerns?
14   A    Of course I had concerns, but --
15   Q    Okay.
16   A    -- it's -- it's kind of like when your child
17 first gets their driver's license and you have to let
18 them leave and you have to trust that they're telling you
19 the truth and they're going to do what they're supposed
20 to do and not the opposite.
21   Q    Okay. Now, I understand that. So you're
22 saying even though you had your apprehensions, you
23 trusted that he would not do that; is that fair?
24   A    Right. Yes.
25   Q    Would you agree with me that if you did not

---

Page 78

1  have that trust that you were just talking about, if you
2  did not trust that he was not going to try to do that
3  again, you would have done something; be it, try to make
4  him stay with you, or, be it, take him to another
5  facility?
6          You would have done something to prevent that
7  from happening, is that fair, if you didn't have that
8  trust?
9    A    Yeah. But, I mean, I'm not going to say that I
10 didn't get on his nerves and show up at his house at all
11 random hours --
12   Q    Okay.
13   A    -- and just pop in on him. So don't think that
14 I wasn't -- you know, stay for five minutes, but --
15   Q    No, no. That's just being a parent. So that's
16 okay.
17   A    Yeah. You know, he wasn't in a bedroom right
18 next to me where I could go open the door. So I had to
19 drive 30 minutes away to do it, but yeah.
20   Q    Okay. So at any time between the time he was
21 discharged from Riverwood and he went back to his own
22 home, were there any more incidents of him attempting to
23 die by suicide --
24   A    No.
25   Q    -- that you're aware of?

---

Page 79

1    A    No.
2    Q    All right. Now, from the time that he went
3  back to his home until today, have there been any more
4  incidents of him trying to die by suicide?
5    A    He's had one mental break, but, you know, I was
6  dealing with an old charge so I wasn't here.
7    Q    Okay. When did that mental break happen that
8  you're talking about, if you have an idea?
9    A    I don't even -- I can't even tell you a day. I
10 was gone for 45 days.
11   Q    Okay. Let me ask you this. So we know that --
12 let me do it this way. Let me ask you about this.
13        Did you know that on September 9th, 2024, Ezra
14 had to go back to the Piedmont emergency room because he
15 got punched in the nose by -- what he said by a neighbor?
16   A    Oh, yeah. I know about that.
17   Q    Okay.
18   A    I was -- what day did you say; September 9th
19 what?
20   Q    September 9th of 2024.
21   A    Oh, yeah. That was last year, yeah. That was
22 the neighbor across the street, yep.
23   Q    So let me -- let's just try this and see if
24 this helps anything. So we know that punch happened or
25 whatever happened with that happened on September 9th.

---

Page 80

1  And then we know -- normal holidays. I don't know if you
2  celebrate the holidays.
3          But normal holidays come and you've got your
4  Thanksgivings, your Christmas, all those things. At what
5  point, was it at some point between September, that
6  punch, and maybe Christmas that he had a mental break or
7  would it have been in the New Year of 2025, if you know?
8    A    No. That was '25. It was between -- it was
9  around the time the -- the anniversary of all of this
10 happening to begin with. I was gone March 22nd until
11 July 23rd or 24th. I wasn't around.
12   Q    That's of this year; of 2025?
13   A    Yes.
14   Q    Okay. So that mental break would have happened
15 within that time frame; March to July you think?
16   A    I -- you know, I want to say it is like
17 July 8th or 9th of this year.
18   Q    Okay.
19   A    Honestly, it's around the anniversary of this
20 whole thing.
21   Q    Now, is there something that he told you --
22 excuse me. Is there something that he told you or that
23 you know that makes you think -- well, let me withdraw
24 that question.
25        Do you think that mental break was related to

