IN THE GEORGIA COURT OF APPEALS

| | | |
|---|---|---|
| KELSIE BRANTLEY, Individually and | ) | |
| as Administratrix of the Estate of | ) | |
| LISA MICHELLE ARIAIL, | ) | |
| | ) | APPEAL NO. |
| Plaintiff, | ) | |
| vs. | ) | A21A1251 |
| | ) | |
| MICHAEL HANNAH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## BRIEF OF APPELLEES JONES, CAPES, DAVIS, RICHARDSON AND HANNAH

---

TERRY E. WILLIAMS
Georgia Bar No. 764330
JASON C. WAYMIRE
Georgia Bar No. 742602

Williams, Morris & Waymire, LLC
Bldg. 400, Suite A
4330 South Lee Street
Buford, Georgia 30518
678-541-0790
678-541-0789
Attorneys for Defendants/Appellees

## **TABLE OF CONTENTS**

**PART I:  FACTS** ……….……………………………….…….…….. 6

**PART II.  ARGUMENT AND CITATION TO AUTHORITIES** ………. 22

1.   Arial's Suicide is the Sole Proximate Cause of Her Injury and Death,
     Barring Negligence Liability …………………………………… 22

     A.   Defendants Were Not the Cause in Fact of Suicide …………….. 22

     B.   Suicide Was the Sole Proximate Cause of Death as a Matter of
          Law …………………………………………………………… 23

          1.  Georgia Law Typically Bars Liability for Suicide …….………. 23

          2.  Georgia Law Requires Knowledge of Suicide Risk Before
              Liability for Suicide Can Arise…………………….…………..24

          3.  Other Jurisdictions Require Knowledge of Information About
              Suicide Risk Before Liability for Suicide Can Arise ...………….26

          4.  Defendants Had No Information that Ariail Posed a Suicide
              Risk ……………………………………………………………27

          5.  The Intoxication Policy Did Not Raise a "Special Relationship"
              or Duty to Prevent Suicide……………………..…………..28

     C.   Litigation Expenses and Punitive Damages Are Not
          Recoverable ……………………………………………………29

2.   Summary Judgment Should Be Affirmed on Other Independent
     Grounds ……………………………………………..………… 29

     A.   Assumption of Risk and Comparative Fault Require
          Summary Judgment ..……………………………………..30

1. The Trial Court Improperly Declined to Find Assumption
   Of Risk and Comparative Fault ……………………………… 30

2. Assumption of the Risk Bars the Claim…………………………… 33

3. Comparative Fault Bars the Claim …………………………………33

B. Official Immunity Requires Summary Judgment ..……………..… 35

1. General Official Immunity Standards …………………………… 35

2. Ariail's Intoxication Did Not Trigger a 15-Minute Watch ……….. 37

3. The Screening Form Is Not a Basis for Liability ………………… 40

4. Jail Policy Permitted Ariail to Keep Her Tank Top ……………… 40

5. Officer Hannah Completed 30-Minute Staggered Checks ……….. 41

6. Summary ………………………………………………………… 41

C. Plaintiff Lacks Standing to Assert a Wrongful Death
   Claim ………………………………………………………..……... 41

**CONCLUSION**…………………………………….…………….……………… 44

**CERTIFICATE OF SERVICE** ……….……….……………….……….……… 45

## TABLE OF AUTHORITIES

**Georgia Supreme Court**

*Brown v. Liberty Oil & Refining Corp.*, 261 Ga. 214, 403 S.E.2d 806 (1991) . .42

*City of Richmond Hill v. Maia,* 301 Ga. 257, 800 S.E.2d 573 (2017)..........*passim*

*Dept. of Human Res. v. Allison,* 276 Ga. 175, 575 S.E.2d 876 (2003)...............43

*Durrence v. State*, 287 Ga. 213, 695 S.E.2d 227 (2010) ....................................32

*Foster v. State*, 283 Ga. 47, 48 656 S.E.2d 838 (2008).......................................32

*McDowell v. Smith*, 285 Ga. 592, 678 S.E.2d 922 (2009) .................................35

*McReynolds v. Krebs*, 291 Ga. 850, 725 S.E.2d 584 (2012)...............................35

*Muldovan v. McEachern,* 271 Ga. 805, 523 S.E.2d 566 (1999).........................34

*Stevens v. Steadman,* 140 Ga. 680, 79 S.E. 564 (1913)......................................24

*Union Camp Corp. v. Helmy*, 258 Ga. 263,  367 S.E.2d 796 (1988).................35

*Williams v. DeKalb Cty.*, 308 Ga. 265, 840 S.E.2d 423  (2020) .......................43

**Georgia Appellate Courts**

*Appling v. Jones*, 115 Ga. App. 301, 154 S.E.2d 406 (1967).......................24, 29

*Auto Doors, Inc. of Georgia v. Zivoluba*, 277 Ga. App. 288,  626

      S.E.2d 256 (2006) .....................................................................................43

*Banks v. Happoldt*, 271 Ga.App. 146, 608 S.E.2d 741 (2004)...........................37

*Barnard v. Turner Cty.,* 306 Ga.App. 235, 701 S.E.2d 859 (2010)...................37

*Brandvain v. Ridgeview Inst., Inc.*, 188 Ga.App. 106,  372 S.E.2d 265 (1988)...32

*First Pacific Mgmt. Corp. v. O'Brien*, 184 Ga. App. 277,

261 S.E.2d 261 (1987)...............................................................34

*Gish v. Thomas*, 302 Ga. App. 854,  691 S.E.2d 900 (2010).......................37, 40

*Happoldt v. Kutscher*, 256 Ga. App. 96, 98 (2002) ...........................................37

*Harvey v. Nichols*, 260 Ga.App. 187, 581 S.E.2d 272, 278  (2003) .......23-24, 41

*Horton v. Dennis*, 325 Ga.App. 212, 750 S.E.2d 493 (2013) ...........................30

*Kendrick v. Adamson*, 51 Ga.App. 402, 180 S.E. 647 (1935).................26-27, 29

*King v. Goodwin,* 277 Ga.App. 188, 626 S.E.2d 165 (2006).............................44

*La Quinta Inns, Inc. v. Leech,* 289 Ga.App. 812, 658 S.E.2d 637 (2008)...........41

*Peterson v. Reeves*, 315 Ga.App. 370, 727 S.E.2d 171(2012)...........................32

*Sewell v. Dixie Region Sports Car Club of America, Inc.*, 215 Ga.App. 611,

451 S.E.2d 489 (1994)...............................................................35

*Thomas v. Williams,* 105 Ga.App. 321, 124 S.E.2d 409 (1962)...................25-27

*Union Carbide Corp. v. Holton,* 136 Ga.App. 726, 222 S.E.2d 105 (1975)......35

*Walker Cty. v. Tri-State Crematory*, 292 Ga.App. 411, 664 S.E.2d 788 (2008).30

**Other State and Federal Appellate Courts**

*City of Crossville v. Haynes*, 925 So. 2d 944 (Ala. 2005)..................................28

*Guice v. Enfinger*, 389 So. 2d 270 (Fla.App. 1980)......................................27-28

*Jackson v. West*, 787 F.3d 1345 (11th Cir. 2015)................................................28

## **Official Code of Georgia**

Ga. Const. Art. I, § 2, ¶ IX (d)................................................................36

OCGA § 51-11-7...........................................................................31, 33, 35

OCGA § 51-12-5.1(b)..............................................................................30

OCGA § 51-12-33.........................................................................31, 33, 35

OCGA § 16-3-2 ......................................................................................32

OCGA § 16-3-3 ......................................................................................32

## PART I:  FACTS

Appellees provide the following statement of facts, followed by a sample of Plaintiff's factual misrepresentations.

