IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EZRA SMITH,

     Plaintiff,

v.

DEPUTY MONIQUE TRACEY, *et al.*,

    Defendants.

Civil Action No.:

1:24-cv-05158-TWT

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT TRACEY'S MOTION FOR SUMMARY JUDGMENT

"Be a man about it."
"Don't talk about it. Be about it. Fucking do it."
"Kill yourself."

These were Defendant Tracey's words to a desperate inmate whom she knew to be suicidal. After badgering Plaintiff to kill himself, Defendant Tracey left Plaintiff alone in his cell for five minutes. That gave Plaintiff all the time he needed to wrap a telephone cord around his neck, drop his weight to the floor, and strangle himself.

Minutes after Tracey walked away, Plaintiff, who had been screaming and slamming his head against his cell door, went silent. For three minutes, there was no movement in his cell, and no movement on the video feed from Plaintiff's cell that Tracey claims she was watching. After three minutes of silence, Defendant

1

Tracey walked from her desk to Plaintiff's cell and found him with a phone cord around his neck, unconscious, bleeding from the nose, and soaked in urine. Plaintiff ultimately survived that suicide attempt, but still lives with the physical and mental trauma of that day.

Defendant Tracey now asks this Court to hold that she responded reasonably to Plaintiff's mental health crisis by encouraging him to kill himself. Defendant Tracey's conduct was unconscionable and her arguments are unavailing. She ignores binding precedent, distorts the standard of review, and argues as if this case were before a jury at trial rather than before the Court at summary judgment. For the reasons set forth below, her motion for summary judgment should be denied.

## I.    STATEMENT OF FACTS

On July 6, 2024, Plaintiff was released from a psychiatric hospital after being treated for suicidal ideations. Smith Dep. 92:17. Two days later, he was transported to the Rockdale County Jail to be detained for a for a probation violation. Pittman George Dep. 27:13–28:5. After arrived at the jail, Plaintiff was being held in a booking cell with 9 to 10 other detainees. Tracey Dep. 58:19-23; Gomez Dep. 29:18-21. There were three detention officers on duty in the booking area: Defendants Gomez, Tracey, and Jackson. Jackson Dep. 58:24–59:8; Tracey Dep. 39:6-15; Gomez Dep. 21:23-25.

### a.    Initial suicide warning from inmates

While Plaintiff was held in the holding cell, he was thinking about committing suicide and talked about it with the other inmates in his cell. Smith Dep. 77:19–78:1; 79:2–7. Specifically, Plaintiff told the other inmates that he planned to kill himself in front of his wife. Doc. 89-1, Declaration of Ezra Smith ("Smith Decl.") ¶¶ 5-6. Although Plaintiff often joked about committing suicide, he only did so because he was actively considering committing suicide. Smith Dep. 79:2–4; 84:16–23; 103:15–104:16. Although Plaintiff told the other inmates that he was joking about killing himself in front of his wife, one of the inmates decided to tell detention officers about Plaintiff's statements. Smith Dep. 78:7–10, 85:17–25. As a result, some of the detainees called out on the intercom that, "He's going to kill himself. This white guy says he's going to kill himself." Tracey Dep. 57:17-21, 58:19-25, 59:9-20; Jackson Dep. 70:11–16, 71:19–21.

Defendants Jackson and Tracey heard the call over the intercom. Jackson Dep. 72:19–22. Defendant Jackson falsely claims that after the initial suicide report, they checked on the booking cell and Plaintiff and others were laughing. Jackson Dep. 71:25–72:7. Defendant Jackson also falsely claims that, after the initial report that Plaintiff was suicidal, Plaintiff was laughing and joking. Jackson Dep. 81:13–23.  14. In reality, neither Defendant Jackson nor any other detention

officer went to the cell to check on Plaintiff. See generally Doc. 89-6, Ezra Smith Booking Area 07-09-2024.mp4. Neither Defendant Tracey nor Jackson approached the booking cell; they both stayed on their platform. Tracey Dep. 60:11-25. Plaintiff never told any of the officers that he was joking. Smith Decl. ¶ 7.

Under RCSO policy, when when an inmate threatens suicide, officers cannot decide whether it is a legitimate, sincere threat of suicide that the deputy is to immediately take that threat and escalate it to a mental health professional on duty. Doc. 89-10 at 1:19:03–1:19:47; Tracey Dep. 26:2-13; Doc. 74-1. Then, either an officer or medical professional initiates the jail's suicide prevention protocols. Doc. 89-11 at 00:50:33. *See also* Doc. 74-1; Tracey Dep. 24:15-23.

