IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EZRA SMITH,

     Plaintiff,

    v.

DEPUTY MONIQUE TRACEY, *et al.*,

     Defendants.

Civil Action No.:

1:24-cv-05158-TWT

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS JACKSON AND GOMEZ'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ezra Smith responds in opposition to Defendants Shenequa Jackson Raul Gomez's motion for summary judgment (Doc. 75) as follows:

## I.    INTRODUCTION

After waiting more than ten hours to be processed at the Rockdale County Jail, Ezra Smith found himself alone in a holding cell, two days after being released from a psychiatric hospital for suicidal ideations. As the hours ticked by, those suicidal thoughts became more intrusive, and Mr. Smith became more depressed. He kicked the cell door for help, which finally brought Deputy Monique Tracey to his cell window. Once at the cell, Tracey cursed Mr. Smith out, told him he was a piece of shit, and then dared him to "be a man" and hang himself. And, in case her words were not clear enough, Tracey acted it out with a hand gesture and

1

choking sounds. Her fellow officers, Defendants Shenequa Jackson and Raul Gomez, were several feet away. They saw the interaction and overheard Mr. Smith say he was suicidal while Tracey goaded him into hanging himself. But they did nothing.

Mr. Smith then told Jackson he was suicidal over the intercom, but she hung up because he was a "white privilege prick" and she didn't want to process him. When he started banging his head on the cell wall, Jackson said he could "bang all night." She also knew that he tried to hang himself in the cell next door a few years earlier.  Instead of intervening to protect Mr. Smith and place him on suicide watch, Defendants Jackson and Gomez did nothing to respond to threat of suicide until after Defendant Tracey alerted them to Mr. Smith's unresponsive body hanging by the phone cord in his cell. Doing nothing under these circumstances violates clearly established law and the Sheriff's nondiscretionary policies. Their motion should be denied.

## II.    RECITATION OF FACTS

Plaintiff Ezra Smith had a history of mental health disorders and suicidal behavior. Smith Dep. 75:24–76:18, 90:2–9; 91:2–16, 96:7-12. On July 6, 2024, Plaintiff Ezra Smith was released from a psychiatric hospital after being treated for suicidal ideations. *Id.* 92:1-7. On July 8, 2024, after his release from treatment, Plaintiff was transported to the Rockdale County Jail to be detained for a for a

probation violation. Pittman George Dep. 27:13–28:5. There, Plaintiff was placed in Holding Cell 7, where he was held with others who were waiting to be processed by jail staff. Tracey Dep. 58:19-23; Gomez Dep. 29:18-21.

Gomez, Tracey, and Jackson were assigned to the booking area of the jail that day. Jackson Dep. 58:24–59:8; Tracey Dep. 39:6-15; Gomez Dep. 21:23-25. They were required to process inmates who were held in the booking cells. Jackson Dep. 59:24–60:15; Tracey Dep. 39:16-20.

### Initial suicide warning from inmates

While Plaintiff was held in the holding cell, he was thinking about committing suicide and talked about it with the other inmates. Smith Dep. 77:19–78:1; 79:2–7. Plaintiff told the other inmates that he planned to kill himself in his car in front of his wife's house so that she could have all his belongings and know he loved her. Doc. 89-1, Declaration of Ezra Smith ("Smith Decl.") ¶¶ 5-6. Some of the detainees called out on the intercom that, "He's going to kill himself. This white guy says he's going to kill himself." Tracey Dep. 57:17-21, 58:19-25, 59:9-20; Jackson Dep. 70:11–16, 71:19–21. The intercom system allows inmates to communicate with detention officers who are at the desk of the holding area. Jackson Dep. 71:21–72:14. Jackson heard the report over the intercom that Plaintiff was suicidal. *Id.* 72:19–22. Jackson falsely claims that after the initial suicide report, they checked on the booking cell and Plaintiff and others were

3

laughing. *Id.* 71:25–72:7, 81:13–23. Really, neither Defendant Jackson nor any other officer went to the cell to check on Plaintiff. *See generally* Doc. 89-7, Ezra Smith Booking Area 07-09-2024.mp4. Neither approached the booking cell; they both stayed on the platform. Tracey Dep. 60:11-25.

### Call from Plaintiff's mother

Later on, Plaintiff's mother called the jail and spoke to Tracey. Tracey Dep. 50:15–51:9, 59:1-4. Tracey put the call on speaker phone in the booking area. *Id.* 52:6-7. Plaintiff's mother told Tracey that her son was just released from a crisis center because of his suicidal behavior and that he "didn't feel like he had a reason to go on." Pittman George Dep. 37:15–38:8. She told Tracey she was worried about Plaintiff and gave her the backdrop on everything that had happened with Plaintiff's wife leaving him and his suicidal ideations. *Id.* 35:23–36:12, 37:15-23.

