IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EZRA SMITH,

      Plaintiff,

v.

DEPUTY MONIQUE TRACEY, *et al.*,

      Defendants.

Civil Action No.:

1:24-cv-05158-TWT

## PLAINTIFF'S RESPONSE TO DEFENDANT SANCHEZ'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Ezra Smith responds to Defendant Erica Sanchez's Statement of Material Facts Not at Issue (Doc. 84-1) as follows:

1.    Defendant Sanchez was a Licensed Practical Nurse who worked for NaphCare in the Rockdale County Jail. (Erica Sanchez Dep. T. 7:24-25; 8:1-23.)

**Undisputed**.

2.    Defendant Sanchez is BLS (Basic Life Support) certified and worked in correctional care from 2018 through the date of her deposition either at Armor, Wellpath, or NaphCare. (Id. at 10:11-25; 11:1-25; 12:1-25; 12:1-25; 13:1-25; 14:1-25; 16:1-19.)

**Undisputed**.

3.      Defendant Sanchez explained the general intake process at the Rockdale County Jail as it related to NaphCare: There is an initial screening when an offender is first arrested and enters the jail. At that time, medical staff inquires about chronic medical issues, suicidal ideations, and whether an offender should be taken to a hospital or allowed to enter the jail. There is a separate screening after an offender is official booked into the jail. (Id. at 37:5-20.)

**Undisputed.**

4.      Defendant Sanchez does not know about an inmate or know that she needs to conduct her initial screening until after the official booking occurs and the inmate is placed in her queue. (Id. at 96:22-25; 97:1-21.)

**Disputed in part.** It is undisputed that Defendant Sanchez would not know to conduct the initial medical screening of an inmate before it appears in her queue. However, this does not mean she does not "know about an inmate." Here, Defendant Sanchez knew an inmate was in the holding cell, was banging on the cell door, had said he was suicidal, and that Defendant Monique Tracey had encouraged him to kill himself, even though she had not yet screened Plaintiff. Sanchez Dep. 61:19–62:1; 62:16–23; 67:22-68:6; 68:24-69:1.

5.      Defendant Sanchez arrived at the Rockdale County Jail on July 8, 2024, around 7:15 p.m. for her shift (Id. at 50:4-11.), she was not assigned to the

initial screening area (Id. at 51:6-9.) and did not know whether Plaintiff went through the initial screening process. (Id.)

**Undisputed**.

6.      Plaintiff had not yet gone through the second or booking screening that occurs after he would have been officially booked into the jail. (Id. at 51:13-20.)

**Undisputed.**

7.      Earlier in the night deputies approached the cell where Plaintiff and other inmates were located, inquired about anyone being suicidal, and the inmates responded by laughing and stating that none of them were suicidal. (Shanequa Jackson Dep. T. 72:19-25; 73:1-7; 74:5-25; 75:1-4.)

**Immaterial and disputed.** First, this statement is immaterial to the claims against Defendant Sanchez. Defendant Sanchez was not present for the exchange and did not know about the exchange until *after* Plaintiff attempted suicide. Sanchez Dep. 63:12-15 (she could not hear the intercom), 64:22-65:3 (no discussion about Plaintiff before the suicide attempt). Second, there are conflicting versions of this event between Plaintiff, Tracey, and Jackson. Plaintiff expressed suicidal thoughts to the inmates housed with him. Smith Dep. 77:19–78:1; 79:2–7. Those inmates told Defendants Tracey and Jackson using the intercom. Tracey

Dep. 59:17-18. Defendants Tracey and Jackson did not leave the platform to check on Plaintiff; they told the inmates to stop playing with the intercom. Tracey Dep. 59:22-24; 60:16-19. Plaintiff never told any of the officers that he was joking. Doc. 89-1, Declaration of Ezra Smith ¶ 7.

8.      Deputy Jackson did not "report" the incident because "they were all in there joking and playing. It seemed as if they were just saying stuff to get our attention, to get them to get us to move faster." (Id. at 80:21-25; 81:1-3.)