---

Page 81

1 the suicide attempt from July of 2024?
2     A    Yeah.  Because around that time, he -- you
3 know, my husband was here to deal with it.  So he, you
4 know, was worried about Ezra.
5          But I didn't find out any extent of anything
6 until I came home because my husband didn't want me
7 stressing about it and worrying about it.  Because I
8 couldn't do anything about it.
9     Q    So he would -- so what I'm hearing from you is
10 that he would likely have more information about that
11 mental break, what it was related to, any talks with Ezra
12 around that time; is that fair?
13    A    Yeah.
14    Q    Okay.  All right.  The September 9th, 2024
15 punch, that incident, were you present when that
16 happened?
17    A    Not when he hit him.  Not at that moment.  But
18 he called me right after it happened and I went over
19 there.
20    Q    When you say "he," you mean Ezra, I assume;
21 right?
22    A    Yeah.  Ezra called me and I went over there.
23 Me and my husband went over there.
24    Q    Okay.  Were you able to find out what happened?
25    A    Oh, the neighbor was drunk and his claim was

Page 82

1 Ezra had his stereo up too loud at, like, 9:30, 10:00 at
2 night.
3     Q    Okay.  How quickly did it -- well, let me
4 withdraw that question.
5          You said Ezra called you.  Was it -- did you
6 have an understanding about how long or what time elapsed
7 between him getting punched and him calling you?
8     A    Immediately, I would say.  Because when I -- by
9 the time I got there, his nose was still bleeding and I
10 was trying to help him control the bleeding from his
11 nose.
12    Q    Okay.
13    A    So he hadn't had time to figure out how to get
14 the bleeding to stop.
15    Q    Okay.  Did you take him to the ED or did y'all
16 call 9-1-1?
17    A    No.  I was furious when I got there and the
18 drunk neighbor called the police back out there because
19 he was afraid of me.
20    Q    Okay.  So did anyone get arrested for the
21 incident?
22    A    No.
23    Q    I didn't see anything saying -- okay.
24    A    Huh-uh.
25    Q    So how did Ezra get to the emergency room or

Page 83

1 what made him go there, if you know?
2     A    A couple days later, I think, he was having
3 trouble breathing and he needed -- I told him that he
4 needed to just go up there.
5     Q    Okay.
6     A    I didn't take him.
7     Q    All right.
8     A    I think he called me from there, to be honest
9 with you.  He didn't even tell me he was going to go
10 until after the fact, but...
11    Q    Okay.  All right.  You gave some background
12 information about Ezra earlier.  Does Ezra drive?
13    A    He's got a driver's license.  He doesn't have a
14 car right now.
15    Q    Okay.  But he drove normally when he -- or did
16 he drive normally?
17    A    Yeah.
18    Q    Okay.  Where did he work back in 2024, if you
19 know?
20    A    In '24, he hasn't worked a whole lot since --
21 let's see.  So, yeah, I guess it would be '24.  It has
22 only been a year since all this.
23         Yeah, he worked for a little while.  And then
24 after he got with her, she had issues with him working.
25 So he really didn't work a lot.  He worked for a

Page 84

1 pharmaceutical company delivering pharmacies.  Like,
2 driving was his job.
3     Q    Okay, okay.  I want to make sure I have the
4 timing correct.  I think your testimony was that -- just
5 based on your recollection, I'm not going to marry you to
6 it.
7          That he was diagnosed with schizoaffective
8 disorder when he was 17 years old of age; does that sound
9 right?
10    A    Yeah.  Now, I never read the -- I never read
11 anything like that.  That was just Ezra had gone to the
12 doctor and told me, you know, the new diagnosis.  And
13 explained to me that's why it had been so hard to treat
14 things over the years.
15    Q    All right.  So do you know whether that
16 diagnosis -- I will call it a diagnosis.  I know it's
17 just what he told you, but I'm just going to call it a
18 diagnosis, even though -- just for purposes of this
19 question.
20         Do you know whether that diagnosis happened
21 before or after his father committed -- or died by
22 suicide?
23    A    His dad -- he did it in 2019.  Ezra was 19 when
24 his dad did what he did.
25    Q    I'm sorry.  Okay.  All right.  I think I -- I