### ARIAIL'S DUI ARREST

In the early morning hours of May 10, 2017, Hiram police officer Jennifer Darr stopped Lisa Ariail's car for a broken headlight. V1-266, 271 (Darr Dep. at 42, 64). Ariail told Officer Darr that something was wrong with the wiring, and she was headed to Florida. Hiram and Darr 767 Video at 2:30 *et seq*. Ariail said she was taking Topomax, and she denied drinking. Hiram Video 767 at 4:20 *et seq*.

Arial was married at the time, as evidenced by her multiple references to her husband. Darr Video 767 (Ariail explaining her husband's efforts to fix car); Darr Video 766 at 10:40 (Ariail asks "can I call my husband to come get me?"); Darr Video 766 at 26:24 (Ariail states "can I please call my husband to come and get my car?  … please call him to come and get my car.").

Video reveals that during the traffic stop, Ariail could walk, talk, understand questions, respond to questions, and she was coherent. V1-271-72 (Darr Dep. at 64-65, 68); Hiram Video 767 at 8:50 *et seq*. Ariail was conscious the entire time. *Id*. (Darr Dep. at 65-66). Officer Darr did not view Ariail as dangerously intoxicated, though she believed Ariail was too impaired to drive. V1-272 (Darr

Dep. at 66).

Ariail agreed to a breath test, but when it came time to blow she repeatedly did not blow. Video 767 at 13:55 *et seq*. Ariail's level of intoxication did not appear to endanger her health. *Id*. (Darr Dep. at 66); Hiram Video 767 at 8:50 *et seq*. Had Ariail appeared dangerously intoxicated, Officer Darr would have called an ambulance. *Id*. (Darr Dep. at 67). Officer Darr arrested Ariail and drove her to the Paulding County Jail. Hiram Video 767 at 23:50 *et seq*.

### ARIAIL AT THE JAIL

Ariail had been in the jail on three prior occasions, and on each occasion she denied any suicidal intention or prior suicide attempts. V1-185-205. On this occasion, Officer Darr arrived with Ariail shortly before 5:00 a.m. V1-783 (Jones Dep. at 98), 299 (Capes Dep. at 31). Jail video shows Arial walking into the Jail with Officer Darr and a detention officer. V1-273 (Darr Dep. at 71-72); (jail video … 192.1. 68.19.15_6_20170510031617 … 62 at 1:28:13).

Officer Darr sat at the desk in the jail hallway, where she filled out forms with Ariail. V1-272-73 (Darr Dep. at 72-75). One screening form asked, among other things, about whether Ariail was suicidal. V1-275-76, 286 (Darr Dep. at 81-82, Def. Ex. 1). Officer Darr filled out the jail screening form from the top down to number 11. V1-274 (Darr Dep. at 76-77). Officer Darr specifically asked Ariail

7

whether she was suicidal, and Ariail answered "no." V1-272, 275-76 (Darr Dep. at 67, 81-82). Likewise, Officer Darr indicated "no" to all of the following screening questions. V1-274-75, 286 (Darr Dep. at 76-81, Def. Ex. 1).



Darr signed the form and provided it to an unknown detention officer. V1-276 (Darr Dep. at 83). Ariail never gave Officer Darr any indication that Ariail was suicidal. V1-262 (Darr Dep. at 67:5-7). Ariail never indicated to Officer Darr any history of suicide attempts. *Id*. (Darr Dep. at 67:8-11). Darr had no information that Ariail posed suicide risk, so she did not provide any information about suicide risk to any jail officer. *Id*. (Darr Dep. at 67:13-25 – 68:1, 87).

**OFFICERS AT THE JAIL**

Officers Davis, Capes and Jones worked on the "C-shift," which ran from 5:30 p.m. to 5:30 a.m. on the morning of May 10, 2017. V1-314, 293, 787 (Davis

Dep. at 15; Capes Dep. at 6; Jones Dep. at 103). Officers Richardson and Hannah came on duty at 5:30 a.m. V1-371, 351 (Richardson Dep. at 6; Hannah Dep. at 8). None of these officers had ever encountered Ariail before. V1-789, 206-12, 382 (Jones Dep. at 105; Affidavits of Officers Jones, Capes, Davis, Hannah and Richardson). As the trial court found, no officer at the jail was ever provided with information that Ariail was at risk for suicide. V1-1250; V1-206-12, 382 (Affidavits of Defendants Jones, Capes, Davis, Hannah and Richardson).

### Officer Kallie Capes

Kallie Capes is a detention officer at Paulding County Sheriff's Office. V1-292 (Capes Dep. at 5). Officer Capes searched Ariail and gave her an inmate jumpsuit (pants and a top) and allowed Ariail to keep her white tank top on because it was functioning as a bra, it did not have a wire and Ariail asked to get it back. V1-296, 297-98 (Capes Dep. at 20, 25-26). The jail policy permitted inmates to keep their white underwear as long as it did not have wire in it. V1-297, 319-20 (Capes Dep. at 24; Davis Dep. at 36, 38).

Ariail was belligerent with Capes, so Capes asked Officer Jones to help her escort Ariail to the holding cell. V1-295-96, 304, 783-84, 788, 808 (Capes Dep. at 15, 18, Ex. 27; Jones Dep. at 99-100, 104, Ex. 23 at 2). The officers did not receive any information that suggested Ariail was at risk for suicide. V1-789, 295-96, 304

(Jones Dep. at 105; Capes Dep. at 15, 18 & Ex. 27). Ariail was placed in a holding cell to wait for booking on the next shift. V1-294 (Capes Dep. at 12-13). Officers Davis, Jones and Capes left their shift at 5:30 a.m. V1-787, 294, 314, 326 (Jones Dep. at 103; Capes Dep. at 12; Davis Dep. at 15, 63).

### Officer Andrew Jones

Officer Andrew Jones was a book-out officer on the night of Ariail's arrest. V1-783-84, 808 (Jones Dep. at 99-100, Ex. 23 at 2). Officer Jones's only interaction with Ariail involved joining Officer Capes in escorting Ariail to the holding cell. *Id.* (Jones Dep. at 99-100, Ex. 23 at 2). Jones was not responsible for checking on Ariail during the shift. *Id.* at 807-08 (Ex. 23 at 1).