As part of her duties as a detention deputy at RCSO, Defendant Tracey received annual training on suicide protocols and intervention. Tracey Dep. 19:12-20. Defendant Tracey was also trained on RCSO General Order 5.22. Tracey Dep. 23:23–24:14. Defendant Tracey also received training on suicide intervention and prevention, Defendant Tracey and other RCSO detention deputies would role play intervention, which included methods to restrain the detainee, dress them in the appropriate gear, shower them, take them to see a nurse, and then place them in a padded suicide prevention cell. Tracey Dep. 20:20–21:5.

**b.     Call from Plaintiff's mother**

After the report that Plaintiff was suicidal from other inmates, Plaintiff's mother called the jail and spoke to Defendant Tracey. Tracey Dep. 50:15–51:9, 59:1-4. Defendant Tracey put Plaintiff's mother's call on speaker phone in the booking area. Tracey Dep. 52:6-7.  Plaintiff's mother told Defendant Tracey that her son was just released from a crisis center because of his suicidal behavior and that he "didn't feel like he had a reason to go on." Pittman George Dep. 37:15–38:8. Plaintiff's mother told Defendant Tracey she was worried about Plaintiff and gave her the backdrop on everything that had happened with Plaintiff's wife leaving him and his suicidal ideations. Pittman George Dep. 35:23–36:12, 37:15-23. Plaintiff's mother also told Defendant Tracey she was "worried about" Plaintiff and asked Defendant Tracey to look out for him because it was possible he could hurt himself. Pittman George Dep. 36:7-12. In response, Defendant Tracey told Ms. Pittman George that she would look out for Plaintiff. Pittman George Dep. 37:15-23. After that call, Defendant Tracey did not notify any medical professional that Plaintiff was suicidal, nor did she initiate the suicide prevention protocol.

### c.    Plaintiff is left alone in the cell

At about 1:00 a.m., all other inmates in the holding cell had been processed and Plaintiff was the only one who remained in the cell. Jackson Dep. 74:16–19; Gomez Dep. 80:13–23. After other inmates were removed from Cell 7, Defendants

Tracey and Jackson got to a final folder for processing—Plaintiff's blue folder. Tracey Dep. 39:21-40:24.  Defendant Tracey asked Defendant Jackson whose folder it was, to which Defendant Jackson replied, "I'm not doing that folder." Tracey Dep. 40:10-17. According to Defendant Tracey, the folder was being moved from table to table. Tracey Dep. 53:24-25. Defendant Jackson told Defendant Tracey that Plaintiff was "a prick. He can stay there." Tracey Dep. 40:18-24. Jackson told Defendant Tracey to just leave the folder, that it was "that prick's folder," that Plaintiff was a "white privilege prick." Tracey Dep. 54:1–55:1. Defendant Jackson told Defendant Tracey that Plaintiff had previously "showed out in court," Tracey Dep. 40:18-24, and that Plaintiff "got in front of the Court and started acting stupid." Tracey Dep. 54:4-7. Defendant Jackson told Defendant Tracey to leave Plaintiff in the cell, to "forget him." Tracey Dep. 46:4-11.

Plaintiff became increasingly depressed after he was left alone in the holding cell. Smith Dep. 45:19–25. Once alone, Plaintiff started banging on his cell door. Jackson Dep. 75:9–12; Tracey Dep. 40:25-41-7. Defendants Tracey, Jackson, and Gomez could each hear Plaintiff banging and mule kicking the door. Tracey Dep. 49:4-13. Plaintiff then started to kick the cell door to get the officers' attention. Smith Dep. 46:10–13.

During this time, Defendant Tracey knew there was a phone with a cord in Cell 7. Tracey Dep. 84:17–85:14. And the phone cord is long enough to wrap around a person's neck. Doc. 89-9, Jackson Body Camera at 00:00:34. Meanwhile, Plaintiff was kicking and repeating "I'm going to kill myself" and "let me out." Tracey Dep. 49:17–50:6. In response, Defendant Jackson told Defendant Tracey that Plaintiff could "bang all night. He can do it all night." Tracey Dep. 41:1-7.