### Deputies Jackson and Gomez refuse to process Plaintiff

At about 1:00 a.m., all other inmates in the holding cell had been processed and Plaintiff was the only one who remained in the cell. Jackson Dep. 74:16–19; Gomez Dep. 80:13–23. After other inmates were removed from Cell 7, Tracey and Jackson were left with Plaintiff's blue folder. Tracey Dep. 39:21-40:24. Tracey asked Jackson whose folder it was, to which Jackson replied, "I'm not doing that folder." *Id.* 40:10-17. According to Tracey, the folder was being moved from table to table. *Id.* 53:24-25. Jackson told Tracey that Plaintiff was "a prick. He can stay

4

there." *Id.* 40:18-24. Jackson told Tracey to just leave the folder, that it was "that prick's folder," that Plaintiff was a "white privilege prick." *Id.* 54:1–55:1. Jackson told Tracey that Plaintiff had previously "showed out in court," *Id.* 40:18-24, and that Plaintiff "got in front of the Court and started acting stupid." *Id.* 54:4-7. Jackson told Tracey to leave Plaintiff in the cell, to "forget him." *Id.* 46:4-11.

Plaintiff became increasingly depressed after he was left alone in the holding cell. Smith Dep. 45:19–25. Once alone, Plaintiff started banging and kicking the cell door to get the officers' attention. *Id.* 46:10–13; Jackson Dep. 75:9–12; Tracey Dep. 40:25-41-7. Tracey, Jackson, and Gomez could each hear Plaintiff banging and mule kicking the door. Tracey Dep. 49:4-13. Gomez knew that there was a phone with a cord in Cell 7. Gomez Dep. 80:21–81:3. Jackson knew there was a phone with a metal cord in the cell. Jackson Dep. 27:10-12, 28:2-10.

Defendants Jackson, Gomez, and Tracey each knew that Plaintiff was alone in Cell 7. Gomez Dep. 80:21-23; Tracey Dep. 40:25-41-7, 46:4-11. As shown in the screenshot below, the phone cord in Cell 7 was long enough to wrap around a person's neck. Doc. 89-9, Jackson Body Camera at 00:00:34.



5

Indeed, Jackson knew it was possible, because she knew that Plaintiff tried to hang himself with an identical cord in Cell 6 a few years earlier. Tracey Dep. 55:9-21.

### Defendant Tracey urges Plaintiff to kill himself

After Plaintiff had been kicking his cell door and banging his head against the door, Defendant Tracey approached the holding cell. Smith Dep. 46:10–13. Jackson then saw Tracey go to the cell door and observed Plaintiff and Defendant Tracey yelling at each other. Jackson Dep. 76:5–10. Plaintiff asked Defendant Tracey why he was the only person in the cell who hadn't been processed and asked if he could make a phone call. Smith Dep. 47:9–14. According to Defendant Sanchez: Defendant Tracey said things like "stop kicking on the fucking door" and being very nasty, Tracey said "your fucking mommy was calling up here asking about you," and in response to Plaintiff stating that he was going to kill himself, Defendant Tracey said "Don't talk about it, be about it. Fucking do it." Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 00:40:15; Tracey Dep. 47:25–48:25. Tracey also told Plaintiff to take the number of hours he had been in Cell 7 and double it and that's how long he'd have to sit in booking before being processed. Smith Dep. 52:17–53:7. Plaintiff understood this as a threat. *Id.* 53:8-15.  Defendant Tracey then told Plaintiff that he was a "piece of shit," told him to kill himself multiple times, and gestured that he should hang himself. Smith Dep. 48:11–25; Doc. 89-2, Verified Response No. 7 to Defendant

6

Gomez's First Set of Interrogatories.

Jackson heard much of the same. She heard Plaintiff scream to Tracey that he was suicidal and heard Tracey tell him to "do it" while making a choking noise at Plaintiff. Jackson Dep. 76:15-23, 82:2-6; Doc. 8911, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 00:25:24–25:55. Gomez was initially standing next to Defendant Tracey as she encouraged Plaintiff to commit suicide. Doc. 89-7, Ezra Smith Booking Area 2 07-09-2024.mp4 at 01:28:28. He also heard Plaintiff say he was suicidal. Gomez Dep. 81:4-6. The exchange between Tracey and Plaintiff was loud and heard throughout the booking area of the jail. Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 00:37:02.