**Immaterial and disputed**. This statement is immaterial to the claims against Defendant Sanchez. Defendant Sanchez was not present for the exchange and did not discuss the exchange with Deputy Jackson before the attempt. Sanchez Dep. 63:12-15 (she could not hear the intercom), 64:22-65:3 (no discussion about Plaintiff before the suicide attempt). Plaintiff did not refer to the other inmate's call as a joke. Plaintiff testified that, to him, his statement about committing suicide "was kind of a joke." Smith Dep. 77:19-1. Plaintiff did not communicate to Defendant Tracey or any other detention officer or jail staff that his statement about suicide was a joke. Doc. 89-1, Declaration of Ezra Smith ¶ 7. His statement was that he was going to commit suicide in his wife's driveway. *Id.* ¶¶ 5-6. It was impossible to determine from the video feed from the holding cell whether which inmates, if any, were joking or what they were joking about. *See* Doc. 89-5 Ezra

4

Smith Holding Cell 7 07-08-2024.mp4 at 04:00:00–05:00:00. A jury who views this video could easily reject Defendant Jackson's claim that it showed that the initial suicide report was a joke.

9.    Plaintiff agreed that he told other inmates that he was suicidal on July 8, 2024, because he thought about it, so he joked about. (Plaintiff's Dep. T. 77:19-25; 78:1-25; 79:1-16.)

**Immaterial.** This statement is immaterial to the claims against Defendant Sanchez. Defendant Sanchez was not present for the exchange and did not know about this exchange until *after* Plaintiff attempted suicide. Sanchez Dep. 63:12-15 (she could not hear the intercom), 64:22-65:3 (no discussion about Plaintiff before the suicide attempt). *See also* ¶ 8, *supra*.

10.    Plaintiff also explained that "too often" he jokes about suicide; but nevertheless, he should be taking seriously because "there's a little truth in every joke;" and that someone cannot know when he is joking if he has told them he was joking. (Plaintiff's Dep. T. 84:16-25; 85:1-25; 86:1-5).

**Immaterial.** According to Defendant Sanchez, she only knew an inmate was in the holding cell, had been banging on the cell door, said he was suicidal, and that Defendant Monique Tracey had encouraged him to kill himself. Sanchez Dep. 67:22-68:6; 68:24-69:1. Whether Plaintiff made prior statements about suicide that

5

she did not hear are immaterial to the claims against her.

11.    Defendant Sanchez could not hear all the communications between or among the deputies and Plaintiff.

a. She cannot hear when someone calls on the intercom from booking or from the holding cells. (Sanchez Dep. T. 63:12-15.)

b. No one talked to her about Plaintiff or told her anything Plaintiff may have said. (Id. at 63:16-26; 64:1-22-25; 65:1-3.)

**Undisputed.**

12.    Deputy Jackson described the interaction between Deputy Tracey and Plaintiff as the two "yelling at each other." (Jackson Dep. T. 77:5-25.).

**Disputed.** Plaintiff testified he was not yelling but did have to raise his voice to talk through the cell door. Smith Dep. 47:1-4.

13.    Deputy Gomez agreed that Plaintiff and Deputy Tracey were yelling at each other. (Raul Gomez Deposition T. 50:1-18.)

**Disputed**. Plaintiff testified he was not yelling but did have to raise his voice to talk through the cell door. Smith Dep. 47:1-4.

14.    Defendant Sanchez explained that she would have assessed an inmate if an officer told her that he wanted to kill himself or herself. (Id. at 12-21.)

**Disputed in part**. Defendant Sanchez also understood that if she, as a

6

Naphcare employee, hears a patient verbalizing a desire or intent to commit suicide, she as the nurse on duty is required to assesses the patient. Sanchez Dep. 42:6–10; 43:12–18. Otherwise, it is undisputed that Defendant Sanchez would have assessed an inmate if she had been informed that the inmate was suicidal.

15.    Defendant Sanchez did not become aware of Plaintiff being housed in the jail until she entered his cell to perform CPR (Id. at 67:20-25.), and she was not made aware of anyone remaining in the respective holding cell until the person who was later identified as Plaintiff was kicking the door. (Id.)

**Disputed**. Defendant Sanchez testified that, before Plaintiff's suicide attempt, she knew an inmate was in the holding cell, was banging on the cell door, had said he was suicidal, and that Defendant Monique Tracey had encouraged him to kill himself. Sanchez Dep. 61:19–62:1; 62:16–23; 67:22-68:6; 68:24-69:1.