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 85

1 just had the timing wrong. That's my mistake. I'm
2 sorry.
3    A    Yeah.
4    Q    Okay. You mentioned -- or there was a little
5 bit of back and forth earlier about it. You said I
6 think -- I'm paraphrasing. That sometimes we have to let
7 folks that have mental health issues, and especially your
8 children, kind of open up to you at some point and you
9 don't really push them.
10       Is that generally fair what you said
11 earlier a little bit?
12    A    Yes. Yeah. And not -- and everybody is
13 different.
14    Q    Right.
15    A    So I just know how Ezra is. If I back him in a
16 corner, you know, he might get agitated, which is just
17 going to prolong anything. He'll talk to me about it
18 when he's ready.
19       Does that make sense?
20    Q    Okay. Did he ever -- was he ever ready to talk
21 to you about the suicide attempt on July 8th and 9th of
22 2024?
23       Did he ever get to that point and talk to you
24 about it?
25    A    I mean, we've talked about it, but there's --

---

Page 86

1 the biggest thing that we've talked about is that, you
2 know, it's not as worthless. It's more or less me just
3 trying to convince him he's got support where he feels
4 like he doesn't. Or felt like he doesn't.
5       Let me rephrase that. Felt like he doesn't.
6    Q    Okay. So, if you can, tell me about what Ezra
7 -- how Ezra responded to what you were saying to him and
8 what he thought about what he tried to do and all those
9 things, if you could.
10    A    I mean, he -- he feels bad about it. I mean,
11 he's -- I think he's more scared now than what he was
12 before. I don't know. I don't -- it's hard to --
13    Q    Could I -- let me ask you this. I can see you
14 searching for words. And I know this is tough and I
15 apologize.
16       But as one of the other attorneys said, this is
17 really the only time we get to ask you these questions
18 before this case goes to trial, if it goes to trial.
19    A    Uh-huh.
20    Q    So I just want to make sure I can get as many
21 of the answers as I can or know what you might say if
22 this case goes to trial. What it seems like to me is
23 that after he attempted to die by suicide and he was not
24 successful, thankfully, he has some remorse about it?
25       It's not something it seemed like he wanted to

---

Page 87

1 do; is that fair?
2    A    Right.
3    Q    Okay, okay. You mentioned, if I remember
4 correctly, him either -- did he say to you that he,
5 quote, or something to the effect of: I can't believe
6 she told me to do it?
7       Did he say that to you in some way or is that
8 what you read somewhere?
9    A    He said to me: Why would somebody tell you to
10 do that?
11       I didn't register who he was speaking of or --
12    Q    Okay.
13    A    You know, it was just -- we're at the hospital.
14 He's got this mark around his neck. I kind of -- I knew
15 where he was going with it, but that's all he said.
16       Other than that, you know, it was, "Mom, I'm
17 sorry," and me holding him.
18    Q    Okay. And I'm going to assume -- and this is
19 to the extent you know because he's your son and you've
20 talked to him before.
21       When he said he was sorry, was he saying -- did
22 you take it to mean he was sorry that he tried to do what
23 he did?
24       Is that what you took it to mean when he said,
25 "I'm sorry"?

---

Page 88

1    A    Well, yeah. Yeah.
2    Q    Okay. I was just making sure. I didn't want
3 to assume anything incorrectly, so...
4       Okay. All right. Now, I have some questions
5 and I want to preface these questions by -- you know,
6 saying I'm not trying to get into anything that's too
7 terribly personal. But these are some things that showed
8 up in Ezra's medical records as he was talking to certain
9 folks about certain things.
10       And some of those things seem to be -- and I
11 may be wrong and we'll find out hopefully in a few
12 minutes. Seem to be inconsistent with some things you've
13 said. I'm trying to see if we can reconcile the two
14 things.
15       And if we can't, that's fine. And if you don't
16 know something, that's fine. So don't be concerned if
17 this is something you've never heard or you're not aware
18 of. I just want to preface it that way because some of
19 these things could be sensitive in nature.
20       Now, are you aware of Ezra attempting to commit
21 suicide at the age of 16?
22    A    He was with his dad at the time -- well, no.
23 He was -- that's when his dad took off and he was lying
24 about his dad being gone and he ended up in DFACS.
25    Q    Okay. What year would that be, if you know