### Sergeant Vida Davis

Defendant Vida Davis was the sergeant for the jail shift that ran from 5:30 p.m. to 5:30 a.m. V1-314 (Davis Dep. at 14, 15). At some point during the shift, Sergeant Davis was provided with the form filled out by Officer Darr. V1-328, 344 (Davis Dep. at 72-73, Ex. 5). The form indicated that Ariail was not at risk for suicide. V1-316, 328 (Davis Dep. at 24, 72-73). Davis checked off two questions designed for her review and she signed the form. V1-328, 344 (Davis Dep. at 72-73, Ex. 5). There is no evidence that Sergeant Davis ever dealt with Ariail. V1-382 (Aff. of Vida Davis). Sergeant Davis had no information that Ariail posed a suicide

risk. V1-328-29 (Davis Dep. at 73-74).

## ARIAIL'S HOLDING CELL

Ariail's holding cell was configured as detailed by the diagram below. V1-177 (Hunton Aff. at ¶16). A metal partition provided privacy for an inmate using the toilet. *Id.*



An officer looking into the cell could not see someone behind the partition. V1-355, 362-63 (Hannah Dep. at 23, Ex. 33-34). As detailed by the photo below,

an officer could look into the holding cell through one of two observation points: (1) through a window installed in a wall adjacent to the cell door (to the left in the photo below) or (2) from the cell door (to the right in the photo below). V1-177-78 (Hunton Aff. at ¶ 17).

Officers who performed periodic checks of the holding cell normally looked into the window flap (to the left in the photo above) rather than through the door, and that is how Officer Hannah did his checks on Ariail's cell. V1-354-55 (Hannah



Dep. at 18-21, 22).

When a detainee arrived near the end of a shift, it was common for the newly arrived detainee to be housed in a holding cell to await booking during the oncoming shift. V1-371, 301 (Richardson Dep. at 7; Capes Dep. at 38). When C-

shift ended at 5:30 a.m., Ariail had not been booked. V1-294, 787 (Capes Dep. at 12; Jones Dep. at 103). Detainees waiting for booking normally were placed on 30-minute watches. V1-794, 798 (Jones Dep. at 110, 114). Ariail was not put on a suicide watch because there was no information that she posed a suicide risk. V1-789, 295-96, 304 (Jones Dep. at 105; Capes Dep. at 15, 18, Ex. 27 at 2).

### NEXT SHIFT (5:30 a.m. to 5:30 p.m.)

Officers Kaitlyn Richardson and Michael Hannah relieved the previous shift at 5:30 a.m. V1-371, 351 (Richardson Dep. at 6; Hannah Dep. at 8).

### Officer Kaitlyn Richardson

Defendant Richardson was the booking officer for this shift, and she was training another officer. V1-370-71, 373 (Richardson Dep. at 5-6, 14). Richardson had no personal dealing with or observation of Ariail while she was alive, and she did not make any evaluation about Ariail's condition. V1-373, 375 (Richardson Dep. at 17, 22).

Between 5:30 and 6:00 a.m., Richardson heard Ariail yelling. V1-373-74, 379 (Richardson Dep. at 17-18, Ex. 31 at 2). It sounded like belligerent yelling that is common with drunk detainees. *Id.*; V1-210-11 (Richardson Affidavit at ¶ 4). Therefore, Richardson did not believe Ariail was at risk for harm. *Id.* Richardson had discretion on whether to respond to Ariail's yelling. V1-353, 210-11 (Hannah

Dep. at 15, 39; Richardson Affidavit at ¶5).

About two hours later, around 8:00 a.m., Richardson heard an officer yell and she responded to Ariail's cell, where Ariail was hanging. V1-374 (Richardson Dep. at 20).

### Officer Michael Hannah

After the shift change at 5:30 a.m., Officer Hannah was responsible for performing periodic checks on the C-Hall, among other things. V1-351 (Hannah Dep. at 8). Ariail was not on a special "watch," so her cell was to be checked at staggered intervals roughly 30 minutes apart. V1-351, 355, 794 (Hannah Dep. at 9, 23; Jones Dep. at 110). Hannah understood that Ariail was in a holding cell waiting to be booked. V1-352 (Hannah Dep. at 13).

Hannah had no information about Ariail, and he had no information that she was at any risk of harm. V1-353, 359 (Hannah Dep. at 16-17, 40). Ariail was not on a special watch or identified as posing a risk requiring close surveillance. V1-359 (Hannah Dep. at 38). Hannah performed approximately five checks on Ariail's cell from the time he started the shift to the time that she was discovered. V1-355, 364 (Hannah Dep. at 24, Ex. 35). After a check around the shift change, Hannah logged checks at 6:42, 7:30, 7:41 and 8:00 a.m. V1-355, 366-67, 359, 804 (Hannah Dep. at 23, Ex. 36 at 2-3; Hannah Dep. at 41; Jones Dep., Ex. 22).

Hannah recalls seeing Ariail at some point on the bench in the cell trying to get comfortable. V1-367 (Hannah Dep., Ex. 36 at 3). Hannah did checks on Ariail's cell at staggered intervals by looking into the window flap. V1-354 (Hannah Dep. at 18); exterior cell photo (above). Each of Hannah's checks involved looking into the cell, inspecting for something out of the ordinary. V1-354, 357 (Hannah Dep. at 18, 32); *see* V1-327 (Davis Dep. at 68-69).

Hannah's log indicates that at approximately 6:42 a.m. he started giving out breakfast trays to inmates. V1-320, 804 (Hannah Dep. at 41; Jones Dep., Exhibit 22). At some point after Hannah started serving breakfast trays, he came to believe that Ariail had been removed from the holding cell and taken to booking because he did not see Ariail in the cell. V1-356-57 (Hannah Dep. at 26, 29-30). It was common for inmates to be removed to booking without notice to Hannah. V1-356 (Hannah Dep. at 29).

## ARIAIL'S SUICIDE

Ariail was discovered hanging by her tank top shirt shortly after 8:00 a.m. V1-355, 364, 379 (Hannah Dep. at 24, Ex. 35; Richardson Dep., Ex. 31 at 2). Ariail had attached the shirt to the metal partition used to provide privacy to inmates using the toilet. V1-379 (Richardson Dep., Exhibit 31 at 2). Ariail never went through the jail's booking process, but rather stayed in a holding cell until

discovery of her body. V1-318, 326 (Davis Dep. at 30, 63); V1-294-98 (Capes Dep. at 12, 17-18, 27); V1-374 (Richardson Dep. at 18); V1-358 (Hannah Dep. at 35).

## SAMPLING OF PLAINTIFF'S MISREPRESENTATIONS

Plaintiff misrepresents a number of facts. Some of the more glaring misrepresentations are considered here. More could be identified, but the following make the point that Plaintiff is not being honest with the record, and is not being candid with the Court.

### Misrepresentation 1

**Plaintiff claims:** "Prior to the incident at issue in this case, Lisa Ariail had attempted suicide on four separate occasions, which was documented in records accessible to the Appellees, **because Davis pulled the records that were produced in the case**. *Plaintiff's Brief* at 3 (item 2, citing R 759-762; ) (emphasis supplied).

**Fact:** The referenced deposition passage from Officer Jones says absolutely nothing about Sergeant Davis, much less Davis having compiled records. Even if, post-incident, Davis had compiled some record(s), no relevant conclusion would follow.