Defendant Jackson told Defendant Tracey, referring to Plaintiff, that "All he's going to do is cry 52. I'm not dealing with him." Tracey Dep. 57:7-15. "52" refers to the code for suicide. Tracey Dep. 60:4-10; Gomez Dep. 18:7-9. Again, Defendant Tracey did not initiate any suicide prevention protocol or notify any medical professional that Plaintiff was suicidal.

### d.    Tracey urges Plaintiff to kill himself

After Plaintiff had been kicking his cell door and banging his head against the door, Defendant Tracey approached the holding cell. Smith Dep. 46:10–13. Plaintiff asked Defendant Tracey why he was the only person in the cell who hadn't been processed and asked if he could make a phone call. Smith Dep. 47:9–14. Defendant Tracey told Plaintiff not to kick the door and then told Plaintiff she had spoken with Plaintiff's mother. Smith Dep. 47:25–48:12. Defendant Tracey insinuated and gestured to Plaintiff that his mother was crazy. Smith Dep. 48:11–

25. Defendant Tracey also told Plaintiff to take the number of hours he had been in Cell 7 and double it and that's how long he'd have to sit in booking before being processed. Smith Dep. 52:17–53:7.

Defendant Tracey then told Plaintiff that he was a "piece of shit," told him to kill himself multiple times, and gestured that he should hang himself. Smith Dep. 48:11–25; Doc. 89-2 ¶ 7 to Defendant Gomez's First Set of Interrogatories. At about 1:28 a.m., Defendant Tracey gestured that Plaintiff should hang himself and told him to commit suicide. Doc. 89-6, Ezra Smith Booking Area 07-09-2024.mp4 at 01:28:41; Smith Dep. 55:2–8. At that point, Defendant Tracey knew that Plaintiff had stated that he was suicidal. Smith Dep. 49:1–3.

### e. Plaintiff again reports he is suicidal

After Defendant Tracey left the cell door, Plaintiff used the intercom to speak with a female officer at the booking desk. Smith Dep. 57:7–58:9, 58:23–59:17. Plaintiff knew that he spoke with a female officer, and that the officer was not Defendant Tracey. Smith Dep. 57:7–58:9, 58:23–59:17. Defendant Gomez is a male officer. Jackson Dep. 59:25–60:2. The only other female officer on duty was Defendant Jackson. Gomez Dep. 25:15-21. Plaintiff told Defendant Jackson that he was suicidal. Smith Dep. 57:7–58:9; 58:23–59:17. Defendant Tracey told Defendant Jackson to tell Plaintiff to kill himself and then told Defendant Jackson

8

to hang up the intercom. Smith Dep. 57:7–58:9; 58:23–59:17. Defendant Jackson hung up the intercom. Smith Dep. 57:7–58:9; 58:23–59:17.

Defendants Tracey and Jackson then stopped answering the intercom, and Plaintiff began hitting his head against the cell door and then the cell wall. Smith Dep. 59:10–17; 61:23–62:2. When Plaintiff started banging on the glass with his head, Defendant Tracey said, "Oh, my God. He's doing it with his head." Tracey Dep. 49:6-13. Defendant Jackson or Gomez responded "He's got a hard head. He's fine." Tracey Dep. 49:12-21.

### f. Plaintiff attempts suicide

Minutes after Defendant Tracey urged Plaintiff to kill himself, Plaintiff stopped hitting his head against the cell wall, he took the phone cord in the cell, wrapped it around his neck, lowered his body, and hung himself. Smith Dep. 62:17–25. The video feed from the holding cell shows Plaintiff wrapping the telephone around his neck, then his head and body move off-screen until only his prone legs and feet can be seen. Doc. 89-6, Holding Cell Video 01:31:13–01:31:46. After Defendant Tracey no longer heard any noise from Plaintiff she to check inside the cell. Tracey Dep. 41:15-17.