As shown below, at about 1:28 a.m., Tracey gestured that Plaintiff should hang himself and told him to commit suicide. Doc. 89-7, Ezra Smith Booking Area 07-09-2024.mp4 at 01:28:41; Smith Dep. 55:2–8. At that point, Defendant Tracey



knew that Plaintiff had stated that he was suicidal. Smith Dep. 49:1–3.

Gomez did not report what he saw and heard. Gomez Dep. 83:23-25. Jackson did not take any action after hearing Plaintiff say that he was suicidal because she "figured he was just upset." Jackson Dep. 82:7–10.

### *Plaintiff reports he is suicidal to Jackson*

After Defendant Tracey left the cell, Plaintiff used the intercom to speak with a female officer at the booking desk. Smith Dep. 57:7–58:9, 58:23–59:17. Plaintiff knew that he spoke with a female officer, and that the officer was not Defendant Tracey. *Id.* 57:7–58:9, 58:23–59:17. Gomez is a male officer. Jackson 59:25–60:2. The only other female officer on duty was Jackson. Plaintiff told Jackson that he was suicidal. *Id.* 57:7–58:9; 58:23–59:17. Plaintiff was kicking and repeating "I'm going to kill myself" and "let me out." Tracey Dep. 49:17–50:6. In response, Jackson told Tracey that Plaintiff could "bang all night. He can do it all night." *Id.* 41:1-7. Gomez knew that Plaintiff stated that he wanted to kill himself. Gomez Dep. 49:17-25, 50:11-12. Jackson told Tracey, referring to Plaintiff, that "All he's going to do is cry 52. I'm not dealing with him." Tracey Dep. 57:7-15. "52" refers to the code for suicide. Tracey Dep. 60:4-10; Gomez Dep. 18:7-9. Jackson denies stating to Defendant Tracey that she didn't want to deal with Plaintiff because he'd "cry 52" meaning that he would claim to be suicidal. Jackson Dep. 96:3–8. Tracey told Jackson to tell Plaintiff to kill himself and then told

Jackson to hang up the intercom. Smith Dep. 57:7–58:9; 58:23–59:17. Jackson hung up the intercom. *Id.* 57:7–58:9; 58:23–59:17. Tracey and Jackson then stopped answering the intercom, and Plaintiff began hitting his head against the cell door and then the cell wall. *Id.* 59:10–17; 61:23–62:2. When Plaintiff started banging on the glass with his head, Tracey said "Oh, my God. He's doing it with his head." Tracey Dep. 49:6-13. Jackson or Gomez responded "He's got a hard head. He's fine." *Id.* 49:12-21.

### *Plaintiff attempts suicide*

Neither Defendant checked on Plaintiff after hearing Tracey taunt him. Neither Defendant checked on him after hearing him yell that he would commit suicide. A couple of minutes after Jackson hung up the intercom, the booking area went quiet as Plaintiff stopped hitting his head and wrapped the cell's phone cord around his neck and hanged himself. Doc. 89-7, Ezra Smith Booking Area 07-09-2024.mp4 at 01:29:10–01:34:15; Smith Dep. 62:17-25. The sudden quiet prompted Tracey longer to check the camera in the cell. Tracey Dep. 41:8-15. She saw his feet on the camera and went around to the cell. *Id.* 41:15-17. When Sanchez responded to Plaintiff's suicide attempt, she observed that Plaintiff had turned blue and that he didn't have a pulse. His nose was bleeding and he had urinated on himself. Sanchez Dep. 82:13–18. Defendant Tracey described Plaintiff as "purple," that his eyes were "crystal," and there was blood coming out of his eyes and ears.

9

Tracey Dep. 41:15-20. According to Tracey, Gomez was laughing and thought it was "hilarious" that Plaintiff attempted suicide. Tracey Dep. 42:13-24, 61:21-25.

Plaintiff was eventually revived and taken by ambulance to the hospital. Doc. 89-2, Verified Response No. 7 to Defendant Gomez's First Set of Interrogatories. Following the incident, Plaintiff was diagnosed with myalgia, conjunctival hemorrhage, elevated blood pressure, transaminitis, and major depressive disorder. *Id.* at Response No. 12. Plaintiff continues to suffer from back pain, difficulty raising his left arm above his head, difficulty breathing, and head trauma and pain. *Id.* Plaintiff also continues to experience psychological trauma, including anxiety. *Id.* Following the incident, Plaintiff continues to have suicidal ideations, because the experience of dying at the jail made him feel like death was easy. *Id.* Plaintiff has battled with thoughts of committing self-harm again, particularly because of the ease in which he was able to do it at the jail in July 2024. *Id.* Had defendants acted, Plaintiff would have been placed in available suicide prevention cell. Tracey Dep. 21:6-18; Jackson Dep. 83:7-16, 85:2-4.