16.    Defendant Sanchez could hear an audible exchange between Deputy Tracey and Plaintiff, but she could not hear all of Plaintiff's statements. (Id. at 68:20-25; 69:1-17; 70:16-25; 71:1-1.)

**Disputed**. Defendant Sanchez testified that, before Plaintiff's suicide attempt, she heard and saw Plaintiff banging on the cell door, Sanchez Dep. 67:22–68:6. She also heard Plaintiff say he was going to kill himself and heard Defendant Tracey respond by telling Plaintiff to kill himself. Sanchez Dep. 69:12–17; 68:24–

69:1.

17.    Defendant Sanchez explained that based on her corrections experience and inmates commonly feigning suicidal ideations, she did not feel Plaintiff was suicide risk, and she felt it was more behavioral based on the exchange between Plaintiff and Deputy Tracey. (Id. at 74:5-25; 75:1-16; 99:19-25; 100:1-3; 106:21-25; 107:1-25; 108:1-25; 109:1-10.)

**Disputed**. Defendant Sanchez is not qualified, by education or experience, to offer an opinion on the risk of suicide. Sanchez was a licensed practical nurse whose sole other certification was in CPR. Sanchez Dep. 7:24–8:3; 9:19–21. Plaintiff's suicide attempt was the first suicide attempt Sanchez had ever seen. Sanchez Dep. 54:18–22. Moreover, she did not evaluate Plaintiff before his suicide attempt and claims not to have known anything about him upon which to base that opinion. Sanchez Dep. 68:22-24; 73:4-9. Moreover, a defendant's knowledge of a serious risk of harm can be proven through circumstantial evidence and inferred from the obviousness of the risk. A defendant's knowledge of the seriousness risk of a harm therefore "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 840 (1994)). This means that "a factfinder may conclude that a prison

official knew of a substantial risk from the very fact that the risk was obvious."

*Farmer*, 511 U.S. at 842. Given that Defendant Tracey urged Plaintiff to commit

suicide, a jury could reject Defendant Sanchez's explanation that she believed that

there was no risk to Plaintiff. Finally, the policy the governed Sanchez's role at the

jail required her to respond whenever an inmate verbalized a threat. Doc. 90-1,

Naphcare Policy B-05 Suicide Prevention and Intervention § 8 (filed under seal).

18.    Consistent with Defendant Sanchez's experience and explanation,

Deputy Jackson explained by Plaintiff purported suicidal ideations were not

deemed credible. (Jackson Dep. T. 81:17-24; 82:15-23; 83:1.)

**Disputed and immaterial**. First, Defendant Sanchez is not qualified, by

education or experience, to offer an opinion on the risk of suicide. Sanchez was a

licensed practical nurse whose sole other certification was in CPR. Sanchez Dep.

7:24–8:3; 9:19–21. Plaintiff's suicide attempt was the first suicide attempt Sanchez

had ever seen. Sanchez Dep. 54:18–22. Second, the citation provided by Defendant

Sanchez is misleading because it refers to an exchange earlier that evening

involving Plaintiff when there were still other inmates in the cell. The crux of the

opinion given by Defendant Jackson in that testimony is her disputed assertion that

she went to his cell, asked him whether he was suicidal, and that he said "no."

Jackson Dep. 81:17-24; 82:15-83:1. This information is also immaterial because

there is no evidence that Defendant Sanchez knew this information prior to the time that Plaintiff attempted suicide.

19.     Deputy Gomez explained that he did not Plaintiff was actually suicidal because "they were just arguing with each other, like, a normal argument." (Gomez Dep. T. 82:12-16.).

**Disputed and Immaterial**. Whether Defendant Gomez believed it to be "a normal argument" is immaterial. Defendant Sanchez heard Plaintiff banging on the door, heard Defendant Tracey say that Plaintiff's "effing mommy" called the jail, and heard Defendant Tracey encourage Plaintiff to kill himself. Sanchez Dep. 67:22-68:6; 68:24-69:1. Defendant Gomez likewise recalled Plaintiff saying he was suicidal and Defendant Tracey responded by saying "Well, be a man about it. Do it, then." Gomez Dep. 50:11-18. Defendant Gomez's self-serving characterization of Defendant Tracey's statements has no bearing on Defendant Sanchez's liability.