---

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 89

1 off- -- if you can remember?
2    A   Oh, year would it have been when he was 15?
3    Q   What year was he born; how about that?
4    A   He was born in 2000. So I guess that would be
5 2000- --
6    Q   2015 and '16?
7    A   Yeah.
8    Q   Look, we'll get there. We'll get there one way
9 or another.
10   A   Right. That makes sense.
11   Q   That's okay. That's okay. All right.
12   A   And let me reiterate. It's nothing because of
13 something I did. It was because of his dad. He wanted
14 to go live with his dad at 14. Then his dad took off and
15 abandoned him. So, you know, they put him in DFACS
16 custody before even contacting me to come and get him.
17   Q   Okay.
18   A   And DFACS has a way of -- once they're in the
19 system, you've got to jump through hoops to get them out.
20 And I did just that.
21   Q   All right.
22   A   So there were issues, you know, that they
23 wouldn't let me have a whole lot to do with in DFACS.
24 But, you know, I was there every week and went grocery
25 shopping, put groceries in the house that he was at

---

Page 90

1 with -- you know, the group home and everything else.
2        So I still saw my son, you know, two or three
3 times a week. And there was a couple of counselors that
4 kind of bent some of the rules for me and Ezra to spend
5 more time together.
6    Q   Okay.
7    A   So -- but there were some things they couldn't
8 tell me because he was in state custody.
9    Q   Okay. But it sounds to me during that time
10 frame, though, there -- there was no communication to you
11 that Ezra had attempted to commit suicide during that
12 time period; is that fair?
13   A   Right.
14   Q   Ezra never -- Ezra has never talked to you
15 about that; right?
16   A   No.
17   Q   Okay. I will represent to you -- excuse me --
18 that in -- in or around November 2022 -- end of November
19 2022 -- excuse me -- Ezra was arrested --
20   A   Right.
21   Q   -- for -- okay. So you know about that.
22 Criminal damage to property in the second degree, which
23 normally means --
24   A   That was his house, right.
25   Q   Okay. Go ahead.

---

Page 91

1        What do you know about that?
2        Go ahead. What do you know about that?
3    A   That was at his -- that was at his house and he
4 had been drinking. And he knocked his bedroom door down.
5 That's the house he has now. It was --
6    Q   Okay.
7    A   Yeah.
8    Q   Was he living there alone?
9    A   He was taking care of his great-grandfather.
10   Q   Okay. So his great-grandfather lived in the
11 home?
12   A   At the time. He passed away January of -- so I
13 guess that would be '23. So, yeah, that sounds about
14 right.
15   Q   Do you know -- I'm sorry.
16   A   No.
17   Q   Do you know how is it -- or how the police got
18 involved in that incident since it's kind of happening at
19 his home, inside his home?
20        Do you know who, if anyone, called the police
21 or how they became involved?
22   A   I believe it was his uncle called the police,
23 who wasn't even here. But I wasn't there so I can't --
24   Q   Okay. That's fine.
25        Now, I bring that up because he's taken to the

---

Page 92

1 Rockdale County Jail, I'll represent to you. And if you
2 need to see a record to prove it, I can show it. And if
3 anybody needs to see it, I can do that, as well.
4        But when he went to jail in November of 2022,
5 he -- he was placed on suicide watch in 2022.
6    A   Yeah.
7    Q   Okay. I'm wondering -- are you familiar with
8 that?
9    A   Yeah. I mean, I don't know the details of what
10 he did, but I'm sure, you know, it's because he said
11 something or whatever.
12   Q   Now, how do you know about that?
13   A   Well, I mean, because I know they put him on
14 suicide watch because they're limited on, you know, the
15 contact with certain people, especially in a certain time
16 frame. So, you know, the whole time he was there, you
17 know, he would call me and we would talk.
18        But there was a couple of times where he
19 wouldn't. And I'd call up there and they won't give you
20 no information because he's an adult.
21   Q   Okay. So you don't know what led to him being
22 on suicide watch; you just know that he was on it?
23   A   Right.
24   Q   Okay. Did he ever talk to you about that;
25 about what happened, what caused it, what caused him to