Aside from that, "Sheriff's Office records from prior bookings relating to

Mrs. Ariail ... show that Mrs. Ariail was not identified as a suicide risk during prior incarcerations at the Paulding County Jail." V1-176 (Affidavit of Chad Hunton at ¶14).

### Misrepresentation 2

**Plaintiff claims:** "Capes also allowed Ariail to keep her tank top **in violation of jail policy**, which required "all clothing" to be taken from detainees upon admittance." *Plaintiff's Brief* at 7-8 (item 9, citing (R 297) (emphasis supplied).

**Fact:** As Officer Capes pointed out to Plaintiff's counsel in her deposition (after Plaintiff's counsel tried to deceive her), in fact the jail policy permitted inmates to keep their white underwear as long as it did not have wire in it. *Id.* (Capes Dep. at 24); V1-319-20 (Davis Dep. at 36, 38). Ariail's tank top had no wire and functioned as a bra. V1-297 (Capes Dep. at 26). Officer Capes quoted the policy that Plaintiff's counsel attempted to misconstrue. V1-308 (Exhibit 29, Policy 1.10):

> Capes: "The inmate's underwear is to be returned to the inmate after
>
> inspection if it is white and contains no wire." So not all clothing needs
>
> to be taken.
>
> **Plaintiff's counsel: Right, and I'm glad you made that**

**clarification 'cause you're absolutely right about that.** So what this says is all clothing's got to be removed when the uniform is put on the inmate, but the inmate's underwear is to be returned to the inmate after inspection if it is white and contains no wire, right?

Capes: Correct, from the policy.

V1-297 (Capes Dep. at 24) (emphases supplied).

So, Plaintiff has absolutely no basis to claim some confusion or mistake. The only possible option is that Plaintiff has deliberately attempted to mislead the Court, just as she did in the trial court.

### Misrepresentation 3

**Plaintiff claims:** "Arresting officers are required to complete a jail screening form **at the time of booking**, and this report must be filled out completely and accurately by the arresting officer **and the book-in officer (here, Capes)** …" *Plaintiff's Brief* at 8 (item 10; citing R-706-707 (Jones Dep. at 22-23); emphases supplied).

**Fact:** In fact, Jones testified **"It's a medical sheet that the arresting officer fills out** prior to the inmate coming in."  V1-706 (Jones Dep. at 22:16-17). About a minute later, Jones explained "The initial screening, **the arresting officer is the one that does the screening, sir."** V1-707 (Jones Dep. at 23:15-16). Jones

agreed that a detention officer is supposed to make sure the form is completed *by the arresting officer*. That was done in this case. Booking is a separate process, and booking was never done with Ariail. V1-294-98 (Capes Dep. at 12, 17-18, 27); V1-374 (Richardson Dep. at 18).

### Misrepresentation 4

**Plaintiff claims:** "An inmate is not to be admitted into the custody of the jail until the "inmate's condition has been evaluated, verified, and deemed fit for incarceration." **This includes whether the inmate has mental health issues, whether they are on any drugs, and whether they are intoxicated, and if so the level of intoxication**. *Plaintiff's Brief* at 8-9 (item 11; citing R-708-709 (Jones Dep. at 24-25; emphasis supplied)).

**Fact:** The cited testimony reflects the policy language quoted in the first sentence, but the second sentence is completely unsupported. Officer Jones simply agreed that upon an inmate's entry to the facility *he* would "want to know what kind of mental health issues the inmate may have, whether they're on any drugs that could present a problem, anything like that, right?" V1-709 (Jones Dep. at 25).[1] Contrary to Plaintiff's claim, the record does not support that some type of suicide or mental health evaluation is required to be done by a jail officer right

---

[1] Defendant Jones answered questions truthfully to the best of his capability, but he is not a policymaker for the Sheriff's Office.

when an inmate enters the facility. In fact, the record says the opposite. That type of screening is to be done at booking, and Ariail never went through jail's booking process, but rather stayed in a holding cell until discovery of her body. V1-318, 326 (Davis Dep. at 30, 63); V1-294-98 (Capes Dep. at 12, 17-18, 27); V1-374 (Richardson Dep. at 18); V1-358 (Hannah Dep. at 35).

### Misrepresentation 5

**Plaintiff claims:** "Davis did not look into whether Ariail had prior suicide attempts **even though she had access to this information and that is the type of information they are supposed to access at the time of booking**. *Plaintiff's Brief* at 9 (item 12; citing R-317, 325; emphasis supplied)).

**Fact:** First, Sergeant Davis was a shift supervisor, and she had no responsibilities about booking or for looking into any given arrestee's background. Second, her testimony cited by Plaintiff is that "book-out officers" were **not** required to investigate prior arrests or suicide attempts, but could if they wanted to. V1-317 (Davis Dep. at 27:21-25 – 28:1-7). Otherwise, the cited testimony reflects that some unspecified officer ordinarily "checked for outstanding charges and review[ed] local warrants and information on GCIC/NCIC … by running a rap sheet on that person." Ariail's GCIC/NCIC criminal background has no relevance to this case, and certainly would not show prior alleged suicide attempts.

## Misrepresentation 6

**Plaintiff claims:** Jail officers are not allowed to take inmates' answers to suicide related questions at face value and are instead required to actively look into the issue, including looking into whether there has been "prior mental health treatment/hospitalization." *Plaintiff's Brief* at 9 (item 12, citing R731-733).

**Fact:** The cited testimony relates to the initial form filled out by the **arresting officer,** which is then provided to jail staff. V1-730-31 (Jones Dep. at 46-47). This is **not** the booking process. Booking officers had no responsibility regarding this form. Officer Jones testified:

Q. And in terms of the staff at the jail who would be responsible for performing this function, would that be the booking officer, typically?

A. **When they get booked in**, yes, sir. They'll ask them a multitude of questions, and all this is covered in there once they've been booked in.

V1-733 (Jones Dep. at 49:13-18).

No officer booked Ariail because she came in near the end of a shift, and then hanged herself on the next shift before booking was initiated. V1-318, 326 (Davis Dep. at 30, 63); V1-294-98 (Capes Dep. at 12, 17-18, 27); V1-374 (Richardson Dep. at 18); V1-358 (Hannah Dep. at 35).

## II. ARGUMENT AND CITATION TO AUTHORITIES

The trial court granted summary judgment on one of numerous grounds raised by these Defendants. Each of those grounds is sufficient for summary judgment and therefore asserted here under the "right for any reason" rule.

## 1. ARIAL'S SUICIDE IS THE SOLE PROXIMATE CAUSE OF HER INJURY AND DEATH

The trial court ruled that no jail officer proximately caused the suicide. That ruling is well-founded and dispositive.

### A. Defendants Were Not the Cause in Fact of Suicide

Plaintiff's primary contention is that some officer(s) was responsible to check Ariail every 15 minutes rather than every 30 minutes. That is inaccurate, but also beside the point because lack of a 15-minute check did not cause Ariail to take her own life. Just as this Court found in *Harvey v. Nichols*:

> [T]here was no evidence that [Ariail's] suicide was a probable consequence of the detention officers' failure to monitor [her] cell. … Nothing about [her] behavior suggested anything out of the ordinary or that [she] might be a danger to [herself]. [Ariail] was not placed on suicide watch. Nothing in the record … suggests that, if [a 15-minute] surveillance protocol had been followed, [Ariail] would not have been

> able to take [her] own life. Any assertion that [Ariail's] attempt at suicide would have been unsuccessful if procedure had been followed is pure speculation.