When Defendant Sanchez responded to Plaintiff's suicide attempt, she observed that Plaintiff had turned blue and that he didn't have a pulse. His nose

was bleeding and he had urinated on himself. Sanchez Dep. 82:13–18. Defendant Tracey described Plaintiff as "purple," that his eyes were "crystal," and there was blood coming out of his eyes and ears. Tracey Dep. 41:15-20. Plaintiff was eventually revived and taken by ambulance to the hospital. Doc. 89-2 ¶ 7. Following the incident, Plaintiff was diagnosed with myalgia, conjunctival hemorrhage, elevated blood pressure, transaminitis, and major depressive disorder. Doc. 89-2 ¶ 12 to Defendant Gomez's First Set of Interrogatories. Plaintiff continues to suffer from back pain, difficulty raising his left arm above his head, difficulty breathing, and head trauma and pain. *Id.*

## II.    ARGUMENT AND CITATION OF AUTHORITY

### a.    Plaintiff's claim under 42 U.S.C. § 1983 should proceed to trial

A jail official acts with deliberate indifference under the Fourteenth Amendment if she has subjective knowledge of a risk of serious harm and disregards that risk by engaging in conduct that amounts to subjective recklessness. *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024).

In the context of a jail suicide, "deliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur. [T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the

care of prisoners." *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1268-69 (11th Cir. 2005) (cleaned up).

> **1.    *The Court should apply the civil recklessness standard to Plaintiff's Fourteenth Amendment claims***

While a recent panel of the Eleventh Circuit Court of Appeals has applied the Eighth Amendment *Wade* standard to a Fourteenth Amendment jail suicide case, *see Gantt v. Everett*, — F.4th — 2025 WL 3676948, at *2 (11th Cir. Dec. 18, 2025) (quoting *Wade*, 106 F.4th at 1262), the result of applying *Wade* here would not change the outcome. Indeed, it appears that the court in *Wade* merely rephrased the same test that this Circuit previously used, except this time substituting "unreasonable" for the phrase "more than negligent." The subjective knowledge standard analyzed in *Wade* remains unchanged because this Circuit has always required subjective knowledge. As Judge Jordan's concurrence advised, "courts and attorneys look carefully at prior Eleventh Circuit cases to see if they are consistent with the subjective component of deliberate indifference set out in *Farmer*. If they are consistent, then they should continue to be cited as binding precedent." *Wade*, 106 F.4th at 1265 (Jordan, J., concurring). Every case relied upon by Plaintiff here uses that standard, and thus the Court can rely on them as binding authority.

To the extent that *Wade* has any effect on this litigation, to preserve the argument for appeal, Plaintiff argues that the Court should adopt the Fourteenth Amendment deliberate indifference standard based on civil recklessness, rather than the criminal recklessness standard that the Supreme Court adopted under the Eighth Amendment in *Farmer*.[1]

### 2.    *Defendant Tracey knew there was a substantial risk of harm*

The first element of a deliberate indifference claim is subjective awareness of a serious risk of harm. When assessing a defendant's knowledge, it is important to consider that a "defendant will rarely make the admission of an awareness and appreciation that the inmate was in serious need of medical care to avoid the risk of harm, because to do so is an admission of subjective indifference, i.e., admission of

---

[1] The foundational assumption of *Hamm v. DeKalb Cnty.*, 774 F.2d 1567 (11th Cir. 1985), that the two rights were coextensive was abrogated by the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), where the court held that the Eighth and Fourteenth Amendments require different standards for excessive force claims because "the language of the two Clauses differs, and the nature of the claims often differs." *Id.* In the wake of *Kingsley*, many circuits reevaluated the Fourteenth Amendment deliberate indifference standard. Rather than applying the criminal recklessness standard announced in *Farmer* (and reiterated by *Wade*). *See, e.g.*, *Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919, 927 (6th Cir. 2024) ("officers can face liability even if they did not actually know of a risk of harm to a pretrial detainee. Pretrial detainees need only prove that the officers recklessly disregarded a risk so obvious that they either knew or should have known of it.") (emphasis added). *See also Miranda v. Cty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (adopting the "knew or should have known" standard).

a culpable state of mind and liability." *Howard v. City of Columbus*, 239 Ga. App. 399, 404 (1999). A defendant's knowledge of the seriousness risk of a harm therefore "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 840 (1994)). This means that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.[2]

In the context of the risk of suicide, the Eleventh Circuit has held that an officer has the requisite subjective knowledge that an inmate is suicidal when (1) the inmate attempted suicide the previous month at a different jail; and (2) the inmate told the officer he was suicidal. *Snow*, 420 F.3d at 1270.