### *Policies governing the Rockdale County Sheriff's deputies*

According to General Order 5.22, "Any inmate who threatens or attempts self mutilation or suicide will be viewed as a mental health emergency." Doc. 74-1, General Order 5.22; Tracey Dep. 24:15-23. According to Major Jason Welch of the RCSO, RCSO detention staff have no discretion in determining the legitimacy of a

suicide threat. Doc. 89-10, Merit Board Hearing - M. Tracey-20240823_090650-Meeting Recording.mp4 at 1:18:00-20:00, 51:02-51:15. Jackson claims that she has the discretion in determining whether to report a threat of suicide. Jackson Dep. 80:8–13. But she agreed with the Merit Board that she had none. Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 33:48-34:09. Jackson understood that regardless of her personal opinion on whether the threat of suicide was legitimate, if someone threatens suicide there are certain protocols that must be taken. *Id.* She also understood that when she heard Plaintiff's threats and Defendant Tracey's taunts at the cell door that, based on her training under the policies and procedures of the RCSO, she was required to treat that as a medical emergency. *Id.* at 34:10-34:32. Defendant Gomez had been trained on and understood the importance of following RCSO procedures in the jail. Gomez Dep. 14:6-17. He also understood that he had a duty to follow RCSO policies and procedures. *Id.* 14:3-5.

## III.  ARGUMENT AND CITATIONS OF AUTHORITY[1]

### a.  The Fourteenth Amendment standard for deliberate indifference to risk of self-harm.

Pretrial detainees like Plaintiff "plainly have a Fourteenth Amendment due

---

[1] Under Rule 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam).

process right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.'" *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)); *see also Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015).

To establish liability for a prisoner's suicide (or attempt), "the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." *Cook*, 402 F.3d at 1115 (quoting *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (per curiam)) (internal quotation mark omitted). The plaintiff must prove that the official had subjective knowledge of a risk of serious harm and disregarded that risk. *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir.2005) (quoting *Cook*, 402 F.3d at 1115).

"[D]eliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.'" *Cook*, 402 F.3d at 1115 (quoting *Cagle*, 334 F.3d at 986) (emphasis omitted); *see also Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Gish*, 516 F.3d at 954 (quoting *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994) (en banc).

12

The Fourteenth Amendment requires that a jailer have "personal, subjective knowledge of a suicide risk," *Jackson*, 787 F.3d at 1356–57 n.6, and be subjectively aware that "the combination of the [detainee's] suicidal tendencies and the feasibility of suicide in the context of the [detainee's] surroundings [will] create[] a strong likelihood that the [detainee] will commit suicide." *Gish*, 516 F.3d at 954–55. A defendant's subjective knowledge of the seriousness of risk of self-harm "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 840, (1994)).

1.    *The Court should apply the civil recklessness standard to Plaintiff's Fourteenth Amendment claims*

While a recent panel of the Eleventh Circuit Court of Appeals has applied the Eighth Amendment *Wade* standard to a Fourteenth Amendment jail suicide case, *see Gantt v. Everett*, — F.4th — 2025 WL 3676948, at *2 (11th Cir. Dec. 18, 2025) (quoting *Wade*, 106 F.4th at 1262), the result of applying *Wade* here would not change the outcome. Indeed, it appears that the court in *Wade* merely rephrased the same test that this Circuit previously used, except this time substituting "unreasonable" for the phrase "more than negligent." The subjective knowledge standard analyzed in *Wade* remains unchanged because this Circuit has always required subjective knowledge. As Judge Jordan's concurrence advised, "courts and attorneys look carefully at prior Eleventh Circuit cases to see if they are

13

consistent with the subjective component of deliberate indifference set out in *Farmer*. If they are consistent, then they should continue to be cited as binding precedent." *Wade*, 106 F.4th at 1265 (Jordan, J., concurring). Every case cited by Plaintiff uses that standard, and Court can rely on them as binding authority.

To the extent that *Wade* has any effect on this litigation, to preserve the argument for appeal, Plaintiff argues that the Court should adopt the Fourteenth Amendment deliberate indifference standard based on civil recklessness, rather than the criminal recklessness standard that the Supreme Court adopted under the Eighth Amendment in *Farmer*.[2]

## 2.    *Defendants Jackson and Gomez were deliberately indifferent to the strong likelihood that Plaintiff would inflict self-harm.*

The evidence demonstrates that Defendants Jackson and Gomez had actual awareness of Plaintiff's suicide threats and unreasonably disregarded the strong likelihood that he would commit self-harm.