20.     Plaintiff agrees that he and Deputy Trace had "a lot of back-and-forth confrontation." (Plaintiff's Deposition T. 48:5-8)

**Undisputed.**

21.     Plaintiff stated that he would commit certain acts to get the attention of jail staff.

a. Hitting head against glass and wall: Plaintiff's Dep. T. 60:1-25; 61:1-25; 62:1-16; 100:25; 101:1-8

b. Pressing Intercom Button: Id. at 35:24-25; 36; 1-25; and

c. Kicking Door: Id. at 1-16.

**Undisputed.**

22.    Plaintiff stated that he attempted to commit suicide after the deputies no longer responded to his requests and because "Tracey" told him to do it and that he was only "considering it" because it is "always there." (Plaintiff's Dep. T. 62:17-25; 63:1-16; 67:6-25; 68:1-10).

**Immaterial**. Why Plaintiff attempted suicide is immaterial to the claim against Defendant Sanchez. Further, Plaintiff has a history of mental health issues and testified he became more depressed when left alone in the holding cell. Smith Dep. 90:2–9; 91:2–6; 45:19–25. At that point, he began kicking the door and told Defendants Tracey and Jackson that he was suicidal. Smith Dep. 46:10–13. He then attempted suicide after Tracey told him to kill himself and Jackson disregarded his statement that he was suicidal. Smith Dep. 48:11–25; 57:7–58:9; 58:23–59:17; 61:23–62:2; 62:17–25.

23.    Deputy Tracey did not believe Plaintiff was actually suicidal. (Monique Tracey Deposition T. 87:9-25; 88:1-6.)

**Immaterial and disputed**. Whether Defendant Tracey believed Plaintiff was suicidal is immaterial to the claims against Sanchez. However, even if it were relevant, Plaintiff disputes Defendant Tracey's alleged belief. Defendant Tracey knew from her conversation with Plaintiff's mother about Plaintiff's recent involuntary hospitalization for suicidal ideations. Pittman George Dep. 35:23–36:12, 37:15–38:8. She likewise heard from Jackson that Plaintiff had a history of suicidal thought. Tracey Dep. 57:7-15. She heard Plaintiff say he was suicidal, Tracey Dep. 49:17–50:6, and then taunted him to hang himself, Smith Dep. 48:11–25, while knowing that the cell in which Plaintiff was located had a corded telephone. Tracey Dep. 84:9–13. The allegations against Defendant Tracey are detailed in full in the response to her motion for summary judgment.

24.    Defendant Sanchez further explained what behavioral meant: "Meaning he's not getting his way or he's not – he's not getting his way. He's not being told what he wants to know." (Id. at 77:2-13.)

**Disputed**. Defendant Sanchez is not qualified, by education or experience, to offer an opinion on the risk of suicide. Sanchez was a licensed practical nurse whose sole other certification was in CPR. Sanchez Dep. 7:24–8:3; 9:19–21. Plaintiff's suicide attempt was the first suicide attempt Sanchez had ever seen. Sanchez Dep. 54:18–22. Moreover, even if Defendant Sanchez were so qualified,

she did not have sufficient information on which to base this opinion. She testified

that she heard Plaintiff banging on the cell door and say he was suicidal. Sanchez

Dep. 67:22–68:6; 68:24–69:1; 69:12-17. But she never evaluated Plaintiff before

his suicide attempt and claims not to have known anything about him upon which

to base that opinion. Sanchez Dep. 68:22-24; 73:4-9.

25.    Defendant Sanchez began CPR and was part of the team who revived

Plaintiff after he attempted to commit suicide. (Id. at 82:1-25; 85:3-18.)

**Undisputed.**

Submitted January 9, 2026.

<u>**Jeff Filipovits**</u>
Jeff Filipovits
Georgia Bar No. 825553

<u>**Wingo Smith**</u>
Wingo Smith
Georgia Bar No. 147896

Spears & Filipovits, LLC
315 W. Ponce de Leon Ave.
Suite 865
Decatur, GA 30030
404.905.2225
jeff@civil-rights.law
wingo@civil-rights.law

<u>**James M. Slater**</u>
James M. Slater
Georgia Bar No. 169869

Slater Legal PLLC
2296 Henderson Mill Rd. NE #116
Atlanta, GA 30345
(404) 458-7283
james@slater.legal