---

Page 93

1    be on suicide watch?
2        A    Not -- not in details.  Probably kicking and
3    beating on the doors.  I don't know what he said -- you
4    know, verbatim what he might have said.
5        Q    Okay.  Was that something -- when you said
6    kicking and beating on the door, is that something that
7    he would kind of sometimes do when he was in jail; is
8    that fair?
9            Just kind of -- or do you know?
10        A    Well, I'm not on that side of that wall.  So, I
11    mean, I --
12        Q    Oh, no.  You mentioned it.  I don't know if he
13    said that to you that's something that he had done
14    before.
15        A    Yeah, he may have told me or -- you know, he
16    had to have told me, I guess.  I mean --
17        Q    Okay, okay.  That's fair.
18        A    There's a lot that's went on, so...
19        Q    Oh, I -- look, I know.  We're going back in
20    time.  So I know you're not -- your memory may not be
21    great on it.  And that's okay.
22            It seems like there are some things that you're
23    remembering now that I -- you know, that we have asked
24    some different questions.
25        A    Uh-huh.

Page 94

1        Q    So this is what I want to get into that I'm
2    trying to figure some things out and reconcile some
3    things.  When he was going through the mental health and
4    suicide evaluation in 2022, he stated, according to the
5    records, that his mother and father were drug addicts.
6            Do you know -- let me start at this.  Let me
7    ask you this way.  His father being a drug addict, is
8    that something that you knew about, you were aware of, or
9    that he's ever talked to you about?
10            I know that's a lot of questions there.  So
11    just answer how you see fit.
12        A    Well, there's a reason that I left his dad to
13    begin with.
14        Q    Okay.
15        A    And, you know -- but you have to understand,
16    you know, this is in 2022.  He's saying his mother and
17    father are drug addicts and his dad killed himself in
18    2019.
19        Q    Right.
20        A    So that's a statement saying -- like his dad
21    was still around when he wasn't.
22        Q    Okay.
23        A    So, you know, Ezra when he gets in his mental
24    out there, there's things that he'll say to people
25    that --

Page 95

1        Q    Uh-huh.
2        A    -- he won't remember saying.  Like, hurtful
3    things.  When he's hurting, I guess you can say.
4        Q    Okay.
5        A    And it's just -- I don't know.  You know, we --
6    like I said, I'm not a doctor.  So I can't explain why --
7        Q    That's fair.
8        A    -- he'll say things to hurt people, but...
9        Q    Right.  Let me ask you this because -- and I'm
10    not trying to get you to diagnose anyone.  I'm not trying
11    to get you to give a medical opinion.
12            But what we've gathered from this now almost
13    two hours we've been talking to you today, is that you
14    know your son.
15        A    Uh-huh.
16        Q    And so what it sounds like to me is that
17    sometimes when he's in a -- not his normal mental state,
18    he'll say sometimes mean things that he may not remember
19    and that may not be accurate; is that fair?
20        A    Yeah.
21        Q    And he'll just get in a place where he's saying
22    things that may not be as accurate as they would normally
23    be if he's kind of in his right mental state; is that
24    fair?
25        A    Well, I don't -- I don't --

Page 96

1        Q    Just your experience with him.  Let me just put
2    it that way.  Because that's all we can limit it to
3    because that's all you know.  Just based on what you know
4    and your experience with him.
5        A    Well, no, I'm not saying, like, accurate
6    accounts.  When he tells me, you know, things and I --
7    you know, I go behind him and try to back it up, it's
8    usually pretty much spot on.  He might leave some things
9    out, you know, for what whatever reason.  I mean, he's a
10    son, just like I'm a mother.
11        Q    Uh-huh.
12        A    And he tends to try to be protective of me,
13    too.  You know, even though he knows I can handle more
14    than what he thinks.  But if he thinks something's going
15    to hurt him -- hurt me more than what he feels, then he
16    might not, you know, give all the details to me.  But not
17    that it's a misplacement of things.  He'll give me --
18        Q    Okay.
19        A    -- the outcome.
20        Q    All right.  Well, let me ask you this:  Was his
21    father a drug addict before he died by suicide, to your
22    knowledge?
23        A    From -- well, you know, Shane and I wasn't
24    together from 2009.  But that was the reason why; the
25    drinking and he was taking pills.