*Harvey v. Nichols*, 260 Ga.App. 187, 193–94, 581 S.E.2d 272, 278 (2003), disapproved on different ground, *City of Richmond Hill v. Maia*, 301 Ga. 257, 800 S.E.2d 573 (2017).

The trial court properly granted summary judgment on this ground. Plaintiff offers no basis to disturb the trial court's ruling.

**B.  Suicide Was the Sole Proximate Cause of Death as a Matter of Law**

**1.  Georgia Law Typically Bars Liability for Suicide**

Georgia's general rule in a death by suicide claim is that the suicide is the sole proximate cause of death, for which no third party can be liable. *See Maia*, 301 Ga. at 261 (dismissing suicide claim for lack of proximate causation); *Stevens v. Steadman*, 140 Ga. 680, 79 S.E. 564, 568 (1913); *Appling v. Jones*, 115 Ga.App. 301, 303, 154 S.E.2d 406, 408 (1967) ("[T]he practically unanimous rule is that [suicide] is a new and independent agency" that bars liability).

In *Maia*, the Supreme Court indicated that "Georgia courts have … deviated from the general rule that suicide absolves an alleged tortfeasor of liability in cases

involving a special relationship between the tortfeasor and decedent, such as where a tortfeasor owes the unusual duty to prevent the decedent from harm." *Maia*, 301 Ga. at 260. *Maia* points out that this Court recognized a "special relationship" in a few cases. *Maia* provides no detail about when this exception might arise, or its specific scope. As discussed below, no "special relationship" removes this case from the rule that Ariail's suicide was the sole proximate cause of her death.

### 2. Georgia Law Requires Knowledge of Suicide Risk Before Liability for Suicide Can Arise

No Georgia appellate court has ever applied a "special relationship" rule in the case of a jail suicide. However, the decision in *Thomas v. Williams*, 105 Ga.App. 321, 124 S.E.2d 409 (1962), is instructive. In *Thomas*, a non-suicide case, the Court ruled that jail officers could be liable where they negligently failed to save an inmate trapped in his cell during a fire. *Thomas*, 105 Ga.App. at 327. Usually there is no affirmative duty to save another from peril, but *Thomas* relaxed that rule because imprisonment rendered the inmate helpless against the fire and smoke inhalation. *Id*. Therefore, a duty to rescue arose. The Court explained:

In the performance of his duty to exercise ordinary diligence to keep his prisoner safe and free from harm, an officer having custody of a prisoner, *when he has knowledge of facts from which it might be concluded that*

> *the prisoner may harm himself* or others unless preclusive measures are taken, *must use reasonable care to prevent such harm*. In some circumstances reasonable care may require the officer to act affirmatively to fulfill this duty.

*Thomas*, 105 Ga.App. at 327 (emphasis supplied).

*Thomas* distinguished *Kendrick v. Adamson*, 51 Ga.App. 402, 180 S.E. 647, 648 (1935), where the Court held that jailers were *not liable* when a drunken inmate committed suicide by setting himself on fire. *Kendrick*, 180 S.E. at 648. *Kendrick* explains the basis for a "special relationship" as follows: "A sheriff owes to a prisoner placed in his custody a duty to keep the prisoner safely and free from harm, to render him medical aid when necessary, and to treat him humanely and refrain from oppressing him." *Id.; see Maia*, 301 Ga. at 261 (citing *Kendrick* for a "special relationship" concept). The self-inflicted harm in *Kendrick* did not fall within the "special relationship" exception. *Id.*

Together, *Kendrick* and *Thomas* explain when a "special relationship" exception can apply in a jail suicide case. *Kendrick* confirms that jailers normally *have no duty* to prevent self-inflicted harm. *Kendrick*, 180 S.E. at 648 (holding no liability where inmate set himself on fire). Whereas, *Thomas* indicates that a detention officer may have a limited duty to take precautions against suicide where

the officer has "knowledge of facts from which it might be concluded that the prisoner may harm [her]self." *Thomas*, 105 Ga.App. at 327.

In summary, if a jail officer is provided with credible information providing knowledge that an inmate poses a suicide risk, then the "special relationship" exception may be triggered. On the other hand, in the *absence* of knowledge that a detainee is suicidal, a jail officer has no duty to prevent suicide. *Kendrick*, 180 S.E. at 648 (holding no liability for inmate suicide).

Without knowledge of suicide risk, Georgia's normal proximate causation rule applies, *i.e.*, suicide is the sole proximate cause of harm. *See Maia*, 301 Ga. at 261. That is why a drunken inmate who sets himself on fire is the sole proximate cause of his own death, where there was no knowledge that he was a suicide risk. *Kendrick*, 180 S.E. at 648.

### 3. Other Jurisdictions Require Knowledge of Information About Suicide Risk Before Liability for Suicide Can Arise

Other jurisdictions that allow jail suicide claims require knowledge of information about suicide risk before a jailer can be found liable for the prisoner suicide. For example, the Florida case of *Guice v. Enfinger* involved an intoxicated inmate confined in the jail sick bay; hours later an officer discovered that he had hanged himself with his belt. *Guice v. Enfinger*, 389 So. 2d 270 (Fla.App. 1980).

The court concluded that the "suicide was not sufficiently foreseeable to impose upon the Sheriff's employees the duty to remove the deceased's belt," finding "no facts in the record to indicate that the deceased had suicidal tendencies and no facts to indicate that the booking officer at the jail should have been suspicious of suicidal tendencies of the deceased." *Guice,* 389 So.2d at 271.[2]

Likewise, federal case law requires an officer to have knowledge of information indicating a "strong likelihood" of suicide before liability can be imposed. *See Jackson v. West*, 787 F.3d 1345, 1354 (11th Cir. 2015) (reversing denial of summary judgment where "officers [lacked] subjective knowledge of a strong risk that [decedent] would attempt suicide"). There is no federal claim asserted in this case, but the federal approach conforms to the usual rule that a defendant who lacks credible knowledge of a suicide risk cannot be liable.

### 4. Defendants Had No Information that Ariail Posed a Suicide Risk

The trial court correctly found, and the record is undisputed, that no defendant had information that Ariail was at risk for suicide. V1-1250. In the

_____

[2] Alabama follows the same basic approach. *See City of Crossville v. Haynes*, 925 So. 2d 944, 951 (Ala. 2005) (vacating jury verdict where suicide was unforeseeable due to lack of information regarding suicide risk).

absence of information indicating an inmate poses a suicide risk, Georgia's general proximate causation rule applies and there is no liability for suicide. *Appling v. Jones,* 115 Ga.App. 301, 303, 154 S.E.2d 406, 408 (1967); *Kendrick v. Adamson*, 51 Ga.App. 402, 180 S.E. 647, 648 (1935). That rule mandates summary judgment in this case. Because no Defendant had information that Ariail posed a suicide risk, Ariail's voluntary act of suicide was the sole proximate cause of her injury and death as a matter of law.