Plaintiff easily meets this standard here. Defendant Tracey had three separate reports that Plaintiff was suicidal: first, inmates who were initially incarcerated in the same cell as Plaintiff reported that he was suicidal. *See* Tracey Dep. 57:17-21, 58:19-25, 59:9-20; Jackson Dep. 70:11–16, 71:19–21. Second, Plaintiff's mother called the jail, spoke to Defendant Tracey, and reported that Plaintiff had just been

---

[2] *See also Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("When [officials] ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference").

released from a mental health crisis center because he was suicidal, that he had

ongoing suicidal ideations, and that Plaintiff felt that he did not have a "reason to

go on." Pittman George Dep. 35:23–38:8. Third, Plaintiff clearly, unequivocally,

and repeatedly told Defendant Tracey that he was suicidal. *See* Smith Dep. 49:1–3,

57:7–58:9, 58:23–59:17; Jackson Dep. 76:20–23, 82:2–6.

Defendant Tracey also knew that, in response to Plaintiff's statement that he

was suicidal, she encouraged Plaintiff to commit suicide and demonstrated how to

do it by gesturing that he should hang himself, and telling him he was a "piece of

shit." *See* Smith Dep. 48:11–25; Doc. 89-2 ¶ 7 to Defendant Gomez's First Set of

Interrogatories;  Doc. 89-6, Ezra Smith Booking Area 07-09-2024.mp4 at

01:28:41.

If this information is not enough to place an officer on notice that an inmate

is suicidal, it is difficult to imagine how the standard could ever be met. Defendant

Tracey attempts to avoid these facts by recasting them. For example, she argues

that Plaintiff's clear and unequivocal statement that he was suicidal was a "temper

tantrum." And her response that Plaintiff was a "piece of shit" who should kill

himself, and—her demonstration how he should kill himself—was merely the

product of a "heated emotional exchange between two frustrated people."

14

Defendant Tracey also minimizes the report from another inmate that Plaintiff was suicidal by claiming that Plaintiff stated that he was only joking when he made those comments. But there is no support for Defendant Tracey's claim that she determined that Plaintiff was joking when he made those comments. The evidence shows that, after that report, neither she nor any other deputy approached the holding cell. *See generally* Doc. 89-8, Ezra Smith Booking Area 07-09-2024.mp4; Tracey Dep. 60:11–25. It is impossible for Defendant Tracey to determine whether the suicide threat was legitimate based solely on the video evidence. *See* Doc. 89-5, Ezra Smith Holding Cell 7 07-08-2024.mp4 at 04:00:00–05:00:00.

The precedent relied upon by Defendant Tracey is unavailing. *Jackson v. West*, 787 F.3d 1345 (11th Cir. 2015), has no bearing on this case. In *Jackson*, the court held that anti-social and aggressive behavior did not rise to the level of a strong risk of suicide. There was no evidence that the inmate ever stated that he was suicidal and no indication of the propensity to self-harm. It is a far cry from the facts of this case. Likewise, *Whitaker v. Jefferson*, 2023 WL 3444042, at *4 (M.D. Ga. Apr. 19, 2023), *report and recommendation adopted*, 2023 WL 3442221 (M.D. Ga. May 12, 2023), is not instructive. In that case, officers had a clear basis for believing that an inmate's claim that he was suicidal was an effort to

manipulate his housing placement, and the plaintiff admitted he would seek placement suicide prevention cell so he could masturbate. *Id.* There was no basis for that conclusion here, and an officer cannot escape liability merely by claiming she did not believe an inmate's claim. *See, e.g.*, *Goebert v. Lee County*, 510 F.3d 1312, 1327–28, 1331 (11th Cir. 2007) (holding jail captain who decided to disbelieve a pregnant inmate's medical complaints that she was leaking fluid could be found deliberately indifferent, writing that "[t]he problem is that Captain Weaver did not believe Goebert, and the reason he did not believe her smacks of deliberate indifference.").

Defendant Tracey next argues that, even if she knew Plaintiff was suicidal, she did not anticipate that he would use the telephone cord in the cell to strangle himself. A jury could easily reject this argument and find that Defendant Tracey's gesture that Plaintiff should hang himself, while making a choking noise at him, demonstrate that she knew exactly how Plaintiff could commit suicide, and could reject her claim that it was "highly improbable" that Plaintiff could use the cord for that purpose.[3]

---

[3] Defendant Tracey argues that the risk was not obvious because the method by which Plaintiff strangled himself does not fit the definition of "hanging" found in Black's law dictionary. *See* Doc. 74-3 at 9 n.2 (citing *United States v. Rice*, 36 F.4th 578 (4th Cir. 2022)). The citation to *Rice* is puzzling because it is a criminal case and the definition of hanging was used in the context analyzing the text of a statute. It is irrelevant. Defendant Tracey does not provide the definitions of