---

[2] The foundational assumption of *Hamm v. DeKalb Cnty.,* 774 F.2d 1567 (11th Cir. 1985), that the two rights were coextensive was abrogated by the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), where the court held that the Eighth and Fourteenth Amendments require different standards for excessive force claims because "the language of the two Clauses differs, and the nature of the claims often differs." *Id.* In the wake of *Kingsley*, many circuits reevaluated the Fourteenth Amendment deliberate indifference standard. Rather than applying the criminal recklessness standard announced in *Farmer* (and reiterated by *Wade*), which requires subjective knowledge of a serious risk of harm, those circuits follow the civil recklessness standard that defendant knew *or should have known* of a substantial risk of harm. *See, e.g.*, *Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919, 927 (6th Cir. 2024).

### *Defendant Jackson*

Defendant Jackson knew that Plaintiff told other inmates he was suicidal. Jackson Dep. 70:11-16, 71:19-21. But she did not investigate. Tracey Dep. 60:11-25.  Plaintiff's mother was on speaker phone in the booking area when she explained that Plaintiff was just released from a crisis center and was suicidal. Tracey Dep. 52:6-7. Jackson knew that Plaintiff previously tried to hang himself in the adjacent cell and that his current cell had the same phone with a metal cord. Tracey Dep. 55:9-21. Jackson then heard Plaintiff threaten suicide to Tracey. Jackson Dep. 82:2-6. She heard Tracey taunt Plaintiff into committing suicide while making choking noises. *Id*. 76:15-19. Jackson told Tracey to leave Plaintiff in the cell after he threatened suicide and was banging his head—that he could "bang all night." Tracey Dep. 41:1-7. That he had "a hard head." *Id.* 49:12-21.

Plaintiff then told Jackson *directly* that he was going to commit suicide. Smith Dep. 57:7–58:9; 58:23–59:17. Rather than act, she hung up the intercom. *Id.* 57:7–58:9; 58:23–59:17. Defendant Jackson knew that the Sheriff's policy dictated that she act. Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 33:48-34:32. She knew there was an open suicide prevention cell that evening in booking. Jackson Dep. 83:7-16, 85:2-4. Yet despite all this, she did nothing.

### *Defendant Gomez*

Defendant Gomez was also there when Plaintiff threatened suicide. Tracey Dep. 49:4-13. He heard Plaintiff say he was going to commit suicide. Gomez Dep. 49:17-25, 50:11-12, 81:4-6. Despite saying he was at the fingerprinting station, the video shows he was standing near Defendant Tracey when she made the hanging gesture. Doc. 89-7, Ezra Smith Booking Area 07-09-2024.mp4 at 01:28:41. He heard Defendant Tracey urge Plaintiff to commit suicide. Gomez Dep. 49:17-25, 50:11-12.  He knew there was a phone with a cord in the cell. *Id.* 80:21–81:3. He and the others knew Plaintiff was alone in the cell. *Id.* 80:21-23. He knew that he had to abide by the Sheriff's policies. *Id.* 14:3-17. Those policies required him to take action. Gomez Dep. 66:5-9; *see also* Doc. 74-1, General Order 5.22; Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 19:08-19:25. He admits that he could have gone to his lieutenant or medical to report what happened. Gomez Dep. 72:18-25, 73:13–74:5. Both offices were nearby. *Id.* 40:20–41:2, 42:4-8, 73:18-24. Instead, he did nothing, only to laugh at the "hilar[ity]" of Plaintiff's suicide attempt. Tracey Dep. 42:13-16, 61:21-25.

In their motion, they deny many of these facts—brazenly. For example, Jackson claims that she never told Tracey that she would not process Plaintiff's folder. Doc. 75-1 at 4 n. 4. But Tracey says that is exactly what happened because, according to Jackson, Plaintiff was a "white privilege prick" who "showed out" in

court. Tracey Dep. 40:10-24, 46:4-11, 54:1–55:1.

Defendant Jackson urges dismissal because she claims she had minor interactions with Plaintiff. Doc. 75-1 at 9. But Plaintiff told her he was suicidal. Smith Dep. 57:7–58:9; 58:23–59:17. Gomez claims he was over at the fingerprinting machine the whole time Plaintiff was telling Tracey he was suicidal and while Tracey was taunting him and making the hanging gesture. Doc. 75-1 at 9 (citing Gomez Dep. 50:19-24). But the video evidence clearly shows Gomez walking up to Cell 7 while Tracey was making the gesture. Doc. 89-7, Ezra Smith Booking Area 07-09-2024.mp4 at 01:28:41; Smith Dep. 55:2–8.