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

---

Page 97

1    Q   Okay. And, again, I'm just going through the
2    records and want to see if I can reconcile. Were you
3    ever a drug addict?
4    A   I got in trouble about 20 years ago over
5    something. I got everything -- I went to therapy.
6    I've -- you know.
7    Q   Okay. So 20 years ago -- 20 years ago from
8    today, so that is 2005; is that about right?
9    A   Yeah. I was -- well, maybe -- let's see. How
10   old am I am now?
11       Oh, my God. I'm telling my age. I was about
12   32, 33.
13   Q   Okay. So that's -- that doesn't help me a
14   whole lot. So is that 2005 or sometime before then?
15   A   Or maybe 2007. I'm trying not to tell my real
16   age here right now.
17   Q   That's fine, that's fine. I'm not trying to do
18   the math either.
19       So we'll go between 2005 and 2007, you had the
20   -- I think it was a methamphetamine charge that you got
21   resolved and went through the process for that; is that
22   fair?
23   A   Exactly.
24   Q   So that means Ezra would have been about five
25   to seven years old; is that fair?

Page 98

1    A   Yeah.
2    Q   Do you -- okay.
3    A   But I didn't spend any time away from him until
4    he was around nine or ten.
5    Q   Okay. So he would have -- it doesn't sound
6    like -- and I'm not saying that you are. Whatever drug
7    issue you had, do you think he was aware of it at the age
8    of five to seven?
9    A   Okay. What he was aware of is what his dad
10   told him.
11   Q   I gotcha.
12   A   Because his dad had a -- that's why I said his
13   dad played mental games with him.
14   Q   Okay.
15   A   And, you know, his dad dies, he was the perfect
16   angel and never did any wrong. And even though Ezra
17   witnessed it, you know, his dad -- I was the terrible
18   person.
19   Q   Okay. Excuse me. Now, I'm asking this
20   question -- again, it showed up in the medical record.
21   Ezra told the folks back in 2022 during his mental health
22   evaluation that he sustained physical, sexual and
23   emotional abuse during his childhood.
24   A   Yeah. He never said anything to me.
25   Q   Okay.

Page 99

1    A   Now, his dad would get physical with me. After
2    that, I mean, I -- you know, a child when they're young
3    and you spank them, that's --
4    Q   Uh-huh.
5    A   But, no, I never -- I never put marks on my
6    child. And, you know, part of the reason is we dealt
7    with the mental health issues was DFACS coming to my
8    house, doing their little investigation, and seeing no
9    reason to continue because they -- my house was always
10   full of food and my kids were never bruised up.
11   Q   Now, again -- and I can show you the record. I
12   don't think it's necessary. But if anybody wants me to,
13   I can.
14       He said that somebody tried to rape him at some
15   point when he was a child. I -- by your response, I
16   don't think that's anything you've ever heard of before?
17   A   No.
18   Q   All right. On May 17th of 2024 -- all right?
19   A   Uh-huh.
20   Q   Ezra was arrested for disorderly conduct in
21   Rockdale County. Do you recall that at all?
22   A   He must have been at his house. I mean, that
23   was 2024? That was right after the wife happened.
24   Q   That was right -- this is right before --
25   A   Right. That was right before that --

Page 100

1    Q   Right.
2    A   Right after his wife pulled out. So all of
3    this is like all one thing.
4    Q   Okay.
5    A   Yes. But he wasn't with me. He was, you know,
6    in Rockdale. I think he was at his house in his front
7    yard, to be honest. I don't know.
8        I know I brought him to my house. I picked him
9    up. Either me or my husband did.
10   Q   All right. Do you know whether Ezra was
11   arrested on September 5th of 2024?
12       Does that sound familiar at all?
13   A   September 5th of 2024?
14   Q   Uh-huh.
15   A   No. That was when he -- that is Baldwin
16   County; right?
17   Q   Is that -- yes, it is.
18   A   That's where we --
19   Q   It is listed as Baldwin County.
20   A   That's where the detective -- after all this
21   happened at Rockdale, the detective and me and Ezra all
22   decided it would be better for him to just go to Baldwin
23   County and turn himself in.
24   Q   Okay.
25   A   And the detective, you know, showing Ezra

Ezra Smith v.
Deputy Monique Tracey, et al.