### 5.  The Intoxication Policy Did Not Raise a "Special Relationship" or Duty to Prevent Suicide

Plaintiff argues that Ariail was under the influence of intoxicants and thus jail Policy 3.8 II(c) required in-person surveillance at least every 15 minutes. As detailed in § II(B)(2) below, the policy did not require that. Even if it did, Plaintiff ignores that neither Ariail's intoxication nor a policy about intoxication had anything to do with *suicide prevention.* A "special relationship" raising a duty for reasonable measures *to prevent suicide* is triggered only when *suicide* is a known risk. Ariail's minor intoxication did not reveal a risk for suicide. Intoxication did not raise the type of "special relationship" required to trigger a duty to prevent suicide.

### C. Litigation Expenses and Punitive Damages Are Not Recoverable

Plaintiff asserts that the record would allow a jury to find bad faith or stubborn litigiousness and award litigation expenses, and also punitive damages. That is wrong. At most this is a negligence case with disputed liability and damages. "[W]here a *bona fide* controversy clearly exists between the parties, the defendant is entitled to judgment as a matter of law on the plaintiff's claim for attorney fees and expenses of litigation based on stubborn litigiousness or the causing of unnecessary trouble and expense." *Horton v. Dennis,* 325 Ga.App. 212, 217, 750 S.E.2d 493, 497–98 (2013).

As for punitive damages, there is no clear and convincing evidence that would support a jury finding under OCGA § 51-12-5.1(b).

## 2. SUMMARY JUDGMENT SHOULD BE AFFIRMED ON OTHER INDEPENDENT GROUNDS

"The dismissal of a complaint will be affirmed if right for any reason." *Walker Cty. v. Tri-State Crematory*, 292 Ga.App. 411, 412, 664 S.E.2d 788, 790 (2008). Here, there are sufficient alternative reasons for the Court to affirm summary judgment.

A. **ASSUMPTION OF RISK AND COMPARATIVE FAULT REQUIRE SUMMARY JUDGMENT**

1. **The Trial Court Improperly Declined to Find Assumption of Risk and Comparative Fault**

The trial court declined to apply assumption of the risk and comparative negligence, even though Georgia law codifies those doctrines by statute. OCGA § 51-11-7 ("If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover."); OCGA § 51-12-33 (requiring decedent's fault to be apportioned). There is no legislative exception for suicide cases, and no legal basis for a court to ignore these statutes.

The trial court seemed troubled by the difficulty in reconciling Georgia's allowance of recovery for suicide in some cases, with the fact that suicide inherently involves voluntary action resulting in harm. There are two solutions to that dilemma, but only one that makes sense and is faithful to Georgia law.

The first solution, and the only one that is faithful to Georgia law while also allowing recovery for suicide in some cases, involves a requirement that the plaintiff prove the decedent was compelled to suicide by mental disorder, thereby eliminating the decedent's responsibility for comparative fault and/or assumption of the risk. Some suicides involve psychological or drug-induced brain disorder

that arguably removes freedom of choice from the suicidal person. In such a case, assumption of risk and comparative fault may make little sense because their fundamental basis—personal responsibility for voluntary choices and self-protection—does not exist. And in such a case, it is reasonable to impose liability upon a defendant who undertakes responsibility to care for and protect the person *from suicide* if the defendant negligently discharges that responsibility.

This rationale explains the psychological care cases involving suicide, because a medical professional or facility may have a responsibility to protect a suicidal patient from suicide. *See Peterson v. Reeves*, 315 Ga.App. 370, 375, 727 S.E.2d 171, 175 (2012); *Brandvain v. Ridgeview Inst., Inc.*, 188 Ga.App. 106, 116, 372 S.E.2d 265, 273–74 (1988), *aff'd,* 259 Ga. 376, 382 S.E.2d 597 (1989). This rationale also accounts for the "special duty" that may arise in a jail setting when jailers are aware that an inmate poses a strong risk for suicide. *See Maia*, 301 Ga. at 261.

The rule in Georgia should be that assumption of risk and comparative fault are available defenses in suicide cases, subject to rebuttal if the plaintiff presents competent evidence that the decedent's choice about suicide was no real choice at

all.[3] The plaintiff's rebuttal to these defenses might involve expert testimony, as well as evidence about the circumstances of the decedent and the suicide.

There is a second "solution" to the dilemma. The trial court's solution was to do away with one horn of the dilemma. The trial court decided that OCGA §§ 51-11-7 and 51-12-33 could be ignored. That is no solution at all. However, given the unsettled nature of the law in this area, it is no wonder that the trial court was hesitant to take a more nuanced approach.

Here, the evidence is that Ariail had mental and volitional competency that made her responsible for her actions. Plaintiff offered no evidence to the contrary. Therefore, as discussed next, assumption of the risk and comparative fault bar liability.

---

[3]    This would be similar to the insanity defense in criminal cases, where the law removes criminal responsibility due to brain dysfunction. In Georgia, a criminal defendant is not criminally liable if s/he "did not have mental capacity to distinguish between right and wrong in relation to the criminal act or acted because of a delusional compulsion which overmastered his will to resist committing the crime." *Durrence v. State*, 287 Ga. 213, 215, 695 S.E.2d 227, 229 (2010) (citing OCGA §§ 16–3–2, 16–3–3; *Foster v. State*, 283 Ga. 47, 48, 656 S.E.2d 838 (2008)). The criminal defendant bears the burden of proving insanity. *Id.*

### 2. Assumption of the Risk Bars the Claim

Ariail assumed the risk that hanging herself posed the likelihood of death, barring recovery in this action. "A person cannot undertake to do what is obviously a dangerous thing and at the same time avoid the responsibility for the self-assumed risk." *First Pacific Mgmt. Corp. v. O'Brien*, 184 Ga.App. 277, 281, 361 S.E.2d 261 (1987). In *Muldovan v. McEachern*, 271 Ga. 805, 523 S.E.2d 566 (1999), assumption of the risk barred recovery where a drunk adolescent was shot while playing "Russian Roulette." The elements of this defense are that decedent (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed herself to those risks. *Id.* at 808.

The only significant differences between this case and *Muldovan* are that Ariail intentionally harmed herself by hanging, as opposed to taking a risk of someone else pulling a trigger that might fire a fatal shot. That difference makes the assumption of the risk doctrine even more clear-cut than in *Muldovan*. Ariail knew that hanging could cause her death, and she took specific action to make that risk materialize. Consequently, the trial court's order should be affirmed based on Ariail's assumption of the risk.

### 3. Comparative Fault Bars the Claim

Similar to the assumption of the risk doctrine, comparative fault bars the

suicide claim. Ariail had the duty to avoid obvious risks of harm, and the law presumed she was able to appreciate and avoid obvious danger.

> That which a plaintiff may not do without barring [her]self from recovery is to accept a risk so obvious that taking it amounts to failure to exercise ordinary care for [her] own safety, or recklessly to test an observed and clearly obvious peril. A person cannot undertake to do an obviously dangerous thing without [her]self being guilty of such lack of due care for [her] own safety as to bar [her] from recovery if [she] is injured.