Again, the precedent relied upon by Defendant Tracey does not bear on the case here. In *Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003), officers removed everything in an inmate's cell they believed could be used to commit suicide, but neglected to remove the inmate's underwear because they did not anticipate the elastic could be used as a ligature. Here, Defendant Tracey did not remove anything from Plaintiff's cell or take any steps whatsoever to reduce the risk of harm to Plaintiff. Instead, she exacerbated the risk. Likewise, in *Gish v. Thomas*, 516 F.3d 952, 953 (11th Cir. 2008), a handcuffed arrestee who the officer thought was locked in the back of his patrol car was able to access a loaded gun in the front seat. There was no dispute that the officer believed that the security screen of the patrol car was locked. Unlike those cases, there is no reason to believe that Defendant Tracey believed that the phone cord in the cell could not be used as a ligature; on the contrary, she demonstrated to Plaintiff how he could commit suicide.

### 3. *Defendant Tracey did nothing in response to the substantial and immediate risk of harm to Plaintiff*

After Plaintiff's mother warned her that Plaintiff was suicidal, and Plaintiff told Defendant Tracey he was suicidal, Defendant Tracey urged him to commit

---

"ligature," "strangulation," "asphyxiation," "partial hanging," or any other relevant term.

suicide and demonstrated how he should do it. She then left him alone and—she claims—watched on a video monitor which showed wrapping the telephone around his neck, then his head and body move off-screen until only his prone legs and feet can be seen. Doc. 89-6, Holding Cell Video at 01:31:13–01:31:46.

Then she continued to wait for three minutes after he stopped moving before she walked a short distance to his cell to look inside. A jury could find that Defendant Tracey gave Plaintiff the exact amount of him he needed to kill himself.

This is not a case where a jailer failed to conduct rounds while someone was on suicide watch. This is a case where a jailer implored an inmate she knew was suicidal to kill himself and gave him time to do it. The situation was emergent and there was an immediate need for action. Defendant Tracey utterly failed to mitigate the risk of suicide, and her response was not reasonable. *See Greason v. Kemp,* 891 F.2d 829, 835–36 (11th Cir. 1990) (with knowledge of a threat of suicide, "failure to take steps to prevent [a detainee from] committing suicide can amount to deliberate indifference."); *Snow,* 420 F.3d at 1270 (11th Cir. 2005) (holding that failing to alert others at the jail or mitigate a known risk of suicide constituted deliberate indifference); *Nelson v. Tompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024).

### 4.    *Defendant Tracey is not entitled to qualified immunity*

In this Circuit, a plaintiff may establish that a right is clearly established if he shows: (1) "that a materially similar case has already been decided, giving notice to the police;" (2) "that a broader, clearly established principle should control the novel facts in this situation;" or (3) "this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F. 3d 1152, 1159 (11th Cir. 2005).

Here, *Snow* and *Greason* clearly establish—prior to July 8, 2024—that an officer with knowledge of a threat of suicide must take steps to prevent the commission of suicide. *Greason v. Kemp,* 891 F.2d at 835–36 (with knowledge of a threat of suicide, "failure to take steps to prevent [a detainee from] committing suicide can amount to deliberate indifference."); *Snow,* 420 F.3d at 1270 (holding that failing to alert others at the jail or mitigate a known risk of suicide constituted deliberate indifference). Defendant Tracey was on notice that she was required to take some action—both under federal law and the Sheriff's policies and procedures—when Plaintiff told her he was going to commit suicide, she urged him to "be a man about it" and commit suicide, and then observed Plaintiff banging his head on the wall and kicking the door yelling that he was going to kill himself.

Defendant Tracey's citation to *Taylor v. Barkes*, 575 U.S. 822, 827 (2015), is misleading. *Taylor* held that there was no constitutional obligation for a jail to

implement a mental health screening procedure to identify suicidal inmates. The opinion's statement that there is no right to "adequate suicide prevention protocols" refers to screenings to detect whether a person is suicidal. It does not mean—as Defendant Tracey appears to believe—that after an officer learns that an inmate is suicidal that she is free to ignore the risk let alone to encourage him to commit suicide and demonstrate how to do it. *Taylor* did not overrule any Eleventh Circuit precedent concerning deliberate indifference to the risk of suicide, and no court has ever suggested that it did.