The defendants also deny, for example, that the Sheriff's policy required them to act on Plaintiff's suicidal threats as a medical emergency. *See* Jackson Dep. 80:8-13. But that is not what they told the Merit Board after Tracey's termination. Doc. 89-11, Merit Board Hearing - M. Tracey-20240830_100444-Meeting Recording.mp4 at 33:48-34:32. And Defendants claim that Plaintiff relayed to Defendant Jackson that he was not suicidal, and she did not hear him state that he was suicidal at any point. Doc. 75-1 at 9-10. Again, that is disputed by Plaintiff and her own testimony. Jackson Dep. 82:2-6; Doc. 89-1, Smith Decl. ¶ 7.

When there is a conflict "between the facts evidenced by the parties, [courts] credit the nonmoving party's *version*" at the summary judgment stage. *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) (emphasis in original).

17

This is not "some metaphysical doubt as to the material facts." *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The Court should not credit versions of the events contradicted by other record evidence. Instead, when construing the evidence in the light most favorable to Plaintiff, there is sufficient evidence for a reasonable jury to find that these defendants had actual awareness of the strong risk of suicide and unreasonably disregarded that risk.[3] *See Greason v. Kemp,* 891 F.2d 829, 835–36 (11th Cir. 1990) (with knowledge of a threat of suicide, "failure to take steps to prevent [a detainee from] committing suicide can amount to deliberate indifference."); *Snow*, 420 F.3d at 1270 (11th Cir. 2005) (failing to alert others at the jail or mitigate a known risk of suicide constituted deliberate indifference); *Nelson v. Tompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024).

In addition to crediting contradicted and disputed testimony, Defendants also argue that they should escape liability here because (1) they did not participate in

---

[3] Gomez hides behind inexperience and belief that other officers would have taken appropriate action. Doc. 75-1 at 14. Not so. He was trained in the Sheriff's policies and knew to obey them. Gomez Dep. 14:3-17. General Order 5.22 required him to treat Plaintiff's threats as a medical emergency. Defendant Jackson knew that she was required to act under this policy based on her training, and such action was to be taken without regard to whether the threat was serious or not. *See* Doc. 89-11 at 33:48-34:32. The Defendants' violation of the policy is evidence of their deliberate indifference. *Stewart v. Johnson*, 2021 WL 3081882, at *3 (S.D. Ga. July 21, 2021) ("evidence of a policy violation may be evidence of deliberate indifference"); *Hope v. Pelzer*, 536 U.S. 730, 743-44 (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct.").

the wrongdoing and (2) there is a break in the causal chain based on Plaintiff's self-harm. But there is ample evidence that Defendants were there, heard and saw what was going on, (as to Defendant Jackson) directly interacted with Plaintiff who told her he was going to commit suicide, and did *nothing* in response.

As for the causation/foreseeability argument, Defendants perplexingly rely on Florida law. Doc. 75-1 at 9 (quoting *Cook*, 402 F.3d 1092, 1120). The entire passage defendants quote from *Cook* on page 9 of their brief is about whether self-inflicted injury breaks the chain of causation *under Florida law*. *See, e.g.*, *id.* (citing *Guice v. Enfinger,* 389 So.2d 270, 271 (Fla. Dist. Ct. App. 1980). The Court should ignore defendants' misguided effort to impose the requirements of Florida tort law on Plaintiff's Fourteenth Amendment claim. But even so, it was foreseeable here that Plaintiff—who threatened suicide multiple times, was urged to follow through with it, and who had the means—would commit self-harm. Defendants knew all these things. They also knew that there was a phone in the cell, and Defendant Jackson knew Plaintiff hanged himself in the adjacent cell a few years earlier with the same type of phone, but neither Defendant did anything.

**b.    A reasonable jury can conclude that Defendants Jackson and Gomez violated clearly established law.**

Defendants next ask the Court to permit them to evade accountability under the cloak of qualified immunity. Because Plaintiff has established that a reasonable jury could find Defendants Jackson and Gomez liable for a constitutional violation,

he turns to the second prong of the qualified immunity test—whether the defendants violated clearly established law.[4]

In this Circuit, a plaintiff may establish that a right is clearly established if he shows: (1) "that a materially similar case has already been decided, giving notice to the police;" (2) "that a broader, clearly established principle should control the novel facts in this situation;" or (3) "this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F. 3d 1152, 1159 (11th Cir. 2005).