Carmen Pittman George
October 13, 2025

Page 101

1  support, drove him from Rockdale County to Baldwin
2  County, off duty.
3  Q   Got it, got it.
4  A   Okay.  And my husband and I were there as soon
5  as they placed the bond and picked him up.
6  Q   Got it.  Okay.  All right.
7      Okay.  I think -- let me see just to make sure.
8      I think this is -- I'm not going to go over all
9  of it.  But the only time you talked to Deputy Tracey was
10 during that 10:33 p.m. call; right?
11 A   Right.
12 Q   And you told her about the history -- what had
13 been going on with Ezra as relates to the wife and what
14 happened; is that fair?
15 A   Right.  And his mental health.  That I was
16 worried about him and then --
17 Q   Right.  I'm -- okay.  I was going to get there,
18 but okay.
19     And then you told her about his mental health
20 and the situation.  Did you tell her about the earlier
21 time when Ezra was turned away from the jail?
22 A   I'm pretty sure I did because it was all
23 related.
24 Q   Okay.
25 A   I may or may not, but I'm pretty sure I did.

Page 102

1  Q   Okay.
2  A   Because that's what sent him to the crisis
3  center.  So, I mean, I don't know why I would have left
4  that out.
5  Q   Okay.  So you were -- it seems like essentially
6  you were giving her your opinion of Ezra's mental state
7  because you knew him as his mother; is that fair?
8  A   Yes.
9  Q   Did Ezra ever tell you what, if anything, he
10 was doing while he was in the holding cell on July 8th
11 and 9th waiting to be booked in?
12 A   No.
13 Q   Okay.  When you -- I know you said you looked
14 at some of the reports or documents written about what
15 transpired.  Did any of those documents discuss how Ezra
16 was acting or what, if anything, he was doing prior to
17 the attempted suicide?
18 A   I'm going to be honest, when it came to -- when
19 I read -- the only one I read thoroughly in any amount
20 because I haven't -- the whole situation has been super
21 stressful for me.
22 Q   Okay.
23 A   And I'm -- I try not to break down over the
24 whole thing because every time I think about it, I think
25 it could have went another way and he could not be here

Page 103

1  now.
2      But when I read Tracey's statement and got to
3  the -- you know, one of the parts about, you know, this
4  is what white inbreds -- it happens when they --
5  somewhere along those lines, have a kid, I was just kind
6  of floored.
7  Q   Okay.
8  A   So, I mean, I feel like the whole thing was
9  handled wrong and there -- you know, police officers are
10 supposed to protect and serve.  Not only on the street,
11 but inside the jail.  And not just from each other, but
12 from themselves.  And she --
13 Q   Okay.
14 A   They knew there was a situation and that he had
15 this situation.  And this could have been a possibility
16 that they could have avoided and prevented.
17 Q   Okay.
18     MR. WAYMIRE: Object to responsiveness.
19 BY MR. VEAL:
20 Q   Now, between --
21     MR. BUCKLEY: Join in the objection.
22 BY MR. VEAL:
23 Q   Between the day he was released from the crisis
24 center, I believe you said July 6th; is that fair?
25 A   On a Saturday, uh-huh.