*Sewell v. Dixie Region Sports Car Club of America, Inc.*, 215 Ga.App. 611, 612-613, 451 S.E.2d 489, 491 (1994).

Here, Ariail breached her duties of self-preservation and reasonable care by concealing her intent to commit suicide and then hanging herself. She was at least 50% responsible for her injury and death, barring recovery under Georgia law. *See* OCGA § 51-11-7 ("If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover."); OCGA § 51-12-33 (requiring decedent's fault to be apportioned); *McReynolds v. Krebs*, 290 Ga. 850, 851, 725 S.E.2d 584, 586–87 (2012) (statute "prohibit[s] recovery where the plaintiff is 50 percent or more responsible for the

injury or damages claimed."); *Union Camp Corp. v. Helmy*, 258 Ga. 263, 267, 367 S.E.2d 796,799 – 800 (1988) (no recovery is available where plaintiff's fault equals or exceeds aggregate fault of defendants); *Union Carbide Corp. v. Holton*, 136 Ga.App. 726, 730-731, 222 S.E.2d 105, 109–110 (1975) ("every adult is presumed to possess such ordinary intelligence, judgment, and discretion as will enable [her] to appreciate obvious danger.").

The trial court's summary judgment should be affirmed based on Ariail's fault.

### B.   OFFICIAL IMMUNITY REQUIRES SUMMARY JUDGMENT

#### 1.   General Official Immunity Standards

"Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." *McDowell v. Smith*, 285 Ga. 592, 593, 678 S.E.2d 922 (2009) (citation and punctuation omitted); Ga. Const. Art. 1, § 2, ¶ IX (d).

A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them

in a way not specifically directed. Procedures or instructions adequate to
cause an act to become merely ministerial must be so clear, definite and
certain as merely to require the execution of a relatively simple, specific
duty.

*Banks v. Happoldt*, 271 Ga.App. 146, 149, 608 S.E.2d 741, 744 (2004) (quoting
*Happoldt v. Kutscher,* 256 Ga.App. 96, 98 (2002)). In the absence of specific
policies directing some simple function, the act in question is discretionary. *See,
e.g., Gish v. Thomas*, 302 Ga.App. 854, 860, 691 S.E.2d 900, 905 (2010) (holding
that officer had no ministerial duty where he "was never instructed to put his gun
in a certain location or to handcuff a prisoner in a certain way").

In this case, official immunity bars liability under two rationales. First, most
of Defendants' actions clearly fall into the category of discretionary conduct.[4]
Second, even if any alleged actions could be considered "ministerial" duties, they
were performed *without negligence* and did not proximately harm Ariail.[5]

[4]      The complaint does not allege that any defendant acted with actual
malice, and there is no evidence to support that high showing. Therefore, nothing
more needs to be said about actual malice. *Barnard v. Turner Cty.*, 306 Ga.App.
235, 237, 701 S.E.2d 859, 862 (2010) (holding that, where complaint did not allege
actual malice, only negligence was at issue).

[5]  Proximate causation is considered primarily in § II(1) above.

## 2. Ariail's Intoxication Did Not Trigger a 15-Minute Watch

The trial court read jail Policy 3.8 (II)(C) to say that Ariail was supposed to be on a 15-minute watch due to intoxication. V1-1250. That is a misinterpretation. Before discussing that point, however, it bears noting that the trial court's order incorporated the separate error of failing to distinguish between individual officers.

Specifically, the trial court erred by lumping all Defendants together in regard to a "duty" under the policy. The problem is that the five jail officers involved here worked on different shifts and had different jobs. There is no evidence that any Defendant specifically was tasked with putting Ariail on a 15-minute watch. The only Defendant ever assigned to check on Ariail was Defendant Hannah, and he was never told to check Ariail at 15-minute intervals.

Contrary to the trial court's idea, that an officer simply works at the jail does not mean that the jailer has responsibility for every job function or policy directive. In fact, the opposite has to be true—discrete responsibilities have to be allocated to particular officers for a given shift. That is how all functional organizations work.

Assuming for the sake of argument that the jail policy directed a 15-minute watch for Ariail, there is nothing in the record to show that any *Defendant* was responsible to put her on such a watch. Without a finding of individual responsibility, no Defendant had a "ministerial duty" regarding a 15-minute watch. Put differently, even if the policy required a 15-minute watch, it does not follow

that any specific Defendant was responsible to initiate or perform a 15-minute watch regarding Ariail. Some other jailer may have been responsible, but not any Defendant before the Court.

Turning to what the policy actually required, Policy 3.8 (II)(C) says that "Inmates who are suicidal, assaultive, escape risks, mentally/emotionally disordered, or recovering from intoxicants shall receive in-person surveillance of at least every 15 minutes." V1-183. Colonel Hunton's affidavit explains that jail policy never mandated every single intoxicated inmate to be on a 15-minute watch. Sometimes such a watch was required, depending on intoxication level or other circumstances.

"[J]ail officers have never been trained that every detainee under the influence of alcohol and/or drugs must be placed on a 15-minute watch." V1-175 (Hunton Aff. ¶9). *Some* detainees recovering from intoxicants are in danger and should be put on a 15-minute watch, and that is the category of intoxicated detainees referenced in Policy 3.8 (II)(C). "Whether a 15-minute watch is appropriate must be based on information provided to the officer who decides, in that officer's judgment, whether a 15-minute watch should be started." V1-174 (Hunton Aff. ¶10). That is, officers have *discretion* whether to place an intoxicated detainee on a 15-minute watch. *Id*. That type of decision called for judgment and discretion, so it is *not* a "ministerial" duty.

Most intoxicated detainees are not in the type of danger contemplated by Policy 3.8 (II)(C), including Mrs. Ariail. Ariail manifestly was fully functional, though not fit to drive a motor vehicle. V1-271-72 (Darr Dep. at 64-65, 68); Hiram Video 767 at 8:50 *et seq*. Therefore, "Policy 3.8 II (c) did not require a 15-minute watch for Mrs. Arial under the circumstances evident from video." V1-176 (Hunton Aff. ¶12).

The trial court simply read too much into guidelines written by and for non-lawyers. Jail policies are not designed for lawyers and litigation, but rather they are designed to guide officers about the many aspects involved in running an incarceration facility full of inmates. Consequently, the only authoritative construction of jail rules can come from officers who write, train and implement them. Indeed, it would be unjust and irrational to hold any officer responsible for a construction of Policy 3.8 (II)(C) that was never adopted, taught or implemented at the jail. *See Gish v. Thomas*, 302 Ga.App. 854, 860, 691 S.E.2d 900, 905 (2010) (granting official immunity where officer "was never instructed to put his gun in a certain location or to handcuff a prisoner in a certain way").

The last point about a 15-minute watch is that there is no evidence that such a watch would have prevented the suicide. Mrs. Ariail hanged herself from a partition in an area of the cell that was not observable from the flap that Officer Hannah used to check the cell. As explained above in § II(1), "there [is] no

evidence that [Mrs. Ariail's] suicide was a probable consequence of [alleged] failure to monitor [her] cell." *Harvey v. Nichols*, 260 Ga.App. 187, 193, 581 S.E.2d 272, 278 (2003). Therefore, summary judgment should be affirmed.