### b.    Plaintiff's state law claim should proceed to trial

#### 1.    *Defendant Tracey had a ministerial duty to place Plaintiff on suicide watch*

Under Georgia law, a government employee is protected by official immunity "unless the plaintiff can establish that the official negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure." *Glass v. Gates*, 311 Ga. App. 563, 574 (2011). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Grammens v. Dollar*, 287 Ga. 618, 619 (2010) (quoting *McDowell v. Smith*, 285 Ga. 592, 593 (2009)). By contrast, a "discretionary act" is one that "calls for the exercise of personal deliberation and judgment, which in turn entails examining the

facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*[4]

Defendant Tracey address the case most directly on point, *Lundy v. Hancock Cnty.*, 368 Ga. App. 772, 778 (2023).[5] In *Lundy*, two jailers found, two separate times, an inmate with "fabric wrapped around his neck and tied to a bedpost." *Id.* at 777. Both times, the officers removed the fabric and other items from the cell, but allowed the inmate to wear his underwear, socks, and a cap. About twenty minutes after the second incident, a jailer checked on the inmate and found that he had hanged himself from the corner of the bunk using his cap. *Id.* The Court of Appeals found that both jailers violated a ministerial duty which was created by

---

[4] Defendant Tracey's argument that "emergency responses are always and inherently discretionary" and that "inmate supervision is inherently discretionary," *see* Doc. 74-3 at 21, is wrong. Numerous decisions have found that jailers have violated ministerial duties in emergency situations. For example, in *Garren v. Bryant*, 922 S.E.2d 902 (Ga. Ct. App. 2025), the Court of Appeals held that the retrieval and use of an AED was a ministerial duty. In *Melton v. McCarthan*, 356 Ga. App. 676, 678 (2020), the court found that an officer had a ministerial duty to separate cellmates in a jail after a physical altercation between them. *See also Brantley v. Jones*, 363 Ga. App. 466, 475 (2022) ("[w]e have held, in the context of detention officers, that the acts of following established policies of inspecting and monitoring detainees are ministerial tasks."); *Clark v. Prison Health Svcs.*, 257 Ga. App. 787, 794 (2002) (holding officers were not entitled to official immunity for breach of clear and simple duties of inspecting cells according to a prescribed schedule). Defendant Tracey does not disclose any of this precedent that contradicts her broad statement of the law.

[5] Defendant Tracey is undoubtedly aware of this decision because her attorney handled the appeal.

policies which stated, in relevant part, that a detainee who expresses suicidal ideation "should be observed by detention officers at staggered intervals not to exceed every 15 minutes" and that suicidal inmates "should be observed by a staff member on a continuous, uninterrupted basis." *Id.*

The court found these "policies clearly establish ministerial duties for detention officers to observe a detainee who has expressed suicidal ideation at intervals not to exceed 15 minutes and to observe a detainee who is either threatening or engaging in an act of suicide on a continuous basis." *Id.* at 779.

The policy in this case states: "Any inmate who threatens or attempts self-mutilate or suicide will be viewed as a MENTAL HEALTH EMERGENCY. Upon notification, the Mental Health Professional will provide a face-to-face interview with the inmate. Additionally, the inmate's mental health and/or medical chart(s) will be reviewed as part of the initial assessment." Defendant Tracey limits her argument to the text of the written policy, but a policy that creates a ministerial duty does not need to be in writing. *See, e.g.*, *Joyce v. Van Arsdale*, 196 Ga. App. 95, 95 (1990) (holding a road superintendent's actions in erecting road barricade were ministerial where county commission instructed him to erect barricade); *Glass v. Gates*, 311 Ga. App. 563, 574 (2012) (finding there was an issue of fact

concerning whether there was an unwritten policy requiring officer supervising a road work crew to contact the facility in the event a tractor became stuck).