Here, *Snow* and *Greason* clearly establish—prior to July 8, 2024—that an officer with knowledge of a threat of suicide must take steps to prevent the commission of suicide. *Greason v. Kemp,* 891 F.2d at 835–36 (with knowledge of a threat of suicide, "failure to take steps to prevent [a detainee from] committing suicide can amount to deliberate indifference."); *Snow*, 420 F.3d at 1270 (holding that failing to alert others at the jail or mitigate a known risk of suicide constituted deliberate indifference). Defendants Jackson and Gomez were on notice that they were required to take some action—both under federal law and the Sheriff's policies and procedures—when they observed Plaintiff threaten suicide, Defendant Tracey urge him to "be a man about it" and commit suicide, and Plaintiff banging his head on the wall and kicking the door yelling that he was going to kill himself.

---

[4] No party disputes that the defendants were acting within their discretionary duty at the time.

The arguments Defendants raise in support of qualified immunity—that Plaintiff told Defendant Jackson he denied suicidal thoughts (which he denies), it was all Tracey's fault, and there is a lack of causation under Florida law (*see* Doc. 75-1 at 16) (citing *Cook*, 402 F.3d at 1120 (applying Florida law))—are all easily dismissed as explained above. Qualified immunity should not shield Defendants from utterly ignoring the strong risk that Plaintiff would commit self-harm.

**c.    Defendants Jackson and Gomez are not entitled to official immunity.**

Under Georgia law, a government employee is protected by official immunity "unless the plaintiff can establish that the official negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure." *Glass v. Gates*, 311 Ga. App. 563, 574 (2011).

"A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Grammens v. Dollar*, 287 Ga. 618, 619 (2010) (quoting *McDowell v. Smith*, 285 Ga. 592, 593 (2009)). By contrast, a "discretionary act" is one that "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*[5]

---

[5] Numerous decisions have found that jailers violated ministerial duties in emergency situations. For example, in *Garren v. Bryant*, 922 S.E.2d 902 (Ga. Ct. App. 2025), the Court of Appeals held that the retrieval and use of an AED was a

*Lundy v. Hancock Cnty.*, 368 Ga. App. 772, 778 (2023), is instructive. In

*Lundy*, two jailers found, two separate times, an inmate with "fabric wrapped

around his neck and tied to a bedpost." *Id.* at 777. Both times, the officers removed

the fabric and other items from the cell, but allowed the inmate to wear his

underwear, socks, and a cap. About twenty minutes after the second incident, a

jailer checked on the inmate and found that he had hanged himself from the corner

of the bunk using his cap. *Id.* The Court of Appeals found that both jailers violated

a ministerial duty which was created by the following policies:

> 1. Close Observation is reserved for the detainee who is not actively
> suicidal, but expresses suicidal ideation and/or has a recent prior
> history of self-destructive behavior. This detainee should be observed
> by detention officers at staggered intervals not to exceed every 15
> minutes.
>
> 2. Constant Observation is reserved for the detainee who is actively
> suicidal, either by threatening or engaging in the act of suicide. This
> detainee should be observed by a staff member on a continuous,
> uninterrupted basis.
>
> 3. Other supervision aids, (e.g. closed circuit television, detainee
> companion/watchers, etc.) can be utilized as a supplement to, but
> never as a substitute for, the above observation levels.

---

ministerial duty. In *Melton v. McCarthan*, 356 Ga. App. 676, 678 (2020), the court
found that an officer had a ministerial duty to separate cellmates in a jail after a
physical altercation between them. *See also Brantley v. Jones*, 363 Ga. App. 466,
475 (2022) ("[w]e have held, in the context of detention officers, that the acts of
following established policies of inspecting and monitoring detainees are
ministerial tasks."); *Clark v. Prison Health Svcs.*, 257 Ga. App. 787, 794 (2002)
(holding officers were not entitled to official immunity for breach of clear and
simple duties of inspecting cells according to a prescribed schedule). Tracey does
not disclose any of this precedent that contradicts her broad statement of the law.

The Court of Appeals found that these "policies clearly establish ministerial duties for detention officers to observe a detainee who has expressed suicidal ideation at intervals not to exceed 15 minutes and to observe a detainee who is either threatening or engaging in an act of suicide on a continuous basis." *Id.* at 779.