Page 104

1  Q   Okay.  Between July 6th and July 8th when you
2  went to court --
3  A   Uh-huh.
4  Q   -- do you recall Ezra saying anything that made
5  you think he wanted to attempt to commit suicide?
6  A   At that moment he was feeling better.  We --
7  you know, he was feeling positive.  And, you know, we
8  were -- I had him -- you know, I believed that the worst
9  was behind us.
10 Q   Right.  Okay.
11 A   You know, that --
12 Q   And that's based on -- I'm sorry.  Go ahead.
13 I'm sorry.
14 A   That we were moving forward with it.  You know,
15 him getting the help he needed.  He was still -- we still
16 had a plan set up for him to talk to this counselor.
17     And if they found -- you know, that was the
18 plan.  We had a plan.  And so for a full day and even
19 going to court Monday morning -- of course, he was
20 nervous.
21 Q   Right.
22 A   But we were -- I was still hopeful.  He was
23 hopeful at the moment, so...
24     And then the rug got pulled out from underneath
25 him again.

Page 105

```
 1    Q   Okay.
 2    A   So -- you know.
 3    Q   So as far as you could tell -- and what I'm
 4  hearing from you -- and if I have it wrong, let me know.
 5       As far as you could tell, after he was
 6  discharged, if you will, from the crisis center, between
 7  that day and the day he went to court, you thought
 8  you-all had made a turn.  And at that point, as it
 9  related to maybe him trying to commit suicide, based on
10  kind of your discussions with Ezra and he was behaving;
11  is that fair?
12    A   Right.
13    Q   Okay.
14    A   But did I think he was healed, a hundred
15  percent --
16    Q   Right.
17    A   No.
18    Q   Are we ever a hundred percent healed?
19       But, no, I understand.  I got you.
20    A   I'm so glad you asked that question and I
21  didn't have to.  Thank you.
22       MR. VEAL: I understand.  I get you.  I get it.
23       Now, you know what, I think that's all I have,
24  unless something else comes up.  Thank you.
25       THE WITNESS: Okay.
```

Page 106

```
 1              EXAMINATION CONTINUED
 2  BY MR. WAYMIRE:
 3    Q   Ma'am, I forgot to ask you one thing.  And that
 4  is your call with Deputy Tracey on the 8th of July, did
 5  you record that or did anybody record that call?
 6    A   I didn't.  I -- you know, I'm under the
 7  impression that the jails record every phone call that
 8  comes through there.  So, I mean, there should be a
 9  recording through the phone system.
10    Q   Did anybody else overhear that call from your
11  end?
12    A   Where we lived at the time, my cell phone
13  reception is terrible.  So I would have to walk around in
14  the yard to make sure phone calls didn't drop.  So, no.
15       MR. WAYMIRE: Okay.  Thanks.
16       THE WITNESS: Uh-huh.
17       MR. WAYMIRE: I think we're done.
18       MR. BUCKLEY: Yep.
19       MR. SLATER: We have nothing for the witness.
20       MR. WAYMIRE: You did have something or didn't?
21       MR. SLATER: No.  We're -- we don't have any
22  questions.  Sorry.
23       MR. WAYMIRE: Oh, okay.
24       THE STENOGRAPHER: Read or waive?
25       (A discussion was held off the record.)
```

Page 107

```
 1       MR. SLATER: The witness will read.
 2       THE STENOGRAPHER: Mr. Waymire, would you like
 3  this transcribed?
 4       MR. WAYMIRE: I don't need it transcribed right
 5  now.
 6       THE STENOGRAPHER: Okay.  Thank you.
 7
 8  (Video Zoom Deposition concluded at 3:12 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 108

```
 1              C E R T I F I C A T E
 2  PUTNAM COUNTY:
 3  G E O R G I A:
 4       The foregoing proceedings were taken down by
 5  me as a Certified Court Reporter in the State of
 6  Georgia, and the questions and answers thereto were
 7  reduced to typewriting by me, personally.  I hereby
 8  certify that pages 1 through 110, inclusive, comprise a
 9  complete and correct transcript of said proceedings.  I
10  further certify that I am neither kin nor counsel for
11  any party; and am in no way interested in the outcome
12  of said case.
13       This, the 3rd day of November, 2025.
14
15
16
17
18          KELLEY MARIE NADOTTI, RPR, CCR
19             Certified Court Reporter
                CCR 6256-8388-8026-4192
20
21
22
23
24
25
```