### 3.      The Screening Form Is Not a Basis for Liability

In the trial court Plaintiff argued that Sergeant Davis had and breached a duty to complete Officer Darr's screening form "fully and accurately." The facts are that (1) Sergeant Davis's part of the form consisted of only two questions at the bottom, and (2) Davis completed her part of the form "fully and accurately." See V1-348 (form filled out relating to Ariail). Nothing on the form suggested Ariail was a suicide risk. Likewise, any claimed defect in filling out the form was due to Officer Darr, and had no logical relationship to Ariail's suicide. *La Quinta Inns, Inc. v. Leech*, 289 Ga.App. 812, 817, 658 S.E.2d 637, 641 (2008) ("There is no evidence that [decedent's] suicide was triggered by anything [defendants] did or failed to do.").

### 4.      Jail Policy Permitted Ariail to Keep Her Tank Top

In the trial court Plaintiff asserted that Sergeant Davis and Officer Capes had and breached a duty to remove Mrs. Ariail's tank top shirt. Sergeant Davis was not personally involved with Ariail, so she had no responsibility for Arial's clothing.

As for Officer Capes, she followed the policy that says "The inmate's underwear is to be returned to the inmate after inspection if it is white and contains

no wire." V1-297-98, 308 (Capes Dep. at 24-26 & Exhibit 29, policy 1.10). The tank top was white, had no wire, and functioned as a bra. The policy *required* Capes to return the shirt. Plaintiff attempts to deceive the Court by claiming otherwise. *Plaintiff's Brief* at 7-8.

### 5. Officer Hannah Completed 30-Minute Staggered Checks

Officer Hannah assumed his duties at shift change. Hannah had no information that Mrs. Arial was at risk for suicide, and she was not on any type of special watch. V1-353, 359 (Hannah Dep. at 16-17, 38, 40). Hannah's responsibility regarding Ariail solely involved checking her cell at staggered 30-minute intervals. He completed those checks while Mrs. Ariail was still alive. V1-354, 359, 913 (Hannah Dep. at 18, 41 & Exhibit 22, reflecting checks at 6:42, 7:30, 7:41 and 8:00 a.m.). It follows that official immunity bars Plaintiff's claim against Officer Hannah, since he did not breach any duty relating to cell checks.

### 6. Summary

The record does not support that any of these officers breached a ministerial duty to prevent Mrs. Ariail's suicide. Consequently, official immunity bars Plaintiff's claims.

### C. PLAINTIFF LACKS STANDING FOR A WRONGFUL DEATH CLAIM

"A plaintiff must demonstrate standing separately for each form of relief

sought. This is because the question of standing is a jurisdictional issue." *Williams v. DeKalb Cty.*, 308 Ga. 265, 271, 840 S.E.2d 423, 429 (2020) (internal quotations and citations omitted). Defendants presented evidence—in the form of the decedent's own words on the day of her death—that she was married. Darr video 767 (referencing husband's efforts to fix car); Darr video 766 at 10:40 ("can I call my husband to come get me?"); Darr video 766 at 26:24 ("can I please call my husband to come and get my car? … please call him to come and get my car."). On that basis Defendants moved for summary judgment based on Plaintiff's lack of standing to pursue a wrongful death claim.

Plaintiff is Ariail's daughter, not Ariail's surviving spouse. Plaintiff failed to produce a shred of evidence that Ariail's marriage was dissolved, and she failed to present any evidence about the whereabouts or intentions of the proper party spouse. It follows that the trial court was required to dismiss Plaintiff's wrongful death claim for lack of standing. O.C.G.A. § 51-4-2(a); *Brown v. Liberty Oil & Refining Corp.*, 261 Ga. 214, 214–215(1), 403 S.E.2d 806 (1991) ("[T]he statute confers exclusive standing upon the surviving spouse."); *Auto Doors, Inc. of Georgia v. Zivoluba*, 277 Ga.App. 288, 289, 626 S.E.2d 256, 257 (2006) (dismissing wrongful death action because plaintiff lacked standing).

The trial court dispensed with Plaintiff's burden, even though Defendants challenged standing and presented evidence for their argument. V1-1248. The

court found that "a putative husband cannot be located," even though there is no evidence that anyone tried to locate him. *Id*. The trial court declined to dismiss, asserting that Plaintiff had no burden to present evidence and the surviving spouse abandoned the claim. Both rulings were error.

Where a movant challenges standing and presents evidence that the plaintiff is not the proper party, the plaintiff bears the burden to present evidence that at least raises a fact issue. *See Dept. of Human Res. v. Allison*, 276 Ga. 175, 178, 575 S.E.2d 876 (2003) (holding that where standing is disputed, the litigant claiming standing has the burden of proving it). And, absent evidence that a surviving spouse has actually abandoned or declined to pursue a claim, there is no basis for a trial court to disregard the wrongful death statute.

Here, Plaintiff did "not contend or offer evidence to the effect that some external circumstance prevented the [surviving spouse] from exercising his right to bring an action concerning [Ariail's] death. Thus there is nothing in the record ... to obviate the consequences of the [spouse's] failure to pursue such an action ... ." *King v. Goodwin*, 277 Ga.App. 188, 190, 626 S.E.2d 165, 167 (2006). Accordingly, the summary judgment order should be affirmed as to the wrongful death claim because Plaintiff lacks standing.

## CONCLUSION

The trial court properly granted summary judgment to these Defendants. Appellants' arguments are meritless and the trial court's judgment should be affirmed on the grounds detailed in this Brief.

## WORD COUNT CERTIFICATION

This submission does not exceed the word count limit imposed by Rule 24, according to a word count by commercial software and excluding characters like page numbers.

Respectfully submitted,

        WILLIAMS, MORRIS & WAYMIRE, LLC

        /s/ *Jason Waymire*
        JASON WAYMIRE
        Georgia Bar No. 742602
        TERRY E. WILLIAMS
        Georgia Bar No. 764330
        Attorneys for Appellees

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
T: 678-541-0790
F: 678-541-0789
terry@wmwlaw.com
jason@wmwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing

**BRIEF OF APPELLEES JONES, CAPES, DAVIS, RICHARDSON AND**

**HANNAH** upon all parties electronically, through the Court's electronic service system

and separately to the e-mail addresses as follows:

J. Wayne Pierce
2700 N. Berkeley Lake Road Suite 200
Duluth, GA 30096 770-817-8500 piercejwayne@p-dlaw.com

Kyle J. White
P.O. Box 1346
Anderson, SC 29622
kyle@wdwlawfirm.com

Harvey S. Gray
Alex Joseph
950 East Paces Ferry Road, NE
Suite 1700 – Salesforce Tower Atlanta Atlanta, GA 30326

hgray@grsmb.com
ajoseph@grsmb.com

I certify that there is a prior agreement with Mr. Pierce (counsel for Plaintiff) and

Mr. Gray (counsel for Defendants Darr and City of Hiram) to allow documents in a .pdf

format sent via email to suffice for service.

This May 25, 2021.

/s/ *Jason Waymire*
JASON C. WAYMIRE