In addition to the written policy, the evidence in this case shows Defendant Tracey knew that the policy of the Rockdale County Sheriff's Office was, first, that officers do not have the discretion to determine whether an inmate's threat of suicide is a joke, or whether they are laughing. The threat must still be communicated to medical personnel. Doc. 89-10, Merit Board Hearing (Aug. 23, 2024) at 1:19:47–1:20:08. *See also* Tracey Dep. 26:2–13. Moreover, suicide prevention protocols can be implemented by either medical staff or by jail personnel. Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 00:50:33at 00:50:33. The policy also requires that, upon a threat of suicide, Plaintiff would have had dangerous items removed from his possession and been placed into another cell that did not have a corded phone in it prior to meeting with the mental health professional. Jackson Dep. 85:9–23; Sanchez Dep. 80:20–81:6. This would all occur under the policy before the mental health professional would see the inmate. Jackson Dep. 85:9–23.

      **2.**      ***Defendant Tracey breached a ministerial duty by failing to alert medical personnel and implement the suicide prevention protocol after each of the suicide threats***

Defendant Tracey argues that screaming at an inmate to kill himself so loud that medical staff can hear it is a valid way to execute the Sheriff's suicide prevention policy. But this ignores the first suicide threat which occurred several hours before she told Plaintiff to kill himself. To the extent the second suicide threat is the relevant time, it also is an argument for trial. At summary judgment, there is no way to determine whether Defendant Sanchez understood exactly what was happening such that her overhearing the exchange between Tracey and Plaintiff was tantamount to a report of suicidal behavior. It also ignores the second aspect of the policy which is that Plaintiff would have had dangerous materials removed from his person and been placed in a different cell prior to contacting medical. Jackson Dep. 85:9–23; Sanchez Dep. 80:20–81:6.

### 3. *Defendant Tracey's assumption of risk and comparative negligence arguments are foreclosed by binding precedent*

Defendant Tracey's argument concerning assumption of risk is foreclosed by *Brantley v. Jones*, 363 Ga. App. 466 (2022). In *Brantley*, the Georgia Court of Appeals rejected the exact same argument raised by Defendant Tracey here: "there is no bright-line rule in Georgia under which the doctrines of assumption of the risk and comparative negligence always bar recovery in cases of suicide. To the contrary, we have recognized that determining a person's assumption of the risk when that person has killed himself or herself can be a fact-intensive inquiry

24

appropriate for a jury." *Id.* at 480. The court also held that "the degree that the defense of comparative negligence is applicable is a matter for the jury's consideration and is not determinable as a matter of law." *Id.* (cleaned up).

This Court must "must adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise." *King v. Guardian Life Ins. Co. of Am.*, 686 F.2d 894, 898 (11th Cir. 1982) (quoting *Flintkote v. Dravo Corp.*, 678 F.2d 942 at 945 (11th Cir. 1982)). The Supreme Court of Georgia denied certiorari in the case, and the Georgia Court of Appeals has subsequently applied *Brantley*'s holding. *See Lundy v. Hancock Cnty.*, 368 Ga. App. 772, 780 (2023) (applying *Brantley* and holding that a suicide was not an intervening cause). No subsequent decisions have called the holding into question.[6]

### III.    CONCLUSION

For the foregoing reasons, Plaintiff requests this Court deny Defendant Tracey's motion to for summary judgment dismiss and allow this case to proceed to trial.

---

[6] Like *Lundy*, supra, *Brantley* was litigated by Defendant Tracey's counsel. The comparative fault argument in Defendant Tracey's brief is copied nearly verbatim from the appellate brief filed by Defendant Tracey's counsel in the *Brantley* case. *Compare* Doc. 74–3 at 24 *with* Doc. 89-4 at 34. Yet Defendant Tracey's brief does not inform the Court that her arguments were rejected by the Georgia Court of Appeals.

Submitted January 9, 2026.

**<u>Jeff Filipovits</u>**
Jeff Filipovits
Georgia Bar No. 825553

**<u>Wingo Smith</u>**
Wingo Smith
Georgia Bar No. 147896

Spears & Filipovits, LLC
315 W. Ponce de Leon Ave.
Suite 865
Decatur, GA 30030
404.905.2225
jeff@civil-rights.law
wingo@civil-rights.law

**<u>James M. Slater</u>**
James M. Slater
Georgia Bar No. 169869

Slater Legal PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, GA 30345
(404) 458-7283
james@slater.legal

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I certify that the foregoing has been prepared

in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

Submitted January 9, 2026.

**<u>Jeff Filipovits</u>**
Georgia Bar No. 825553

Spears & Filipovits, LLC
315 W. Ponce de Leon Ave.
Suite 865
Decatur, GA 30030
404.905.2225
jeff@civil-rights.law