The policy in this case states: "Any inmate who threatens or attempts self-mutilate or suicide will be viewed as a MENTAL HEALTH EMERGENCY. Upon notification, the Mental Health Professional will provide a face-to-face interview with the inmate. Additionally, the inmate's mental health and/or medical chart(s) will be reviewed as part of the initial assessment." Defendant Tracey limits her argument to the text of the written policy, but a policy that creates a ministerial duty does not need to be in writing. *See, e.g.*, *Joyce v. Van Arsdale*, 196 Ga. App. 95, 95 (1990) (road superintendent's actions in erecting road barricade were ministerial where county commission instructed him to erect barricade); *Glass v. Gates*, 311 Ga. App. 563, 574 (2012) (issue of fact concerning whether there was an unwritten policy requiring officer supervising a road work crew to contact the facility in the event a tractor became stuck).

In addition to the written policy, the evidence in this case shows Defendants knew that the policy of the Rockdale County Sheriff's Office was, first, that officers do not have the discretion to determine whether an inmate's threat of suicide is a joke, or whether they are laughing. The threat must still be

23

communicated to medical personnel. Doc. 89-10, Merit Board Hearing - M.

Tracey-20240823_090650-Meeting Recording.mp4 at 1:19:47–1:20:08. *See also*

Tracey Dep. 26:2–13. Moreover, suicide prevention protocols can be implemented

by either medical staff or by jail personnel. Doc. 89-11, Merit Board Hearing - M.

Tracey-20240830_100444-Meeting Recording.mp4 at 00:50:33at 00:50:33. The

policy also requires that Plaintiff would have had dangerous items removed from

his possession and been placed into another cell that did not have a corded phone

in it prior to meeting with the mental health professional. Jackson Dep. 85:9–23;

Sanchez Dep. 80:20–81:6. This would all occur under the policy before the mental

health professional would see the inmate. Jackson Dep. 85:9–23.

The Sheriff's policy prohibits deputies from determining whether a suicide

threat is serious or valid. Defendants violated this policy after inmates informed

them that Plaintiff was threatening to kill himself, and later when they heard

Plaintiff state that he was suicidal and heard Tracey encourage him to kill himself.

**d.    To the extent the Court dismisses Plaintiff's federal claim, it should exercise supplemental jurisdiction over his state-law claim.**

Defendants next argue that the Court should decline to exercise of

supplemental jurisdiction over Plaintiff's ministerial duty claim under Georgia law.

Because Tracey has argued for summary judgment on the state-law claim, which is

now fully briefed, the Court should, in the event of dismissal of the federal claims,

continue to exercise jurisdiction over the ministerial duty claim. *Cf. Austin v. Metro*

*Dev. Grp., LLC*, 571 F. Supp. 3d 1279, 1295 (M.D. Fla. 2021) (no supplemental jurisdiction because the "Court has not expended unnecessary resources that will need to be repeated in state court" as the state law claims were never briefed and "no duplicative court orders would result from dismissal of the state claims").

### e.    Plaintiff is entitled to seek punitive damages and attorney's fees.

Finally, Defendants argue that Plaintiff is not entitled to punitive damages or attorney's fees for his Fourteenth Amendment claim. Because the motion for summary judgment should be denied, the question of such entitlement is not appropriate at this juncture. *Glick v. Corbin*, 2024 WL 4359920, at *12 (N.D. Fla. Aug. 7, 2024), R&R adopted, 2024 WL 4349998 (N.D. Fla. Sept. 30, 2024) ("unnecessary to determine the issue of punitive damages until liability is established"); *see also Funderbunk v. Fannie Mae*, 2015 WL 11216734, at *4 (N.D. Ga. Aug. 4, 2015) (where claims may proceed, "it would be premature for this Court to prohibit Plaintiff from proceeding on her attorney's fees claim").

## IV.    CONCLUSION

For all these reasons, Defendants Shenequa Jackson and Raul Gomez's motion for summary judgment (Doc. 75) should be denied.

Dated: January 9, 2026

Respectfully submitted,

<u>**Jeff Filipovits**</u>

Spears & Filipovits, LLC                     Jeff Filipovits
315 W. Ponce de Leon Ave., Ste. 865          Georgia Bar No.  825553

Decatur, Georgia 30030
(404) 905-2225
jeff@civil-rights.law
wingo@civil-rights.law

Slater Legal PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, Georgia 30345
(404) 458-7283
james@slater.legal

**Wingo Smith**
Wingo Smith
Georgia Bar No. 147896

**James M. Slater**
James M. Slater
Georgia Bar No. 169869

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

Dated: January 9, 2026.

SLATER LEGAL PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, Georgia 30345
(404) 458-7283
james@slater.legal

**<u>James M. Slater</u>**
James M. Slater
Georgia Bar No. 169869